No. 23-60230

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

_____

Petition for Review from an Order of the Securities and Exchange
Commission

_____

## OPENING BRIEF FOR PETITIONERS
_____

GENE P. HAMILTON
REED D. RUBINSTEIN
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

R. TRENT MCCOTTER
   *Counsel of Record*
JONATHAN BERRY
MICHAEL BUSCHBACHER
JARED M. KELSON
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

### *National Center for Public Policy Research et al. v. SEC*

No. 23-60230

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. National Center for Public Policy Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Nathaniel Fischer

3. Phillip Aronoff

4. The Securities and Exchange Commission

5. Boyden Gray & Associates PLLC

6. R. Trent McCotter

7. Jonathan Berry

8. Michael Buschbacher

9. Jared M. Kelson

10. The Kroger Co. It is publicly traded under the ticker KR, and, according to public information, The Vanguard Group, Inc., owns 10% or more of its stock.

11. BlackRock Inc. It is publicly traded under the ticker BLK, and, according to public information, no publicly held corporation owns 10% or more of its stock.

12. American Express Co. It is publicly traded under the ticker AXP, and, according to public information, Berkshire Hathaway, Inc., owns 10% or more of its stock.

13. Apple Inc. It is publicly traded under the ticker AAPL, and, according to public information, no publicly held corporation owns 10% or more of its stock.

14. Alphabet Inc. It is publicly traded under the ticker GOOGL, and, according to public information, no publicly held corporation owns 10% or more of its stock.

15. Walgreens Boots Alliance Inc. It is publicly traded under the ticker WBA, and, according to public information, no publicly held corporation owns 10% or more of its stock.

16. Gene P. Hamilton

17.  Reed D. Rubinstein

18.  America First Legal Foundation

19.  Theodore J. Weiman

20.  Tracey A. Hardin

21.  Megan Barbero

22.  Michael A. Conley

23.  National Association of Manufacturers

24.  Lehotsky Keller Cohn LLP

25.  Steven P. Lehotsky

26.  Adam Steene

27.  Erica Klenicki

28.  Scott A. Keller

29.  Matthew H. Frederick

30.  Todd Disher

31.  Alexis Swartz

Dated: July 14, 2023                /s/ R. Trent McCotter
                                    R. Trent McCotter
                                    *Counsel of Record for Petitioners*

# **REQUEST FOR ORAL ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioners respectfully request oral argument. This case involves novel and complex issues of constitutional and statutory interpretation and administrative law. Oral argument would substantially aid the Court in its resolution of the case.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF CONTENTS ............................................................. v

TABLE OF AUTHORITIES....................................................vii

JURISDICTIONAL STATEMENT .......................................... 1

STATEMENT OF THE ISSUES............................................. 2

INTRODUCTION.................................................................... 2

STATEMENT OF THE CASE .............................................. 9

    A.    Administrative Proceedings.....................................9

    B.    Proceedings Before This Court ..........................15

    C.    Petitioners' Ongoing Practice of Submitting the Viewpoint-Discrimination Proposal ....................17

SUMMARY OF THE ARGUMENT ...................................... 18

ARGUMENT ......................................................................... 20

    I.    The SEC's Decision Was Legally Erroneous and Arbitrary and Capricious....................................... 20

        A.    The SEC Misapplied Rule 14a-8 By Excluding the Proposal Despite Its Focus on Significant Social Policy. ......................................................................20

        B.    The SEC's About-Face on Discrimination Was Arbitrary and Capricious. ...........................31

    II.    The SEC Violated the First Amendment.............................. 32

    III.    The Court Has Jurisdiction. ................................. 38

     A.     There Is Final Agency Action. ...................................... 39

     B.     Section 78d-1 Applies—But Even If Not, This Court Still Has Jurisdiction. .................................................. 49

     C.     *Heckler v. Chaney* Does Not Bar Review. .................... 53

  IV.   Recent Events Do Not Moot the Case But Instead Confirm Its Justiciability. ................................................................. 54

CONCLUSION ......................................................................... 63

CERTIFICATE OF SERVICE .............................................. 65

CERTIFICATE OF COMPLIANCE ...................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Clothing & Textile Workers Union v. SEC*,
15 F.3d 254 (2d Cir. 1994) ................................................. 40

*Amalgamated Clothing & Textile Workers Union v. Wal-Mart
Stores, Inc.*, 821 F. Supp. 877 (S.D.N.Y. 1993).................................. 34

*Apache Corp. v. N.Y.C. Employees' Ret. Sys.*,
621 F. Supp. 2d 444 (S.D. Tex. 2008) .............................................. 34

*Axon Enter., Inc. v. FTC*, 143 S. Ct. 890 (2023) ........................ 1, 6, 14, 38

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) ...................................................................... 37

*Bennett. Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ........................ 45

*Bennett v. Spear*, 520 U.S. 154 (1997)........................ 39, 41, 42, 43, 44, 46

*Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) .................... 5, 7, 29

*CBS v. United States*, 316 U.S. 407 (1942) ....................................... 39, 47

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ............................................................................ 37

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016)............. 31, 32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................... 31

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021) .................... 31

*Forsyth Cnty., Ga. v. Nat'list Movement*, 505 U.S. 123 (1992) ......... 33, 37

*Glob. Van Lines, Inc. v. ICC*, 691 F.2d 773 (5th Cir. 1982)..................... 1

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ............................................. 32

*Kixmiller v. SEC*, 492 F.2d 641 (D.C. Cir. 1974) ................................... 40

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
 567 U.S. 298 (2012) .............................. 55

*La. State v. U.S. Army Corps of Eng'rs,*
 834 F.3d 574 (5th Cir. 2016) ............................. 45

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .................................... 32

*Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) .................................. 20

*Med. Comm. for Human Rts. v. SEC,*
 432 F.2d 659 (D.C. Cir. 1970) ......................................... 42, 43, 44, 54

*Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut.*
 *Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................... 31

*Murphy v. Hunt*, 455 U.S. 478 (1982) ............................................. 55, 61

*Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.,*
 827 F.3d 51 (D.C. Cir. 2016) ......................................... 47

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ................................ 44

*Qureshi v. Holder*, 663 F.3d 778 (5th Cir. 2011) .................................... 42

*Ret. Sys. v. SEC*, 45 F.3d 7 (2d Cir. 1995) ............................................. 43

*Rollerson v. Brazos River Harbor Navigation Dist.,*
 6 F.4th 633 (5th Cir. 2021) ............................................ 54

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
 515 U.S. 819 (1995) ......................................... 32

*S. Cal. Aerial Advertisers' Ass'n v. FAA,*
 881 F.2d 672 (9th Cir. 1989) ......................................... 48

*Sackett v. EPA*, 566 U.S. 120 (2012) ......................................... 41

*SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ................................. 49

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................ 46

*Trinity Wall St. v. Wal-Mart Stores, Inc.*,
  75 F. Supp. 3d 617 (D. Del. 2014) ....................................... 56

*Trinity Wall St. v. Wal-Mart Stores, Inc.*,
  792 F.3d 323 (3d Cir. 2015) ........................................... 2, 3, 30, 33, 34

*Turner v. Rogers*, 564 U.S. 431 (2011) ............................................... 55, 56

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ................................................................. 38

**Statutes**

5 U.S.C. § 551 ......................................................................... 48

15 U.S.C. § 78d-1 .............. 1, 6, 8, 14, 38, 39, 40, 41, 42, 43, 49, 50, 51, 52

15 U.S.C. § 78n .................................................................... 1, 50

15 U.S.C. § 78y ....................................................................... 38

28 U.S.C. § 2343 ....................................................................... 1

Pub. L. No. 87-592, 76 Stat. 394 (1962) ................................................ 41

Pub. L. No. 100-181, 101 Stat. 1249 (1987) ........................................... 41

D.C. Code § 2-1402.11 ................................................................. 28

N.Y. Lab. Law § 201-D ................................................................. 28

Wash. Rev. Code § 42.17A.495 ......................................................... 28

**SEC No-Action Decisions**

*Alphabet Inc.*, 2020 WL 605360 (SEC No-Action Decision
  Feb. 24, 2020) .................................................................. 18, 58

*Alphabet Inc.*, 2022 WL 392221 (SEC No-Action Decision
  Apr. 12, 2022) ...................................................................... 35

*Altria Grp., Inc.*, 2023 WL 2672368 (SEC No-Action Decision
  Mar. 27, 2023) ...................................................................... 34

*Amazon.com, Inc. (N.Y. State Common Ret. Fund)* (SEC No-Action Decision Apr. 7, 2021), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/ 2021/nyscrfamazon040721-14a8.pdf .................................................. 26

*American Express Co.*, 2023 WL 2524429 (SEC No-Action Decision Mar. 9, 2023) ...................................................... 35

*Apple Inc.*, 2019 WL 5420787 (SEC No-Action Decision Dec. 20, 2019) ................................................................... 18, 58

*AT&T Inc.*, 2023 WL 108213 (SEC No-Action Decision Mar. 15, 2023) .................................................................... 35

*BlackRock, Inc.*, 2022 WL 225967 (SEC No-Action Decision Apr. 4, 2022) .................................................................. 17, 58

*CorVel Corp.*, 2019 WL 1640021 (SEC No-Action Decision June 5, 2019) ........................................... 5, 11, 13, 26

*Cracker Barrel Old Country Store, Inc.*, 1992 WL 289095 (SEC No-Action Decision Oct. 13, 1992) ........................................... 21

*Exxon Mobil Corp.*, 2000 WL 364043 (SEC No-Action Decision Mar. 23, 2000) .................................................... 34

*Levi Strauss & Co.*, 2021 WL 5918662 (SEC No-Action Decision Feb. 10, 2022) .................................................... 25

*Mastercard, Inc.*, 2022 WL 392206 (SEC No-Action Decision Apr. 22, 2022) .................................................... 34

*Pfizer Inc.*, 2021 WL 6126545 (SEC No-Action Decision Feb. 10, 2022) .................................................................... 46

*Salesforce.com, Inc.*, 2020 WL 605941 (SEC No-Action Decision Mar. 5, 2020) .................................................... 18, 58

*The Walt Disney Co.*, 2021 WL 5052838 (SEC No-Action Decision Jan. 19, 2022) .................................................... 26

