No. 23-60230

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Petition for Review from an Order
of the Securities and Exchange Commission

## BRIEF OF ALLIANCE DEFENDING FREEDOM AS AMICUS CURIAE IN SUPPORT OF PETITIONERS

JEREMY TEDESCO
MICHAEL ROSS
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jtedesco@adflegal.org
mross@adflegal.org

JAMES A. CAMPBELL
JOHN J. BURSCH
RYAN L. BANGERT
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(616) 450-4235
jcampbell@adflegal.org
jbursch@adflegal.org
rbangert@adflegal.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Under Fed. R. App. P. 26.1 and 5th Cir. R. 26.1, Amicus Curiae Alliance Defending Freedom states that it is a nonprofit organization, has no parent corporation, and does not issue stock. Under 5th Cir. R. 28.2.1, Amicus is unaware of any additional parties not listed in the Appellants' and Appellees' statements of interested parties.

*/s/ John J. Bursch*
John J. Bursch

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF AUTHORITIES................................................... iii

INTEREST OF AMICUS CURIAE..........................................1

SUMMARY OF ARGUMENT ................................................2

ARGUMENT ........................................................................3

I.     The SEC acts as gatekeeper for shareholder proposals based on
       whether they focus on a "significant social policy" issue, and its
       no-action letters interpreting this rule are practically binding......3

II.    The SEC is engaging in viewpoint discrimination by throttling
       religious shareholder proposals but opening the floodgates for
       progressive ESG proposals................................................8

       A.    The prohibition against viewpoint discrimination applies
             to the SEC's regulation of shareholder proposals. .................8

       B.    The SEC is weaponizing the "significant social policy"
             exception against conservative viewpoints...........................11

             1.    The "significant social policy" exception is
                   unworkable because it confers unbridled discretion
                   on SEC officials. ...........................................11

             2.    The SEC is blocking religious views on political
                   giving, political speech, access to financial services,
                   and ESG. ...................................................13

             3.    The SEC is censoring religious views by blocking
                   topics important to people of faith..............................17

CONCLUSION ......................................................................21

CERTIFICATE OF COMPLIANCE........................................23

CERTIFICATE OF SERVICE.................................................24

# TABLE OF AUTHORITIES

## Cases

*Austin v. Consolidated Edison Company of New York,*
   788 F. Supp. 192 (S.D.N.Y. 1992) .................................................... 7

*City of Lakewood v. Plain Dealer Publishing Co.,*
   486 U.S. 750 (1988) ........................................................................ 9

*Cohen v. California,*
   403 U.S. 15 (1971) .......................................................................... 9

*DeBoer v. Village of Oak Park,*
   267 F.3d 558 (7th Cir. 2001) .......................................................... 9

*Forsyth County v. Nationalist Movement,*
   505 U.S. 123 (1992) ........................................................................ 8

*Freedom From Religion Foundation v. Abbott,*
   955 F.3d 417 (5th Cir. 2020) ........................................................ 10

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) .................................................................... 8

*Matal v. Tam,*
   582 U.S. 218 (2017) .................................................................... 8, 10

*McIntyre v. Ohio Elections Commission,*
   514 U.S. 334 (1995) ........................................................................ 8

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) .................................................... 2, 8, 9, 17, 18

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................................................ 9

*Roosevelt v. E.I. Du Pont de Nemours & Co.,*
   958 F.2d 416 (D.C. Cir. 1992) ...................................................... 10

*Rosenberger v. Rector & Visitors of University of Virginia,*
   515 U.S. 819 (1995) ................................................................ 2, 8, 13

*Shuttlesworth v. City of Birmingham,*
  394 U.S. 147 (1969) ............................................................ 2, 9, 11

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ...................................................................... 11

*Southworth v. Board of Regents of University of Wisconsin System,*
  307 F.3d 566 (7th Cir. 2002) ......................................................... 10

*Trinity Wall Street v. Wal-Mart Stores,*
  792 F.3d 323 (3d Cir. 2015) .................................................... 4, 5, 7

## **Statutes**

15 U.S.C. § 78n(a)(1) ........................................................................ 3, 7

## **Other Authorities**

Amelia Lucas, *Keurig Dr Pepper CEO Resigns After Violating
  Company's Code of Conduct*, CNBC (Nov. 10, 2022) ..................... 15

Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in
  SEC No-Action Letters: Current Problems and a Proposed
  Framework*, 83 Cornell L. Rev. 921 (1998) ................................. 6, 7

