No. 23-60230

# In the United States Court of Appeals for the Fifth Circuit

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Petition for Review from an Order
of the Securities and Exchange Commission

**BRIEF OF INTERVENOR
THE NATIONAL ASSOCIATION OF MANUFACTURERS**

Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001

Michael A. Tilghman II
NAM LEGAL CENTER
733 10th Street, NW
Suite 700
Washington, DC 20001

Scott A. Keller
Matthew H. Frederick
Todd Disher
Alexis Swartz
LEHOTSKY KELLER COHN LLP
919 Congress Avenue
Suite 1100
Austin, TX 78701
scott@lkcfirm.com
(512) 693-8350

*Counsel for Intervenor*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-60230

National Center for Public Policy Research; Nathaniel Fischer;
Phillip Aronoff,
*Petitioners*,
*v.*
Securities and Exchange Commission,
*Respondent*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Intervenor the National Association of Manufacturers has no parent corporations and no publicly held corporation owns 10% or more of its respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners:**
National Center for Public Policy Research; Nathaniel Fischer; Phillip Aronoff

**Counsel for Petitioners:**
R. Trent McCotter (lead counsel)
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES PLLC

Gene Patrick Hamilton
AMERICA FIRST LEGAL FOUNDATION

**Respondent:**
Securities and Exchange Commission

**Counsel for Respondent:**
Theodore J. Weiman (lead counsel)
Megan Barbero
Michael A. Conley
Tracey A. Hardin
SECURITIES AND EXCHANGE COMMISSION

**Intervenor:**
National Association of Manufacturers

**Counsel for Intervenor:**
Scott A. Keller (lead counsel)
Steven P. Lehotsky
Matthew H. Frederick
Todd Disher
Alexis Swartz
LEHOTSKY KELLER COHN LLP

Michael A. Tilghman II
NAM LEGAL CENTER

**Interested Third Party:**
The Kroger Co.

/s/ *Scott A. Keller*
SCOTT A. KELLER
*Counsel of Record for Intervenor*

## STATEMENT REGARDING ORAL ARGUMENT

Under Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a)(1), Intervenor the National Association of Manufacturers ("NAM") respectfully requests oral argument and submits that argument will assist the Court's consideration of the important statutory and constitutional issues presented in this case. The NAM's position is that the petition for review should be denied, but for reasons that the Respondent Securities and Exchange Commission ("SEC") does not support. Accordingly, the NAM asks for separate oral argument time to present its arguments why the SEC lacks the authority under both the First Amendment and the federal securities laws to require Kroger to include Petitioners' policy proposal on Kroger's proxy statement at the company's expense.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................................ i

Statement Regarding Oral Argument ................................................... iii

Table of Authorities ............................................................................. vi

Introduction ........................................................................................... 1

Statement of Jurisdiction ...................................................................... 3

Issues Presented .................................................................................... 3

Statement of the Case ........................................................................... 3

    A.   Corporations are more like republics than direct democracies. ............................................................................ 3

    B.   Corporations use proxy-vote solicitations to obtain voting authority from absent shareholders. .................................. 5

    C.   Congress granted the SEC limited authority to regulate proxy statements. ...................................................................... 8

    D.   The SEC's Rule 14a-8 imposes direct democracy on the corporation's proxy solicitation. ........................................... 9

    E.   Activist groups overburden manufacturers with proposals designed to push ideological agendas. ...................... 12

    F.   The SEC uses Rule 14a-8 to force companies to include activist proposals on company proxy statements. ..................... 17

    G.   Petitioner NCPPR's shareholder proposal. ................................. 18

Summary of the Argument ................................................................... 20

Argument ............................................................................................. 23

   I.   Rule 14a-8 violates the First Amendment. ........................................ 23

    A.   Rule 14a-8 unconstitutionally compels corporations to include shareholders' speech within the companies' own speech on their own proxy statements at the companies' expense. ....................................................... 24

B.  The corporate proxy-statement speech receives full
First Amendment protection............................................................31

II. The SEC does not have statutory authority under 15 U.S.C.
§ 78n to compel corporations to disseminate shareholder
speech in corporate proxy solicitations.................................................41

A.  The text of 15 U.S.C. § 78n does not empower the SEC
to superintend corporate subsidization and
dissemination of shareholder speech. ...........................................42

B.  Clear-statement canons of construction also foreclose
the SEC's statutory interpretation behind Rule 14a-8.................47

Conclusion..................................................................................................54

Certificate of Service ..............................................................................55

Certificate of Compliance ......................................................................55

# TABLE OF AUTHORITIES

Page(s)

## Cases

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023)................................................................20, 25

*Aaron v. SEC,*
  446 U.S. 680 (1980)........................................................................45

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.,*
  140 S. Ct. 2082 (2020)................................................................20, 26

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021)....................................................................51

*Amalgamated Clothing & Textile Union v. Wal-Mart Stores, Inc.,*
  821 F. Supp. 877 (S.D.N.Y. 1993) ........................................................5

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021)....................................................................28

*Apache Corp. v. Chevedden,*
  696 F. Supp. 2d 723 (S.D. Tex. 2010) ..............................................27, 29

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011)....................................................................25, 30

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989)........................................................................31

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023)....................................................................52

*Buckley v. Valeo,*
  424 U.S. 1 (1976)..................................................................25, 26, 30

*Burks v. Lasker*,
   441 U.S. 471 (1979).......................................................................50

*Bus. Roundtable v. SEC*,
   905 F.2d 406 (D.C. Cir. 1990).........................................28, 42, 44, 45

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980)................................................................30, 32

*Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993)................................................................21, 31

*Citizens United v. FEC*,
   558 U.S. 310 (2010).......................................................................25

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987)...................................................................2, 50

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).......................................................................40

*Dyer v. SEC*,
   266 F.2d 33 (8th Cir. 1959).............................................................49

*Edenfield v. Fane*,
   507 U.S. 761 (1993).......................................................................37

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades
   Council*,
   485 U.S. 568 (1988).......................................................................48

*Express Oil Change, LLC v. Miss. Bd. of Licensure for Pro. Eng'rs &
   Surveyors*,
   916 F.3d 483 (5th Cir. 2019)............................................................32

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).......................................................................52

*In re Franchise Servs. of N. Am., Inc.,*
    891 F.3d 198 (5th Cir. 2018) .................................................................2, 4

*Freedman v. Redstone,*
    753 F.3d 416 (3d Cir. 2014) ......................................................................50

*Gearlds v. Entergy Servs., Inc.,*
    709 F.3d 448 (5th Cir. 2013) .....................................................................38

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ...................................................................................53

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) .........................................................................45, 48

*Herpich v. Wallace,*
    430 F.2d 792 (5th Cir. 1970) ...............................................................50, 51

*Hooper v. Mountain States Sec. Corp.,*
    282 F.2d 195 (5th Cir. 1960) .....................................................................42

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) ........................................................................20, 26, 34

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.,*
    448 U.S. 607 (1980) .............................................................................45, 48

*Int'l Ass'n of Machinists & Aerospace Workers v. FEC,*
    678 F.2d 1092 (D.C. Cir. 1982) .................................................................39

*J.I. Case Co. v. Borak,*
    377 U.S. 426 (1964) ..................................................................1, 8, 22, 43

*Jama v. ICE,*
    543 U.S. 335 (2005) ...................................................................................46

*Jana Master Fund, Ltd. v. CNET Networks, Inc.,*
    954 A.2d 335 (Del. Ch. 2008) ...............................................................7, 27

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*,
  138 S. Ct. 2448 (2018)........................................................20, 21, 25, 26

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991).......................................................................50

*Lowe v. SEC*,
  472 U.S. 181 (1985)................................................................31, 48

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)................................................................25, 30

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)................................................................36, 37

*Morgan Stanley Capital Grp. Inc. v. Pub. Utils. Dist. No. 1*,
  554 U.S. 527 (2008).....................................................................24

*NAACP v. FPC*,
  425 U.S. 662 (1976).....................................................................45

*Nat'l Ass'n of Mfrs. v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014)............................................22, 31, 37

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015)..............................22, 31, 34, 35, 37

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018)..........................................................28, 34, 37

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022).......................................................24, 34

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969).....................................................................39

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978)................................................................36, 37

ix

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,*
  475 U.S. 1 (1986)................................................... 22, 25, 26, 38, 39, 40

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.,*
  9 F.4th 247 (5th Cir. 2021)..............................................6

*Polselli v. IRS,*
  143 S. Ct. 1231 (2023)..................................................46

*Rauchman v. Mobil Corp.,*
  739 F.2d 205 (6th Cir. 1984).........................................44

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)......................................................28

*Roosevelt v. E.I. Du Pont de Nemours & Co.,*
  958 F.2d 416 (D.C. Cir. 1992)...................................10, 29

*Rosenfeld v. Fairchild Engine & Airplane Corp.,*
  128 N.E.2d 291 (N.Y. 1955)............................................7

*Santa Fe Indus., Inc. v. Green,*
  430 U.S. 462 (1977)..................................................50, 51

*Sebelius v. Cloer,*
  569 U.S. 369 (2013)......................................................46

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943)........................................................24

*SEC v. Tex. Gulf Sulphur Co.,*
  401 F.2d 833 (2d Cir. 1968)...........................................36

*SEC v. Wall St. Publ'g Inst.,*
  851 F.2d 365 (D.C. Cir. 1988).......................................37

*Spiegel v. Buntrock,*
  571 A.2d 767 (Del. 1990) ............................................3, 4

*Stroud v. Grace,*
    606 A.2d 75 (Del. 1992) ................................................................5

*Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.,*
    551 U.S. 291 (2007).................................................................37

*Trinity Wall St. v. Wal-Mart Stores, Inc.,*
    792 F.3d 323 (3d Cir. 2015) ..................................5, 6, 18, 21, 27

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976).............................................................8, 43

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000).................................................................28

*United States v. United Foods,*
    533 U.S. 405 (2001).............................................................25, 31

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014).................................................................52

*Va. Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991)............................................................. 42b

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943).........................................................21, 25, 34

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022)......................................................51, 52, 53

*Wooley v. Maynard,*
    430 U.S. 705 (1977).................................................................25

*Zauderer v. Office of Disc. Couns. of Sup. Ct. of Ohio,*
    471 U.S. 626 (1985)..............................................22, 31, 34, 35, 37

## Statutes & Regulations

15 U.S.C. § 78d-1 ................................................................................3

xi

15 U.S.C. § 78n ....................... 1, 2, 8, 22, 23, 41, 42, 43, 45, 46, 47, 48, 49, 51, 53

15 U.S.C. § 78y ................................................................................................3

Securities Exchange Act of 1934, Pub. L. No. 73-291,
    48 Stat. 881 ................................................................................................8

Dodd-Frank Wall Street Reform & Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 .................................................45

