No. 23-60230

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NATHANIEL FISCHER; PHILLIP ARONOFF,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

-------------------

Petition for Review from an Order
of the Securities and Exchange Commission

-------------------

**BRIEF OF *As You Sow* AS AMICUS CURIAE IN SUPPORT OF RESPONDENT**

DANIELLE FUGERE
LUKE MORGAN
*AS YOU SOW*
P.O. Box 751
Main Post Office
Berkeley, CA 94701
(510) 735-8158
dfugere@asyousow.org
lmorgan@asyousow.org


*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

Under Fed. R. App. P. 26.1 and 5th Cir. R. 26.1, Amicus Curiae *As You Sow* states that it is a nonprofit organization, has no parent corporation, and does not issue stock.  Under 5th Cir. R. 28.2.1, Amicus is unaware of any additional parties not listed in the Petitioners', Respondent's, and Intervenor's statements of interested persons.

/s/ Luke Morgan
Luke Morgan

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

TABLE OF AUTHORITIES.............................................................................iii

INTEREST OF AMICUS CURIAE ................................................ 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT................................................................................ 3

I.     Rule 14a-8 is Authorized by the Securities Exchange Act of 1934 .. 3

    A.  Rule 14a-8 furthers both the narrow purpose and the broader philosophy of the 1934 Act. ........................................................ 4

        1.  Rule 14a-8 prohibits misleading proxy solicitations. ................... 4

        2.  Rule 14a-8 advances the 1934 Act's broader goal of shareholder democracy. ..................................................... 7

    B.  Rule 14a-8 has been ratified by Congress. ..................................... 11

II.    NAM Relies on Myths About the Rule 14a-8 Process ..................... 20

    A.  There is no overwhelming flood of ESG proposals from activists. ............................................................................... 20

    B.  Proposals are not unduly expensive............................................. 24

    C.  ESG proposals are not new. ........................................................ 25

    D.  Proposals must be relevant to an issuer's business. ..................... 28

III.   Shareholder Proposals Are Valuable ............................................. 30

CONCLUSION.............................................................................. 33

CERTIFICATE OF COMPLIANCE ........................................... 35

CERTIFICATE OF SERVICE ..................................................... 36

# TABLE OF AUTHORITIES

## <u>Cases</u>

*American Power & Light Co. v. SEC*,

    329 U.S. 90 (1946) ......................................................................19

*Bob Jones Univ. v. United States*,

    461 U.S. 574 (1983) ............................................................. 18, 19

*Bowen v. Massachusetts*,

    487 U.S. 879 (1988) ......................................................................18

*Citizens United v. FEC*,

    558 U.S. 310 (2010) ........................................................................9

*Medical Comm. for Human Rights v. SEC*,

    432 F.2d 659 (D.C. Cir. 1970) ........................................... 9, 14, 29-30, 33

*Melot v. Bergami*,

    970 F.3d 596 (5th Cir. 2020) ......................................................14

*Pacific Gas & Electric Co. v. Public Utilities Commission*,

    475 U.S. 1 (1986) ........................................................................27

*Save the Bay, Inc. v. Admin. of EPA*,

    556 F.2d 1282 (5th Cir. 1977) ....................................................14

*SEC v. Transamerica Corp.*,

    163 F.2d 511 (3d Cir. 1947) ...................................................8, 12-13

*United States v. New Orleans Public Service, Inc.*,

    553 F.2d 459 (5th Cir. 1977) ....................................................11, 18-19

## <u>Statutes & Regulations</u>

17 C.F.R. § 240.14a-8 ........................................................................ 23, 28

85 Fed. Reg. 70,240 (Nov. 4, 2020) ......................................................24-25

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) ........................................................17

Exchange Act Release No. 3638 (1945)..................................................25-26

Securities Act Release No. 3347 (1942) ........................................................ 6

Securities Exchange Act of 1934, Pub L. 73-291, 48 Stat. 881 (1934) ..... 3

SEC Release No. 34-40018 (May 21, 1998)..................................................29

## Other Authorities

*As You Sow*, *Proxy Preview* (2022), https://tinyurl.com/mpzw2ueu ........22

David Bayne et al., *Proxy Regulation and the Rule-Making Process: The 1954 Amendments*, 40 Va. L. Rev. 387 (1954) ...................... 9

Blackrock, *2022 Voting Spotlight* (2022), https://tinyurl.com/2bbm7hwf .................................................................21-22

Corporate Participation Act, S. 4003, 91st Cong. (1970) ..........................14

Corporate Rights & Responsibilities, Hearings before the Comm. on Commerce, 94th Cong. (1976) ...........................14-15

Council of Institutional Investors, *Frequently Asked Questions about Shareholder Proposals*, https://tinyurl.com/4sfyxsat ................20-21

James Cox & Randall Thomas, *The SEC's Shareholder Proposal Rule: Creating a Corporate Public Square*, 2021 Colum. Bus. L. Rev. 1147 ....................................................... 6, 10, 33

Frank Emerson & Franklin Latcham, *The SEC Proxy Proposal Rule: The Corporate Gadfly*, 19 Univ. Chi. L. Rev. 807 (1952) ..........................................................26-27

Timothy Feagans, *SEC Rule 145a-8: New Restrictions on Corporate Democracy*, 33 Buff. L. Rev. 225 (1984) ..............................27-28

Jill Fisch, *From Legitimacy to Logic: Reconstructing Proxy Regulation*, 46 Vand. L. Rev. 1129 (1993) ................................................. 7-8

Milton Freeman, *An Estimate of the Practical Consequences of the Stockholder's Proposal Rule*, 34 U. Det. L.J. 549 (1957) ....... 6-7, 10

Amy Goodman & John Olson, *Shareholder Proposal Developments During the 2014 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (July 2, 2014), https://tinyurl.com/yc7jzae2 ................................................22

Virginia Harper Ho, *Risk-Related Activism: The Business Case for Monitoring Nonfinancial Risk*, 41 J. Corp. L. 647 (2016) ................................................. 30-31, 33