*Walgreens Boots All., Inc.*, 2020 WL 5656738 (SEC No-Action
  Decision Nov. 12, 2020) ................................................................ 17, 58

**Other Authorities**

17 C.F.R. § 200.30-1 ................................................................... 11, 52

17 C.F.R. § 201.430 .............................................................................. 14

17 C.F.R. § 202.1 ........................................................ 11, 44, 50, 51, 52

17 C.F.R. § 202.2 ........................................................ 11, 44, 50, 51, 52

17 C.F.R. § 240.14a-8 ...................................... 3, 4, 21, 24, 43, 44, 61, 62

*Statement of Informal Procedures for the Rendering of Staff
  Advice with Respect to Shareholder Proposals*, 41 Fed.
  Reg. 29,989 (July 20, 1976) ............................................................. 52

76 Fed. Reg. 71,872 (Nov. 21, 2011) ........................................................ 50

*Procedural Requirements and Resubmission Thresholds
  Under Exchange Act Rule 14a-8*, 84 Fed. Reg. 66,458 (Dec.
  4, 2019) ........................................................................................ 23

S. Rep. 100-105, 1987 WL 61544 (1987) ................................................ 41

2020–21 Shareholder Proposal No-Action Responses Chart,
  SEC, https://www.sec.gov/divisions/corpfin/cf-
  noaction/14a-8/ ............................................................................. 26

*Consumers' Research SEC No-Action Audit 2018–2022* (May
  4, 2023), https://consumersresearch.org/secnoactionaudit ............... 36

Division of Corporation Finance, *Staff Legal Bulletin No.
  14A* (July 12, 2002), https://www.sec.gov/interps/legal/
  cfslb14a.htm ............................................................................. 23, 27

Division of Corporation Finance, *Staff Legal Bulletin No.
  14L* (Nov. 3, 2021), https://www.sec.gov/corpfin/staff-legal-
  bulletin-14l-shareholder-proposals ................................. 12, 25, 30, 60

Fed. Rsrv. Bank of Atlanta (2006),
    https://fraser.stlouisfed.org/files/docs/publications/frbatlre
    view/rev_frbatl_2006_v91no3.pdf ...................................................... 24

*Free Enterprise Project*, Nat'l Ctr. for Pub. Pol'y Res.,
    https://nationalcenter.org/programs/free-enterprise-
    project/ .............................................................................................. 9, 10

*Hearing on Reorganization Plans of 1961: No. 1, Securities*
    *and Exchange Commission Before the S. Comm. on Gov't*
    *Operations*, 87th Cong. 45 (1961) (statement of William I.
    Cary, Chairman, SEC), *available at*
    https://tinyurl.com/5n72te5r ............................................................. 42

Hugh Rice Kelly, *Administrative Law*, 49 Tex. L. Rev. 322
    (1971) ................................................................................................ 50

Paula Tkac, *One Proxy at a Time: Pursuing Social Change*
    *Through Shareholder Proposals*, Fed. Rsrv. Bank of
    Atlanta (2006), https://fraser.stlouisfed.org/files/docs/
    publications/frbatlreview/rev_frbatl_2006_v91no3.pdf ..................... 24

Pet. of U.S. Chamber of Commerce et al. for Rulemaking
    Regarding Resubmission of Shareholder Proposals Failing
    to Elicit Meaningful Shareholder Support, *In re Exclusion*
    *of Resubmitted Shareholder Proposals, 17 C.F.R.*
    *§ 240.14a-8(i)(12)* (Apr. 10, 2014), https://www.sec.gov/
    rules/petitions/2014/petn4-675.pdf ................................................... 24

*Record-Breaking Year, Despite Political Attacks*, As You Sow
    (Mar. 22, 2023), https://tinyurl.com/yepkf97n ................................. 24

*Shareholder Impact Review*, As You Sow (2022),
    https://tinyurl.com/pfizersettle ......................................................... 46

Steven Wallman, *Equality Is More Than "Ordinary*
    *Business,"* N.Y. Times (Mar. 30, 1997) ............................................ 22

The Kroger Co., *Definitive Proxy Statement (Schedule 14A)*
    *May 12, 2023,* https://tinyurl.com/bdf7veeh ..................................... 15

The Kroger Co., *The Kroger Co. Policy on Business Ethics*,
https://tinyurl.com/n2dc2jzp ............................................................... 30

*The SEC and "No-Action" Decisions Under Proxy Rule 14a-8*,
84 Harv. L. Rev. 835 (1971) .................................................... 43, 44, 54

# JURISDICTIONAL STATEMENT

The Rule 14a-8 Review Team of the Division of Corporation Finance ("Division") of the Securities and Exchange Commission issued its decision on April 12, 2023. JA34. The next day, Petitioners sought review directly from the SEC Commissioners, who declined to review the Division's decision, rendering it the "[f]inal[]" SEC decision for "all purposes," including judicial "review." 15 U.S.C. § 78d-1(c); *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 898 (2023) ("[I]f no such review has occurred [by the Commission], the [subordinate's] ruling itself becomes the decision of the Commission."). That decision was issued under SEC Rule 14a-8, promulgated under § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. § 78n(a).

This Court has jurisdiction to review such an order pursuant to § 25(a) of the Exchange Act. 15 U.S.C. § 78y(a); *see* Part III, *infra*. The petition was filed timely on April 28, 2023, and venue is proper because Petitioners Fischer and Aronoff reside within this Circuit. 28 U.S.C. § 2343; *Glob. Van Lines, Inc. v. ICC*, 691 F.2d 773, 774 n.1 (5th Cir. 1982).

## STATEMENT OF THE ISSUES

(1)  Whether the SEC acted contrary to law and arbitrarily and capriciously by blessing companies' exclusion of shareholder proxy proposals about viewpoint and ideological discrimination, on the basis that such statements do not raise "significant discrimination matters."

(2)  Whether the SEC's disparate treatment of Petitioners' conservative viewpoints violates the First Amendment.

(3)  Whether this Court has jurisdiction to review Petitioners' timely challenge to the SEC's final order.

## INTRODUCTION

In advance of annual shareholder meetings, public companies solicit the votes of shareholders eligible to vote at the meeting by circulating "proxy" voting materials. The ability to "[v]ote by proxy has become an indispensable part of corporate governance." *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015) (internal citation omitted). These materials provide information about matters to be voted upon at the meeting, the company's recommendation as to how shareholders should vote, and a proxy card soliciting the shareholder's votes on those matters.

Under the SEC's Rule 14a-8, companies must include certain shareholder proposals in their proxy materials, but the company can seek to exclude proposals on certain bases the Rule provides. *See Trinity*, <u>792 F.3d at 335</u>–37. One basis for exclusion is when the proposal "deals with a matter relating to the company's ordinary business operations." <u>17 C.F.R. § 240.14a-8(i)(7)</u>. If the company believes a proposal falls within an exclusion, the company "must file with the [SEC's Division of Corporation Finance] staff the reasons why it believes the proposal is excludable." *Trinity*, <u>792 F.3d at 336</u>. The Division then issues a decision either agreeing or disagreeing that the proposal is excludable, and separately stating whether the Division would recommend against enforcement action if the company did exclude the proposal.

This is sometimes referred to as the "no-action" process, in which companies seek what is sometimes labeled in shorthand as "no-action relief." But the SEC's decision in such proceedings is far more than an announcement that the Division will recommend that no enforcement action be taken if a company excludes a particular proposal. The SEC affirmatively decides that the proposal falls within an exclusion, and then expressly blesses the companies' decision to exclude the proposal

from ever receiving a vote. The Division's decision receives deference within the SEC itself and even during some judicial proceedings.

One of Rule 14a-8's bases for exclusion is when the proposal "deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). The SEC has long taken the position that this exclusion does *not* apply to proposals involving "significant discrimination matters," which inherently "transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." JA14.

Petitioner National Center for Public Policy Research ("NCPPR"), which owns shares of The Kroger Company, sought to have that company include the following proposal ("Proposal") in its proxy materials for its 2023 shareholder meeting:

> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

JA3.

On February 16, 2023, Kroger asked the Staff of the SEC's Division of Corporation Finance to bless Kroger's intention to omit the Proposal

from its proxy materials. Kroger argued that the Proposal fell within the "ordinary business operations" exclusion and therefore "should be excluded from Kroger's Proxy Materials pursuant to Rule 14a-8(i)(7)." JA10.

In line with its view that companies cannot exclude proposals that pertain to significant matters of discrimination, the SEC routinely rejects requests to exclude proposals that focus on the risks of discrimination. For example, even before *Bostock*, the SEC rejected a request to bless the exclusion of a proposal that was identical to NCPPR's Proposal *except* the proposal asked about equal-employment provisions for "sexual orientation" and "gender identity," whereas NCPPR's Proposal was for "viewpoint" and "ideology."[1]

When faced with NCPPR's Proposal, however, the Division concluded that discrimination on the basis of viewpoint and ideology is not a significant discrimination matter and that it instead "relates to, and does not transcend, ordinary business matters." JA34. The Division

_____

[1] *Compare CorVel Corp.*, 2019 WL 1640021 (SEC No-Action Decision June 5, 2019), *with Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020).

thus agreed that Kroger could exclude the Proposal from its proxy materials. JA34.

NCPPR, as well as Petitioners Fischer and Aronoff, who also own shares of Kroger and wished to vote on the Proposal, sought review by the SEC Commissioners themselves, but the Commission declined review, thereby converting the Division's decision into the final decision of the Commission itself. 15 U.S.C. § 78d-1(c); *see Axon,* 143 S. Ct. at 898.

For several reasons, this Court should vacate the SEC's order and remand. *First*, the SEC's conclusion that viewpoint and ideological discrimination is not a matter of significant social policy concern was contrary to law and arbitrary and capricious. *See* Part I.A, *infra*. The SEC itself has repeatedly stated that discrimination is undoubtedly a matter of significant social policy concern, and thus shareholder proposals related to discrimination cannot be excluded as dealing merely with "ordinary business matters." There is no reason to treat viewpoint and ideological discrimination any differently, especially given the significant evidence presented below that such discrimination is rampant across the country, is a matter about which millions of Americans are deeply concerned, and is prohibited by law in numerous jurisdictions. At the

very least, the SEC's decision was arbitrary and capricious because it did not even attempt to explain its sudden change in position on whether companies can exclude proposals about significant discrimination. *See* Part I.B, *infra*.