Freshfields, *Trends and Updates from the 2022 Proxy Season* (July
  2022) ............................................................................................ 21

Jill E. Fisch, *From Legitimacy to Logic: Reconstructing Proxy
  Regulation*, 46 Vand. L. Rev. 1129 (1993) ....................................... 7

Proposed Amendments to Rule 14a–8, Exchange Act Release No.
  19,135, 1982 WL 600869 (Oct. 14, 1982) ...................................... 10

Reilly S. Steel, *The Underground Rulification of the Ordinary
  Business Operations Exclusion*, 116 Colum. L. Rev. 1547
  (2016) ............................................................................................. 6

Sean Peek, *A Culture of Ethical Behavior is Essential to Business
  Success*, Business News Daily (Apr. 28, 2023) .............................. 15

SEC Division of Corporate Finance, Staff Legal Bulletin No. 14A
(July 12, 2002) ............................................................... 4, 12

SEC Division of Corporate Finance, Staff Legal Bulletin No. 14E
(Oct. 27, 2009) ................................................................... 5

SEC Division of Corporate Finance, Staff Legal Bulletin No. 14H
(Oct. 22, 2015) ................................................................ 5, 6

SEC Division of Corporate Finance, Staff Legal Bulletin No. 14L
(Nov. 3, 2021) .................................................................... 5

*Significant*, Dictionary.com ................................................ 12

Stephanie F. Dyson, *The Clash Between Corruption and Codes of
Conduct: The Corporate Role in Forging a Human Rights
Standard*, 17 Conn. J. Int'l L. 335 (2002) ...................... 15

## **Regulations**

17 C.F.R. § 202.1(d) ............................................................ 6

17 C.F.R. § 240.14a-8 .................................................. 3, 7, 14

Exchange Act Release No. 34-12999 (Nov. 22, 1976) ........... 3, 5

Exchange Act Release No. 40018, 63 Fed. Reg. 29106 (May 28,
1998) .............................................................................. 3, 4

Monthly Publication of List of Significant Letters Issued by the
Division of Corporation Finance, Securities Act Release No. 33-
5691, Exchange Act Release No. 34-12222, Trust Indenture Act
Release No. 39-430, 41 Fed. Reg. 13,682 (1976) .............. 7

## INTEREST OF AMICUS CURIAE[1]

Amicus Alliance Defending Freedom is the world's largest legal organization committed to protecting free speech and religious freedom. ADF promotes these fundamental freedoms at corporations through its Viewpoint Diversity Score Business Index, the first comprehensive benchmark that measures corporations' respect for free speech and religious freedom. ADF also works with shareholders of publicly traded corporations to file shareholder proposals on these issues and to address the growing illiberalism and cancel-culture prevalent within corporate America.

Like Petitioners, ADF is concerned that the SEC is discriminating against shareholders based on viewpoint. Although the SEC has opened the floodgates for shareholder resolutions from progressive-minded proponents, it routinely closes the proxy statement door to proposals that advance policies favored by religious proponents. This discrimination impairs ADF's ability to advocate for shareholder resolutions that promote responsible corporate governance by protecting fundamental freedoms in the workplace, marketplace, and public square.

---

[1] The SEC has withheld consent to the filing of this brief, so ADF is submitting a motion for leave to file this brief. No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

## SUMMARY OF ARGUMENT

Shareholder proposals are the modern forum for shareholder suffrage. By lobbying corporations with proposals at their annual shareholder meetings, shareholders can enact lasting change at companies and rightly take their place in corporate governance. The SEC is the gatekeeper for—and supposed protector of—shareholder rights. Under SEC Rule 14a-8, publicly traded corporations can exclude proposals that deal with day-to-day "ordinary business matters." But if the SEC determines that a proposal focuses on a "significant social policy issue," the company must include it. The SEC is employing this vague language to engage in viewpoint discrimination.

The SEC's action against Petitioner NCPPR's proposal is part of a larger pattern and practice of viewpoint discrimination. First, the "significant social policy" standard falls well short of the "narrow, objective, and definite" limitations required to enact a viewpoint-neutral prior restraint on speech. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). Second, the SEC excludes "particular views taken by speakers on [ ] subject[s]" like codes of conduct and ESG (environmental, social, and governance). *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And third, the SEC greenlights ESG proponents' submissions while screening "disfavored subjects" important to religious shareholders. This double standard is classic viewpoint-based censorship. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992).