17 C.F.R. § 240.14a-6.......................................................................................40

17 C.F.R. § 240.14a-7..............................................................................9, 27, 29

17 C.F.R. § 240.14a-8......................................................................10, 11, 12, 27

17 C.F.R. § 240.14a-9..............................................................................9, 23, 29

63 Fed. Reg. 29,106 (May 28, 1998) ....................................................10

85 Fed. Reg. 70,240 (Nov. 4, 2020).....................................................15

8 Del. Code Ann. § 142 .............................................................................4

8 Del. Code Ann. § 211 ..........................................................................4, 5

8 Del. Code Ann. § 212 ..............................................................................5

8 Del. Code Ann. § 216 ..............................................................................5

8 Del. Code Ann. § 222 ..............................................................................6

8 Del. Code Ann. § 242 ..............................................................................5

8 Del. Code Ann. § 251 ..............................................................................5

8 Del. Code Ann. § 271 ..............................................................................5

8 Del. Code Ann. § 275 ..............................................................................5

Nev. Rev. Stat. § 78.320............................................................................5

Nev. Rev. Stat. § 78.330......................................................................5

Nev. Rev. Stat. § 78.370......................................................................6

**Other Authorities**

American Express Co., SEC No-Action Letter, 2023 WL 2524429
    (Mar. 9, 2023) ................................................................13

As You Sow, https://www.asyousow.org (last visited July 21,
    2023) ...........................................................................13

As You Sow, Proxy Preview 2022 (Feb. 24, 2022),
    https://www.proxypreview.org/2022/report ...............................14

Stephen M. Bainbridge, *The Short Life and Resurrection of SEC
    Rule 19c-4*, 69 Wash. U. L.Q. 565 (1991) ..........................43

Henry N. Butler & Larry E. Ribstein, *Corporate Governance
    Speech and the First Amendment*, 43 U. Kan. L. Rev. 163 (1994) .................40

Comment Letter from NAM to SEC (Sept. 12, 2022),
    https://www.sec.gov/comments/s7-20-22/s72022-20138839-
    308542.pdf ....................................................................17

Comment Letter from NAM to SEC (Feb. 3, 2020),
    https://www.sec.gov/comments/s7-22-19/s72219-6735396-
    207626.pdf ..............................................................13, 15

James R. Copland, *Proxy Monitor 2022 Voting Results: Mid-
    Season Review*, Manhattan Inst. (May 19, 2022),
    https://manhattan.institute/article/proxy-monitor-2022-
    voting-results-mid-season-review............................................14

Eli Lilly & Co., SEC No-Action Letter, 2023 WL 2524430 (Mar. 8,
    2023) ...........................................................................14

5 Fletcher Cyc. Corp. § 1996.20 .............................................5

5 Fletcher Cyc. Corp. § 1996.30 ............................................................5

Thomas Lee Hazen, 2 Law Sec. Reg. § 10:6 .........................................5

The Kroger Co., 2023 Proxy Statement (May 12, 2023),
    https://ir.kroger.com/CorporateProfile/financial-
    performance/sec-filings/sec-filings-
    details/default.aspx?FilingId=16646572 ..................... 6, 18, 19, 32, 33, 35, 36

Lab'y Corp. of Am. Holdings, SEC No-Action Letter, 2023 WL
    174011 (Mar. 22, 2023) .....................................................................13

Letter from 21 State Attorneys General to ISS & Glass Lewis
    (Jan. 17, 2023) ....................................................................................16

Letters from 22 State Financial Officers to ISS & Glass Lewis
    (May 15, 2023) ....................................................................................16

Susan W. Liebeler, *A Proposal to Rescind the Shareholder Proposal
    Rule*, 18 Ga. L. Rev. 425 (1984) ...........................................................7

Tom C.W. Lin, *CEOs and Presidents*, 47 U.C. Davis L. Rev. 1351
    (2014) ....................................................................................................4

Mem. ISO NAM Combined Cross-Mot. for Summ. J. & Opp'n
    to Pl.'s Mot. for Summ. J. (ECF 33-2), *Inst. Shareholder Servs.
    Inc. v. SEC*, No. 1:19-cv-03275-APM (D.D.C.) .............................26

Model Bus. Corp. Act § 8.40 ................................................................4

Pfizer Inc., SEC No-Action Letter, 2021 WL 6126545 (Feb. 10,
    2022) ...................................................................................................14

Pfizer Inc., SEC No-Action Letter, 2022 WL 17832223 (Jan. 19,
    2023) ...................................................................................................14

*Protect*, Merriam-Webster.com Dictionary .......................................43

*Protect*, The American Heritage Dictionary 1408 (5th ed. 2022) ....................43

S. Rep. No. 73-792 (1934) ......................................................................44

SEC, Amendments to Exemptions from the Proxy Rules for
    Proxy Voting Advice, Release No. 34-87457, 2019 WL
    5869793 (Nov. 5, 2019) ..................................................................15

SEC, Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021),
    https://www.sec.gov/corpfin/staff-legal-bulletin-14l-
    shareholder-proposals...................................................... 11, 17, 18, 33, 35, 52

SEC, Statement of Informal Procedures for the Rendering of
    Staff Advice with Respect to Shareholder Proposals, Release
    No. 12599, 1976 WL 160411 (July 7, 1976)........................................7

Robert B. Thompson, *Defining the Shareholder's Role, Defining a
    Role for State Law: Folk at 40*, 33 Del. J. Corp. L. 771 (2008)..........................7

The Travelers Cos., SEC No-Action Letter, 2023 WL 352627
    (Mar. 30, 2023) ..............................................................................13

Richard Vanderford, *Shareholder Activists Drag Companies Into
    U.S. Culture Wars*, Wall St. J. (May 23, 2023),
    https://www.wsj.com/articles/shareholder-activists-drag-
    companies-into-u-s-culture-wars-775804cd?mod=hp_lead
    _pos1 ......................................................................................14, 18

# INTRODUCTION

The National Association of Manufacturers ("NAM") intervened to raise a fundamental threshold issue affecting every publicly traded company in the United States that neither Petitioners nor Respondent will advance: Whether the First Amendment and federal securities laws allow the Securities and Exchange Commission ("SEC"), through its Rule 14a-8, to compel a corporation to use its proxy statement to disseminate shareholders' speech about abortion, climate change, diversity, gun control, immigration, or other contentious issues unrelated to the corporation's core business or the creation of shareholder value.

The answer is "No." The SEC's approach in Rule 14a-8 violates the First Amendment by compelling companies to include shareholder-selected proposals on the company's own proxy statement. This unconstitutionally forces companies to use their own speech as a mechanism for subsidizing and disseminating others' speech. *See infra* Part I. And Congress did not authorize the SEC to require public companies to communicate shareholders' views on issues that the corporation does not want to address. *See infra* Part II. The statutory authority invoked by the SEC for its Rule 14a-8—15 U.S.C. § 78n(a)—authorizes the SEC to regulate proxy statements as "necessary or appropriate in the public interest or for the protection of investors," such as rules prohibiting deceptive or misleading statements *by corporations* when they solicit shareholder-proxy votes. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 434-35 (1964),

*abrogated on other grounds by Ziglar v. Abbasi*, 582 U.S. 120 (2017). Nowhere does it grant the SEC power to compel corporations to publish shareholders' speech in the corporations' own proxy statements. Rule 14a-8's compelled-speech regime violates the plain text of 15 U.S.C. § 78n, by allowing ideologically motivated shareholders to demand that their particular policy agendas be displayed rent free in the corporation's proxy statement. At a minimum, this statutory provision lacks the clear statement required by the constitutional-avoidance and federalism canons of statutory construction, as well as the major questions doctrine.

Congress designed federal securities laws to preserve the *States*' traditional authority "to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). And state corporate law empowers corporate *management—i.e.*, officers subject to oversight by the board of directors— to determine whether and how the corporation will speak or act. *See, e.g., In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 210 (5th Cir. 2018). Consistent with state corporate law and the Constitution, manufacturers choose to express certain views—or not—through the choices of their management, as directed by their boards, which in turn are elected by shareholders.

But each year, manufacturers are inundated with proposals from activist shareholders pushing their own agendas divorced from shareholder value creation, and companies must spend tens of millions of dollars addressing these proposals under Rule 14a-8. Although the NAM is concerned, like Petitioners, that the SEC has applied Rule 14a-8 in an inconsistent and politically

motivated manner, the NAM also agrees with the SEC that Kroger should not be forced to include Petitioners' policy proposal in Kroger's proxy statement. Therefore, although the NAM agrees that the petition for review should be denied, it should be on the ground that the SEC lacks authority to force *any* public company to include *any* shareholder-selected policy proposal in the company's proxy solicitation.

## STATEMENT OF JURISDICTION

As explained in Intervenor the NAM's Opposition to the SEC's Motion to Dismiss (which this brief incorporates by reference), this Court has jurisdiction to review the SEC's no-action decision regarding the Petitioner National Center for Public Policy Research's ("NCPPR") shareholder proposal. This no-action decision constitutes a final order by the SEC under 15 U.S.C. § 78d-1(c), and review of that decision is available in this Court under section 78y(a)(1).

## ISSUES PRESENTED

Whether the First Amendment and federal securities laws authorize the SEC to compel the inclusion of shareholder proposals in a publicly traded corporation's proxy solicitation.

## STATEMENT OF THE CASE

### A.  Corporations are more like republics than direct democracies.

Black letter corporation law provides "that directors, rather than shareholders, manage the business and affairs of the corporation." *Spiegel v.*

3

*Buntrock*, 571 A.2d 767, 772-73 (Del. 1990). As this Court has explained, "the management prerogative rests with the board." *In re Franchise Servs.*, 891 F.3d at 210. "The exercise of this managerial power is tempered by fundamental fiduciary obligations owed by the directors to the corporation and its shareholders." *Spiegel*, 571 A.2d at 773 (citation omitted). A corporation's directors, in turn, select officers to manage the affairs of the corporation. *E.g.*, 8 Del. Code Ann. § 142(b); Model Bus. Corp. Act § 8.40. Management—rather than shareholders—therefore controls a corporation's actions.

The separation of management from ownership means, among other things, that "corporations are governed less as direct democracies, and more as democratic republics. Shareholders elect board members to govern the corporation just as citizens elect representatives to govern the nation." Tom C.W. Lin, *CEOs and Presidents*, 47 U.C. Davis L. Rev. 1351, 1400 (2014) (footnote omitted). The corporation then acts through its management—that is, officers subject to the board of directors' oversight—for the benefit of its shareholders.

Under that governance structure, shareholders have the final say on who serves on the board of directors and on fundamental corporate changes such as mergers, acquisitions, or the sale of substantially all corporate assets. But shareholders do not exercise direct, day-to-day management of the corporation.