Hearings on Security and Exchange Commission Proxy Rules Before the House Comm. on Interstate and Foreign Commerce ("1943 Hearings"), 78th Cong. (1943) ................. 4, 5-6, 12, 23

H.J. Res. 36, 117th Cong. (2021)................................................16

H.R. 5756, 115th Cong. (2018) ......................................................16

H.R. Rep. No. 1383 (1934)......................................................... 5, 8

Investor Equality Act, S. 1658, 101st Cong. (1989) ..................................16

Elizabeth Ising, *Shareholder Proposal Developments During the 2015 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (July 17, 2015), https://tinyurl.com/4vu4jw4z ...........................................22

Elizabeth Ising, et al., *Gibson Dunn Discusses Shareholder Proposal Developments for the 2022 Proxy Season*, CLS Blue Sky Blog (July 29, 2022), https://tinyurl.com/5n9srju8....................24

Sanford Lewis, *SEC Resets the Shareholder Proposal Process*, Harv. L. Sch. F. on Corp. Gov. (Dec. 23, 2021), https://tinyurl.com/3c3e7dtb ...........................................................29

Ronald Mueller et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (Aug. 3, 2023), https://tinyurl.com/mwsxt5dh ...................... 22, 30

NAM, *Diversity and Inclusion: What You Need to Know*, NAM News Room (Feb. 12, 2021), https://tinyurl.com/bddswdd6 ......31-32

NAM, *Get Help with Post-Dobbs Health Plan Compliance*, NAM News Room (June 29, 2022), https://tinyurl.com/2p9w9cp4 ..........32

Nomination of Charles Coleman Cox, Hearing before the Comm. on Banking, Housing & Urban Affairs, 98th Cong. (1983) .................15-16

Restoring Shareholder Transparency Act of 2022, S. 3945,
117th Cong. (2022) .........................................................................16

The Role of the Shareholder in the Corporate World, Hearings
Before the Subcomm. on Citizens & Shareholders Rights &
Remedies, 95th Cong. (1977) ........................................................15

Patrick Ryan, *Rule 14a-8, Institutional Shareholder Proposals,
and Corporate Democracy*, 23 Ga. L. Rev. 97 (1988) ................... 8

*Pfizer, Inc.*, 2021 WL 6126545 (Feb. 10, 2022) .........................31

S.J. Res. 16, 117th Cong. (2021) ..................................................16

Donald Schwartz & Elliott Weiss, *An Assessment of the SEC
Shareholder Proposal Rule*, 65 Geo. L.J. 635 (1976) ....... 5, 9-10

SEC Enforcement Problems, Hearing before the Subcomm. On
Securities, 85th Cong. (1957).......................................................13

SEC, Staff Legal Bulletin No. 14E (Oct. 27, 2009) ....................28

SEC, Staff Legal Bulletin No. 14L (Nov. 3, 2021) .....................29

Staff Report on Corporate Accountability for the U.S. Senate Comm.
on Banking, Housing & Urban Affairs, 96th Cong. (1980) .............. 10, 23

Stock Market Study (Corporate Proxy Contests), Hearings
before the Subcomm. on Securities, 84th Cong. (1955) ...........................13

Dalia Tsuk Mitchell, *Shareholders as Proxies:
The Contours of Shareholder Democracy*,
63 Wash. & Lee L. Rev. 1503 (2006) ............................... 8, 11, 26

Harwell Wells, *Shareholder Meetings and Freedom Rides:
The Story of* Peck v. Greyhound, 45 Seattle U. L. Rev. 1 (2021) .............26

## INTEREST OF AMICUS CURIAE

Amicus *As You Sow* is a nonprofit shareholder advocacy organization that represents shareholders in engagements with companies on a range of issues with the goal of reducing risk, benefiting brand reputation, and increasing company value. *As You Sow* files shareholder proposals under SEC Rule 14a-8 to advance the interests of shareholders on issues of critical importance to companies and stakeholders. If the National Association of Manufacturers' arguments against the rule were to prevail, *As You Sow*'s interests would be substantially impaired.

Additionally, *As You Sow*'s long history of shareholder advocacy and familiarity with the shareholder proposal process enables it to provide the Court with additional context and information from a perspective not represented by the parties to the litigation.[1]

---

[1] No counsel for a party authored this brief in whole or in part. No person other than amicus made any monetary contribution intended to fund the preparation or submission of this brief.

1

# SUMMARY OF ARGUMENT

SEC Rule 14a-8, the shareholder proposal rule, allows the owners of publicly traded companies to make their voices heard. For most shareholders, filing and voting on proposals is the primary means of providing feedback on corporate decisions and raising issues of concern to management and board attention.

Since first promulgated 81 years ago, the shareholder proposal rule has provided a core right in American corporate governance: the right to raise concerns to fellow shareholders about company actions that may create risk for the company and negatively impede value, among other concerns. Shareholders exercising this right have brought emerging risks to the forefront of the national conversation and have prompted valuable innovations in corporate governance. The rewards of shareholder proposals are felt daily by investors, consumers, and society.

Today, even though shareholder proponents are subject to more stringent threshold requirements than ever before, they persist in exercising this core property right. Shareholders file proposals with companies to obtain greater information and transparency, to improve governance, to seek measures likely to add long term value, or to ensure

risks are confronted and reduced. Proponents may also be diversified investors, who recognize that corporate decisions that add short-term value by externalizing costs do not benefit them. These investors are participants in a long, democratic and market-based tradition.

The National Association of Manufacturers asks this Court to end this tradition and insulate its members from investor feedback. *See generally* Brief of Nat'l Ass'n of Manufacturers ("NAM Brief"), Dkt. No. 66. NAM's arguments in support of this radical request ignore the history of the shareholder proposal rule, exaggerate its costs, and overlook its benefits.