*Second*, by blessing proposals that ask about sexual orientation and gender identity discrimination even before *Bostock*, while agreeing that identical proposals about viewpoint discrimination and ideology can be excluded, the SEC has engaged in unconstitutional viewpoint discrimination. The problem runs much deeper. There is a documented pattern of the SEC disfavoring conservative shareholder proposals to prevent them ever from receiving votes. *See* Part II, *infra*. The SEC's actions demonstrate that it believes discrimination is a matter of significant social policy concern and thus worthy of receiving a shareholder vote—unless (ironically) it involves discrimination on the basis of viewpoint or ideology, in which case the SEC will move to chill such speech by agreeing with companies seeking to exclude such proposals.

For these reasons, the Court should vacate and remand.

Seeking to shield its illegal and unconstitutional actions, the SEC has previously argued that this Court cannot review the SEC's decisions made during the no-action process because there is allegedly no final order of the Commission. That is wrong and ignores the Exchange Act provision expressly deeming such decisions by the Division to be the "[f]inal[]" and judicially reviewable decisions *of the Commission itself* after the Commission has either declined review or the time to seek such review has expired. 15 U.S.C. § 78d-1(c). The SEC's arguments about finality and reviewability are premised on nonsensical theories, such as a claim that the Division was never delegated the power to issue no-action decisions in the first place (which is both wrong and irrelevant), or that such decisions have no real-world effects (even though they are given deferential weight in certain judicial proceedings, and even though the SEC treats the decisions as absolutely binding, as do the receiving companies). *See* Part III, *infra.*

The SEC also claims the case is moot because the 2023 proxy season for Kroger has now ended and Kroger included the Proposal after this Court stayed the SEC's decision. But Petitioners' challenge is against the SEC, not Kroger. And Petitioners' injury—i.e., that the SEC is illegally

blessing companies' requests to exclude Petitioners' viewpoint-discrimination proposal—is capable of repetition yet evading review. *See* Part IV, *infra*. The shareholder season typically lasts only a few months at most, and Petitioners have repeatedly submitted the exact same Proposal in the past, only to have the companies seek no-action relief and the SEC grant it *every time*, ensuring the proposal does not receive a vote. Petitioners continue to submit the same viewpoint-discrimination proposal going forward (several more are pending right now), demonstrating there remains a live controversy against the SEC, which is certain to grant no-action relief against the very same proposal in the future.

The Court has jurisdiction and should vacate and remand the SEC's decision.

## STATEMENT OF THE CASE

### A.  ADMINISTRATIVE PROCEEDINGS

NCPPR is the "original and premier … defender of true capitalism." *Free Enterprise Project*, Nat'l Ctr. for Pub. Pol'y Res., https://nationalcenter.org/programs/free-enterprise-project/ (last visited July 13, 2023). NCPPR "files shareholder resolutions, engages corporate

CEOs and board members, submits public comments, engages state and federal leaders, crafts legislation, files lawsuits and directs media campaigns to push corporations to respect their fiduciary obligations and to stay out of political and social engineering." *Id.*

NCPPR submits shareholder proposals on a range of subjects, from gun rights and religious freedom to corporate free speech, ideological diversity, voter integrity, freedom of conscience and others, which tend to align more closely with a conservative political perspective.

NCPPR is a longtime Kroger shareholder. On December 21, 2022, NCPPR sent its Proposal to Kroger and requested that it be included in Kroger's 2023 proxy materials so Kroger shareholders could vote on it. JA1. The Proposal states:

> RESOLVED
>
> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

JA3.

NCPPR modeled the Proposal on an earlier proposal and supporting statement that the SEC had previously said was *not*

excludable under Rule 14a-8(i)(7). The 2019 proposal to *CorVel Corp.* requested that the company "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity (EEO) policy." *CorVel Corp.*, 2019 WL 1640021 at *1 (SEC No-Action Decision June 5, 2019). The SEC concluded this proposal was not excludable. *Id.*

On February 16, 2023, Kroger submitted a letter to the Division, which is the component of the SEC to which the Commission has delegated responsibility to review requests to exclude shareholder proposals. JA6; *see* 17 C.F.R. §§ 202.1(d), 202.2, 200.30-1(f)(4). Kroger argued that NCPPR's Proposal "deals with matters relating to the Company's ordinary business operations" because it pertains only to "Kroger's management of its workforce and policies concerning employees." JA7, JA9. Kroger also argued that the Proposal did not implicate a "significant policy issue" for the same reasons. JA10.

On March 2, 2023, NCPPR responded to Kroger's letter by pointing out that the SEC itself has held that "'significant discrimination matters'" "'transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote,'"

and thus proposals on such matters should not be excluded. JA14 (quoting Amendments to Rules on Shareholder Proposals, Exchange Act Release No. 40018 (May 21, 1998) (hereinafter "1998 Amendments"), *available at* https://www.sec.gov/rules/final/34-40018.htm). NCPPR also argued that the Division's *Staff Legal Bulletin No. 14L* ("*SLB-14L*"), issued in 2021, had even more clearly privileged those "proposals squarely raising human capital management issues with a broad societal impact," regardless of whether they raised a policy of significance "for the company" specifically. Division of Corporation Finance, *SLB-14L* (Nov. 3, 2021), https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

NCPPR further cited extensive statistics about the existence of viewpoint and ideological discrimination, as well as the importance of that issue to society. For example, a recent Society for Human Resource Management study demonstrated that the percentage of American workers who say they have experienced political affiliation bias in the workplace *doubled* from 2019 to 2022. JA51. And an Economist/YouGov poll revealed that over 79% of conservatives feel they face discrimination either "a great deal" or "a fair amount," and a Hill-HarrisX survey found

that 78% of Republicans believe conservatives "have to deal with discriminatory behavior," whereas just 16% of Democrats felt the same way. JA18.

On April 12, 2023, after the parties completed adversarial briefing on the matter, the Division issued a decision agreeing with Kroger that the Proposal "relates to, and does not transcend, ordinary business matters," and thus there "appears to be some basis for your view that [Kroger] may exclude the Proposal under Rule 14a-8(i)(7)." JA34.

On April 13, 2023, NCPPR sought review directly from the Commissioners. JA35. NCPPR explained that the Division's decision was inconsistent with its 2019 *CorVel Corp.* decision, which involved a proposal identical to NCPPR's except it substituted "sexual orientation" and "gender identity" for "viewpoint" and "ideology." JA52–54; *see CorVel*, [2019 WL 1640021](). The *CorVel* decision pre-dated *Bostock*'s holding that Title VII extended to sexual orientation and gender identity, yet the Division concluded that proposal was *not* excludable.

NCPPR also argued that the SEC was engaging in viewpoint discrimination by giving the green light to proposals about certain forms of discrimination (e.g., against sexual orientation and gender identity)

while agreeing companies could exclude proposals about other forms of discrimination that are at least as significant to society (e.g., viewpoint and ideology, especially against conservatives). JA53–57. NCPPR further argued that the SEC was acting arbitrarily and capriciously by denying or granting relief in inconsistent ways, without explanation, JA57–59, and that the SEC lacked statutory authority to undertake the Rule14a-8 process in the first place, JA59–64.

Petitioners Fischer and Aronoff, who both own Kroger stock, participated in the proceedings by submitting formal statements adopting NCPPR's arguments and also supporting NCPPR's petition for Commission review. JA82, JA150. These Petitioners explained their desire to vote on NCPPR's Proposal, which would almost certainly be foreclosed if the SEC maintained its view that the Proposal was excludable.

The Commission declined review, however, rendering the Division's decision the "[f]inal[]" SEC decision for "all purposes," including judicial "appeal or review thereof." 15 U.S.C. § 78d-1(c); *see* 17 C.F.R. § 201.430; *Axon*, 143 S. Ct. at 898 ("[I]f no such review has occurred [by the

14

Commission], the [subordinate's] ruling itself becomes the decision of the Commission.").

## B.  PROCEEDINGS BEFORE THIS COURT

On April 28, 2023, Petitioners filed the Petition with this Court, sought expedited consideration, and submitted an emergency motion for a stay pending review. ECF1, 4.[2] The Court promptly issued an administrative stay and set an expedited briefing schedule on the emergency motion. ECF10-2. On May 10, 2023, after emergency briefing completed, the Court ordered the emergency motion to be carried with the case, denied the request for expedited consideration, and kept the administrative stay in place. ECF29-2. The emergency motion remains pending.

On May 12, 2023, Kroger, having been deprived of its SEC no-action relief as a result of this Court's decision to keep the administrative stay in place for an indefinite period of time, issued its 2023 proxy materials and included the Proposal. *See* The Kroger Co., *Definitive Proxy*

---

[2] Citations to "ECF" refer to the ECF number on this Court's docket in this case.

*Statement (Schedule 14A) May 12, 2023*, at 92–93, https://tinyurl.com/bdf7veeh.

On May 24, 2023, the National Association of Manufacturers sought to intervene, arguing that the SEC lacks authority to compel corporations to speak or subsidize shareholder speech about any shareholder proposal. ECF31. The Court granted the motion to intervene. ECF36.

On June 2, 2023, the SEC moved to dismiss the Petition, re-raising the same arguments it had made in opposition to the emergency motion for a stay, and also arguing the case was moot because of Kroger's decision to include the Proposal. ECF37. Petitioners opposed, and the SEC filed a reply brief. ECF44, 51. A motions panel subsequently ordered the motion to dismiss to be carried with the case, and that motion remains pending. ECF61.

The SEC also attempted to avoid filing the administrative record by arguing there had been no proceedings below, ECF38, but the Court rejected that request, ECF43, and the SEC filed a certified index of the record on July 7, 2023, ECF56.