# ARGUMENT

**I.    The SEC acts as gatekeeper for shareholder proposals based on whether they focus on a "significant social policy" issue, and its no-action letters interpreting this rule are practically binding.**

One of the cornerstones of corporate democracy is shareholder voting. Most voting is done not in person, but on proxy ballots that companies send in advance of their annual shareholder meetings. Shareholders can submit proposals to be included on those ballots, and other shareholders can vote on whether to approve them. As part of the Securities and Exchange Act of 1934, Congress tasked the SEC with prescribing "rules and regulations" for proxy solicitations "as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). The SEC in turn promulgated Rule 14a-8 (17 C.F.R. § 240.14a-8), which requires companies to put shareholder proposals on the proxy ballot unless the company can show the proposal meets one of 13 enumerated grounds for excluding it.

One ground companies commonly assert for exclusion is that a proposal "deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). Yet the SEC reads into this exclusion an exception for "proposals relating to such matters but *focusing on sufficiently significant social policy issues*." Exchange Act Release No. 40018, 63 Fed. Reg. 29106, 29108 (May 28, 1998) (emphasis added); *see also* Exchange Act Release No. 34-12999 (Nov. 22, 1976). In

general, the SEC applies these standards to exclude proposals on the types of services and products offered, customer relationships, and other "mundane matters," but it protects proposals that focus on issues like discrimination, human rights, or otherwise guide "high level decision-making." *Trinity Wall St. v. Wal-Mart Stores*, 792 F.3d 323, 338 (3d Cir. 2015).

There is little caselaw on these terms and *Trinity Wall Street* is the only appellate case in recent history on the issue. "[F]rom the beginning, Rule 14a–8 jurisprudence—both in quality and quantity—has rested almost exclusively with the SEC." *Id.* at 337 (citation omitted). In particular, the legal bulletins and no-action decisions of the SEC Staff for the Division of Corporate Finance ("Staff") contain the vast majority of relevant regulations and evidence of how they are interpreted and enforced in the SEC's unfettered discretion.

To determine whether a proposal focuses on a significant social policy, the Staff assesses whether the proposal deals with what Staff consider an issue of "broad societal impact," Exchange Act Release No. 40018, 63 Fed. Reg. 29106, 29108 (May 21, 1998), and whether there is "widespread public debate," SEC Division of Corporate Finance, Staff Legal Bulletin No. 14A (July 12, 2002).[2] The Staff used to require a "nexus" between the company and the social significance of the policy

---

[2] SEC Staff Legal Bulletins are available at https://www.sec.gov/regulation/staff-interpretations/legal-bulletins.

(e.g., nuclear power plants raise safety concerns). SEC Division of Corporate Finance, Staff Legal Bulletin No. 14E (Oct. 27, 2009); *see* Exchange Act Release No. 34-12999 (Nov. 22, 1976). But the Staff rescinded these limitations in a recent 2021 bulletin. The Staff stated there that "undue emphasis was placed on evaluating the significance of a policy issue to a particular company at the expense of whether the proposal focuses on a significant social policy." SEC Division of Corporate Finance, Staff Legal Bulletin No. 14L (Nov. 3, 2021). Accordingly, "staff will no longer focus on determining the nexus between a policy issue and the company, but will instead focus on the social policy significance of the issue that is the subject of the shareholder proposal." *Id.*

In 2015, the Staff also rejected the Third Circuit's analytical framework for the "significant social policy" exception from *Trinity Wall Street*. SEC Division of Corporate Finance, Staff Legal Bulletin No. 14H (Oct. 22, 2015). The Third Circuit's framework made it harder for resolutions to qualify for the significant social policy exception by holding that a resolution must not only focus on significant social policy issues but also "transcend" ordinary business matters. *Trinity Wall St.*, 792 F.3d at 346–47. The Staff noted their concern "that the new analytical approach introduced by the Third Circuit goes beyond the Commission's prior statements and may lead to the unwarranted exclusion of shareholder proposals," so they affirmed that they would "continue to

apply Rule 14a-8(i)(7) as articulated by the Commission and consistent with the Division's prior application of the exclusion." Bulletin No. 14H.