State law typically requires the corporation to hold an annual meeting for shareholders to elect directors. *E.g.*, 8 Del. Code Ann. § 211(b); *id.* § 216(3);

4

Nev. Rev. Stat. § 78.330(1); *see* 5 Fletcher Cyc. Corp. § 1996.20. State law may require a shareholder vote for other specific matters of corporate governance, such as fundamental corporate changes—like charter amendments, 8 Del. Code Ann. § 242; mergers, *id.* § 251; sale of assets, *id.* § 271; and dissolution, *id.* § 275. Corporations may also voluntarily choose to take shareholder votes on other matters. *E.g.*, *id.* § 211; *see* 5 Fletcher Cyc. Corp. § 1996.30.

## B. Corporations use proxy-vote solicitations to obtain voting authority from absent shareholders.

Most shareholders do not attend shareholder meetings in person. *See Stroud v. Grace*, 606 A.2d 75, 86 (Del. 1992). Yet state law or company bylaws often require a certain number of shares to be represented at a meeting for the corporation to conduct business. *See* 8 Del. Code Ann. § 216(1) (quorum requires majority of shares entitled to vote); Nev. Rev. Stat. § 78.320(1)(a) ("[a] majority of the voting power . . . present in person or by proxy").

State corporate laws therefore allow shareholders who do not attend in person to grant the corporation (or sometimes other shareholders) a proxy to vote on their behalf at the meeting. *See Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015); *e.g.*, 8 Del. Code Ann. § 212(b). "A proxy is a means by which a shareholder authorizes another person to represent her and vote her shares at a shareholders' meeting in accordance with the shareholder's instructions on the proxy card." *Amalgamated Clothing & Textile Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 881 (S.D.N.Y. 1993); *see* Thomas Lee Hazen, 2 Law Sec. Reg. § 10:6 ("The proxy itself is any

shareholder consent or authorization regarding the casting of that share-holder's vote.").

Corporations solicit absent shareholders' proxy votes by sending them a "proxy statement" before the shareholder meeting. The corporation's proxy statement contains multiple features. It solicits authority for the corporation to vote the shares of the absent shareholder, asking the absent shareholder to return a signed "proxy card" to the corporation giving the shareholder's proxy. *Trinity*, 792 F.3d at 334 (citation omitted). The corporation's proxy statement also "includes information about items or initiatives on which the shareholders are asked to vote" by the corporation through management.[1] *Id.* at 328 (citation omitted). And it can contain the corporation's own speech advocating for shareholders to support the corporation's proposals.[2]

_____

[1] Some state laws do not require corporations to provide notice of what will be voted on at the annual meeting. *See, e.g.*, 8 Del. Code Ann. § 222(a) (requiring advance notice of "the purpose or purposes for which the meeting is called" for special meetings but not annual meetings); Nev. Rev. Stat. § 78.370(2) ("Except in the case of the annual meeting, the notice must state the purpose or purposes for which the meeting is called.").

[2] *E.g.*, The Kroger Co., 2023 Proxy Statement (May 12, 2023) ("Kroger 2023 Proxy Statement"), https://ir.kroger.com/CorporateProfile/financial-performance/sec-filings/sec-filings-details/default.aspx?FilingId=16646572. As an SEC filing, this proxy statement may be judicially noticed for the purpose of determining its contents. *See Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 255 (5th Cir. 2021).

State corporate laws typically also permit activist shareholders to seek their own "independently financed proxy solicitation," asking other shareholders to grant their proxy to the soliciting shareholder rather than the corporation's management. *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 342 (Del. Ch. 2008); *see Rosenfeld v. Fairchild Engine & Airplane Corp.*, 128 N.E.2d 291 (N.Y. 1955).

Whether shareholders themselves have the right to *present proposals* for shareholder voting *while attending the annual meeting* without management's approval depends on state law. *See* SEC, Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals, Release No. 12,599, 1976 WL 160411, at *3 (July 7, 1976) ("[T]he right of security holders to present proposals at the meeting . . . turns upon state law."). In Delaware, the "default rule" is that "'stockholders are free to raise for the first time and present any proposals they desire at the Annual Meeting.'" *Jana*, 954 A.2d at 344 (citation omitted).

State laws do not, however, grant shareholders power to compel a corporation's management to disseminate shareholder-generated proposals on a company's proxy statement at corporate expense. *See* Robert B. Thompson, *Defining the Shareholder's Role, Defining a Role for State Law: Folk at 40*, 33 Del. J. Corp. L. 771, 779 (2008) ("Delaware's statute is silent on such shareholder action."); Susan W. Liebeler, *A Proposal to Rescind the Shareholder Proposal Rule*, 18 Ga. L. Rev. 425, 457 (1984) ("Shareholders do not have access to the issuer's proxy materials under state law.").

### C. Congress granted the SEC limited authority to regulate proxy statements.

As part of the Securities Exchange Act of 1934, Congress granted the SEC certain authority to regulate proxy solicitations. Section 14(a) of the Act, now codified at 15 U.S.C. § 78n(a), permits the SEC to regulate "proxy" solicitations "as necessary or appropriate in the public interest or for the protection of investors." Securities Exchange Act of 1934, § 14(a), Pub. L. No. 73-291, 48 Stat. 881, 895 (codified as amended at 15 U.S.C. § 78n(a)).

This delegation is not an open-ended grant of authority to the SEC. Rather, Section 14(a) empowers the SEC "to prevent management or others from obtaining authorization for corporate action by means of *deceptive or inadequate* disclosure in proxy solicitation." *J.I. Case*, 377 U.S. at 431 (emphasis added). It does not allow the SEC to compel a corporation to include within its own proxy solicitation shareholder proposals on the day's most contentious social issues that have no nexus to the corporation's bottom line.

Section 14(a) thus allows the SEC to prohibit a corporation—or an activist shareholder—from misleadingly obtaining proxy votes from absent shareholders. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976) (Section 14(a) deals with the corporation's "'explanation to the stockholder'" when the corporation's "misstatement or omission was material" (citation omitted)). When a corporation seeks proxy votes from absent shareholders, it must tell shareholders what proposals *the corporation* will ask shareholders to vote on so that shareholders can make an informed decision

8

whether to grant their proxies to the corporation. But Section 14(a) does not grant the SEC power to let *shareholders* commandeer a corporation's proxy statements to disseminate the shareholders' own speech.

Consistent with Section 14(a)'s focus on misleading speech, SEC Rule 14a-9 prohibits the solicitation of proxies through statements that are "false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a). Examples of statements that may be misleading include "[p]redictions as to specific future market values" and failure to identify a proxy solicitation "as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter." *Id.* § 240.14a-9.

In addition, SEC Rule 14a-7 allows shareholders to arrange for corporations to send a *shareholder's own proxy solicitation* to other shareholders. But it is sent separately from the corporation's proxy statement. *See id.* § 240.14a-7(a)(2)(i). And the shareholder must pay the costs for disseminating its proxy solicitation. *See id.* § 240.14a-7(e). Alternatively, and at the shareholder's option, the company must provide the shareholder with the information necessary to allow the shareholder himself to deliver his solicitation to other shareholders. *Id.* § 240.14a-7(a)(2)(ii).

### D.  The SEC's Rule 14a-8 imposes direct democracy on the corporation's proxy solicitation.

The SEC has wandered far from its statutory base in promulgating an ever-expanding series of rules to require corporate inclusion of shareholders' proposals in the corporation's proxy statement. Rule 14a-8 goes well

beyond prohibiting corporations from engaging in false or misleading speech on their proxy statements (like Rule 14a-9) or requiring corporations to send activist shareholders' own proxy solicitations at the shareholders' expense (like Rule 14a-7). Rule 14a-8 requires a company to include shareholder-generated proposals within the company's own proxy statement—and at the company's own expense. The Rule permits shareholders with as little as $2,000 worth of shares to commandeer the company's proxy statement for whatever issue that shareholder wants to raise. *Id.* § 240.14a-8(b)(1)(i)(A).

Rule 14a-8 lists the many circumstances in which "a company *must* include a shareholder's proposal in its proxy statement." *Id.* § 240.14a-8 (emphasis added); *see* 63 Fed. Reg. 29,106, 29,119 (May 28, 1998). Rather than ensure shareholders have access to accurate information, Rule 14a-8 allows shareholders to commandeer "[a]ccess to management proxy solicitations." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992).

Rule 14a-8 contains exceptions, one of which allows a company "to exclude [a shareholder] proposal . . . [i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). Recently, the SEC narrowed its interpretation of this exception, asserting that any "proposal rais[ing] issues with a broad societal impact" does

not qualify for the exception—even if there is no "nexus between a policy issue and the company."[3]

Under the SEC's "Mother, may I?" regime, a company bears the burden of persuading the SEC that a shareholder's proposal may be excluded from the company's proxy solicitation. Rule 14a-8(j) provides that a company "*must* file its reasons with the Commission" if it wishes to exclude a shareholder-submitted proposal, and Rule 14a-8(g) makes clear that "the burden is on the company to demonstrate that it is entitled to exclude a proposal." 17 C.F.R. § 240.14a-8(j)(1), (g) (emphasis added). The Rule thus establishes the SEC's "no-action" process, through which the SEC makes a final, binding decision as to whether a given proposal qualifies for the Rule 14a-8 exclusion criteria or, alternatively, the company must include the proposal on its proxy statement. If the SEC forces a company to include a shareholder proposal on the company's proxy statement, then the company must disseminate shareholder speech in two ways: it must publish the shareholder's proposal, and it must publish "any accompanying supporting statement" from the shareholder. *Id.* § 240.14a-8(d).

Mandatory inclusion of a shareholder proposal with an accompanying supporting statement also forces the company itself to engage in additional

---

[3] SEC, Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021) ("SEC Staff Legal Bulletin No. 14L"), https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

responsive speech on its proxy statement. Under Rule 14a-8, the company "may elect to include in its proxy statement reasons why it believes shareholders should vote against [a shareholder] proposal." *Id.* § 240.14a-8(m)(1). Companies may prefer not to take *any* position on controversial social and political issues, especially when the issue has nothing to do with their business. But when a shareholder proposal raises such an issue, the company may have little choice but to take a public position on the issue if it wants to persuade shareholders not to adopt the proposal.