## ARGUMENT

### I. RULE 14A-8 IS AUTHORIZED BY THE SECURITIES EXCHANGE ACT OF 1934

The Securities Exchange Act of 1934 (the "1934 Act") authorized the Securities and Exchange Commission to issue "such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pub. L. 73-291 § 14, 48 Stat. 881, 895 (1934). The Commission swiftly exercised this authority to require the inclusion of shareholder proposals in corporate proxies, responding to prevalent corporate abuse of the proxy

and fulfilling Congress's broad goals in passing the Act. Subsequent history has demonstrated congressional ratification of the rule.

### A. Rule 14a-8 furthers both the narrow purpose and the broader philosophy of the 1934 Act.

In passing the 1934 Act, Congress sought to address corporate abuse of the proxy while also advancing a broader philosophy of shareholder democracy. The shareholder proposal rule furthers each goal.

### *1. Rule 14a-8 prohibits misleading proxy solicitations.*

Under common and state law, corporate shareholders have always held rights "to appear at [a corporate] meeting; to make a proposal; to speak on that proposal at appropriate length; and to have [the] proposal voted on." Hearings on Security and Exchange Commission Proxy Rules Before the House Comm. on Interstate and Foreign Commerce ("1943 Hearings"), 78th Cong. at 172 (1943). However, as corporations increased in size and their shares became more widely dispersed, the rights to attend a company meeting and vote on a shareholder proposal were "rendered largely meaningless." *Id.* The solution was and remains the corporate proxy solicitation process, in which a shareholder authorizes

management to exercise their shares' voting rights at a corporate meeting.

At the time of the 1934 Act, corporate abuse of the proxy was rampant. Management "solicited stockholders' proxies without telling the stockholders what matters would be considered at the annual meeting. Once they obtained sufficient votes to control the meeting, managements used the proxies for a variety of questionable purposes." Donald Schwartz & Elliott Weiss, *An Assessment of the SEC Shareholder Proposal Rule*, 65 Geo. L.J. 635, 636 (1976). Hence, a central purpose of the 1934 Act was to give the SEC the "power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders." H.R. Rep. No. 1383, at 14 (1934).

Considered particularly egregious was the practice of soliciting proxies without informing shareholders that their proxies would be used to defeat shareholder proposals. Ending this abuse was one of the central purposes of the 1934 Act. *See id.* ("Insiders have at times solicited proxies without fairly informing the stockholders of the purposes for which the proxies are to be used . . . ."). In 1938, the SEC informally concluded that

the failure to disclose shareholder proposals on corporate proxy statements was "misleading" because "shareholders were entitled to know" what would be up for consideration at the meeting when "deciding whether to give their proxies to management." 1943 Hearings at 170.[2] In 1942, this *ad hoc* determination by the SEC was formalized as Rule X-14A-7—now known as Rule 14a-8. Securities Act Release No. 3347 (1942).

To adequately inform solicited shareholders what their proxies will be used for, the corporate proxy statement must identify the items of business to be voted on at a shareholder meeting. This, by definition, requires their inclusion in the solicitation, and failure to include them constitutes a "glaring omission." James Cox & Randall Thomas, *The SEC's Shareholder Proposal Rule: Creating a Corporate Public Square*, 2021 Colum. Bus. L. Rev. 1147, 1176. As Milton Freeman, the principal author of many SEC regulations, explained, the SEC's stance "was the only one which it could adopt under the law," and, indeed, "the point once

---

[2] Even where management does not intend to use proxies directly to defeat a proposal, disclosing the proposal to solicited shareholders is still necessary because the shareholders' proxies create the quorum necessary to take *any* action at a meeting. *Accord.* NAM Brief at 5.

6

made was immediately if reluctantly conceded by the management." Milton Freeman, *An Estimate of the Practical Consequences of the Stockholder's Proposal Rule*, 34 U. Det. L.J. 549, 550 (1957).

This history readily answers NAM's argument that the 1934 Act's prohibition of "misleading" or "deceptive" practices does not authorize the shareholder proposal rule. Rather, the failure to disclose shareholder proposals in proxy solicitations was among the very evils the Act was intended to remedy.

2. *Rule 14a-8 advances the 1934 Act's broader goal of shareholder democracy.*

In addition to addressing proxy abuse, the 1934 Act also embodied Congress's intent to promote a broader philosophy of shareholder democracy. NAM argues that democracy has no role in corporate governance. *See* NAM Brief at 3-5, 9-10. But the Congress that passed the 1934 Act disagreed, and explicitly intended to infuse corporate governance with democratic principles. Rule 14a-8 plays an essential role in advancing this goal.

To Congress, corporate proxy abuse was a symptom of a broader problem: "that shareholder control over corporate governance was

weakening," Jill Fisch, *From Legitimacy to Logic: Reconstructing Proxy Regulation*, 46 Vand. L. Rev. 1129, 1133 (1993), leading to "[t]he control of great corporations by a very few persons," *SEC v. Transamerica Corp.*, 163 F.2d 511, 518 (3d Cir. 1947). Congress compared corporate managers to "kings and great men" and asserted that "[m]odern democratic society . . . cannot afford to constitute its economic undertakings upon the monarchial or aristocratic principle." H.R. Rep. No. 1383, at 5. Its solution was democracy: in return for access to the securities exchanges, corporations would incur "a corresponding duty of according to shareholders fair suffrage." *Id.* at 14.

Consequently, from the ground up, the SEC's "proxy regulation power [was] designed to protect the shareholder voice in control of the corporation." Patrick Ryan, *Rule 14a-8, Institutional Shareholder Proposals, and Corporate Democracy*, 23 Ga. L. Rev. 97, 140 (1988). This ideal had "significant and nearly universal support" among the congressional majority. *Id.* at 142. As such, the 1934 Act was "meant to create a deliberative corporate democracy." Dalia Tsuk Mitchell, *Shareholders as Proxies: The Contours of Shareholder Democracy*, 63 Wash. & Lee L. Rev. 1503, 1549 (2006). So central was this goal that the

D.C. Circuit described it as "obvious to the point of banality" to restate it. *Medical Comm. for Human Rights v. SEC*, 432 F.2d 659, 676 (1970), *vacated as moot*, 404 U.S. 403 (1972).