## C. Petitioners' Ongoing Practice of Submitting the Viewpoint-Discrimination Proposal

NCPPR has already submitted the same viewpoint-discrimination proposal to BlackRock and Walgreens for their upcoming proxy seasons, and will imminently submit that proposal to American Express, Apple, and Alphabet for their upcoming seasons, as well. *See* Add.Ex.A (Shepard Decl.).[3] Petitioners Fischer and Aronoff own shares in BlackRock and intend to participate in the SEC proceedings when it seeks no-action relief. *See* Add.Exs.B–C (Fischer and Aronoff Decl.). Further, Petitioner Fischer has submitted the same viewpoint-discrimination proposal to Redfin for its 2024 shareholder meeting. Add.Ex.B. These proposals all remain pending.

At least one (and likely all) of those companies will seek no-action relief from the SEC, which will just as certainly grant such relief and conclude that the proposal is excludable. This is not speculation. When NCPPR previously submitted the exact same viewpoint-discrimination proposal to BlackRock, Walgreens, Kroger, Salesforce.com, Alphabet, and Apple over a period of several years, *each* of them sought no-action relief

---

[3] The Shepard, Fischer, and Aronoff declarations are in the concurrently filed Addendum.

from the SEC, which granted such relief and concluded the proposal could be excluded *every single time*. *See BlackRock, Inc.*, 2022 WL 225967 (SEC No-Action Decision Apr. 4, 2022); *Walgreens Boots All., Inc.*, 2020 WL 5656738 (SEC No-Action Decision Nov. 12, 2020); *Salesforce.com, Inc.*, 2020 WL 605941 (SEC No-Action Decision Mar. 5, 2020); *Alphabet Inc.*, 2020 WL 605360 (SEC No-Action Decision Feb. 24, 2020); *Apple Inc.*, 2019 WL 5420787 (SEC No-Action Decision Dec. 20, 2019).

NCPPR also intends to continue submitting the viewpoint-discrimination proposal to companies where it is eligible to do so, *see* Add.Ex.A, continuing its years-long practice.

## SUMMARY OF THE ARGUMENT

The Court should grant the Petition and vacate the SEC's decision below. The SEC acted contrary to law and arbitrarily and capriciously by concluding that a shareholder proposal about viewpoint and ideological discrimination did not raise a matter of significant social policy, given that (1) the SEC has previously agreed that proposals about discrimination raise significant social policy concerns, (2) the SEC has concluded that otherwise-identical proposals about sexual orientation and gender identity discrimination *do* raise a matter of significant social

policy, and (3) evidence submitted below confirms that viewpoint and ideological discrimination are matters of exceptional importance and concern to Americans. *See* Part I.A, *infra*. Further, to the extent the SEC has suddenly changed its position on proposals about discrimination, such an about-face is itself arbitrary and capricious because the SEC never acknowledged, let alone explained, why it was changing its position. *See* Part I.B, *infra*.

The SEC's decision is also unconstitutional. Several detailed studies demonstrate that Petitioners were victims of the SEC's viewpoint discrimination against conservative shareholder proposals. *See* Part II, *infra*. The SEC disproportionately grants no-action for conservative-aligned proposals as compared to liberal-aligned ones, demonstrated most obviously by the SEC's grant of such relief here despite previously declining to issue such relief for otherwise-identical proposals that address forms of discrimination often raised by liberal groups.

Finally, the Court should reject the SEC's unpersuasive arguments that its decision is judicially unreviewable and that this action is moot. *See* Parts IV–V, *infra*. The Exchange Act clearly establishes this Court's jurisdiction, and the challenged SEC action here is not only capable of

repetition yet evading review—but has in fact already repeatedly happened and is nearly guaranteed to happen again in the near future.

## ARGUMENT

I. **THE SEC'S DECISION WAS LEGALLY ERRONEOUS AND ARBITRARY AND CAPRICIOUS.**

A. **THE SEC MISAPPLIED RULE 14a-8 BY EXCLUDING THE PROPOSAL DESPITE ITS FOCUS ON SIGNIFICANT SOCIAL POLICY.**

The SEC has long applied Rule 14a-8 to compel the inclusion of shareholder proposals that relate to matters of "significant social policy issues." NCPPR's Proposal relates to the policy issue of discrimination against employees on viewpoint and ideological grounds. Discrimination, and especially discrimination on the basis of viewpoint or ideology, is undoubtedly a significant social policy issue under the SEC's own regulations. The SEC was wrong to conclude otherwise, and this Court should vacate that decision and remand. *See, e.g., Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997) (standards of review for SEC decisions).

1. **REGULATORY BACKGROUND**

SEC Rule 14a-8 compels companies to include a validly submitted shareholder proposal in its proxy materials unless the proposal falls under one of the Rule's bases for exclusion. One of Rule 14a-8's bases for

exclusion of a proposal is in Rule 14a-8(i)(7), which states that a company may exclude a proposal "[i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). This basis for exclusion is commonly referred to as the "ordinary business exclusion."

Decades ago, the SEC would apply the ordinary business exclusion to block social-issue proposals. For example, in the landmark 1992 no-action response in *Cracker Barrel Old Country Store, Inc.*, the Division applied the exclusion to permit the company to block a proposal that requested the company "implement non-discriminatory policies relating to sexual orientation and to add explicit prohibitions against such discrimination to their corporate employment policy statement." 1992 WL 289095, at *6 (SEC No-Action Decision Oct. 13, 1992). The Division stated that under Rule 14a-8(i)(7), a proposal's focus on a "social issue" did not "remov[e] the proposal from the realm of ordinary business operations." *Id.* at *1.

But after *Cracker Barrel*, Democratic SEC Commissioners and several activist groups criticized the SEC's decision to allow companies to exclude social-issue proposals related to employment, and pushed for

changes in the SEC's interpretation of the ordinary business exclusion in order to permit greater proxy inclusion for social-issue proposals. *See, e.g.*, Steven Wallman, *Equality Is More Than "Ordinary Business,"* N.Y. Times (Mar. 30, 1997); *Proxies: SEC Should Reexamine Position on Shareholder Proposals, Wallman Says*, 28 Sec. Reg. & L. Rep. (BNA) 1134 (Sept. 20, 1996); *Group Petitions SEC for Change on Proxy Resolutions about Employment*, 27 Sec. Reg. & L. Rep. (BNA) 1366, 1367 (1995) (petition of 30 institutional investors).

In 1998, the SEC responded to that pressure and reversed its interpretation of how the ordinary business exclusion applied to social-issue proposals. Noting "changing societal views" and the fact that "the relative importance of *certain* social issues relating to employment matters has reemerged as a consistent topic of widespread public debate," the SEC reconsidered its prior approach. The SEC adopted changes to "reverse the *Cracker Barrel*" decision and narrow the ordinary business exclusion to prevent companies from excluding proposals that "focus[] on sufficiently significant social policy issues." 1998 Amendments, *supra*.

Specifically, the SEC's 1998 Amendments provided that "proposals relating to such [ordinary business] matters but focusing on sufficiently

significant social policy issues (e.g., *significant discrimination matters*) generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." *Id.* (emphasis added). This is now commonly referred to as the "significant social policy exception" to the ordinary business exclusion.

The Division subsequently provided in 2002 that "the presence of widespread public debate" over an issue must be considered in determining whether the issue transcends ordinary business operations. Division of Corporation Finance, *Staff Legal Bulletin No. 14A (SLB-14A)* (July 12, 2002), https://www.sec.gov/interps/legal/cfslb14a.htm.

In the years following these pronouncements, the number of shareholder proposals focusing on social and political issues has increased significantly. As the SEC recounted in a recent proposed rulemaking, from 2004 to 2018, proposals focusing on environmental issues grew from 5% to 16% of all shareholder proposals, and social-issue proposals from 25% to 39%.[4] Today, "shareholder proposals are now a

---

[4] *Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8*, <u>84 Fed. Reg. 66,458</u>, 66,479 (Dec. 4, 2019).

central tool for shareholders seeking to advance social change."[5] Each proxy season, shareholder activists submit hundreds of shareholder proposals on topics ranging from climate change to abortion and LGBT rights. *See Shareholders File More Than 500 ESG-Related Resolutions in Record-Breaking Year, Despite Political Attacks*, As You Sow (Mar. 22, 2023), https://tinyurl.com/yepkf97n.

In 2021, the SEC signaled it would allow even more social-issue proposals to be included in proxy materials. The Division issued *SLB-14L*, which explained even more forcefully that the significant social-policy exception does not "focus on ... the nexus between a policy issue and the company, but will instead focus on the social policy significance of the issue that is the subject of the shareholder proposal," and thus turns on "whether the proposal raises issues with a broad societal impact, such that they transcend the ordinary business of the company."

---

[5] Pet. of U.S. Chamber of Commerce et al. for Rulemaking Regarding Resubmission of Shareholder Proposals Failing to Elicit Meaningful Shareholder Support, *In re Exclusion of Resubmitted Shareholder Proposals, 17 C.F.R. § 240.14a-8(i)(12)*, at 15 (Apr. 10, 2014), https://www.sec.gov/rules/petitions/2014/petn4-675.pdf; *see generally* Paula Tkac, *One Proxy at a Time: Pursuing Social Change Through Shareholder Proposals*, Fed. Rsrv. Bank of Atlanta (2006), https://fraser.stlouisfed.org/files/docs/publications/frbatlreview/rev_frbatl_2006_v91no3.pdf.

*SLB-14L, supra. SLB-14L* further re-emphasized the 1998 Amendments'
direction that "[m]atters related to employment discrimination" are
proposals that "may rise to the level of transcending the company's
ordinary business operations." *Id.* at n.5.

> ## 2. PROPOSALS RELATED TO SIGNIFICANT DISCRIMINATION MATTERS SATISFY THE SIGNIFICANT SOCIAL POLICY TEST.