The Staff apply these bulletins through their no-action letters. Although the SEC and its Staff say these are merely advisory, the letters are practically binding. "Virtually every company that wishes to omit a proposal requests a no-action letter (NAL) concurrently with its required submission to the SEC." Reilly S. Steel, *The Underground Rulification of the Ordinary Business Operations Exclusion*, 116 Colum. L. Rev. 1547, 1552 (2016). The Commission does not appear to have ever prosecuted a company for excluding a shareholder proposal if the SEC Staff has issued no-action relief. *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921, 943 (1998).

Other factors underscore the letters' binding nature. There is little litigation over shareholder proposals and no-action letters. Steel, *supra,* at 1554 (observing that only one case was litigated for over 200 staff no-action letters in 2015). The Commission and its Staff will rehear or take an appeal of a no-action letter, but only within its discretion and for matters of "substantial importance . . . where the issues are novel or highly complex." 17 C.F.R. § 202.1(d). In practice, the Commission handles only a few appeals each year. Courtney E. Bartkus, *Appealing No-Action Response under Rule 14a-8: Informal Procedures of the SEC*

6

*and the Availability of Meaningful Review*, 93 Denver L. Rev. 199, 203 (2016) (assessing data from 2005–2015).

The Commission and its Staff also urge companies to rely on no-action letters. 17 C.F.R. § 240.14a-8(j)(2)(ii) (requesting that companies' no-action requests refer to prior NALs as "authority"); Monthly Publication of List of Significant Letters Issued by the Division of Corporation Finance, Securities Act Release No. 33-5691, Exchange Act Release No. 34-12222, Trust Indenture Act Release No. 39-430, 41 Fed. Reg. 13,682, 13,682 (1976) (announcing the monthly publication of a list of "significant" NALs); Intervenor's Opp'n to Mot. to Dismiss 10–12, ECF No. 46.

All of these factors mean that no-action letters exert enormous influence on third parties' interpretation of the significant social policy exception. That is why practitioners treat no-action letters as "de facto law," Nagy, *supra*, at 924–25; courts often rely on them, *see, e.g.*, *Trinity Wall St.*, 792 F.3d at 342–43; *Austin v. Consol. Edison Co. of N.Y.*, 788 F. Supp. 192, 195 (S.D.N.Y. 1992); and scholars have described them as a "common law" for Rule 14a-8, Jill E. Fisch, *From Legitimacy to Logic: Reconstructing Proxy Regulation*, 46 Vand. L. Rev. 1129, 1151 (1993).

Ironically, the no-action letters themselves contain scant analysis, often offering little more than a brief mention of the ground for exclusion or whether the significant social policy exception applies.

## II. The SEC is engaging in viewpoint discrimination by throttling religious and conservative shareholder proposals but opening the floodgates for progressive ESG proposals.

### A. The prohibition against viewpoint discrimination applies to the SEC's regulation of shareholder proposals.

The prohibition against viewpoint discrimination is a "core postulate of free speech law." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). It prevents governments from regulating speech "because of the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger*, 515 U.S. at 820. Viewpoint discrimination is an "egregious form of content discrimination," *id.* at 829, which is already "presumptively invalid," *R.A.V.*, 505 U.S. at 382. And it is "poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring).

The Supreme Court defines "the term 'viewpoint' discrimination in a broad sense." *Matal v. Tam*, 582 U.S. 218, 243 (2017). The rule against such discrimination prohibits the government from allowing speech based on one "political, economic, or social viewpoint" but not other views on the same topics. *Rosenberger*, 515 U.S. at 831. It prohibits excluding views because the government deems them "unpopular," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or because of a perceived hostile reaction to the views expressed, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

Even if a government regulates content in a way that is generally permissible, it cannot do so when the government's motive is to silence a

particular viewpoint. So the government may never regulate content when it acts based on hostility toward the speaker's views. *R.A.V.*, 505 U.S. at 384; *cf. Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (facially content-neutral law is invalid if "adopted by the government because of disagreement with the message the speech conveys") (citation omitted).

In short, the government should be "putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity." *Cohen v. California*, 403 U.S. 15, 24 (1971). Put another way, the government should be "acting with indifference to the viewpoints of speakers in its forums." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 571 (7th Cir. 2001).