### E. Activist groups overburden manufacturers with proposals designed to push ideological agendas.

A surge of activist shareholders have used Rule 14a-8 to force onto corporate proxy statements a host of proposals addressing social issues, many of which have little or no relevance to the target company's business. The activist-proposal process involves three elements. First, an advocacy group formulates a social policy proposal and, relying on Rule 14a-8, submits it on behalf of a small shareholder for inclusion in a corporation's proxy statement. Second, the SEC uses Rule 14a-8 to force the company to include the proposal. Third, proxy-advisory firms direct institutional investors to support the proposal, which guarantees that the SEC will require inclusion of the proposal in a future year even if it fails at the next shareholder meeting.[4]

---

[4] Rule 14a-8(i)(12) guarantees the inclusion of any proposal that has achieved 5% shareholder support in a previous year if the proposal has been voted on a single time, rising to 15% after two votes and 25% after three. Studies have

The process begins with activist groups like As You Sow, whose stated mission is to "empower[] shareholders to change corporations" on issues such as "gender inequalities, workplace equity, environmental health, and more."[5] These activists usually hold a *de minimis* stake in the corporation, often having acquired shares for the primary purpose of advancing their social or political goals, not for economic reasons. Unable to achieve success for their agendas in the political arena, these groups attempt instead to exploit Rule 14a-8. On behalf of a qualifying shareholder, the advocacy group submits a proposal seeking to force the company to announce and address the proposal in its proxy statement. *E.g.*, The Travelers Cos., SEC No-Action Letter, 2023 WL 352627 (SEC Mar. 30, 2023) (proposal to have the insurance company oversee an audit to "improv[e] the racial impacts of its policies, practices, products, and services"); Lab'y Corp. of Am. Holdings, SEC No-Action Letter, 2023 WL 174011 (Mar. 22, 2023) (proposal to reduce company's cooperation with law enforcement enforcing abortion laws); American Express Co., SEC No-Action Letter, 2023 WL 2524429 (Mar. 9, 2023) (proposal to report on how to "reduce the risk" allegedly associated with

_____

shown that proxy advisory firms control between 20% and 30% of the shareholder vote, so their support virtually guarantees that a proposal must be included on a corporation's proxy statement in perpetuity. *See* Comment Letter from NAM to SEC at 4 (Feb. 3, 2020) ("NAM 2020 Comment"), https://www.sec.gov/comments/s7-22-19/s72219-6735396-207626.pdf.

[5] As You Sow, https://www.asyousow.org (last visited July 21, 2023).

tracking gun purchases); Eli Lilly & Co., SEC No-Action Letter, 2023 WL 2524430 (Mar. 8, 2023) (proposal to report on how company changed its policy in response to state abortion laws); Pfizer Inc., SEC No-Action Letter, 2022 WL 17832223 (Jan. 19, 2023) (proposal to report on company's collaboration with "businesses, governments and NGOs for social and political ends"); Pfizer Inc., SEC No-Action Letter, 2021 WL 6126545 (Feb. 10, 2022) (proposal to report on the company's "diversity, equity, and inclusion efforts" and to report "data by gender, race, and ethnicity").

As these examples suggest, activist proposals tend to focus on environmental, social, and governance ("ESG") matters. "Fully 60% of all shareholder proposals on company proxy ballots [in 2022] involve[d] environmental or social issues—an all-time high percentage."[6] In February 2022, As You Sow boasted that activists had already "filed 529 shareholder resolutions on environmental, social and related sustainable governance issues for the 2022 proxy season."[7] And "[t]he current political climate means companies can expect more proposals" in future years.[8]

---

[6] James R. Copland, *Proxy Monitor 2022 Voting Results: Mid-Season Review*, Manhattan Inst. (May 19, 2022), https://manhattan.institute/article/proxy-monitor-2022-voting-results-mid-season-review.

[7] As You Sow, Proxy Preview 2022 at 5 (Feb. 24, 2022), https://www.proxy-preview.org/2022/report.

[8] Richard Vanderford, *Shareholder Activists Drag Companies Into U.S. Culture Wars*, Wall St. J. (May 23, 2023), https://www.wsj.com/articles/shareholder-

Even when they fail, these proposals impose real costs on companies and, ultimately, shareholders. The SEC itself estimates that shareholder proposals can impose up to $150,000 in direct costs on a company *per proposal*. *See* 85 Fed. Reg. 70,240, 70,275 (Nov. 4, 2020). Thus, the process wastes tens of millions of dollars that could otherwise be used to create value for investors.

Activist groups are not alone in their crusade. Joining them are so-called proxy-advisory firms, which advise institutional investors about upcoming proxy votes, including shareholder-submitted proposals on activist causes.[9] These institutional investors (such as BlackRock or State Street Global Advisors) control a clear majority of market value on U.S. exchanges. SEC, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, Release No. 34-87457, 2019 WL 5869793, at *3 (Nov. 5, 2019). Given the enormity of their investments, fund managers at these large institutions rely on proxy-advisory firms to consider a large volume of proxies for their clients and sometimes to cast votes on their behalf. *Id.* Proxy-advisory firms can therefore impact the direction of a business and the life savings of millions of investors. *See* 85 Fed. Reg. 55,082, 55,083 & n.18 (Sept. 3, 2020).

---

activists-drag-companies-into-u-s-culture-wars-775804cd?mod=hp_lead
_pos1.

[9] *See* NAM 2020 Comment at 3-4.

Control of the proxy-advisory industry is concentrated in two firms, Glass Lewis and Institutional Shareholder Services ("ISS"), which control an estimated 97% share of the proxy-advisory market. *Id.* at 55,127 n.517. These proxy-advisory firms increasingly advocate for a normative agenda, seeking to dictate rather than merely analyze corporate behavior—particularly as it relates to ESG priorities. But the ESG agenda that they support is often contrary to the financial interests of investors. *See, e.g.*, Letter from 21 State Attorneys General to ISS & Glass Lewis (Jan. 17, 2023) ("AG Letter").[10] Fiduciaries of state pension and retirement funds have therefore questioned whether such "proxy-voting advice is prudent, open, honest, and consistent with [their] public constituents' long-term economic interests." Letters from 22 State Financial Officers to ISS & Glass Lewis at 1 (May 15, 2023) ("Some of the ESG proposals are plainly ancillary to a company's principal business, while others appear flatly contradictory to it.").[11]

Consider, for example, a 2022 recommendation by Glass Lewis to reject an oil and gas company's climate plan. *See* AG Letter at 3 & n.12. The recommendation was "based on a concern that it did not do enough to reduce *customers'* emissions." *Id.* at 3. "Put another way, Glass Lewis faulted the

---

[10] https://attorneygeneral.utah.gov/wp-content/uploads/2023/01/2023-01-17-Utah-Texas-Letter-to-Glass-Lewis-ISS.pdf.

[11] https://treasurer.utah.gov/wp-content/uploads/Proxy-Voting-Letter-to-Proxy-Advisory-Firms.pdf.

company for not having a good enough plan to get its customers to stop buying its own product." *Id.*

### F.  The SEC uses Rule 14a-8 to force companies to include activist proposals on company proxy statements.

At the center of this new battleground for the Nation's most intractable policy debates sits the SEC. Rule 14a-8 requires companies to include shareholder proposals on the company proxy statement unless they can convince the SEC that an exception to the rule applies. Corporations have thus been forced to seek SEC no-action decisions to prevent the wave of activist proposals from overwhelming their businesses. They often argue that activist proposals need not be included in corporate proxy statements under Rule 14a-8(i)(7)'s ordinary-business-operations exception.

But the Biden Administration's SEC has taken the categorical position that "issues with a broad societal impact" do not qualify for that exception, regardless of whether there is any "nexus" between the issue and the company's actual business.[12] This new position has drastically reduced corporations' success in seeking SEC no-action decisions, with only 38% of requests succeeding in 2022—down from 71% the year before.[13] And the SEC's stance

---

[12] SEC Staff Legal Bulletin No. 14L.

[13] Comment Letter from NAM to SEC at 3 (Sept. 12, 2022), https://www.sec.gov/comments/s7-20-22/s72022-20138839-308542.pdf.

on no-action requests has only encouraged a new surge of ideologically driven proposals.[14]

Recognizing that policy fights have shifted from the halls of government into the corporate world, groups like Petitioner NCPPR have sought to use Rule 14a-8 to include conservative proposals in corporate proxy statements. This only serves to increase the number of politically motivated proposals with which companies are forced to contend. And it enables the SEC, through Rule 14a-8, to force companies to speak about controversial political topics when they would rather stay silent—often through an arbitrary "'we-know-it-when-we-see-it' approach," *Trinity*, 792 F.3d at 346, with respect to the "social policy significance" of a given proposal.[15]

### G. Petitioner NCPPR's shareholder proposal.

Petitioner NCPPR submitted a shareholder proposal for inclusion in Kroger's proxy materials for its annual shareholder meeting. The proposal requested that the company "issue a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity (EEO) policy," and it included a statement by NCPPR in support of the proposal.[16] In other words, NCPPR, like share-holder proponents before it, wished the SEC to compel the corporation to

---

[14] *See* Vanderford, *supra*.

[15] SEC Staff Legal Bulletin No. 14L; *see* Vanderford, *supra*.

[16] Kroger 2023 Proxy Statement at 92.

alter its own proxy statement by including shareholder speech on a political topic with little nexus to the company's operations. Kroger sought to exclude the proposal, and the SEC allowed its exclusion via a no-action decision issued on April 12, 2023.[17]

On April 28, 2023, Petitioners filed a petition for review and an emergency motion to stay the SEC's order and expedite the case. This Court entered an administrative stay of the SEC's order. It later carried Petitioners' motion to stay with the case and denied Petitioners' motion to expedite.

After the Court entered its administrative stay depriving Kroger of the no-action relief it had sought from the SEC, Kroger included the NCPPR proposal on its 2023 proxy statement together with the NCPPR's supporting statement.[18] Kroger also included a responsive statement advising shareholders why the corporation recommended a vote against the NCPPR proposal.[19]

Intervenor the NAM filed an unopposed motion for leave to intervene, which this Court granted on May 25, 2023. The NAM intervened to protect manufacturers' interests by seeking a ruling from this Court denying the petition for review, but on the ground that the SEC lacks authority to compel

---

[17] *See* Pet'rs' Opposed Emergency Mot. for a Stay Pending Review & for Expedited Consideration (ECF 4), Ex. F (Apr. 28, 2023).

[18] Kroger 2023 Proxy Statement at 92-93.

[19] *Id.* at 93-94.

the inclusion of the NCPPR proposal, or *any* shareholder-selected proposal, on public company proxy statements.

## SUMMARY OF THE ARGUMENT

**I.** Rule 14a-8 violates the First Amendment by forcing corporations to change the content of their own speech on their own proxy statements by subsidizing and disseminating activist shareholders' speech. The Supreme Court has consistently held that the First Amendment prohibits government from compelling private speakers to convey others' speech. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (government cannot "force an individual to include other ideas with his own speech that he would prefer not to include"); *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020) ("*USAID*") (First Amendment does not permit government to "force[] one speaker to host another speaker's speech"); *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all" (citation omitted)); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (The "general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."). This line of cases developed from the bedrock principle that government may not "force an individual to 'utter what is not in [her] mind' about a question of political and religious significance." *303 Creative*, 143 S.

Ct. at 2318 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)). Furthermore, Rule 14a-8—unlike Rule 14a-7—forces corporations to "subsidize[]" shareholder speech. *Trinity*, 792 F.3d at 335. This independently violates the First Amendment. *See, e.g., Janus*, 138 S. Ct. at 2464 ("Compelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns.").