Corporate democracy is so foundational to our system of corporate governance that it has come to play an important role even in constitutional law. In *Citizens United v. FEC*, the Supreme Court defended its expansion of corporate speech rights by stating that "there is little evidence of abuse that cannot be corrected by shareholders 'through the procedures of corporate democracy.'" 558 U.S. 310, 361-62, 370 (2010).

But corporate democracy is an empty promise absent the procedures designed to ensure it, including the shareholder proposal rule. Indeed, proposals "constitute virtually the only device shareholders can employ to influence corporate decisions affecting them," at least short of a board contest. *See* Schwartz & Weiss, *supra*, at 635. Accordingly, the rule has always had "special significance" in fulfilling the 1934 Act's ideal of shareholder democracy. David Bayne et al., *Proxy Regulation and the Rule-Making Process: The 1954 Amendments*, 40 Va. L. Rev. 387, 388 (1954). Most obviously, the 14a-8 process serves as a forum for

shareholders to be heard on matters of significance to the corporation, thereby providing a "safety valve for dissent," Schwartz & Weiss, *supra*, at 635, and avoiding the inefficient alternative of costly director elections to resolve every dispute between management and ownership.

Shareholder proposals also function as a "corporate public square" that provides directors with "valuable information" that enables them "to inform themselves about issues that require them to balance the effect of their actions on their firm's stock price and on other interests of their company." Cox & Thomas, *supra*, at 1154. Proposals can "introduce a fresh perspective" and cause "the directors and executives to reflect on an issue that may not otherwise have been considered." *Id.* at 1165. They also "place[] on management the obligation to justify itself" and its actions "to the body of shareholders." Freeman, *supra* at 554*; see also* Staff Report on Corporate Accountability for the U.S. Senate Comm. on Banking, Housing & Urban Affairs, 96th Cong. at 133 (1980) quoting Business Roundtable comment that "14a-8 is a viable and valuable part of corporate governance, through which management and shareholders express their views"). Shareholder proposals thus play a foundational role in corporate governance.

## B. Rule 14a-8 has been ratified by Congress.

Given the shareholder proposal rule's consistency with the essential purposes of the 1934 Act, it should come as no surprise that Congress has considered and declined to act on challenges to the rule's legal validity. This history demonstrates congressional acquiescence to the rule. As "an integral part of a long-standing program which Congress has recognized and approved," there is "no difficulty . . . in finding congressional authorization for the provision." *See United States v. New Orleans Public Service, Inc.*, 553 F.2d 459, 467 (5th Cir. 1977), *vacated on other grounds*, 98 S. Ct. 2841 (1978).

At the rule's inception, the SEC itself considered and disregarded the very objection NAM now makes. The only SEC commissioner to vote against adoption of the rule "believed that the rule reached beyond the remedy of disclosure and thus beyond the scope of the SEC's authority." Tsuk Mitchell, *supra* at 1552. Although the rule was promulgated despite this objection, business groups were later able to interest Congress in the argument that the shareholder proposal rule exceeded the SEC's statutory authority. "Congressional hearings ensued." *Id.* at 1553.

At that early hearing, the SEC's authority to issue the rule under the 1934 Act was specifically addressed. Responding to a question as to whether the rule could "be justified under section 14 even if [that section] were interpreted as a disclosure section," SEC Commissioner Purcell emphatically answered "Yes." 1943 Hearings, at 118-119. The SEC's Director of the Division of Corporation Finance went further in noting that the proxy rules "go in some particulars beyond mere disclosure," and argued that the Commission in promulgating such rules was "carrying out the desire . . . [of] the Congress" because Congress intended "something further than disclosure." *Id.* at 238. Importantly, Director Bane testified that the SEC, when interpreting "what the Congress intended also bore in mind that Congress said that it wanted, through this legislation to afford the security holder an opportunity for fair suffrage," which the SEC understood to *require* the shareholder proposal rule. *Id.* at 239. Having heard arguments for and against the validity of the rule and questioned the SEC about its adoption, Congress elected not to eliminate the rule. Shortly thereafter, the Third Circuit confirmed the SEC's interpretation, announcing that it "entertain[ed] no doubt that [the rule] represents a proper exercise of the authority conferred by

Congress on the Commission under Section 14(a)." *Transamerica Corp.*, 163 F.2d at 518.

Congress has considered the shareholder proposal rule numerous times since *Transamerica Corp.* in hearings concerning the SEC, shareholder rights, and corporate power. Over that span, Congress did not act to limit or override 14(a)-8; in fact, it has appeared much more concerned that Rule 14a-8 is too restrictive than about any supposed inconsistency with the 1934 Act.

In 1955, the Senate heard testimony from multiple witnesses in favor of expanding the rule to shareholders' benefit. *See* Stock Market Study (Corporate Proxy Contests), Hearings before the Subcomm. on Securities, 84th Cong. at 1601-04, 1636, 1649-55 (1955). And in 1957, written questions to the SEC suggest that Congress was still concerned that the rule was biased against shareholders. *See* SEC Enforcement Problems, Hearing before the Subcomm. On Securities, 85th Cong. at 75-76 (1957) (questioning, *inter alia*, why the rule was amended to add resubmission thresholds and whether "management ha[d] an advantage" in opposing proposals due to the word limit on proponent statements).

In 1970, the D.C. Circuit questioned the SEC's conclusion that a shareholder proposal addressing Dow Chemical's production of napalm was properly omitted from a proxy, concluding that "the clear import of the language, legislative history, and record of administration of section 14(a)" supported an expansive interpretation of the shareholder proposal rule that "assure[d] to corporate shareholders the ability to exercise their right—some would say their duty—to control the important decisions," including the moral and political decisions, of the corporation. *Medical Committee*, 432 F.2d at 680-81 (1970).[3]  Legislation was subsequently introduced with the goal of affirming the court's holding, but Congress declined to take this additional step. *See* Corporate Participation Act, S. 4003, 91st Cong. § 2 (1970).