The Commission's and Division's interpretations of the "significant
social policy exception" repeatedly cite discrimination as the prototypical
example of a significant social policy issue that transcends ordinary
business matters. In addition to the 1998 Amendments' express mention
of "significant discrimination matters" (discussed above), *SLB-14L*
further emphasized that "[m]atters related to employment
discrimination" are prime examples of issues that "may rise to the level
of transcending the company's ordinary business operations." *SLB-14L*,
*supra.*

Accordingly, the Division has consistently denied companies no-
action relief for proposals that focus on risks of employment
discrimination. *See, e.g.*, *Levi Strauss & Co.*, <u>2021 WL 5918662</u> (SEC No-
Action Decision Feb. 10, 2022) ("audit analyzing the Company's impacts

on civil rights and non-discrimination" in "workplace and employment practices"); *The Walt Disney Co.*, 2021 WL 5052838 (SEC No-Action Decision Jan. 19, 2022) ("workplace non-discrimination audit"); *Amazon.com, Inc. (N.Y. State Common Ret. Fund)* (SEC No-Action Decision Apr. 7, 2021), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2021/nyscrfamazon040721-14a8.pdf ("racial equity audit analyzing Amazon's impacts on civil rights, equity, diversity and inclusion" and discussing "discrimination against Black and Latino workers").[6]

Most significantly, in *CorVel Corp.*, the SEC determined that a proposal was *not* excludable where it requested a company to "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity (EEO) policy." 2019 WL 1640021. As discussed further below, that is *verbatim* what NCPPR's Proposal states, except it

---

[6] The no-action decision in *Amazon.com, Inc.*, *supra*, was not delivered by letter. *See* 2020–21 Shareholder Proposal No-Action Responses Chart, SEC, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/shareholder-proposal-no-action-responses-2020-2021.htm.

switches "sexual orientation" and "gender identity" for "viewpoint" and "ideology."

### 3. NCPPR'S PROPOSAL FOCUSED ON THE SIGNIFICANT SOCIAL POLICY ISSUE OF CORPORATE VIEWPOINT DISCRIMINATION.

NCPPR's Proposal requested that Kroger "issue a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity (EEO) policy." Nowhere does the Proposal seek to manage Kroger's workforce. It instead seeks the issuance of a *report* that gathers information. That alone made clear that the Proposal does not seek to micromanage the day-to-day business operations of Kroger.

Moreover, even assuming the Proposal did relate to ordinary business matters, it was still not excludable, as it focused on a sufficiently significant social policy issue involving discrimination, which—as demonstrated above—is the prototypical example of a matter transcending ordinary business operations, according to the SEC itself.

The Proposal focuses squarely on the issue of discrimination against viewpoint and ideology, which is a matter of widespread and intense public debate today. *See SLB-14A*, *supra* (noting that "the

presence of widespread public debate" over an issue must be considered in determining whether the issue transcends ordinary business operations). As NCPPR explained to the SEC below, the rise of "woke capital" has become a major political issue that drives current political and public policy debates. JA18–19. According to a recent Society for Human Resource Management study, the percentage of American workers who say they have experienced political affiliation bias in the workplace *doubled* from 2019 to 2022. JA51. As a result, advocates increasingly call for new laws to protect workers from discrimination on the basis of political and ideological viewpoints. JA51 (citing authorities). And numerous states now treat political affiliation or political activities as protected characteristics. *See, e.g.*, D.C. Code § 2-1402.11; N.Y. Lab. Law § 201-D; Wash. Rev. Code § 42.17A.495(2).

As NCPPR explained to the Division, an Economist/YouGov poll revealed that 79% of conservatives felt conservatives face "a great deal" or "a fair amount" of discrimination in America today, and a Hill-HarrisX survey found that 78% of Republicans believe conservatives "have to deal with discriminatory behavior." JA18.

This should have been more than enough for the Division to conclude that the Proposal was not properly excludable. After all, as noted above, the SEC routinely states that matters involving significant discrimination matters will transcend ordinary business operations and thus should not be excluded from proxy materials. The most pertinent example is in *CorVel Corp.*, where the SEC determined that a proposal *identical* to NCPPR's—except that it substituted "sexual orientation" and "gender identity" for "viewpoint" and "ideology"—rose to the level of significant social policy. 2019 WL 1640021. Notably, *CorVel* was issued before the Supreme Court held in *Bostock* that Title VII extended to sexual orientation and gender identity, meaning the SEC could not claim that it denied no-action relief on the basis that the proposal tracked Title VII's coverage. And to the extent the SEC would make such a claim anyway, it would not explain why it deemed NCPPR's Proposal excludable, given that numerous jurisdictions have already outlawed political discrimination, as noted above.

Given that viewpoint and ideological discrimination are at least as socially significant in 2023 as sexual-orientation and gender-identity

discrimination were in 2019, there was no reason for the Division to deny excludability in the latter scenario but grant it in the former.

Kroger's governing documents also prove that the Proposal involves a matter of such significance that it warrants board-level attention. Kroger's non-discrimination policy—the very same one mentioned in the Proposal—was adopted by Kroger's board. The Kroger Co., *The Kroger Co. Policy on Business Ethics* at 1, 7, https://tinyurl.com/n2dc2jzp. This board-level event shows Kroger clearly views significant non-discrimination policy as an issue that transcends ordinary day-to-day business operations, and is consistent with the SEC's earlier "view [that] management teams generally handle 'mundane matters' while boards of directors are responsible for high level decision-making." *Trinity*, 792 F.3d at 338.

By any measure, therefore, the issue of viewpoint and ideological discrimination is clearly socially significant and transcends ordinary business matters. It was inexplicable for the SEC to conclude otherwise.

Finally, under *SLB-14L*, it is not necessary to demonstrate further that the Proposal raises a policy issue "of significance for the company" specifically, *see SLB-14L*, *supra*, but Petitioners nonetheless note that

Kroger has demonstrated a company-wide lack of consideration for employees with diverse points of view, as evidenced by Kroger's release of an "allyship guide" that says, "Some people's morality can be a barrier to accepting LGBTQ+ people," as well as a newsworthy settlement Kroger made after disciplining employees who had refused on religious grounds to wear rainbow "flair" that Kroger required. JA21.

## B. THE SEC'S ABOUT-FACE ON DISCRIMINATION WAS ARBITRARY AND CAPRICIOUS.

Agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Under this precedent, the agency must rationally explain its decision. *See Prometheus*, 141 S. Ct. at 1160.

Here, the Division did not explain its rationale beyond a single conclusory sentence. But "conclusory statements do not suffice to explain [an agency's] decision." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). The Division's decision was therefore arbitrary and capricious on that basis alone.

Further, where an agency seeks to change its position from a prior regime, it must "display awareness that it *is* changing position" and

"show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

As discussed above, the SEC did an about-face by suddenly concluding that "significant discrimination matters" are ordinary business matters—at least when it comes to viewpoint and ideology— despite previously and consistently concluding otherwise with respect to a broad range of discrimination matters. The SEC not only failed to explain this sudden shift but also failed even to acknowledge it. This was also arbitrary and capricious, warranting vacatur of the decision below. *See Encino*, 136 S. Ct. at 2127.

## II.    THE SEC VIOLATED THE FIRST AMENDMENT.

The Decision below should be vacated for the additional reason that the SEC engaged in viewpoint discrimination and the chilling of speech in violation of the First Amendment.

The government cannot engage in viewpoint discrimination. *See Matal v. Tam*, 137 S. Ct. 1744 (2017). This includes regulating speech "because of the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995). The Supreme Court defines "the term 'viewpoint'

discrimination in a broad sense," *Matal*, 137 S. Ct. at 1763, precisely because "[v]iewpoint discrimination is a poison to a free society," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

To avoid viewpoint discrimination the government must have "narrow, objective, and definite" standards to prevent officials from covertly discriminating based on viewpoint through subjective and unclear terms. *Forsyth Cnty., Ga. v. Nat'list Movement*, 505 U.S. 123, 131 (1992) (internal citation omitted).

But here, the Division has wide discretion to determine what "issues" are significant or have "broad societal impact" and even to effectively censor on the same issue—here, the issue of employment discrimination—when they are presented by speakers with differing political views. As one Court has described it, the SEC has adopted "what can only be described as a 'we-know-it-when-we-see-it' approach." *Trinity*, 792 F.3d at 346.

The clear viewpoint discrimination by the Division between NCPPR's Proposal and the *CorVel Corp.* proposal about sexual-orientation and gender-identity discrimination is not just a one-off instance. For decades, "equal employment opportunity" focused

shareholder proposals have been a standard model that liberal activist groups advance at companies, and which courts[7] and the SEC[8] have approved.

Even outside the context of discrimination proposals, the SEC's disfavoring of conservative viewpoints is clear. In *Mastercard, Inc.*, 2022 WL 392206 (SEC No-Action Decision Apr. 22, 2022), the Division denied no-action relief under Rule 14a-8(i)(7) for a liberal-aligned anti-gun proposal requesting that the company issue a report describing if and how it "intends to reduce the risk associated with the processing of

---

[7] *See, e.g.*, *Apache Corp. v. N.Y.C. Employees' Ret. Sys.*, 621 F. Supp. 2d 444, 451 n.7 (S.D. Tex. 2008) ("Had the [proponent] drafted the Proposal to simply request that Apache add sexual orientation to its existing anti-discrimination policy and deleted [extraneous matter], the court would be inclined to agree with the [proponent]."); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 892 (S.D.N.Y. 1993); *Exxon Mobil Corp.*, 2000 WL 364043 (SEC No-Action Decision Mar. 23, 2000) ("amend ExxonMobil's written equal employment opportunity policy to bar sexual orientation discrimination"); *Wal-Mart Stores, Inc.*, 2021 WL 389304 (SEC No-Action Decision Feb. 23, 2021).

[8] *See, e.g.*, *Altria Grp., Inc.*, 2023 WL 2672368 (SEC No-Action Decision Mar. 27, 2023) (audit to "assess the impact of the Company's policies ... on BIPOC (Black, Indigenous and people of color) and Latinx/a/o/e communities"); *Amazon.com, Inc., supra* ("racial equity audit analyzing Amazon's impacts on civil rights, equity, diversity and inclusion" and discussing "discrimination against Black and Latino workers").

payments involving its cards and/or electronic payment system services for the sale and purchase of untraceable firearms, including 'Buy, Build, Shoot' firearm kits, components and/or accessories used to assemble privately made firearms known as 'Ghost Guns.'" But in *American Express Co.*, 2023 WL 2524429 (SEC No-Action Decision Mar. 9, 2023), the Division granted no-action relief for a conservative-aligned pro-gun proposal that was *identical* except it substituted "firearms" for "untraceable firearms" and the examples included thereunder. While the *Mastercard* proposal was concerned with the risks of failing to track gun sales, the *American Express Co.* proposal was concerned with the risks of tracking gun sales. The only basis for the difference between the proposals was a difference in the proponents' public-policy views about gun sales.