When dealing with prior restraints on speech, the government must not only abstain from viewpoint discrimination, it must also employ "narrow, objective, and definite" standards to prevent viewpoint discrimination in the first place. *Shuttlesworth*, 394 U.S. at 150–51. This reflects the risk that administrators with broad (or non-existent) criteria guiding their decisions "may decide who may speak and who may not based upon the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988). In other words, broad discretion enables discrimination. Courts have thus recognized that "the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement." *Southworth v. Bd.*

*of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002); *see Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) ("[T]here is broad agreement that, even in limited and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment.").

In *Matal* and *Iancu*, the Supreme Court unanimously held that this rule applies to traditional areas of commerce. In those cases, the Court struck down Lanham Act statutes prohibiting trademarks that are "disparaging" or "scandalous or immoral." As the *Matal* concurrence observed, "[i]t is telling that the Court's precedents have recognized just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf." 582 U.S. at 253 (Kennedy, J., concurring).

Here, the rule against viewpoint discrimination, including the prohibition against unbridled discretion, applies with full force. Like the Lanham Act, Rule 14a-8 regulates commercial activity that is inherently expressive. The SEC itself describes "the proxy solicitation process . . . [as] the forum for shareholder suffrage." Proposed Amendments to Rule 14a–8, Exchange Act Release No. 19,135, 1982 WL 600869, at *2 (Oct. 14, 1982); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 422 (D.C. Cir. 1992) (quoting 1982 Proposing Release). And the "significant social policy" exception creates a space for "speech on matters of public

concern," which lies "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up).

### B. The SEC is weaponizing the "significant social policy" exception against religious and conservative viewpoints.

The SEC is violating the rule against viewpoint discrimination under the "significant social policy" exception in three ways. First, the "significant social policy" exception—which does not even appear in the text of Rule 14a-8—employs nothing close to "narrow, objective, and definite" standards sufficient to limit SEC officials' discretion. Second, the SEC is throttling religious viewpoints but promoting progressive viewpoints on the same and similar "social policies." And third, the SEC is prohibiting discussion on many topics important to religious shareholders while allowing the discussion of topics important to others. While censoring topics alone ordinarily qualifies as content-based discrimination, censoring a set of topics important to religious views is viewpoint-based discrimination, plain and simple.

### 1. The "significant social policy" exception is unworkable because it confers unbridled discretion on SEC officials.

The SEC has issued no "narrow, objective, and definite" criteria to restrain officials' discretion in determining which shareholder proposals qualify as significant policy issues. *Shuttlesworth*, 394 U.S. at 151. The determination is based solely on the subjective judgment of the SEC staff.

To determine whether an issue is "significant," an SEC official must consider how popular it is. *See Significant*, Dictionary.com, https://www.dictionary.com/browse/significant ("1. important and deserving of attention; of consequence; 2. relatively large in amount or quantity"). Indeed, the SEC concedes that when conducting its analysis, it asks whether an issue implicates a "widespread public debate." SEC Division of Corporate Finance, Staff Legal Bulletin No. 14A (July 12, 2002).

But allowing government officials to assess the "significance" of speech is a recipe for viewpoint discrimination and actions that skew the marketplace of ideas. Yet this is precisely what the "significant social policy" exception empowers SEC staff to do.

Also, whether an issue is sufficiently "social" is contentious. Under the standard ESG framework, most commentators put climate-reform initiatives under the "environmental" and not the "social" category. But the SEC seems to consider those social issues. Conversely, the SEC has blocked resolutions criticizing the focus on social issues over financial return, seemingly because they are not sufficiently "social." As things stand, SEC officials can interpret "social" however expansively, narrowly, or inconsistently they wish.

In sum, the "significant social policy" exception is vague, subject to widely varying interpretations, and ultimately unworkable.

### 2. The SEC is blocking religious and conservative views on political giving, political speech, access to financial services, and ESG.

Petitioners already cover some of the worst examples of viewpoint discrimination: equal employment proposals, misinformation proposals, and firearms proposals. Pet'rs' Br. 34–36, ECF No. 62. But the SEC is also blocking religious shareholder proposals on other topics while allowing pro-ESG proposals on those same topics. This targeting of "particular views taken by speakers on a subject" is textbook viewpoint discrimination. *Rosenberger*, 515 U.S. at 829. These examples also underscore how unworkable the "significant social policy" exception is.

### a. Political giving and speech

The SEC is also using the "significant social policy" exception to discriminate against religious shareholder proposals asking about companies' political spending and speech.