The SEC lacks a sufficient governmental interest to support this compelled-speech regime. The government has an interest in ensuring that corporations provide accurate information to shareholders when they solicit proxy votes, and it has an interest in maintaining the integrity of a national market for the exchange of publicly traded securities. But the government has no freestanding interest in establishing rules of corporate governance, which are the traditional province of state law. And Rule 14a-8 is not sufficiently tailored to the government's legitimate interests in providing accurate information to shareholders—particularly when Rule 14a-7 already gives shareholders a mechanism to distribute their own proxy solicitations to other shareholders, and Rule 14a-9 already forbids the use of inaccurate or misleading language in proxy solicitations.

Speech on a corporation's proxy statement receives full First Amendment protection. It is not subject to more lenient review as "commercial speech," because speech disseminating shareholder proposals for soliciting proxy votes at corporate meetings cannot possibly propose a commercial transaction. *See, e.g., Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423

(1993). Furthermore, proxy statements and shareholder proposals on controversial issues are not subject to relaxed review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), because they contain much more than "purely factual and uncontroversial information," *id.* at 651; *see Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 524 (D.C. Cir. 2015) ("*NAM II*") (holding that *Zauderer* did not apply to a rule compelling corporations to state whether or not their products were "conflict free"). Even if the SEC could satisfy First Amendment scrutiny when regulating the purchase and sale of securities, that rationale cannot save Rule 14a-8, which deals only with corporate speech to shareholders about voting at shareholder meetings unconnected to the purchase and sale of securities. *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) ("*NAM I*"). And the suggestion of the plurality opinion in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1 (1986) *("PG&E"*), in dictum in a footnote, that Rule 14a-8 does not violate the First Amendment is neither controlling nor persuasive on its own terms.

**II.** Congress also did not authorize the SEC, in 15 U.S.C. § 78n, to mandate that a corporation use its own proxy statement to subsidize and disseminate shareholder proposals. The plain text of this provision grants the SEC power to protect the public and investors, such as by prohibiting deceptive or misleading speech on proxy statements. *J.I. Case*, 377 U.S. at 431, 434-35. The SEC has separately exercised that power through Rule 14a-9, which prohibits any solicitation that "is false or misleading with respect to any material

fact." 17 C.F.R. § 240.14a-9(a). But 15 U.S.C. § 78n does not authorize the SEC to commandeer a corporation's own proxy statement on behalf of some shareholders to force the corporation to discuss subjects that the corporation does not want to address. Congress *has* granted the SEC power to require the inclusion of shareholder-selected *nominees* for the board of directors on a corporation's proxy statement. 15 U.S.C. § 78n(a)(2). But it has granted no similar power with respect to shareholder *proposals*.

Multiple canons of construction—constitutional avoidance, federalism, and the major questions doctrine—each independently support this reading of the text of 15 U.S.C. § 78n. The statute lacks any clear statement of congressional intent to invade this core state authority over internal corporate governance.

For these reasons, the SEC does not have the power to require Kroger and other publicly traded companies to include shareholder proposals as part of the companies' proxy solicitations. This Court should therefore deny the petition for review.

**ARGUMENT**

## I.   Rule 14a-8 violates the First Amendment.

The SEC is correct that Kroger is not required to include the shareholder proposal at issue here. But that is because requiring a company, under Rule

23

14a-8, to include a shareholder proposal and supporting speech on the company's own proxy solicitation violates the First Amendment.[20]

### A. Rule 14a-8 unconstitutionally compels corporations to include shareholders' speech within the companies' own speech on their own proxy statements at the companies' expense.

**1.** SEC Rule 14a-8 asserts power to compel corporations to include shareholder proposals on a broad variety of matters, including controversial political and social issues, on the corporation's own proxy statement and at the corporation's expense. This violates the First Amendment's command that the government may not force speakers to alter their own speech in order to subsidize and disseminate others' speech.[21]

---

[20] Review of the First Amendment and federal securities statutory issues the NAM raises is not precluded by *SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943). The SEC has no "discretion[]" to avoid "the necessary result," *Morgan Stanley Capital Grp. Inc. v. Pub. Utils. Dist. No. 1*, 554 U.S. 527, 544-45 (2008), that it lacks authority to compel Kroger—or any other publicly traded company—to include a shareholder's policy proposal on the company's own proxy solicitation at the company's expense.

[21] There is no question that the corporation's proxy statement contains the corporation's "own speech" reflecting management's exercise of judgment on questions of corporate governance. *NetChoice, LLC v. Paxton*, 49 F.4th 439, 459-62 (5th Cir. 2022). This Court stayed its appellate mandate in *NetChoice* pending a petition for writ of certiorari in the Supreme Court. Order (ECF 261), *NetChoice*, 49 F.4th 439 (Oct. 12, 2022). The Supreme Court has since called for the views of the Solicitor General. 143 S. Ct. 744 (2023) (mem.).

Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Janus*, 138 S. Ct. at 2463 (citation omitted). This is true for corporations as well as individuals. *See 303 Creative*, 143 S. Ct. at 2316 (speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech"); *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (collecting 26 examples of Supreme Court decisions acknowledging corporations' First Amendment rights).

Government therefore may not mandate support of "speech by others." *United States v. United Foods*, 533 U.S. 405, 413 (2001); *see, e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 742 n.8 (2011) (government may not compel individuals to "help disseminate" speech when they would prefer not to (citation omitted)); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (First Amendment prohibits compelling newspaper to publish political candidates' responses); *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (per curiam) (government cannot compel speech "in order to enhance the relative voice of others").

Nor may government "force an individual to 'utter what is not in [her] mind' about a question of political and religious significance." *303 Creative*, 143 S. Ct. at 2318 (quoting *Barnette*, 319 U.S. at 634); *see PG&E*, 475 U.S. at 9 (plurality op.);[22] *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (individuals may not be forced to serve as "an instrument for fostering . . . an ideological point

---

[22] All citations to *PG&E* in this brief are to its plurality opinion.

of view"). This "general rule" applies "equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573; *cf. Janus*, 138 S. Ct. at 2463 ("The right to eschew association for expressive purposes is likewise protected."). And it prohibits government regulations that "force[] one speaker to host another speaker's speech." *USAID*, 140 S. Ct. at 2088.

That alone is sufficient to trigger First Amendment strict scrutiny of Rule 14a-8. But worse yet, Rule 14a-8 often forces companies also to engage in additional counter speech responding to the compelled shareholder speech. Granting access to the company's own proxy statement "enhance[s] the relative voice" of shareholders. *PG&E*, 475 U.S. at 14 (quoting *Buckley*, 424 U.S. at 49 & n.55). Like any government rule favoring one speaker or class of speakers, this "necessarily burdens the expression of the disfavored speaker." *Id.* at 15. Under Rule 14a-8, the obligation to include the speech of "a favored speaker" (the shareholder) in the company's proxy statement puts the company to the impermissible choice of "appear[ing] to agree with [those] views or to respond."[23] *Id.* Rule 14a-8 anticipates this very risk,

---

[23] A rule that merely provided an option to make certain factual disclosures in exchange for an exemption from otherwise-applicable regulations would not present the same impermissible choice. *See, e.g.*, Mem. ISO NAM Combined Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. (ECF 33-2), *Inst. Shareholder Servs. Inc. v. SEC*, No. 1:19-cv-03275-APM (D.D.C.) (challenge to proposed rule exempting proxy-advisory firms from disclosure requirements in exchange for disclosing conflicts of interest, making proxy advice available to the issuing corporation, and providing a mechanism for customers to access written statements on proxy voting advice by the

suggesting that the corporation may wish to respond to a shareholder proposal by "includ[ing] in its proxy statement reasons why it believes shareholders should vote against [the] proposal." 17 C.F.R. § 240.14a-8(m)(1). But this provision simply illustrates the larger flaw: Companies that would rather just remain silent on a controversial social topic are forced to engage in speech to respond to the SEC's elevation of an activist shareholder as "a favored speaker."

Adding to that burden, Rule 14a-8 "mandates *subsidized* shareholder access to a company's proxy materials." *Trinity*, 792 F.3d at 335 (emphasis added). Rule 14a-7 independently gives activist shareholders a mechanism to distribute their own proxy solicitations. But that distribution is separate from the company's proxy statement, and the activist shareholder must pay the costs of that distribution. *See* 17 C.F.R. § 240.14a-7(e). Rule 14a-8, in stark contrast, shifts the cost of disseminating speech from the shareholder to the company, enabling shareholders to "force management to include [their] proposal in management's proxy statement, along with a statement supporting the proposal, at the company's expense," *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 728 (S.D. Tex. 2010); *see Jana*, 954 A.2d at 341 (stating that the SEC issued Rule 14a-8 "to give shareholders a greater ability to bring proposals without the cost associated with a fully waged proxy contest").

---

corporation). An exemption triggered by voluntary disclosure would not compel speech; it would provide a genuine choice.

Because Rule 14a-8 compels corporations to subsidize and disseminate speech by third parties within the corporation's own proxy statement, it "plainly 'alters the content' of [companies'] speech," and therefore constitutes "a content-based regulation of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (citation omitted). This conflicts directly with the First Amendment and is presumptively unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Strict scrutiny therefore applies, and the SEC must establish that Rule 14a-8 is narrowly tailored to further a compelling governmental interest, *id.*, by "the least restrictive means" available, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000).[24] Rule 14a-8 cannot survive such a test.

**2.** Rule 14a-8 warrants strict scrutiny, but it fails any level of heightened First Amendment scrutiny. The government has a legitimate interest in preventing misleading statements in corporate proxy solicitations and in ensuring that corporations provide accurate information to shareholders considering whether to grant their proxy to the corporation. *See Bus. Roundtable v. SEC*, 905 F.2d 406, 410 (D.C. Cir. 1990). But Rule 14a-8 is not tailored to serve

---

[24] At the very least, Rule 14a-8 should be subject to "exacting scrutiny," which applies in First Amendment challenges to certain compelled-disclosure rules. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality op.). Exacting scrutiny requires "'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and that the disclosure requirement be narrowly tailored to the interest it promotes." *Id.* at 2385 (majority op.) (citation omitted).

those interests, and the government cannot identify any interest to justify a rule compelling private companies to adopt and disseminate third-party speech on controversial political and social issues.