In 1976 hearings, Congress again underscored its support for the shareholder rule and the goal of "check[ing]" the "concentration of economic, political, and environmental power in large corporations." Corporate Rights & Responsibilities, Hearings before the Comm. on

---

[3] Although *Medical Committee* was vacated as moot by the Supreme Court, it retains its persuasive authority. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (citing as persuasive authority Tenth Circuit precedent subsequently vacated as moot); *Save the Bay, Inc. v. Admin. of EPA*, 556 F.2d 1282 (5th Cir. 1977) (engaging extensively with *Medical Committee*'s reasoning on another issue).

Commerce, 94th Cong. at 1 (1976). One concerned senator asked the SEC Chair if there was "any substance to the reports that the SEC may be contemplating abolition" of the shareholder proposal rule. *Id.* at 318. The Senate then heard testimony from proponents about shareholder proposals. *See id.* at 25-31, 419-20.

The following year, the Senate held hearings on "The Role of the Shareholder in the Corporate World." In his opening remarks, Senator Metzenbaum lamented that "shareholder proposals rarely pass" because the proxy rules "put[] shareholders at a tremendous disadvantage." The Role of the Shareholder in the Corporate World, Hearings Before the Subcomm. on Citizens & Shareholders Rights & Remedies, 95th Cong. at 2 (1977). Once more, the Senate heard testimony on the challenges faced by proponents of shareholder proposals, underscoring the importance of shareholder democracy. *See id.* at 151-63.

In 1983, in a nomination hearing following SEC amendments that added additional filing requirements to the rule, the Senate, in written questions, asked an SEC nominee whether he believed the updated rule "undermined the ability of shareholders to make legitimate proposals" or "imposed excessive burdens on corporations which are required to include

shareholder proposals in their proxies," underscoring Congress' concern that nominees be supportive of the shareholder right to bring proposals. Nomination of Charles Coleman Cox, Hearing before the Comm. on Banking, Housing & Urban Affairs, 98th Cong. at 45-46 (1983). And in 1989, the proposed "Investor Equality Act" would have required that corporate proxy solicitations afford to shareholders "equal space, coverage, and treatment as is received by . . . the board of directors or management" for statements in favor of proposals. S. 1658, 101st Cong. § 8, 9 (1989).

Since 2000, several legislative attempts to alter the rule have fallen short. In 2018, legislation unsuccessfully sought to increase proposal resubmission vote thresholds. H.R. 5756, 115th Cong. § 1 (2018). In 2021, legislation was introduced to nullify Trump Administration changes to the rule that restricted shareholders' rights. *See* H.J. Res. 36, 117th Cong. (2021); S.J. Res. 16, 117th Cong. (2021). And in 2022, legislation introduced in the Senate would have drastically restricted the rule. *See* Restoring Shareholder Transparency Act of 2022, S. 3945, 117th Cong. § 3 (2022).

Significantly, Congress has <u>expressly ratified shareholders' right to make proposals through enacted legislation</u> in the Dodd-Frank Wall Street Reform and Consumer Protection Act. In creating a requirement that shareholders be entitled to vote to approve executive compensation awards, Dodd-Frank also explicitly preserved the right to bring shareholder proposals. It stated that the new requirement was not to be construed "to restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials related to executive compensation." Pub. L. 111-203 § 951(c)(4), 124 Stat. 1376, 1899-1900 (2010). By doing so, Congress explicitly acknowledged shareholder proposal rights under the federal proxy regulations and ensured that its amendments to the securities laws would not restrict those rights.

This history demonstrates congressional ratification of the shareholder proposal rule. Both immediately after the promulgation of the rule and in the decades since, Congress has considered the rule and declined to abrogate or limit it. Indeed, after decades of consideration, Congress's *only* official action with respect to the rule was to ensure its continued availability. Over the same period, two Courts of Appeals have concluded that the rule is consistent with the text and intent of the 1934

Act. *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 896 (1988) (noting "well-settled presumption that Congress understands the state of existing law").

These are precisely the circumstances under which the Supreme Court has found congressional acquiescence in a regulation to confirm its consistency with an enabling statute. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 599-601 (1983). In *Bob Jones*, almost immediately after promulgation of an IRS rule, "Congress held . . . hearings on th[e] precise issue" of its validity, followed by multiple hearings "at various times since then," *see id.* at 600, all without overruling or amending the rule. Moreover, as was the case in *Bob Jones*, Congress has considered and rejected numerous bills that would amend the shareholder proposal rule. *See id.* In fact, "evidence of congressional approval . . . goes well beyond the failure of Congress to act on legislative proposals. Congress affirmatively manifested its acquiescence" through the Dodd-Frank Act's explicit preservation of shareholder proposal rights. *See id.* at 601.

In total, "Congress not only has refused to circumscribe" the shareholder proposal rule, "but has indicated a concern for the efficacy of [the rule] and an intent that [it] would continue." *New Orleans Public*

*Service*, 553 F.2d at 467.  Thus, "[t]he actions of Congress . . . leave no doubt that the [SEC] reached the correct conclusion in exercising its authority."  *See Bob Jones University*, 461 U.S. at 599.