In another context, the Division permitted a proposal under Rule 14a-8(i)(7) that expressed concern that the company did too little to combat alleged "misinformation," but not a proposal that expressed concern that the company did *too much* to combat alleged "misinformation." *Compare Alphabet Inc.*, 2022 WL 392221 (SEC No-

Action Decision Apr. 12, 2022), *with AT&T Inc.*, 2023 WL 108213 (SEC No-Action Decision Mar. 15, 2023).

The trend is significant enough that it reveals itself in aggregate statistics. The Society for Corporate Governance recently concluded that during the 2022 proxy season, the Division granted no-action relief in 50% of the instances where relief was requested on conservative "anti-ESG" proposals—like NCPPR's—compared with just 38% across all proposals. The gap further widened when considering only social/political proposals, where the Division granted companies relief at a 50% rate for proposals from conservative "anti-ESG" proponents, as compared with only 31% across all social/political proposals considered by the Division. JA56–57.

A comprehensive study by the independent, non-profit group Consumers' Research confirms the SEC's viewpoint bias. For the 2018 through 2022 proxy seasons, the SEC granted no-action relief under Rule 14a-8(i)(7) on 46% of all requests for liberal-aligned proposals in which it was raised, but on 72% of all conservative-aligned proposals. *Consumers' Research SEC No-Action Audit 2018–2022* (May 4, 2023), https://consumersresearch.org/secnoactionaudit.

The SEC's viewpoint discrimination makes Petitioners' proposals less effective by preventing them from receiving votes and also chills their speech by discouraging them from making proposals. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–59 (1988). These violations are ongoing and will continue, as Petitioners continue to submit conservative-aligned proposals, including ones identical to those that the SEC has determined can be excluded from proxy materials.

Because the SEC has failed to maintain the neutrality required by the First Amendment, the Court should vacate the decision below. And because the SEC's wide discretion under Rule 14a-8 to determine what "issues" are significant or have "broad societal impact" violates the Supreme Court's requirement that there be "narrow, objective, and definite" standards to prevent government officials from discriminating based on viewpoint, *Forsyth Cnty.*, 505 U.S. at 131, the Court should also declare that the significant social policy exception to Rule 14a-8(i)(7), as promulgated by the 1998 Amendments and *SLB-14L*, is unconstitutional.

Such relief would remedy the injury of the SEC's viewpoint discrimination. *See, e.g., Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2356 (2020) (holding that a court can "cure[] unequal

treatment by, for example, extending a burden or nullifying a benefit," including in the context of First Amendment free speech rights); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting) (noting that the "First Amendment is a kind of Equal Protection Clause for ideas").

## III. THE COURT HAS JURISDICTION.

Seeking to avoid judicial review of its illegal, unconstitutional, and arbitrary actions, the SEC has insisted in prior filings that this Court cannot review the Division decision below because there supposedly is no "final order of the Commission" under 15 U.S.C. § 78y(a)(1). ECF19, 37. That is wrong.

After the Division issued its no-action decision, Petitioners sought review by the Commission itself, which declined to review the matter. Under 15 U.S.C. § 78d-1(c), entitled "Finality of Delegated Action," the Commission's act of declining review means that the Division's decision "shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission." 15 U.S.C. § 78d-1(c); *Axon*, 143 S. Ct. at 898 ("[I]f no such review has occurred [by the Commission], the [subordinate's] ruling itself becomes the decision of the Commission.").

Indeed, this Court has already twice indicated in its rulings that this case is on review from an "Order of the Securities and Exchange Commission." ECF29-2, 61-2.

And by expressly establishing "[f]inality," § 78d-1(c) settles the matter: the Division's decision is not just an order of the Commission but is also the "final order of the Commission" for "all purposes," thereby triggering this Court's jurisdiction under § 78y.

In its prior filings, the SEC has gone to extraordinary lengths to avoid this obvious conclusion. As explained below, the SEC's arguments ignore § 78d-1(c), border on the absurd, and repeatedly rely on the "particular label[s]" the SEC gives its own actions, even though the Supreme Court has held that "it is the substance" that matters when determining judicial reviewability of agency action. *CBS v. United States*, 316 U.S. 407, 416 (1942).

A. **THERE IS FINAL AGENCY ACTION.**

1. **SECTION 78D-1 ESTABLISHES THE CONSUMMATION OF THE AGENCY PROCESS.**

The SEC has disputed that the Division decision represented the "'consummation' of the Agency's decisionmaking process." *Bennett v.*

*Spear*, <u>520 U.S. 154, 178</u> (1997); ECF37 at 33.[9] As explained above, that disregards <u>15 U.S.C. § 78d-1(c)</u>, which states that decisions by SEC delegees "shall, *for all purposes, including appeal or review thereof*, be deemed the action of the Commission," including for "[f]inality," once Commission review has been denied or the time to seek it has expired. *Id.* (emphasis added); ECF1-1 at 5–7.

It is hard to imagine a clearer statutory directive designed to ensure that SEC actions remain judicially reviewable regardless of who exactly at the SEC made the decision and regardless of whatever procedural tricks the Commission may invoke to try and evade review. The SEC never disputes the Commission did in fact deny review here, ECF37 at 16, which is one of the triggers for § 78d-1.

The SEC has also cited out-of-circuit cases finding no final, reviewable order in similar circumstances, *see, e.g.*, *Kixmiller v. SEC,* <u>492 F.2d 641</u> (D.C. Cir. 1974); *Amalgamated Clothing & Textile Workers Union v. SEC*, <u>15 F.3d 254</u> (2d Cir. 1994), but none of those cases cited

---

[9] For all citations to ECF filings, the pincite numbers are to the Court-stamped page numbers at the top of the document.

§ 78d-1—presumably they were simply unaware of it.[10] But its text could not be clearer, and it directly forecloses the SEC's arguments here.

The SEC has also claimed it "'might'" change its mind down the road regarding whether a proposal is properly excluded, ECF37 at 35, but "[t]he mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). And the Commission already had the opportunity to review the Division's decision and declined to do so.

### 2. PETITIONERS NEED NOT SATISFY *BENNETT*'S SECOND PRONG, BUT THEY DO SO ANYWAY.

The SEC has also argued that the Division's decision—issued on SEC letterhead after numerous rounds of briefing pursuant to extensive regulations—is so informal that it was not "one by which rights or obligations have been determined, or from which legal consequences will flow," under the second prong of finality under *Bennett*, 520 U.S. at 177–78; *see* ECF37 at 32. Again, the SEC is incorrect.

---

[10] The substance of § 78d-1 was originally enacted in 1962, *see* Pub. L. No. 87-592, 76 Stat. 394 (1962), but was then re-codified as part of the Exchange Act in 1987, *see* Pub. L. No. 100-181, 101 Stat. 1249, 1254–55 (1987); S. Rep. 100-105, 1987 WL 61544, at *20 (1987) (noting the 1987 Act would "insert [the 1962 Act] provisions into the 1934 Act, where they would be more readily accessible").

*First*, that generic element of finality is a default requirement of the Administrative Procedure Act, ECF1-1 at 7–8, but as discussed above, the Exchange Act specifically provides for "[f]inality" "for all purposes, including appeal or review thereof," once the Commission denies review or the time expires to seek review. § 78d-1(c). That SEC-specific language prohibits any attempt to glom additional tests for review onto the requirements in § 78d-1(c).

In fact, the SEC itself previously confirmed that under the Exchange Act, "a staff decision could become final without review" by the Commission and then "go[] directly to the court of appeals without the benefit of a full Commission hearing." *Hearing on Reorganization Plans of 1961: No. 1, Securities and Exchange Commission Before the S. Comm. on Gov't Operations*, 87th Cong. 45 (1961) (statement of William I. Cary, Chairman, SEC), *available at* https://tinyurl.com/5n72te5r. The Court should reject the SEC's attempt to abandon that long-held view.

*Second*, even if *Bennett* prong-two finality were required, Petitioners satisfy that "pragmatic" inquiry. *Qureshi v. Holder*, <u>663 F.3d 778, 781</u> (5th Cir. 2011); *see Med. Comm. for Human Rts. v. SEC*, <u>432</u>

F.2d 659, 665–76 (D.C. Cir. 1970), *vacated on mootness grounds*, 404 U.S. 403 (1972).[11]

In terms of legal consequences of a no-action decision, Rule 14a-8 itself expressly treats "prior Division letters" as persuasive authority when parties seek no-action relief, 17 C.F.R. § 240.14a-8(j)(2)(ii), and courts often award some level of deference to the SEC's no-action decisions in private lawsuits against the company.[12] Those forms of deference by courts and the SEC itself, no matter how slight, impose collateral legal consequences, satisfying *Bennett* prong two.

The SEC seems to believe that there are legal effects only when an agency decision categorically "bind[s]" others, ECF37 at 35, but that is wrong. As Justice Scalia aptly put it in the context of agency rules, when agency action "gets deference, the people are bound to obey it on pain of sanction, no less surely than they are bound to obey substantive rules"

---

[11] The SEC has previously attempted to distinguish *Medical Committee* because the Commission had adopted the Division decision there, ECF37 at 31, but § 78d-1(c) renders that distinction irrelevant.

[12] *The SEC and "No-Action" Decisions Under Proxy Rule 14a-8*, 84 Harv. L. Rev. 835, 854 (1971); *N.Y.C. Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 14 (2d Cir. 1995).

that are mandatory. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 110 (2015) (Scalia, J., concurring).

The no-action process also has all the tell-tale signs of a formal proceeding designed to establish rights. Companies wishing to exclude proposals are *required* to inform the SEC pursuant to Rule 14a-8. 17 C.F.R. § 240.14a-8(j). And "in the administration of proxy rule 14a-8, … the SEC performs a quasi-judicial function." *The SEC and "No-Action" Decisions Under Proxy Rule 14a-8*, 84 Harv. L. Rev. 835, 837 (1971) ["Harvard"]. The D.C. Circuit has described it as "an adversary encounter" between "two interested private parties," where the SEC "formally decides among conflicting adversary claims premised on detailed legal arguments." *Med. Comm.*, 432 F.2d at 669–70, 675.