Last year, the agency rejected a resolution asking how a company's "public display of the pride flag has impacted current, and to the extent reasonable, past and prospective employees' view of the company as a desirable place to work." SEC Division of Corporate Finance, *No-Action Letter on Intel Corp.* (Mar. 18, 2022).[3] This is difficult to square with its approval of resolutions that asked (1) Johnson & Johnson "whether the

---

[3] Later citations to no-action decisions will contain only the company name and date and, if necessary to clarify, the shareholder filing the proposal. SEC no-action decisions are available at https://www.sec.gov/corpfin/2022-2023-shareholder-proposals-no-action.

Company's lobbying activities align with [it] Position on Universal Health Care Coverage" and (2) biopharmaceutical company Gilead Sciences "whether the Company's lobbying activities . . . align with its Vision statement and Product Pricing and Patent Access Policy Position." *Johnson & Johnson* (Mar. 4, 2022); *Gilead Sciences, Inc.* (Mar. 14, 2022).

The SEC also rejected two proposals from religious shareholder and investment advisor David Bahnsen asking corporations for their reports (1) "analyzing [public] policy endorsement made in recent years" and (2) "analyzing whether the policies advocated can rigorously be established to be of pecuniary benefit to the Company." *McDonald's Corporation* (Apr. 3, 2023); *Walmart Inc.* (Apr. 10, 2023). The SEC said these proposals "micromanaged" the companies and therefore "relat[ed] to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). But it allowed under the "significant social policy" exception two resolutions from left-leaning groups asking that their companies "consider" listing even more burdensome disclosures around company donations and lobbying efforts. *The Walt Disney Co.* (Jan. 12, 2022); *The Kroger Co.* (Apr. 25, 2023).

### b. Access to financial services

Last year, the SEC denied a proposal asking PayPal how denying services to religious and political conservatives "comported with its code of business conduct and ethics," which states that "managing and moving

money is a right for all citizens" and that "[w]e have an obligation to empower people to exercise this right." *PayPal Holdings, Inc.* (Apr. 7, 2022). Incredibly, the SEC said this proposal did not focus on a significant social policy issue. But it has found the opposite for proposals asking other companies to comply with their own codes of conduct for animal rights and net zero emissions. *Brinker Int'l, Inc.* (Sept. 15, 2022); *Citigroup, Inc.* (Mar. 7, 2022); *Harford Fin. Serv. Grp.* (Mar. 28, 2022).

In a world of unfettered regulatory discretion, the SEC may say that politicized financial services is not significant but animal rights and net zero emissions are. Yet ensuring a company complies with its own policies, including its code of conduct, is itself a significant social issue of corporate governance and self-regulation. *See generally* Stephanie F. Dyson, *The Clash Between Corruption and Codes of Conduct: The Corporate Role in Forging a Human Rights Standard*, 17 Conn. J. Int'l L. 335 (2002); *see, e.g.*, Sean Peek, *A Culture of Ethical Behavior is Essential to Business Success*, Business News Daily (Apr. 28, 2023), bit.ly/3DjDT0C; Amelia Lucas, *Keurig Dr Pepper CEO Resigns After Violating Company's Code of Conduct*, CNBC (Nov. 10, 2022), https://cnb.cx/3Dibwjl.

### c. Resolutions complaining about ESG

The SEC is also engaging in viewpoint discrimination by blocking resolutions that criticize ESG. According to the agency, proposals that complain about the effect of ESG prioritization on financial returns do

not raise a "significant policy issue." Yet the SEC has permitted resolutions explicitly asking a company to prioritize ESG factors over its own financial returns under the same exception. For example, the SEC has found that each of these proposals focuses on a significant social policy issue:

- Proposal to adopt stewardship practices "designed to curtail corporate activities that externalize social and environmental costs . . . even if such curtailment could decrease returns as the externalizing company." *BlackRock, Inc.* (McRitchie) (Apr. 4, 2022).

- Proposal seeking a report on "whether the Company participates in compensation and workforce practices that prioritize Company financial performance over the economic and social costs and risks created by inequality and racial gender disparities." *Tractor Supply Co.* (Mar. 9, 2022).

- Request for a report on "the link between the public-health costs created by the Company's food, beverage, and candy business and its prioritization of financial returns over its healthcare purpose." *CVS Health Corp.* (Mar. 15, 2022).

- Proposal for a report on "risks created by Company business practices that prioritize internal financial return over healthy

social and environmental systems." *Meta Platforms, Inc.* (HEST)
(Apr. 2, 2022).