The government's interest in preventing misleading and deceptive statements in proxy solicitations is already protected by Rule 14a-9, which prohibits any solicitation "containing any statement which . . . is false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a). And Rule 14a-7 already protects the government's "informational" interest in providing shareholders with information to make a reasonably informed decision whether or not to grant their proxy to the corporation versus an activist shareholder. *Roosevelt*, 958 F.2d at 421. Rule 14a-7 gives shareholders the right to have the company distribute shareholder proxy solicitations, *see* 17 C.F.R. § 240.14a-7(a)(2)(i), or provide the information necessary for the shareholder to distribute them, *id.* § 240.14a-7(a)(2)(ii); *see Apache*, 696 F. Supp. 2d at 727 (explaining that shareholders "wishing to submit a proposed shareholder resolution may solicit proxies in two ways"). In either case, the shareholder must pay the distribution costs. *See* 17 C.F.R. § 240.14a-7(e). In short, Rule 14a-7 provides a mechanism for giving shareholders information about shareholder-generated proposals. This serves the government's interest in making information about shareholder proposals and

proxy solicitations available to the company's shareholders—so Rule 14a-8 is not narrowly tailored to that interest.[25]

Rule 14a-8's additional burdens—compelling the corporation to subsidize and carry shareholder speech on its own proxy solicitations—add nothing to the interests served by Rules 14a-7 and 14a-9, and they are not tailored to any other legitimate government interest. Rule 14a-8 does not add to Rule 14a-9's protection against misleading or deceptive statements in the corporation's proxy solicitation. It does not provide additional information about shareholder proposals than is provided under Rule 14a-7. No governmental interest justifies a rule that allows shareholders to commandeer corporate resources (or the corporate proxy statement) to solicit proxies at the expense of the corporation and other shareholders. Government has no legitimate interest in regulating private speech to "level the playing field," *Bennett*, 564 U.S. at 748, or "to enhance the relative voice of others," *Buckley*, 424 U.S. at 49; *see Tornillo*, 418 U.S. at 245, 251 (government cannot mandate "enforced access" to "enhance[]" speech or promote "fairness"). Whatever additional interest the government might assert, it could not justify Rule 14a-8's gratuitous burdens on the corporation's First Amendment rights under any level of heightened scrutiny.

---

[25] Even under the less-exacting standard for commercial speech, a regulation is not sufficiently tailored when "narrower restrictions on expression would serve [the government's] interest as well." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 565 (1980).

## B. The corporate proxy-statement speech receives full First Amendment protection.

The SEC does not regulate in a First Amendment-free zone. *See Lowe v. SEC*, 472 U.S. 181, 205 & n.50 (1985) (constitutional avoidance based on First Amendment issues with federal securities law); *NAM II*, 800 F.3d at 524 (invaliding portions of the SEC's "conflict minerals" rule under the First Amendment). Rule 14a-8 does not qualify for any lesser First Amendment scrutiny under either the commercial-speech doctrine or *Zauderer*'s subset of commercial advertising involving purely factual and uncontroversial information. And Rule 14a-8 is not entitled to any lesser First Amendment scrutiny as regulating the purchase and sale of securities: Rule 14a-8 does not concern transactions in securities, it regulates corporate speech about proxy solicitations for voting at shareholder meetings. *NAM I*, 748 F.3d at 372. Finally, the *PG&E* plurality's suggestion, in dictum in a footnote, that Rule 14a-8 does not violate the First Amendment is neither binding nor persuasive on its own terms.

**1.** The speech that companies are forced by Rule 14a-8 to include within their own proxy statement—shareholder proposals and supporting statements—does not qualify as "commercial speech." These statements do not "propose[] a commercial transaction." *Discovery Network*, 507 U.S. at 422. The Supreme Court has "characteriz[ed] the proposal of a commercial transaction as '*the test* for identifying commercial speech.'" *Id.* at 423 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989)); *see United*

*Foods*, 533 U.S. at 409-10. Speech soliciting absent shareholders' proxy votes and making proposals for voting items at shareholder meetings concerns matters of corporate governance. It does not propose any sort of commercial transaction.

Nor do proxy solicitations or shareholder proposals satisfy the broader (and superseded) definition of "commercial speech" used in older Supreme Court cases. They do not involve "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980), *cited in Express Oil Change, LLC v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019). To the contrary, activist shareholders have invoked Rule 14a-8 to force companies to take public positions on controversial social and political questions where they would otherwise prefer to remain silent. Although these proposals may be presented in language that nods to shareholder value, that is not their primary purpose, let alone their sole purpose. They are made to force the company's management to heel to a preferred political or social agenda.

Consider the shareholder proposals included in Kroger's 2023 proxy solicitation. One proposes "listing on the Company website any recipient of $10,000 or more of direct contributions" to "enhance the reputation of the Company" and "create goodwill." Kroger 2023 Proxy Statement at 85. The supporting statement explains that "[s]ome charities may be controversial" and argues that "we market ourselves to the general public and should avoid

32

offending segments of this most critical group." *Id.* A proposal by As You Sow requests "a report . . . describing how the Company could reduce its plastics use . . . to reduce its contribution to ocean plastics pollution." *Id.* at 88. A third proposal requests that the company "report on both quantitative *median and adjusted* pay gaps across race and gender, including associated policy, reputational, competitive, and operational risks, and risks related to recruiting and retaining diverse talent." *Id.* at 90.

Whatever theoretical economic impact these proposals might have on the company is tangential, at best, and subordinate to other concerns. The language of the proposals, supporting statements, and opposing statements by companies focuses on issues other than the mere economic interests of shareholders. For example, the statement supporting the proposal to report on Kroger's reduction in plastics use emphasizes "the reputational, financial, and operational risks associated with continuing to use substantial amounts of single-use plastic packaging while plastic pollution grows." *Id.* at 88. In its response, Kroger points not to economic considerations but to the company's commitment "to protecting people and our planet by advancing positive change in our company and our communities" and its "journey to help create communities free of hunger and waste." *Id.* The SEC's own interpretation of Rule 14a-8 underscores the point—it has declared that the rule promotes shareholder proposals that "raise[] issues with a broad societal impact," even if there is no "nexus between a policy issue and the company." SEC Staff Legal Bulletin No. 14L. Whatever the merits of these proposals,

they do not propose commercial transactions, they do not relate solely to the economic interests of the company and its shareholders, and they do not constitute commercial speech.

**2.** Rule 14a-8 also does not qualify for the more relaxed scrutiny applicable to the subset of commercial speech regulations that "require commercial enterprises to disclose 'purely factual and uncontroversial information' about their services." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) (citation omitted); *see NIFLA*, 138 S. Ct. at 2372. In *Zauderer*, the Court concluded that the government may, at times, "'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information.'" *Hurley*, 515 U.S. at 573 (quoting *Zauderer*, 471 U.S. at 651). The Court appeared to draw the line at government regulation of "'commercial advertising,'" suggesting that "outside that context [the government] may not compel affirmance of a belief with which the speaker disagrees."[26] *Id.* (quoting *Zauderer*, 471 U.S. at 651) (citing *Barnette*, 319 U.S. at 642). Shareholder proposals and proxy solicitations are not commercial advertisements to buy products or services.

---

[26] The circuits are split on whether the *Zauderer* doctrine applies only to commercial "advertising" or also possibly to certain other forms of commercial speech. *See NAM II*, 800 F.3d at 524 & n.16 (identifying circuit split); *cf. NetChoice*, 49 F.3d at 485 (applying *Zauderer* outside the context of advertising).

Even if the *Zauderer* doctrine applied beyond commercial advertisements, it is limited to "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651. The D.C. Circuit considered those limits in *NAM II*, where it sustained a First Amendment challenge to an SEC rule that required firms using so-called "conflict minerals" to "report to the Commission and to state on their website that any of their products have 'not been found to be "DRC conflict free."'" 800 F.3d at 530 (citation omitted). The court concluded that *Zauderer* did not apply because the compelled speech was not purely factual and uncontroversial. *Id*. As it explained, "[t]he label '[not] conflict free' is a metaphor that conveys moral responsibility for the Congo war. It requires an issuer to tell consumers that its products are ethically tainted, even if they only indirectly finance armed groups." *Id.* (citation omitted).

The same reasoning applies here. Shareholder proposals raising policy issues "with a broad societal impact" but no "nexus" to the company's products or services, *see* SEC Staff Legal Bulletin No. 14L, do not contain "purely factual and uncontroversial information." *NAM II*, 800 F.3d at 530; *Zauderer*, 471 U.S. at 651. Recall the shareholder proposal that Kroger recognize "any recipient of $10,000 or more of direct contributions." Kroger 2023 Proxy Statement at 85. The statement supporting that proposal notes:

> our support of Planned Parenthood could win the praise of millions of Americans who have had an abortion at one of their facilities. Educational organizations like the Southern Poverty Law Center have seen an increase in funding since they included several conservative

> Christian organizations on their list of hate groups. Our stakeholders
> and customers might be similarly enthused if we supported them.

*Id.* That speech—which Rule 14a-8 compels Kroger to include on its proxy
statement—is not purely factual or uncontroversial. The possibility that sup-
port for certain groups might "win the praise of millions of Americans" or
please employees or customers is speculative. And the notion that support-
ing specific groups that are often the subject of impassioned political debate
merits praise is hardly uncontroversial.

**3.** The Supreme Court's reference to regulations of "corporate proxy
statements" in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456 (1978),
does not render the First Amendment inapplicable to Rule 14a-8. *Ohralik* in-
volved a First Amendment challenge to rules governing in-person solicita-
tion of clients by attorneys. At the time of the decision, commercial speech
had only recently "come within the ambit of the Amendment's protection."
*Id.* at 455. Explaining why commercial speech occupied a "subordinate posi-
tion in the scale of First Amendment values," the Court, in a dictum, pro-
vided examples of "communications that are regulated without offending
the First Amendment"—among them "the exchange of information about
securities," *id.* at 456 (citing *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.
1968)), and "corporate proxy statements," *id.* (citing *Mills v. Elec. Auto-Lite
Co.*, 396 U.S. 375 (1970)). But neither *Mills* nor *Texas Gulf Sulphur* involved
First Amendment claims or Rule 14a-8. In fact, *Mills* was a *Rule 14a-9* claim,
asserting that a proxy statement favoring a merger "was misleading, in

36

violation of § 14(a) of the Act and SEC Rule 14a-9" because it failed to disclose a conflict of interest. *Mills*, 396 U.S. at 378. *Ohralik*'s dictum does not address Rule 14a-8, and it does not immunize regulations of corporate proxy statements from First Amendment scrutiny. Regardless, the Court has limited *Ohralik* to "the attorney-client relationship." *See Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 305 (2007) (Kennedy, J., concurring in part and concurring in the judgment); *accord id.* at 306-07 (Thomas, J., concurring in the judgment); *Edenfield v. Fane*, 507 U.S. 761, 774 (1993). It has also clarified that *Ohralik* does not create a different standard of scrutiny for "professional speech." *NIFLA*, 138 S. Ct. at 2372.