Bizarrely, NAM attempts to portray Congress's eight decades of not abrogating Rule 14a-8 as indicative of congressional disapproval of the rule, claiming it "speaks volumes" that Congress has not amended the 1934 Act to require the inclusion of shareholder proposals on corporate proxies.  NAM Brief at 45-46.  This ignores the obvious: Congress has not amended the law because the SEC is applying it as intended.  In fact, the law NAM cites to demonstrate that Congress knows how to amend section 14 is the Dodd-Frank Act, *see id.* at 46, 54—the *very law in which Congress preserved existing shareholder proposal rights.*[4]

---

[4] NAM argues that both the major questions doctrine and the federalism canon apply and require a "clear indication" of Congressional intent to authorize the rule. *See* NAM Brief at 49-54.  Neither doctrine should apply: NAM fails to demonstrate that a single major-questions-doctrine factor is met. While stating that some shareholder proposals may raise politically fraught issues, it ignores the fatal point that the legitimacy of shareholder proposals—the relevant inquiry—is not itself a topic of profound national debate.  *See id.* at 53.  The federalism canon is not applicable to "conditions and requirements on those who use the channels of interstate commerce," for which Congress "may compel changes in the voting rights and other privileges of stockholders" despite traditional state control over corporate law.  *American Power & Light Co. v. SEC*, 329 U.S. 90, 99-100 (1946).  But even if the canons applied, the history detailed *supra* provides more than sufficient indication of congressional intent.

## II.    NAM RELIES ON MYTHS ABOUT THE RULE 14A-8 PROCESS

NAM also presents a skewed picture of the shareholder proposal process, depicting companies as newly overburdened by a flood of political "ESG" (Environmental, Social, and Governance) proposals filed by activists and bearing no relationship to companies' businesses. Each element of this picture is false:

- There is no overwhelming flood of shareholder proposals from activists.  In fact, it has never been harder to file a shareholder proposal.

- Shareholder proposals are not prohibitively expensive.

- There is nothing new about the use of the rule by shareholders to address issues such as transparency, value, risk, and reputation raised by social and environmental dimensions of corporate action.

- Proposals are required by law to relate to the issuer's business.

### A. There is no overwhelming flood of ESG proposals from activists.

NAM asserts that companies have been "overburdened" by a "surge" of political proposals from "activist shareholders."  NAM Brief at 12.  This is false.  "Most public companies do not receive any shareholder

proposals." Council of Institutional Investors, *Frequently Asked Questions about Shareholder Proposals*, https://tinyurl.com/4sfyxsat. In fact, "the average Russell 3000 company can expect to receive a proposal once every 7.7 years. For companies that receive a proposal, the median number of proposals is one per year." *Id.* Some larger companies whose actions and policies create risk across a variety of issues, and often are non-responsive to shareholders, receive multiple proposals.

A stark illustration of the scale of this supposed "flood" can be identified in the voting statistics released by Blackrock, the world's largest asset manager, who votes shares on behalf of its clients. Blackrock voted on 47,826 total proposals in the Americas during the 2022 proxy season. Blackrock, *2022 Voting Spotlight* 18 (2022), https://tinyurl.com/2bbm7hwf. "[S]hareholder proposals represented <u>less than 1%</u> of the total proposals [Blackrock] voted on during the 2021-22 proxy year." *Id.* at 12 (emphasis added). And only 28% of shareholder proposals were classified as "environmental" or "social" proposals. *Id.* at

21

19.   So, the "political" proposals NAM claims are overwhelming companies make up <u>less than one-third of one percent</u> of all proposals.[5]

ESG proposals also do not come exclusively or primarily from "activists." Long-term investors like pension funds, foundations or school endowments, alongside faith-based investors, make up a significant proportion of the proponents of such proposals. *See As You Sow*, *Proxy Preview* 10 (2022), https://tinyurl.com/mpzw2ueu. Organizations like *As You Sow*, which receives particular attention from NAM, *represent* a range of different shareholders, from individual investors to endowments and many in between. NAM's observation that organizations like *As You Sow* file many proposals is akin to noting that lawyers file most lawsuits.

One reason that shareholder proposals are relatively rare is the substantial hurdles associated with filing, which became even higher after 2020 amendments to Rule 14a-8. As a result, it is harder to file a

---

[5] There are fewer shareholder proposals submitted now than was typical less than a decade ago. In 2022-23, the number of shareholder proposals increased "for the third year in a row" to a total of 889. Ronald Mueller et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (Aug. 3, 2023), https://tinyurl.com/mwsxt5dh. This is fewer than at any point from 2013 to 2016. *See id;* Elizabeth Ising, *Shareholder Proposal Developments During the 2015 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (July 17, 2015), https://tinyurl.com/4vu4jw4z; Amy Goodman & John Olson, *Shareholder Proposal Developments During the 2014 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (July 2, 2014), https://tinyurl.com/yc7jzae2.

shareholder proposal now than ever before. Rule 14a-8 sets forth numerous procedural thresholds, including: minimum shareholding periods, 17 C.F.R. § 240.14a-8(b)(1)(i); minimum share value, *id.*; a one proposal maximum, *id.* at § 240.14a-8(c); a requirement for the shareholder to meet with the company prior to the meeting, *id.* at § 240.14a-8(b)(1)(iii); and significant resubmission thresholds, *id.* at § 240.14a-8(i)(12). Proposals may also be excluded pursuant to any of a dozen substantive exceptions. *Id.* § 240.14a-8(i)(1)-(13).

*None* of these rules was part of the original shareholder proposal rule. At the time of the rule's promulgation, a shareholder who owned a single share of company stock, with no holding period, could demand inclusion of an unlimited number of proposals in the company's proxy materials. *See* 1943 Hearings at 159, 162, 200. "Until 1948, the shareholder proposal rule did not specify circumstances under which management properly could omit a proposal." Staff Report on Corporate Accountability, *supra*, at 146. Various substantive exceptions and procedural requirements since have been introduced (generally to congressional consternation, *see supra*). Consequently, shareholders

today must jump through more hoops, and corporate management has more opportunities to exclude a proposal, than ever before.