In short, pursuant to Rule 14a-8's "formal procedures," 17 C.F.R. § 202.1(c), the SEC legally compels the company to submit stockholder-proposal disputes, then chooses to treat them as adversarial controversies with full-blown briefing, and resolves them by applying explicit legal standards. Deciding private rights necessarily satisfies *Bennett* prong-two. This is a far cry from mere "investigation and

information gathering," as the SEC has attempted to label it. ECF37 at 22.

Indeed, the entire point of the process is that "'private parties can rely on [the decision] as a norm or safe harbor by which to shape their actions'"—i.e., it provides "'best practices'" for the company—and that alone makes it "final" under *Bennett*. *Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019).

The SEC has previously claimed that a Division decision cannot be final because a company's "management is free to ignore" it. ECF19 at 26–27. But if a company insists on excluding a proposal, the SEC could institute an investigation or lawsuit, *see* ECF37 at 13. At the very least, disregarding the Division's decision "*tend[s] to expose* parties to civil or criminal liability for non-compliance with the agency's view," which is yet another basis for finding finality. *La. State v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016) (emphasis added).

Moreover, the no-action decisions are treated as binding by companies. Petitioners' review of the 2021–22 proxy season reveals that of the 112 instances where the SEC denied no-action relief, the company

complied by including the proposal in their proxy materials in 111.[13] In the one exception, the company agreed to give the proponent the underlying information requested, in exchange for withdrawing the proposal.[14] That means *100%* of the time, the company bowed to the SEC decision to deny Rule 14a-8 no-action relief.

Finality is present for yet another reason: the Division's decisions are "'applied by the agency in a way that indicates it is binding'" within the SEC itself. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015). Petitioners are unaware of any occasion where the Commissioners elected to proceed contrary to what the Division concluded, *see* ECF37 at 35 (SEC claiming this is possible but failing to cite any time when it actually happened). Because the Division's decision is treated as binding at the SEC, the decision is final under *Bennett*. *Texas*, 809 F.3d at 171.

---

[13] Petitioners matched no-action outcomes the SEC marked "include," *see 2021–22 Shareholder Proposal No-Action Responses*, SEC, https://tinyurl.com/sec2021-22, to companies' proxy statements, available at *EDGAR Search*, SEC, https://www.sec.gov/edgar/search/.

[14] *Pfizer Inc.*, 2021 WL 6126545 (SEC No-Action Decision Feb. 10, 2022); *2022 Shareholder Impact Review* 16, As You Sow (2022), https://tinyurl.com/pfizersettle.

To be sure, the SEC theoretically could refuse to issue any decision at all when a company seeks no-action relief, *see* ECF37 at 34–35, but again there apparently is no example of this ever happening, and more importantly this theoretical option does not somehow strip finality where the SEC actually *did* issue a decision, as here.

### 3. THERE IS AN "ORDER."

It is unclear whether the SEC disputes the existence of a Commission "order" on any basis not addressed above. ECF37 at 22–25. If so, the SEC is wrong. Notably, this Court has already twice indicated in its own rulings that this case is on review from an "*Order* of the Securities and Exchange Commission." ECF29-2, 61-2 (emphasis added).

Even setting that aside, there clearly is an order here. The Exchange Act does not define "order," but "[c]ourts sometimes have construed 'order' for purposes of special review statutes more expansively than its definition in the APA" to ensure reviewability even of "informal" rulings. *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 55 (D.C. Cir. 2016). That is warranted here given § 78d-1's broad confirmation of finality for SEC actions, and also because when it comes

to defining an "order," "it is the substance" that matters. *CBS*, <u>316 U.S. at 416</u>.

Concluding—on agency letterhead after full-blown adversarial briefing—that Petitioners' proposal "relates to, and does not transcend, ordinary business matters," and that Kroger may therefore exclude it, JA34, has more than sufficient indicia of finality to qualify as an order. That entails far more formality and process than many agency proceedings that undoubtedly yield reviewable orders.

Even if the APA definition of "order" applied, the outcome is unchanged because "the APA defines 'order' broadly." *S. Cal. Aerial Advertisers' Ass'n v. FAA*, <u>881 F.2d 672, 675</u> (9th Cir. 1989). The written decision here included (1) a "declaratory" disposition, <u>5 U.S.C. § 551(6)</u>, that there is a basis for concluding the Proposal involves only ordinary business matters and thus can be excluded; and (2) an "affirmative" "disposition," *id.*, that the Division will not recommend enforcement if Kroger excludes the Proposal. And that decision was reached only after a formal regulatory process with full-blown adversarial briefing.

Thus, "it would seem entirely consistent with the scheme of the Exchange Act to treat agency determinations under rule 14a-8 as … an 'order' within the meaning of section [78y](a)." Harvard, *supra*, at 861.

## B. SECTION 78D-1 APPLIES—BUT EVEN IF NOT, THIS COURT STILL HAS JURISDICTION.

The SEC has previously tried to escape § 78d-1 altogether by claiming the Commission never delegated authority over the Rule 14a-8 no-action process to the Division, thus never triggering § 78d-1's finality rules for decisions made pursuant to delegated authority. ECF37 at 26–30. This Hail Mary argument implies that Division staff have been issuing no-action decisions for decades, pursuant to detailed regulations issued by the Commission, all without the Commission ever having provided *any* authority to do so. The Court should reject this absurdity.

*First*, the SEC cannot avoid judicial review by letting subordinates issue decisions and then disclaiming that it was done pursuant to any delegation. That charade would eviscerate § 78d-1 and let the SEC do an end-run to avoid judicial review whenever it wished. An agency has no "'power to do indirectly what it cannot do directly'"—i.e., preclude judicial review of subordinates' decisions. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 n.* (2018).

*Second*, the SEC's argument is ultimately irrelevant because if the Commission never delegated Rule 14a-8 no-action authority to the Division, then the Commission itself retains exclusive authority over proxies under 15 U.S.C. § 78n, meaning the Division's decisions *necessarily* represent the Commission's own final orders for judicial review purposes even without resort to § 78d-1. Even under the SEC's view, the Division is the agent communicating the Commission's *own* judicially reviewable decisions, and Petitioners need not even invoke § 78d-1 to trigger this Court's jurisdiction.

The SEC can't have it both ways. The SEC is issuing these decisions, so they must be attributable to the Commission either directly, or indirectly via § 78d-1. Either way, judicial review is available.

*Third*, in any event, "the Commission has in fact delegated its powers in 14a-8 cases to the Division of Corporat[ion] Finance." Hugh Rice Kelly, *Administrative Law*, 49 Tex. L. Rev. 322, 332 n.48 (1971).

Rule 14a-8, which was issued by the Commission (not the Division), refers five different times to the role of "staff" in the no-action process and even says "prior Division letters" are persuasive authority, confirming that the Commission handed this process to the Division Staff

and expected them to issue decisions. Moreover, 17 C.F.R. §§ 202.1(d) and 202.2, which the SEC concedes apply to the Rule 14a-8 process, *see* ECF37 at 28–29, both invoke § 78d-1 for their authority, *see* 76 Fed. Reg. 71,872, 71,875 (Nov. 21, 2011). The SEC has even previously conceded that the no-action process is "recognized by regulation." ECF37 at 27.

This is all inexplicable if the Commission never delegated such authority to the Division in the first place. It is nonsensical to claim the Division has been taking action pursuant to detailed regulations for decades without the Commission ever having authorized the Division to do so.

Resisting the obvious, the SEC has claimed that perhaps § 78d-1 did not "provide[] the authority for each individual subsection" in 17 C.F.R. §§ 202.1(d) and 202.2. ECF37 at 28. This fails, as well. Section 78d-1 is listed as authority for *all* of § 202.1, not just part of it, and in any event § 202.1(d) is the only subsection about the Division's Staff and thus the only subsection that would even need to invoke § 78d-1. Far from helping the SEC, this provides additional evidence for Petitioners' view that the Commission not only delegated no-action authority to the Division but did so *expressly pursuant* to § 78d-1. And § 202.2 has no

subsections at all, so § 78d-1 necessarily provides authority for the entire provision.

Because the Commission delegated the no-action process to the Division in 17 C.F.R. §§ 202.1(d) and 202.2, Petitioners rightfully can invoke 15 U.S.C. § 78d-1 and thereby have the Division's decisions deemed the final decisions of the Commission itself, once the Commission declines review or the time to seek such review has expired.

This conclusion is independently supported by a separate regulation delegating power to the Division to "authorize the use of forms of proxies, proxy statements, or other soliciting material within periods of time less than that prescribed in" relevant regulations, including Rule 14a-8. 17 C.F.R. § 200.30-1(f)(4). The delegation of the power to "authorize the use of proxies" would include the *review* of proxy materials themselves, and the Rule 14a-8 no-action process is part of that "review" because it authorizes an essential part of a company's proxy materials: shareholder proposals. The SEC's own regulations have used the same terminology, confirming that the proxy review power of § 200.30-1(f)(4) includes the no-action process itself. *See Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder*

*Proposals*, [41 Fed. Reg. 29,989](), 29,991 (July 20, 1976) (referring to Rule 14a-8 no-action process as "proxy review").

\* \* \*

At bottom, the SEC never explains how it could be true that the Division has been undertaking review of no-action requests, receiving full adversarial briefing, and issuing decisions on SEC letterhead pursuant to hundreds of pages of intricate regulations, rules, and bulletins—all without ever having been delegated any no-action power by the Commission in the first place. The answer is obvious—the Commission did in fact delegate the power—but is also ultimately irrelevant because even if no such delegation occurred, that simply means the Division's decisions are necessarily those of the Commission itself and thus directly reviewable by this Court, as explained above.

## C. *HECKLER V. CHANEY* DOES NOT BAR REVIEW.

The SEC has also previously argued in passing that the challenged order is unreviewable as a purely discretionary decision. ECF37 at 31–32. That is wrong.