But the SEC says the exception does not apply to multiple
resolutions asking whether companies could imperil financial returns
when they deny customers financial services, *JPMorgan Chase & Co.*
(NCPPR) (Mar. 21, 2023); *MetLife, Inc.* (Apr. 24, 2023), deny news
networks television coverage, *AT&T Inc.* (NCPPR) (Mar. 15, 2023), make
public policy endorsements on divisive issues, *McDonald's Corp.*
(Bahnsen) (Apr. 3, 2023); *Walmart Inc.* (Bahnsen) (Apr. 10, 2023), or
participate in political organizations like the World Economic Forum.
*Johnson & Johnson* (NLPC) (Mar. 2, 2023). The SEC is clearly favoring
only one set of views on the topic of ESG.

### 3.    The SEC is censoring religious views by blocking topics important to people of faith.

The SEC discriminates among different viewpoints within topics; it
also chooses which topics are significant based on viewpoint. It has
blocked discussion on multiple topics important to religious (and
conservative) shareholders but opened the floodgates for the topics of
ESG proponents.

This is a form of viewpoint discrimination like the one invalidated
in *R.A.V.* There, Minnesota had an ordinance prohibiting "bias-
motivated" crimes that "arouse[] anger, alarm or resentment in others"
based on certain protected classifications. 505 U.S. at 380–81. The

statute regulated "fighting words," which is an exception to the general prohibition against content-based regulation. *Id.* at 381. But the Supreme Court still invalidated the ordinance because it discriminated against a set of topics in a viewpoint-discriminatory manner:

> Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use fighting words in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers *who express views on disfavored subjects.*

*Id.* at 391–92 (cleaned up, emphasis added). So too here. The SEC purports to regulate based on "significant social policy" topics, but it is discriminating against "those speakers who express views on disfavored subjects"—conservative and religious shareholders.

The SEC is not stingy about considering ESG topics "significant." In the 2022 and 2023 proxy seasons alone, SEC Staff have found that the following are significant social policy issues: censorship of misinformation,[4] tracking of firearms and ammunition sales,[5] support for military and police,[6] prioritizing of "internal financial return over healthy

---

[4] *Alphabet Inc.* (Mims Trust) (Apr. 12, 2022) (report "evaluating the efficacy of the Company's existing policies and practices to address the human rights impacts of its content management policies to address misinformation and disinformation across its platforms").

[5] *Mastercard Inc.* (Apr. 22, 2022); *Mastercard Inc.* (Apr. 25, 2023).

[6] *Alphabet Inc.* (Feigen) (Apr. 12, 2022).

environmental and social systems,"[7] the effect of state abortion laws on stakeholders,[8] affordable health care,[9] disclosure of lobbying and political statements,[10] child labor,[11] "civil rights" and "human rights,"[12] and

---

[7] *Meta Platforms, Inc.* (HEST) (Apr. 2, 2022); *see also BlackRock, Inc.* (McRitchie) (Apr. 4, 2022); *Tractor Supply Co.* (Mar. 9, 2022); *CVS Health Corp.* (Mar. 15, 2022).

[8] *See, e.g., The TJX Co., Inc.* (Trillium) (Apr. 15, 2022) (report on "enacted or proposed state policies severely restricting reproductive rights").

[9] *See, e.g., Johnson & Johnson* (Feb. 8, 2022) (report on "public health costs created by the limited sharing of the Company's COVID-19 vaccine technologies and any consequent reduced availability in poorer nations"); *Pfizer Inc.* (Feb. 24, 2022) (same).

[10] *The Walt Disney Co.* (Jan. 12, 2022) ("[C]onsider listing on the Company website any recipient of $10,000 or more of direct contributions, excluding employee matching gifts"); *The Kroger Co.* (Apr. 25, 2023) (same).

[11] *Mondelez Int'l, Inc.* (Mar. 30, 2023) (request to "adopt targets and publicly report quantitative metrics appropriate to assessing whether the Company is on course to eradicate child labor in all forms from the Company's cocoa supply chain by 2025").