The D.C. Circuit later suggested, in *SEC v. Wall Street Publishing Institute*, 851 F.2d 365, 373 (D.C. Cir. 1988), that statements related to "the purchase and sale of securities" might warrant lesser scrutiny as "a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." Even if that were a distinct First Amendment category, Rule 14a-8 would not qualify because it does not regulate speech about "the purchase and sale of securities." The D.C. Circuit later distinguished *Wall Street Publishing* on the grounds that it had concerned "'inherently misleading' speech . . . 'to sell securities,'" implicating "the same consumer-deception rationale as did *Zauderer*." *NAM I*, 748 F.3d at 372 (citation omitted), *adhered to*, *NAM II*, 800 F.3d at 524. The D.C. Circuit refused to apply *Wall Street Publishing* broadly, correctly explaining that this would allow "Congress to easily regulate

otherwise protected speech using the guise of securities laws," requiring "issuers to disclose the labor conditions of their factories abroad or the political ideologies of their board members, as part of their annual reports." *Id.* The court considered those examples "obviously repugnant to the First Amendment," and it emphasized that such hypothetical regulations "should not face relaxed review just because Congress used the 'securities' label." *Id.*

**4.** The plurality opinion in *PG&E* appeared to endorse such relaxed review, stating in a dictum in a footnote that Rule 14a-8 does not "infringe corporate First Amendment rights." 475 U.S. at 14 n.10. That dictum, however, is contradicted by decades of preexisting and subsequent Supreme Court majority decisions as explained above. *See supra* Part I-A. The *PG&E* plurality's cursory discussion of SEC regulations—in a case having nothing to do with the SEC or securities—does not control because it is not a "recent and detailed discussion of the law by a majority of the Supreme Court." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013).

Regardless, neither of the two assertions in the *PG&E* plurality's dictum withstands scrutiny. First, the plurality argued that "regulations [like Rule 14a-8] that limit management's ability to exclude some shareholders' views from corporate communications do not infringe corporate First Amendment rights," because management's only "interest in corporate property . . . derives from the shareholders." 475 U.S. at 14 n.10. But a proxy statement is *the corporation*'s property and *the corporation*'s own speech. The question, therefore, is who gets to control the corporation's speech—not who has some

minimal ownership stake in the corporation, or, as the plurality stated, how to "allocate shareholder property between management and certain groups of shareholders." *Id.* As explained above (at pp. 3-5), black-letter state corporate law already answers this question: A corporation's acts are controlled by management (*i.e.*, officers at the board's direction)—not a single shareholder acting as the tail wagging the dog. Management acts on behalf of the corporation for, and with a fiduciary duty owed to, *all shareholders*. Yet Rule 14a-8 forces the corporation to surrender corporate property to subsidize the particular views of a self-selected group of shareholders. In effect, Rule 14a-8 makes activist shareholders the "favored speaker," forcing the opposing majority of shareholders to assist in distributing their message.

Second, the *PG&E* plurality asserted that Rule 14a-8 "govern[s] speech by a corporation *to itself*," whereas "the Constitution protects corporations' right to speak to the public based on the informational value of corporate speech"; therefore, "[r]ules that define how corporations govern themselves do not limit the range of information that the corporation may contribute to the public debate." *Id.* at 14 n.10. This is a distinction without a difference, as corporations do not forfeit First Amendment rights when engaging in speech "internal" to the company. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) ("[A]n employer's free speech right to communicate his views to his employees is firmly established."). The First Amendment therefore protects "the interest of a corporation in communicating with and soliciting its shareholders and employees." *Int'l Ass'n of Machinists & Aerospace Workers v. FEC*,

678 F.2d 1092, 1114 n.96 (D.C. Cir.) (*en banc*), *aff'd*, 459 U.S. 983 (1982). It is implausible that the Supreme Court silently overruled these precedents in a plurality opinion's footnote. *See District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) ("It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a foot-noted dictum in a [prior] case where the point was not at issue and was not argued.").

At any rate, even though proxy statements relate to internal corporate governance, they must be filed with the SEC and distributed to every share-holder. *See* 17 C.F.R. § 240.14a-6. And shareholder proposals frequently seek to force the corporation to take a position on controversial social and political issues where the corporation would prefer to remain neutral. *See, e.g.*, Henry N. Butler & Larry E. Ribstein, *Corporate Governance Speech and the First Amendment*, 43 U. Kan. L. Rev. 163, 189 (1994) ("[E]ven purely 'internal' speech relating to corporate governance has important political ramifica-tions, including the issue of what political positions managers should take.").

The *PG&E* plurality separately recognized the danger in allowing gov-ernment "to compel corporate speakers to propound *political messages* with which they disagree." 475 U.S. at 16 (emphasis added). But when *PG&E* was decided almost 40 years ago, there had not been the explosion of activist shareholder proposals about controversial political topics. Recent experience confirms that this is precisely how activist shareholders are using Rule 14a-

8 to hijack the corporation's own speech on its proxy statements. *See supra* pp. 12-17. This clearly violates the First Amendment under binding Supreme Court precedent.

## II. The SEC does not have statutory authority under 15 U.S.C. § 78n to compel corporations to disseminate shareholder speech in corporate proxy solicitations.

In 15 U.S.C. § 78n, Congress granted the SEC authority to regulate corporate proxy statements to protect investors against deceptive or misleading statements by corporate management. Congress did not grant the SEC a free-range and pervasive authority to determine the substantive measures that should appear on corporate proxy statements, let alone to compel corporations to subsidize shareholder proposals on controversial social and political issues with no relation to the company's business.

Congress has demonstrated that when it intends to grant specific authority over the content of proxy statements, it will amend the governing statute, as it did with respect to shareholder nominees for the board of directors. 15 U.S.C. § 78n(a)(2). But it has not done so for shareholder proposals generally.

Multiple canons of construction buttress this plain reading of the text. The canon of constitutional avoidance favors this interpretation to avoid serious First Amendment issues. The federalism canon and the major-questions doctrine require a similar interpretation, because the statute lacks a clear statement of congressional intent to invade the States' traditional

regulation of corporate law or to expand the reach of federal securities law into corporate governance.

### A. The text of 15 U.S.C. § 78n does not empower the SEC to superintend corporate subsidization and dissemination of shareholder speech.

Congress's delegation of authority to the SEC under section 14(a) of the Securities Act of 1934, 15 U.S.C. § 78n(a), is limited in scope. Section 14(a) authorizes the SEC to prescribe rules "as necessary or appropriate in the public interest or for the protection of investors" with respect to the "solicit[ation] [of] any proxy or consent or authorization in respect of any security." *Id.* § 78n(a)(1). But nothing in the statute grants the SEC broad power to compel a corporation to disseminate third-party speech or affirmatively include additional proposals when it solicits proxy votes from shareholders.

Although Section 14(a) uses seemingly broad language, "it is not seriously disputed that Congress's central concern [in enacting Section 14(a)] was with disclosure." *Bus. Roundtable*, 905 F.2d at 410. As the Fifth Circuit held, the grant of authority in the federal securities laws to regulate "in the public interest or for the protection of investors" "[q]uite obviously" was meant "to keep the channels of interstate commerce, the mail, and national security exchanges pure from fraudulent schemes, tricks, devices, and all forms of manipulation." *Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 202 (5th Cir. 1960). And the Supreme Court has said that by Section 14(a),

the Congress "meant to protect investors from misinformation." *Va. Bank-shares, Inc. v. Sandberg*, 501 U.S. 1083, 1103 (1991).

More specifically, the grant of authority to enact rules "for the protection of investors," 15 U.S.C. § 78n(a)(1), has long been understood as indicating Congress's intent "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case*, 377 U.S. at 431. The textual term "'protection of investors'" entails preventive measures ensuring that a corporation's proxy-vote solicitation to shareholders is not "deceptive" or "misleading." *Id.* at 432, 434-35 (quoting 15 U.S.C. § 78n(a)(1)); s*ee TSC*, 426 U.S. at 444 (statute deals with the corporation's "'explanation to the stockholder'" when the corporation's "misstatement or omission was material" (citation omitted)). Dictionary definitions of the word "protect" reflect preventative measures, rather than an affirmative grant of power. *See Protect*, Webster's New International Dictionary of the English Language 1722 (1st ed. 1930) (defining "protect" as "[t]o cover or shield from danger or injury; to defend"); *Protect*, Webster's Revised Unabridged Dictionary (1913) (same). The statutory plain text therefore does not suggest the SEC can impose additional affirmative authority upon investors to alter the management of corporations.

In enacting the Exchange Act, Congress expressly rejected a general "federal corporation law" that would replace existing state law with roaming SEC power to regulate internal matters of corporate governance. *See* Stephen M. Bainbridge, *The Short Life and Resurrection of SEC Rule 19c-4*, 69

Wash. U. L.Q. 565, 618-19 (1991). Instead, Congress empowered the SEC to require public companies to disclose relevant information to investors, but nothing more. The Senate Committee on Banking and Currency noted that the purpose of Section 14(a) was to ensure that investors had "adequate knowledge" about the "financial condition of the corporation . . . [and] the major questions of policy, which are decided at stockholders' meetings." S. Rep. No. 73-792, at 12 (1934). And the Committee denied that the proposed Securities Exchange Act "would give the Commission 'power to interfere in the management of corporations,'" and maintained "that the bill 'furnish[ed] no justification for such an interpretation.'" *Bus. Roundtable*, 905 F.2d at 411 (quoting S. Rep. No. 73-792, at 10).

Section 14(a) thus gave the Commission authority to compel accurate disclosures so that proxy statements were not false or misleading, but the substantive regulation of stockholder meetings remained with the "'firmly established' state jurisdiction over corporate governance." *Bus. Roundtable*, 905 F.2d at 413. Thus, in interpreting section 14(a), the D.C. Circuit has held that "the Exchange Act cannot be understood to include regulation" of "the substantive allocation of powers" in matters of "corporate governance traditionally left to the states." *Id*. at 407-08. Even assuming Section 14(a) might permit the SEC to regulate certain things beyond the Exchange Act's heartland of disclosure, its power could not extend to substantive matters such as compelling the corporation to distribute shareholder speech or determining which items are put to a shareholder vote, as Rule 14a-8 does. *See Rauchman*

*v. Mobil Corp.*, 739 F.2d 205, 207 (6th Cir. 1984) ("[R]ule 14a-8 seems unrelated to prohibiting the inclusion of misleading or dishonest information in proxy statements, which is the primary object of [Section 14(a)].").