### B. Proposals are not unduly expensive.

NAM also exaggerates the cost of shareholder proposals. NAM claims that "[t]he SEC itself estimates that shareholder proposals can impose up to $150,000 in direct costs on a company *per proposal*." *See* NAM Brief at 15. As the underlying SEC document makes clear, this figure represents an "upper bound" that "includ[es] legal and management time to consider a shareholder proposal and the cost of submitting a no-action request to Commission staff." 85 Fed. Reg. 70,240, 70,274 (Nov. 4, 2020). In other words, this figure includes tremendous self-imposed costs, such as the cost of hiring expensive outside counsel to submit a no-action letter. But most proposals do not generate no-action requests. *See* Elizabeth Ising, et al., *Gibson Dunn Discusses Shareholder Proposal Developments for the 2022 Proxy Season*, CLS Blue Sky Blog (July 29, 2022), https://tinyurl.com/5n9srju8 (868 proposals led to 244 no-action requests). Significantly, the SEC document cited by NAM also includes a Society for Corporate Governance survey that found that 73% of respondent corporations spent less than

$20,000 *total* on <u>all</u> proposals annually.  85 Fed. Reg. at 70,272.  The cost of shareholder proposals is not best estimated by looking exclusively at outliers.

### C. ESG proposals are not new.

NAM's argument also hinges on the idea that proposals dealing with "controversial political and social issues," are a "new" threat to companies.  *See* NAM Brief at 17 (describing shareholder proposals as a "new battleground for the Nation's most intractable policy debates").  Nothing could be further from the truth.  Shareholders have used the rule from its inception to force corporations to grapple with the externalized consequences of their business decisions (and the resulting business risk), a category of proposals that NAM dysphemistically describes as "political" or "social."

The SEC has long enforced a distinction between political proposals having nothing to do with a company and those that involve the social or environmental   implications of the company's business.  Thus, one of the first restrictions placed on the shareholder proposal rule was a prohibition on proposals "which deal with *general* political, social or economic matters."  Exchange Act Release No. 3638 (1945) (emphasis

added).  This rule was used to permit the exclusion of proposals that demanded that federal income tax not be applied to corporate dividends, that "the antitrust laws and their enforcement be revised," and that "all future federal legislation providing for representation of workers and farmers apply equally to investors."  Frank Emerson & Franklin Latcham, *The SEC Proxy Proposal Rule: The Corporate Gadfly*, 19 Univ. Chi. L. Rev. 807, 808-09 (1952).

At the same time, shareholder proposals could address social and environmental issues so long as they were related to the company's business or within management's power to act upon.  For example, among the earliest proposals were several from the Federation of Women Shareholders in American Business calling for women to be included on corporate boards.  *Id.* at 817.  Apparently, no one considered these "board diversity" proposals, as they are called today, subject to exclusion.  The critical distinction was made obvious in the SEC's treatment of a proposal to Greyhound Corporation requesting that "management consider the advisability of abolishing the segregated seating system in the South."  *Id.* at 832.  The SEC permitted exclusion of the proposal because it "was

not limited to segregated seating on the corporation's buses alone." *Id*. at 833.[6]

"Social responsibility proposals," as they were then called, were also extremely common during the 1970s. *See* Tsuk Mitchell, *supra* at 1567. Religious groups submitted proposals "focused on equal employment opportunities, plant closing, racism in South Africa, activities in countries with controversial human rights records, energy conservation, nuclear power and nuclear weapons, as well as military production." *Id*. at 1567-68 (internal quotation marks omitted). The American Jewish Congress introduced proposals concerning the Arab boycott of Israel. *Id*. Social responsibility proposals expanded further in the 1980s, with, *inter alia*, conservative groups introducing a variety of anti-communism proposals. *See id. at* 1568; Timothy Feagans, *SEC Rule 145a-8: New*

---

[6] Subsequent scholarship has argued that the proposal did specifically target Greyhound, and that the SEC staff had previously indicated to the proponents that it was permissible on that basis. However, a new administration's SEC staff intentionally "misdescribed" the proposal to exclude it as a "general" political proposal. *See* Harwell Wells, *Shareholder Meetings and Freedom Rides: The Story of* Peck v. Greyhound, 45 Seattle U. L. Rev. 1, 24-28 (2021).

*Restrictions on Corporate Democracy*, 33 Buff. L. Rev. 225, 229 n.8 (1984).[7]

### D. Proposals must be relevant to an issuer's business.

NAM repeatedly asserts that the SEC recently changed the rule to allow proposals with no relationship to a company's business. *See* NAM Brief at 8, 10-11, 17, 33, 35, 53. This assertion artfully elides the existence of Rule 14a-8(i)(5), which continues to require that proposals be "relevan[t]" to a company either by meeting an economic threshold or by being "otherwise significantly related to the company's business." 17 C.F.R. § 240.14a-8(i)(5). NAM ignores the existence of Rule 14a-8(i)(5), instead focusing on the recent removal of a redundant, confusing "nexus" test first applied in 2009 to Rule 14a-8(i)(7).

Under Rule 14a-8(i)(7), companies may exclude proposals that relate to their "ordinary business," *unless* those proposals raise a "significant issue of social policy." For instance, a proposal about a

---

[7] For this reason, NAM's argument that the Supreme Court in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1 (1986), simply did not understand the supposed First Amendment problem with Rule 14a-8 because that decision came before an "explosion of activist shareholder proposals about controversial political topics," NAM Brief at 40, is ahistorical. Such proposals were common and a subject of frequent commentary in the 1980s. Indeed, in *Pacific Gas*, Justice Stevens noted that "the Rule can and has been used to propagate purely political proposals." 475 U.S. at 39 n.8 (Stevens, J., dissenting).

company's workforce policies may not be excluded if the proposal focuses on discrimination.  SEC Release No. 34-40018 (May 21, 1998).  In 2009, the Staff announced for the first time that it would add a case-by-case "nexus" test to determine whether the social policy issue was significant to the company.  *See* SEC, Staff Legal Bulletin No. 14E (Oct. 27, 2009). Additional guidance issued from 2017-2019 implemented "a wide array of new 'significance to the company' tests that expanded the concept of nexus."  Sanford Lewis, *SEC Resets the Shareholder Proposal Process*, Harv. L. Sch. F. on Corp. Gov. (Dec. 23, 2021), https://tinyurl.com/3c3e7dtb.  As a consequence, "[n]o-action letters became significantly longer and the process more complex."  *Id.*

Staff Legal Bulletin No. 14L, which NAM claims eliminated the requirement that the proposal have any relationship to the company, simply eliminated this redundant nexus test, returning the SEC's application of the rule to its pre-2009 state.  *See* SEC, Staff Legal Bulletin No. 14L (Nov. 3, 2021).  The relevancy test of Rule 14a-8(i)(5) remains in

place, and the rule operates as it did for decades prior to 2009.[8]  Proposals

must, by law, be relevant to a company's business.

### III.   SHAREHOLDER PROPOSALS ARE VALUABLE

Finally, NAM claims that ESG proposals in particular are put forth

for "the primary purpose of advancing [shareholders'] social or political

goals, not for economic reasons."  NAM Brief at 13.  As the D.C. Circuit

explained fifty years ago, shareholders are entitled to weigh in on the

political or moral dimensions of corporate decisions.  *See Medical

Committee*, 432 F.2d at 681.  Nonetheless, most shareholder proposals

are driven by shareholders' economic interests—and have created

enormous value.

The data overwhelmingly supports the conclusion that

environmental, social, and political risks matter, even to the most profit-

oriented investors.  *See generally* Virginia Harper Ho, *Risk-Related*

---

[8] NAM blames this "new position"—*i.e.*, the old position—for "drastically reduced corporat[e] success in seeking SEC no-action decisions."  NAM Brief at 17.  In making this claim, NAM relies on a single year of data.  But the no-action success rate varies wildly by year and is determined by aggregating success rates across several different procedural and substantive exclusions, almost all of which were untouched by Staff Legal Bulletin No. 14L.  Unsurprisingly, the 2023 no-action success rate "rebounded" from 2022.  Ronald Mueller et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harv. L. Sch. F. on Corp. Gov. (Aug. 3, 2023), https://tinyurl.com/mwsxt5dh.

*Activism: The Business Case for Monitoring Nonfinancial Risk*, 41 J. Corp. L. 647 (2016). Positive "ESG" performance has a positive or neutral effect on risk-adjusted returns, profitability, and other standard measures of financial performance at the firm and portfolio level, with benefits including a lower cost of capital, cheaper debt financing, and maintenance of firm value over time. *See id.*

NAM's parade-of-horribles examples of "political" or "social" proposals fall apart under the slightest scrutiny. *See* NAM Brief at 13-14. For example, NAM points to the proposal in *Pfizer, Inc.*, 2021 WL 6126545 (Feb. 10, 2022), which requested that Pfizer report on the effectiveness of its diversity, equity, and inclusion ("DEI") efforts, providing quantitative data on the recruitment, retention, and promotion of employees by race, ethnicity, and gender. While denigrating the proposal, NAM makes no real argument that the effectiveness of a company's DEI programs is not of economic concern to investors. Nor could it. NAM itself claims that DEI is an "economic imperative" because, "[t]o be competitive, businesses must be able to connect with the skills and experiences of a wide range of communities." NAM, *Diversity and Inclusion: What You Need to Know*, NAM News Room (Feb. 12, 2021),

31

https://tinyurl.com/bddswdd6.  Indeed, at a NAM event, Pfizer presented on *the exact information requested by the proposal*: "how leaders can promote racial equity in their companies . . . by setting measurable hiring goals and increasing internal candidate development." *Id.*

Another category of proposals attacked by NAM are those concerning companies' responses to political or social developments, such as state abortion laws.  *See* NAM Brief at 13-14.  These, too, reflect material concerns.  While NAM now denigrates as "political" a proposal "to report on how [a] company changed its policy in response to state abortion laws," *id.*, in the aftermath of the *Dobbs* decision, NAM warned that "[t]he new patchwork of state laws presents an exceptionally complicated and risky compliance burden," including the possibility of civil and criminal liability for "reimbursing the costs of an abortion through health insurance," NAM, *Get Help with Post-*Dobbs *Health Plan Compliance*, NAM News Room (June 29, 2022), https://tinyurl.com/2p9w9cp4.  It is not hard to see why investors might be interested in learning how companies plan to manage this risk.

The process for filing shareholder proposals to address risk has resulted in tremendous benefits to investors, companies, and society.

Shareholder proposals particularly have transformed corporate governance. "Several empirical studies have shown that the shareholder proposal rule has played a positive role in corporate governance reform" by "spurr[ing] the adoption of a variety of governance best practices over the past three decades," including "annual director elections, majority vote rules for director elections, shareholder approval for poison pills, and proxy access bylaws." Cox & Thomas, *supra* at 1188. "Say-on-pay, too, was proposed by shareholders . . . before it became mandatory under Dodd-Frank." Harper Ho, *supra* at 691. Likewise, the "standard" practices of political expenditure disclosures and sustainability reporting originated in shareholder proposals. *Id*. The benefit of these governance reforms "may be difficulty to quantify," but "should not be ignored." *Id*. at 697.

## CONCLUSION

> [T]he clear import of the language, legislative history, and record of administration of section 14(a) is that its overriding purpose is to assure to corporate shareholders the ability to exercise their right — some would say their duty — to control the important decisions which affect them in their capacity as stockholders and owners of the corporation.

*Medical Committee*, 432 F.2d at 681.

33

Shareholder proposals allow the true owners of corporations to be heard on important corporate decisions. They have formed the core of Congress's intended scheme of corporate democracy for more than eighty years. This Court should decline to "fix" what is not broken.

Respectfully submitted,

/s/ Luke Morgan

DANIELLE FUGERE
LUKE MORGAN
AS YOU SOW
P.O. Box 751
Main Post Office
Berkeley, CA 94701
(510) 735-8158
dfugere@asyousow.org
lmorgan@asyousow.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because it contains 6,469 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32(b), as determined by the word counting feature of Microsoft Word 365.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

Dated: September 20, 2023

/s/ Luke Morgan
Luke Morgan
*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ Luke Morgan
Luke Morgan
*Counsel for Amicus Curiae*