*First*, the no-action letter does far more than announce a decision against executive enforcement. The Division unequivocally concluded

that "the Proposal relates to, and does not transcend, ordinary business matters," and thus could be excluded. JA34. That conclusion is segregable, *Med. Comm.*, 432 F.2d at 673–75, and is "an issue which the agency has effectively resolved and which is appropriate for judicial review," Harvard, *supra*, at 865, especially because the SEC "has never indicated that it takes … prosecutorial factors into consideration at all in rule 14a-8 decisions," *id.* at 851.

*Second*, the bar on reviewing discretionary decisions "is very narrow" and does not apply (1) where the agency itself has issued regulations that provide judicially manageable standards for review, or (2) to constitutional claims. *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 644 (5th Cir. 2021). In prior briefing, the SEC has not disputed that both of these exceptions apply here, as there are detailed SEC regulations on when proposals can be excluded, and Petitioners undoubtedly bring a constitutional claim. *See* ECF1-1 at 11.n.2.

## IV. RECENT EVENTS DO NOT MOOT THE CASE BUT INSTEAD CONFIRM ITS JUSTICIABILITY.

The SEC has also claimed this case is moot because Kroger included the Proposal in its 2023 proxy materials. ECF37. That does not moot the case, as explained below. Indeed, presumably the reason this Court

issued an extended administrative stay was to ensure this case would *not* become moot before a merits panel could hear it. ECF10.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012) (cleaned up). And a case remains live under the "'capable of repetition, yet evading review' doctrine" when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (cleaned up); *see Turner v. Rogers*, 564 U.S. 431, 439–40 (2011).

Both elements are satisfied here, as explained below. It is important to remember that the SEC, not Kroger, is the Respondent in this case, and so what matters is the SEC's consistent course of action in the past when faced with the viewpoint-discrimination proposal, and the SEC's near-guaranteed future decisions agreeing that the proposal can be excluded.

## A. THE SHORT DURATION OF THE PROXY SEASON PRECLUDES FULL REVIEW.

The shareholder proxy season is extraordinarily short, almost always precluding full judicial review before the company must print its proxy materials. This case demonstrates it. In late December 2022, NCPPR timely filed the Proposal with Kroger, which timely sought no-action relief. JA1, JA6. Once the Division concluded the Proposal was excludable, Petitioners promptly sought Commission review, and after that was denied, Petitioners promptly sought emergency relief before this Court, which issued an extraordinarily expedited briefing schedule. Despite all this, there was still no realistic chance of a dispositive ruling before Kroger had to print its annual materials for its June 2023 meeting.

Unsurprisingly, in a similar case, the U.S. District Court for the District of Delaware agreed that the proxy review process is a classic scenario for the capable-of-repetition-yet-evading-review doctrine. *See Trinity Wall St. v. Wal-Mart Stores, Inc.*, 75 F. Supp. 3d 617, 627 (D. Del. 2014). And the Supreme Court held in *Turner*, albeit in a different context, that even a one-year window was too short to ensure full litigation. *Turner*, 564 U.S. at 439–40. The window here is far shorter.

**B. THERE IS A REASONABLE EXPECTATION OF THE SAME ACTION RECURRING.**

There is a reasonable expectation that Petitioners will be subjected to the same SEC action again.

*First*, NCPPR has already submitted the same viewpoint-discrimination proposal to Kroger for its 2024 proxy materials. Add.Ex.A. There is no reason to believe that Kroger will include that proposal. To be sure, Kroger included it in the 2023 proxy materials, but that was only because of this Court's decision to impose an indefinite administrative stay, which deprived Kroger of its no-action decision (otherwise, as discussed above, companies follow the SEC's no-action decisions at a 100% rate), and thus Kroger resorted to the default practice of including a proxy proposal unless the SEC has provided no-action relief. It would be wild speculation to conclude that Kroger suddenly decided for some other, unstated reason to include the Proposal, despite having vigorously fought to receive a Division decision granting no-action relief and stating the Proposal was properly excludable.

*Second*, even setting aside Kroger, the case is not moot. Petitioners challenge the SEC's treatment of its viewpoint-discrimination proposal, and that exact same treatment can (and will) be repeated in the future.

The SEC has previously acknowledged that submitting the same proposal to *other* companies could avoid mootness if the SEC were likely to issue the same no-action decision—but the SEC insisted it is unbelievable that this process would occur again. ECF37 at 20.

But the SEC ignores that over a period of years, NCPPR has a consistent pattern of submitting this exact same viewpoint-discrimination proposal to numerous other companies that have sought and obtained decisions from the SEC blessing the exclusion of the proposal every time:

- *Apple Inc.*, 2019 WL 5420787, at *1 (SEC No-Action Decision Dec. 20, 2019) (asking company to "issue a report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity policy").

- *Salesforce.com, Inc.*, 2020 WL 605941, at *1 (SEC No-Action Decision Mar. 5, 2020) (same).

- *Alphabet Inc.*, 2020 WL 605360, at *1 (SEC No-Action Decision Feb. 24, 2020) (same).

- *Walgreens Boots All., Inc.*, 2020 WL 5656738, at *1 (SEC No-Action Decision Nov. 12, 2020) (same).

- *BlackRock, Inc.*, 2022 WL 225967, at *1 (SEC No-Action Decision Apr. 4, 2022) (same).

Keeping with its years-long practice, NCPPR has already submitted the same proposal again to BlackRock and Walgreens for their *upcoming* proxy seasons (as well as to Kroger, as mentioned above). *See* Add.Decl.A. Petitioners Fischer and Aronoff both own shares in BlackRock and would participate in the no-action process to vindicate their rights to vote on NCPPR's viewpoint-discrimination proposal. *See* Add.Decl.B–C. Further, Fischer submitted the same viewpoint-discrimination proposal to Redfin for 2024. *See* Add.Decl.B. These proposals all remain pending.

And Petitioners intend to keep submitting the same proposal in the future, as well. *See* Add.Decl.A–B. NCPPR will imminently submit the proposal to American Express, Apple, and Alphabet, just as NCPPR has done in the past. *See* Add.Decl.A.

It is in no way "speculative," ECF37 at 20, to conclude that at least one of those companies will seek no-action relief under Rule 14a-8(i)(7) (as has *always* happened when NCPPR submitted the proposal in the past to those very same companies), or that Petitioners will again be on the losing end when the SEC issues decisions blessing the companies' exclusion of that proposal (as the SEC has done every time in the past).

What is truly speculative is that *all* of those companies will suddenly start including the viewpoint-discrimination proposal or that the SEC will suddenly begin saying that all those companies must include the proposal in their proxy materials.

The SEC has previously claimed that no-action decisions "are necessarily specific to the particular proposal and company at issue," so perhaps the Court should treat Kroger's 2023 no-action decision as inherently different from the no-action decisions that will be coming down the pike. *Id.* The Court should not credit this self-serving litigation position because the SEC's own formal legal bulletins say the exact opposite: the SEC "is no longer taking a company-specific approach to evaluating the significance of a policy issue under Rule 14a-8(i)(7)," *SLB-14L, supra.* After all, the entire point is that such proposals "transcend the ordinary business of the company," and thus cannot be company-specific. *Id.* When it comes to Petitioners' viewpoint-discrimination proposal, the SEC's decision is therefore decidedly *not* "specific to the particular proposal and company at issue," ECF37 at 20, no matter what the SEC peddles to this Court in the hopes of avoiding judicial review. It does not matter whether the proposal is submitted to Kroger, Apple,

BlackRock, or any other company. Under its own rules, the SEC *must* treat them all the same.[15]

Given all this, it is almost a guarantee that the SEC will bless companies' requests to exclude Petitioners' pending and future viewpoint-discrimination proposals, regardless of which company is at issue. There is accordingly not just "a reasonable expectation"—but *a near certainty*—that Petitioners will "be subjected to the same action again" by the SEC. *Murphy*, 455 U.S. at 482 (internal citation omitted). The SEC's own rules require as much.

Both requirements of the capable-of-repetition-yet-evading-review doctrine are therefore satisfied, and there remains a live controversy between Petitioners and the SEC.

---

[15] Further, Rule 14a-8 expressly deems "prior Division letters" as persuasive authority when considering other proposals, meaning the Division's prior decisions stating that NCPPR's viewpoint-discrimination proposal is properly excludable will make it even more likely that the SEC grants the same relief in the future. *See* 17 C.F.R. § 240.14a-8(j)(2)(ii).

## C.  Kroger's Decision to Include the Proposal in Its 2023 Materials Confirms the Court Can Redress Petitioners' Harms.

If anything, Kroger's decision to include the proposal in the 2023 proxy materials confirms this Court can provide meaningful relief to Petitioners. Companies must include a proposal unless they report to the SEC that they wish to exclude the proposal. 17 C.F.R. § 240.14a-8(j). Unless companies receive a no-action decision from the SEC, they almost invariably include the proposal; and conversely, when they do receive a no-action decision, they always follow the SEC's lead and exclude the proposal. *See, e.g.*, ECF21 at 12–13.

During the SEC proceedings, Kroger fought to keep the Proposal out of the 2023 proxy materials and received its coveted decision saying the Proposal fell within an exception from inclusion in proxy materials. But Kroger suddenly changed course and included the Proposal just two days *after* this Court issued an indefinite administrative stay of the SEC's no-action decision. By doing so, the Court deprived Kroger of the SEC decision greenlighting exclusion of the Proposal. Kroger had to move forward with printing its materials, so it resorted to the default rule and included the Proposal.

This confirms that if the Court grants the Petition and issues a decision against the SEC's illegal actions, there is at least a fair prospect that it will provide some kind of relief to Petitioners. If nothing else, it would be akin to a declaratory judgment that the SEC's actions are illegal, which is a form of relief for Petitioners' pending and future submissions of the very same viewpoint-discrimination proposal.

## CONCLUSION

The Court should grant the Petition, vacate the SEC's decision, and remand.

July 14, 2023                    Respectfully submitted,

/s/ R. Trent McCotter
R. TRENT MCCOTTER
  *Counsel of Record*
JONATHAN BERRY
MICHAEL BUSCHBACHER
JARED M. KELSON
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

GENE P. HAMILTON
REED D. RUBINSTEIN
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

  *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of this Court using the CM/ECF system, which will serve all parties automatically.

July 14, 2023                    /s/ R. Trent McCotter

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a) because it contains 11,637 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

July 14, 2023                                        /s/ R. Trent McCotter