[12] *See, e.g., Verizon Commc'n Inc.* (Milloy) (Mar. 17, 2022) (civil rights audit "analyzing the adverse impact of the Company's policies and practices on the civil rights of Company stakeholders"); *McDonald's Corp.* (Apr. 5, 2022) (report "on the general nature and extent to which corporate operations involve or depend on China, which may raise human rights and other concerns").

animal rights.[13] The SEC has also endorsed myriad proposals on consumer rights[14] and employee rights.[15]

But the SEC has found the opposite for topics like viewpoint discrimination in employment,[16] the financial impact of making political statements on divisive issues,[17] government coercion of financial institutions to deny services to particular customers,[18] and companies limiting customer speech.[19]

---

[13] *See, e.g.*, *Brinker Int'l, Inc.* (Sept. 15, 2022) (report on practices relating to animal welfare "in its supply chain which violate its supplier code of conduct, including how each practice violates the code, how prevalent each practice is in the Company's supply chain, and what steps, if any, the Company is taking to eliminate each area of misalignment").

[14] *The TJX Co.* (IBTGF) (Apr. 15, 2022) (report assessing the "financial, reputational, and human rights risks resulting from the use in the Company's supply chain and distribution networks of companies that misclassify employees as independent contractors"); *Lowe's Co., Inc.* (IBTGF) (Apr. 7, 2022) (same); *CVS Health Co.* (Mar. 18, 2022) (a recommendation to "adopt and publicly disclose a policy that all employees, part- and full-time, accrue some amount of paid sick leave"); *Amazon.com, Inc.* (Apr. 6, 2022) ("audit on workplace health and safety"); *Dollar General Corp.* (Mar. 31, 2023) (third-party audit "on the impact of the Company's policies and practices on the safety and well-being of workers").

[15] *Meta Platforms* (Cortese) (Apr. 2, 2022) (report on "potential psychological and civil and human rights harms to users that may be caused by the use and abuse" of the metaverse VR project); *Alphabet Inc.* (Hardy) (Apr. 15, 2022) (annual report explaining how it is "managing risks associated with user data collection, privacy, and security"); *American Express Co.* (Mar. 9, 2023) (report on potential risks of "fulfilling information requests . . . for enforcing state laws criminalizing abortion access").

[16] The subject of this litigation.

[17] *Intel Corp.* (Mar. 18, 2022) (report on whether public display of pride flag has impacted employees' view of the company as a desirable place to work).

[18] *Wells Fargo & Co.* (Mar. 2, 2023) (report on risks of government asking company to cancel services to customers); *MetLife, Inc.* (Apr. 24, 2023) (same).

[19] *PayPal Holdings, Inc.* (Apr. 10, 2023) (request that "the board revise the Company's transparency reports to provide clear explanations of the number and categories of

Additional data confirm the SEC's viewpoint bias. Petitioners already observe that the SEC has granted no-action relief against conservative proposals at a higher rate (72%) than all left-leaning proposals (46%) since 2018. Pet'rs' Br. 36, ECF No. 62. Worse yet, since the SEC delimited "significant social policy" in 2021, the discrimination is even more exacerbated: in the 2021–2022 proxy season, the SEC granted no-action relief against conservative proposals 50% of the time and a mere 17% for all other social policy proposals. Freshfields, *Trends and Updates from the 2022 Proxy Season* 22 (July 2022).

Together, the disparate no-action rates and the SEC's viewpoint discrimination in determining which topics are "significant social policy" issues reveal a broad pattern of discrimination against religious (and conservative) viewpoints.

## CONCLUSION

The SEC is discriminating against Petitioners and other conservative and religious views under the "significant social policy" exception for shareholder proposals. Petitioners show the disparate treatment among equal employment resolutions and gun rights. But the SEC is also discriminating against resolutions focusing on political contributions and speech, addressing access to financial services, and criticizing ESG. It is blocking topics important to religious shareholders

---

account suspensions and closures that may reasonably be expected to limit freedom of expression or access to information or financial services").

while blessing nearly every pro-ESG topic. At bottom, the "significant social policy" rule is hopelessly flawed because it invites SEC officials to make subjective and arbitrary judgments.

Respectfully submitted,

By: */s/ John J. Bursch*

JEREMY TEDESCO
MICHAEL ROSS
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jtedesco@adflegal.org
mross@adflegal.org

JAMES A. CAMPBELL
JOHN J. BURSCH
RYAN L. BANGERT
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(616) 450-4235
jcampbell@adflegal.org
jbursch@adflegal.org
rbangert@adflegal.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because it contains 4,910 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Dated: July 21, 2023

*/s/ John J. Bursch*
John J. Bursch
Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ John J. Bursch*
John J. Bursch
Counsel for Amicus Curiae