Nor can Rule 14a-8 be justified "as necessary or appropriate in the public interest" under Section 14(a). *See* 15 U.S.C. § 78n(a)(1). "[B]road 'public interest' mandates must be limited to 'the purposes Congress had in mind when it enacted [the] legislation.'" *Bus. Roundtable*, 905 F.2d at 413 (quoting *NAACP v. FPC*, 425 U.S. 662, 670 (1976)). "But unless the legislative purpose is defined by reference to the *means* Congress selected, it can be framed at *any* level of generality—to improve the operation of capital markets, for instance." *Id.* at 410. And "'generalized references to the remedial purposes' of the securities laws 'will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit.'" *Aaron v. SEC*, 446 U.S. 680, 695 (1980) (citation omitted). If the delegation means the SEC can require companies to include whatever it wants on a corporation's proxy statement because the public or shareholders would be interested in the corporation's views on the issues *du jour*, then that would raise a serious nondelegation doctrine problem that would warrant a limiting construction. *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 646 (1980) (plurality op.); *cf. Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in the judgment); *id.* (Gorsuch, J., dissenting).

Setting constitutional issues aside, if Congress meant to grant the SEC the unheralded power to force corporate proxy statements to subsidize and

distribute shareholder speech, it could have attempted to do so by amending the Act. After all, Congress knows how to enact a statutory amendment specifying particular contents of a proxy statement. Indeed, Congress amended 15 U.S.C. § 78n in 2010, adding a subsection that expressly authorizes the SEC to mandate the inclusion of shareholder-selected *director nominees*. Dodd-Frank Wall Street Reform & Consumer Protection Act, § 971(a), Pub. L. No. 111-203, 124 Stat. 1376, 1915 (codified at 15 U.S.C. § 78n(a)(2)). But this amendment says nothing about the inclusion of shareholders' *proposals* in a company's proxy statement. To the extent Congress intended to require *substantive proposals* on corporate proxy statements rather than simply director nominees, it has not done so in the text of section 14(a).

That Congress did not make a similar provision for the inclusion of shareholder proposals speaks volumes. Courts cannot "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," particularly "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. ICE*, 543 U.S. 335, 341 (2005). To the contrary, courts should "assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'" *Polselli v. IRS*, 143 S. Ct. 1231, 1237 (2023) (quoting *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013)). That is especially true where the language "is in the adjacent section." *Id.* Congress's choice to require shareholder-submitted board nominees but not shareholder-submitted proposals belies any

suggestion that Congress granted the SEC authority to require corporate management to include shareholder proposals on the company's proxy statement.

Rule 14a-8 departs sharply from the text and purpose of 15 U.S.C. § 78n, which is to require accurate information allowing shareholders to make an informed choice about granting their proxy votes. On the contrary, Rule 14a-8 is concerned directly with matters of corporate governance. It asserts federal governmental power to override management and compel a corporation to publicize activist shareholders' proposals on divisive issues in its own proxy solicitation. But the SEC's intent to inject shareholders into corporate decisionmaking is untethered to 15 U.S.C. § 78n's stated purpose of ensuring disclosure of material facts to promote a functional national market for securities and protect market participants. The SEC's claimed power to dictate the contents of corporate proxy statements has no basis in federal securities law.

## B. Clear-statement canons of construction also foreclose the SEC's statutory interpretation behind Rule 14a-8.

Rule 14a-8 squarely implicates at least three canons of statutory construction that foreclose the SEC's interpretation of Section 14(a): the constitutional-avoidance canon, the federalism canon, and the major questions doctrine.

### 1.    The Court should rely on the canon of constitutional avoidance to avoid serious First Amendment issues.

Under the canon of constitutional avoidance, the Court should avoid the serious First Amendment issues raised above in Part I by interpreting 15 U.S.C. § 78n as foreclosing SEC power to compel corporations to include shareholder proposals on company proxy statements.

The constitutional-avoidance canon provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The canon applies even where an agency's interpretation would otherwise be entitled to deference. *Id.* at 574. And the Supreme Court has applied the constitutional-avoidance canon when interpreting SEC authority implicating First Amendment rights. *See Lowe*, 472 U.S. at 205 & n.50. Likewise, this canon applies to prohibit open-ended grants of authority to agencies under the nondelegation doctrine. *See Indus. Union*, 448 U.S. at 646 (plurality op.); *cf. Gundy*, 139 S. Ct. at 2131 (Alito, J., concurring in the judgment); *id.* (Gorsuch, J., dissenting).

As explained above in Part II-A, there is an eminently "reasonable construction" of 15 U.S.C. § 78n that avoids constitutional problems. *Edward J. DeBartolo Corp.*, 485 U.S. at 575 (citation omitted). Namely, 15 U.S.C. § 78n can be interpreted as focused on prohibiting misleading or deceptive

48

statements *by the entity seeking shareholder proxy votes*—rather than compelling corporations to include shareholder proposals in the corporation's own proxy statement. Based upon that interpretation, the Court should deny the petition for review and hold that Kroger was not required to include the NCPPR's shareholder proposal on its proxy statement, because the SEC has no authority to require any corporation to include shareholder proposals on the corporation's own proxy statement.

### 2.  The federalism canon further requires a clear statement to override state corporate law.

For decades, the Supreme Court and this Court have recognized that Congress must provide clear statutory language to regulate corporation law, which is an area of traditional state regulation. Nowhere in 15 U.S.C. § 78n did Congress provide clear language to override state corporation law and allow the SEC to compel corporations to disseminate shareholder proposals. As explained above, state corporation law allows shareholders to seek their own independent proxy solicitations, but it does not grant shareholders access to a company's own proxy statement. *See supra* p. 7; *see also Dyer v. SEC*, 266 F.2d 33, 41 (8th Cir. 1959) (Rule 14a-8 "affords a privilege, which does not otherwise ordinarily exist in favor of stockholders"). Likewise, state corporation law dictates that shareholders can raise voting proposals *while attending the shareholder meeting*, but it does not allow shareholders to do so through a company's own proxy statement. *See supra* p. 7.

49

Case after case recognizes that "[c]orporation law is" an area traditionally "governed by state-law standards." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991) (citing *Burks v. Lasker*, 441 U.S. 471 (1979)); *see, e.g., Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478 (1977) ("corporate conduct traditionally left to state regulation"); *Herpich v. Wallace*, 430 F.2d 792, 809 (5th Cir. 1970) ("management of corporations" and "fiduciary responsibilities of corporate directors, officers, and controlling persons" are "an area traditionally handled by the states").

The Supreme Court has even singled out shareholder voting rights as an area of traditional state regulation: "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders." *CTS*, 481 U.S. at 89; *see, e.g., Freedman v. Redstone*, 753 F.3d 416, 430 (3d Cir. 2014) ("[T]he Supreme Court consistently has reiterated that corporate law, including governance and shareholder rights, is a field traditionally left to the states.").

Consequently, "[a]bsent a *clear indication* of congressional intent, [courts] are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities." *Santa Fe*, 430 U.S. at 479 (emphasis added). As this Court has explained, if Congress had intended to override state corporation law dealing with "management of corporations" or "the fiduciary responsibilities of corporate directors, officers, and controlling persons, presumably so revolutionary a federal intervention into an area

traditionally handled by the states would have been *clearly expressed*." *Herpich*, 430 F.2d at 809 (emphasis added). After all, "[c]orporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly requires* certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe*, 430 U.S. at 479 (emphasis added) (citation omitted).

At base, Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) (citation omitted). This federalism clear-statement canon is particularly applicable to state corporate law. And 15 U.S.C. § 78n does not contain clear language regulating internal corporate actions regarding shareholders compelling corporations to disseminate shareholder speech.

### 3. The major questions doctrine also requires a clear statement from Congress to authorize the SEC to grant shareholders significantly intrusive authority into corporate actions.

Similarly, the SEC's interpretation of 15 U.S.C. § 78n violates the major-questions doctrine, which addresses "a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The major-questions doctrine rests on the common-sense

belief that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (citation omitted). The Court has explained that "in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

In applying the major-questions doctrine, courts consider whether "the history and the breadth of the authority that [the agency] ha[d] asserted, and the economic and political significance of that assertion" give "reason to hesitate before concluding that Congress meant to confer such authority." *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (quoting *West Virginia*, 142 S. Ct. at 2608). The doctrine may apply even if every indicator is not present: "[T]he doctrine is not an on-off switch that flips when a critical mass of factors is present—again, it simply reflects 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude.'" *Id.* at 2384 (Barrett, J., concurring) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

As currently interpreted by the SEC, Rule 14a-8 enacts a "major policy decision[]," *West Virginia*, 142 S. Ct. at 2609 (citation omitted), of both economic and political significance that finds no support in the language of the controlling statute. Nothing in Section 14(a) indicates that Congress intended for corporations to spend tens of millions of dollars to host debates about the most divisive political issues of the day. Yet that is exactly what

the SEC has mandated through Rule 14a-8. The SEC has now required every publicly traded corporation to give voice to even a single shareholder with a tiny fractional interest in the company who wants to force the company to consider the most controversial social topics. Subsidizing that speech also requires the company to respond to the shareholder proposal, forcing the company to explain its views on issues that it would rather not address.

The SEC even admits that it seeks this precise outcome through Rule 14a-8. The SEC has now declared that Rule 14a-8 requires corporate proxy statements to include *any* "proposal rais[ing] issues with a broad societal impact," even if there is no "nexus between a policy issue and the company." SEC Staff Legal Bulletin No. 14L. The company must host—and affirmatively weigh in on—issues that have nothing to do with maximizing shareholder value but are often "the subject of an earnest and profound debate across the country." *West Virginia*, 142 S. Ct. at 2614 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006)).

Nothing in the text or statutory context of Section 14(a) suggests that Congress intended to displace the States' traditional control over corporate management's solicitation of votes through its proxy statements. *See* 15 U.S.C. § 78n. To the contrary, the text demonstrates that Congress did not intend to override corporate management's authority under state law to determine the contents of the company's own proxy statement. Congress amended the statute in 2010, adding a subsection that expressly authorizes the SEC to mandate the inclusion of shareholders' *director nominees*. 15 U.S.C.

§ 78n(a)(2). But the amendment says nothing about the inclusion of share-holders' *proposals* in a company's proxy statement. There is no basis to infer a silent grant of general authority to compel corporate speech on other subjects. *See supra* pp. 45-46.

## Conclusion

The Court should deny the petition for review on the ground that Rule 14a-8 is not a valid source of authority to compel companies to include shareholder proposals on corporate proxy statements.

Respectfully submitted.

*/s/ Scott A. Keller*

| | |
|---|---|
| Steven P. Lehotsky | Scott A. Keller |
| Lehotsky Keller Cohn LLP | Matthew H. Frederick |
| 200 Massachusetts Avenue, NW | Todd Disher |
| Suite 700 | Alexis Swartz |
| Washington, DC 20001 | Lehotsky Keller Cohn LLP |
| | 919 Congress Avenue |
| Michael A. Tilghman II | Suite 1100 |
| NAM Legal Center | Austin, TX 78701 |
| 733 10th Street, NW | scott@lkcfirm.com |
| Suite 700 | (512) 693-8350 |
| Washington, DC 20001 | |
| | *Counsel for Intervenor* |

## CERTIFICATE OF SERVICE

On July 21, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,916 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller