# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 23-60230

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

ON PETITION FOR REVIEW OF AN ORDER OF
THE SECURITIES AND EXCHANGE COMMISSION

## BRIEF OF *AMICUS CURIAE*
## INTERFAITH CENTER ON CORPORATE RESPONSIBILITY
## IN SUPPORT OF RESPONDENT

BETH-ANN ROTH
RICHARD A. KIRBY
R|K INVEST LAW, PBC
*Attorneys for Amicus Curiae*
1725 I Street NW, Suite 300
Washington, DC 20006
(202) 664-7171

## CERTIFICATE OF INTERESTED PERSONS

*National Center for Public Policy Research v. SEC*, No. 23-60230

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Petitioners** | National Center for Public Policy Research <br> Nathaniel Fischer <br> Phillip Aronoff |
| **Counsel for Petitioners** | R. Trent McCotter (Lead Counsel) <br> Jonathan Berry <br> Michael Buschbacher <br> Jared M. Kelson <br>       BOYDEN GRAY & ASSOCIATES PLLC <br><br> Gene Patrick Hamilton <br>       AMERICA FIRST LEGAL FOUNDATION |
| **Respondent** | U.S. Securities and Exchange Commission |
| **Counsel for Respondent** | Theodore J. Weiman (Lead Counsel) <br> Megan Barbero <br> Michael A. Conley <br> Tracey A. Hardin <br>       SECURITIES AND EXCHANGE COMMISSION |
| **Intervenor** | National Association of Manufacturers |
| *Certificate of Interested Persons Continued on Next Page* | |

| | |
|---|---|
| **Counsel for Intervenor** | Scott A. Keller (Lead Counsel)<br>Steven P. Lehotsky<br>Matthew H. Frederick<br>Todd Disher<br>Alexis Swartz<br>          LEHOTSKY KELLER COHN LLP<br><br>Michael A. Tilghman II<br>          NAM LEGAL CENTER |
| **Interested Third Party** | The Kroger Company |
| ***Amicus Curiae* in Support of Petitioner** | Alliance Defending Freedom |
| **Counsel for *Amicus Curiae* in Support of Petitioner** | John J. Bursch (Lead Counsel)<br>Ryan L. Bangert<br>James A. Campbell<br>Michael Ross<br>Jeremy Tedesco<br>          ALLIANCE DEFENDING FREEDOM |
| ***Amicus Curiae* in Support of Respondent** | Interfaith Center on Corporate Responsibility*<br>* A list of the organization's members can be found at https://www.iccr.org/membership/iccr-members |
| **Counsel for *Amicus Curiae* in Support of Respondent** | Beth-ann Roth (Lead Counsel)<br>Richard A. Kirby<br>          R\|K INVEST LAW, PBC<br>          with support from<br>          ESG LEGAL SERVICES, INC. |

September 20, 2023                    /s/  Beth-ann Roth

*Attorney for Amicus Curiae*
*Interfaith Center on Corporate Responsibility*

# TABLE OF CONTENTS

Certificate of Interested Persons.......................................................... i

Table of Authorities............................................................................ v

INTEREST OF THE INTERFAITH CENTER ON
CORPORATE RESPONSIBILITY ................................................. 1

ARGUMENT

I.    ICCR's members, like many shareholders, rely heavily on the
      longstanding shareholder proposal process that enabled NCPPR
      to have its proposal included in Kroger's 2023 proxy statement
      despite Kroger's objection and the SEC staff's concurrence .................. 3

      A.    Shareholder proposals: (i) lead to constructive dialogue between
            shareholders and management, (ii) often result in shareholders
            withdrawing their proposals based on productive dialogue, and
            (iii) serve as "early-warning" systems alerting companies to
            issues that could potentially lead to financial, legal, and
            reputational risk.............................................................. 6

      B.    Both shareholders and companies benefit from the shareholder
            proposal process .............................................................. 14

            1.    As a shareholder proponent, NCPPR relied on Rule
                  14a-8 to protect its right to communicate with Kroger
                  and with fellow shareholders, and had an opportunity to
                  present its analysis to the SEC staff as to why Kroger
                  may not lawfully exclude the proposal from its proxy
                  statement...................................................................... 14

            2.    Companies likewise benefit from the shareholder proposal
                  process, which enables companies to stay current on
                  topics of importance to shareholders, and alerts management
                  and the board to issues of potential future risk......................... 15

C.  The shareholder proposal process has evolved over 75 years,
     arriving at the current balance in corporate-shareholder
     communications that permitted NCPPR to achieve its objective ..... 18

II.  This case is not the place to seek changes to Rule 14a-8 outside
     the APA, nor is there a basis to challenge the rule on constitutional
     principles.................................................................................... 25

A.  The shareholder proposal process under Rule 14a-8 already
     facilitates a flexible range of communication alternatives and
     outcomes from which NCPPR and NAM's members have
     benefited, and this case is not the place to seek agency rule
     changes outside the APA .................................................. 25

B.  The proxy rules serve a substantial governmental interest,
     leaving no basis for a constitutional challenge ................................. 27

CONCLUSION ............................................................................. 28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Barr v. American Assoc. of Political Consultants, Inc.*,
　140 S. Ct. 2335 (2020) ........................................................................ 27

*Central Hudson Gas & Elec. Svc. Corp. v. Public Serv. Comm'n of N.Y.*,
　447 U.S. 557 (1980) ............................................................................. 27

*National Center for Public Policy Research v. Kroger*,
　No. 23-cv-00256 (S.D. Ohio) .............................................................. 15

*Roosevelt v. Du Pont*,
　958 F.2d 416 (D.C. Cir. 1992) ......................................................... 21, 22

*SEC v. Transamerica Corp.*,
　163 F.2d 511 (3d Cir. 1947) ......................................................... 5, 19, 27

## <u>Statutes</u>

Securities Exchange Act of 1934 § 14,
　15 U.S.C. 78n ........................................................................................ 4

## <u>Rules</u>

Securities Exchange Act Rule 14a-8,
　17 C.F.R. § 240.14a-8 ...................................................... 1, 2, 3 *passim*

Securities Exchange Act Rule 14a-8(j),
　17 C.F.R. § 240.14a-8(j) ................................................................. 20, 23

## <u>SEC Releases</u>

*Procedural Requirements and Resubmission Thresholds Under Exchange
　Act Rule 14a-8*, File No. S7-23-19 (Nov. 5, 2019)
　[Proposing Release] ............................................................................. 6

*Regulation of Communications Among Shareholders*,
      Exchange Act Release No. 31,326, Fed. Sec. L. Rep. (CCH)
      § 85,051 (Oct. 16, 1992) ........................................................................ 23

*Regulation of Securityholder Communications*,
      Exchange Act Release No. 29-315, 56 Fed. Reg. 28,987
      (June 25, 1991)......................................................................................... 3

*Statement of Informal Procedures for the Rendering of Staff Advice with
      Respect to Shareholder Proposals*," Securities Exchange Act
      Release No. 12,599, 41 Fed. Reg. 29,989 (July 7, 1976)....................... 21, 23

## **Other Materials**

## Congressional

Tenth Annual Report of the Securities and Exchange Commission,
      H.R. Doc No. 158, 79th Cong, 1st Sess. (1945)....................................... 18

## SEC

Letter to Lyuba Goltser of Weil, Gotshal & Manges LLP from the
      Rule 14a-8 Review Team (April 12, 2023)............................................. 14

Letter from NAM to the SEC commenting on File No. S7-23-19:
      Procedural Requirements and Resubmission Thresholds under
      Exchange Act Rule 14a-8 at p. 4 (Feb. 3, 2020) .................................... 7

List of companies that submitted requests for "no action" relief
      https://www.sec.gov/corpfin/2022-2023-shareholder-proposals-no-
      action? and
      https://www.sec.gov/corpfin/shareholder-proposals-incoming?............ 14

## Periodicals

Paul Hodgson, *A Brief History of Say on Pay*, IVEY BUSINESS JOURNAL
      (Sept./Oct. 2009) ..................................................................................... 12

A. McCoy, H. Fetter, and S. Teh, *Board Gender Diversity*, Harvard
      Law School Forum on Corporate Governance, May 29, 2022). ............ 11

Press Release

Press Release, Arjuna Capital, A Majority of Kroger's Investors Vote
    for Racial & Gender Pay Equity Proposal at Annual Meeting
    (June 22, 2023) ........................................................................ 17

## INTEREST OF THE INTERFAITH CENTER
## ON CORPORATE RESPONSIBILITY[1]

The Interfaith Center on Corporate Responsibility ("ICCR") is a coalition of more than 300 institutional investors collectively holding over $4 trillion in assets under management. Its members are a cross section of religious investors, foundations, asset managers, pension funds, endowments, and other long-term institutional investors, most of which owe fiduciary duties to clients and beneficiaries. Many of ICCR's members have nearly 50 years of experience with the shareholder resolution process, and their long-term engagements with companies on a wide variety of issues have brought about valuable improvements for companies and their shareholders. These relationships have helped to mitigate risk and have built long-term value for companies and their shareholders.

Rule 14a-8[2] under the Securities Exchange Act of 1934 has long provided the disclosure framework for the shareholder proposal process in which ICCR and its members have actively participated. It is an orderly mechanism for the two-way exchange of ideas between those who manage a company for long-term success,

---

[1]  This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. The *amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than *amicus* and its counsel contributed money intended to fund this brief.

[2]  17 C.F.R. § 240.14a-8.

and the shareholders who are committed to that long-term success. These shareholders demonstrate their confidence in the company by supplying it with the financial resources on which the company relies. The staff of the Securities and Exchange Commission ("SEC" or "Commission") enhances the efficiency of the rule's operations by providing advisory no-action guidance intended to provide clarity to both management and shareholders. By this brief we seek to emphasize the value to both companies and their shareholders of Rule 14a-8 and the staff's informal no-action process.

ICCR is troubled by the mischaracterizations of the shareholder proposal process put forth by both the NCPPR and NAM in their briefs to this Court as part of their requests for declaratory relief in a matter where there is no case or controversy. We aim to correct those fundamental misunderstandings. NCPPR's and NAM's arguments are neither supported by law or public policy, nor is there a legitimate constitutional issue based on the set of facts in this case.

To illustrate how the shareholder proposal process works, we highlight how NCPPR in fact relied on the current system to achieve its goal of having its fellow Kroger shareholders vote on its proposal. Without that system, NCPPR would have had no recourse and its shareholder proposal would likely not have been included in Kroger's proxy statement. We further note that NAM's representations to this

Court are in direct conflict with the views it expressed to the SEC in providing

comments in prior rulemakings under the Administrative Procedures Act.

## ARGUMENT

**I.    ICCR's members, like many shareholders, rely heavily on the longstanding shareholder proposal process that enabled NCPPR to have its proposal included in Kroger's 2023 proxy statement despite Kroger's objection and the SEC staff's concurrence.**

Shareholders have a "right – some would say their duty" – to participate in

the corporate governance of the companies they own. That right includes

exercising the right to vote during the annual meeting.[3] NCPPR pursued its right to

communicate its concerns to both Kroger and NCPPR's fellow Kroger

shareholders, and submitted a shareholder proposal to Kroger during the 2022-

2023 proxy season.

Kroger took the position that the proposal dealt with the ordinary business of

the company, and that the company could therefore exclude NCPPR's proposal

from its proxy statement pursuant to Rule 14a-8. Because of the existence of Rule

---

[3]  Regulation of Securityholder Communications, Exchange Act Release No. 29-315, 56 Fed. Reg. 28,987, 28,988 n. 11 (1991) (proposed June 25, 1991) (quoting *Medical Comm. for Human Rights v. SEC*, 432 F. 2d 659, 680-81 (D.C. Cir. 1970), *vacated as moot*, 404 U.S. 403 (1972) ("[S]hareholders ... control the important decisions which affect them in their capacity as stockholders and owners of the corporation.")

14a-8 and the informal staff review process, there was an orderly framework by

which NCPPR and Kroger could each move forward efficiently:

- Kroger provided notice of its intent to exclude NCPPR's proposal from its proxy statement,

- The SEC staff responded with a non-binding indication that it would not recommend enforcement were Kroger to omit the proposal from its proxy statement,

- NCPPR sued Kroger in federal court in Ohio, and

- Kroger voluntarily included NCPPR's proposal in its proxy statement.

Once Kroger agreed to include the proposal,

- NCPPR dismissed its suit against Kroger,

- Kroger shareholders voted on NCPPR's proposal and, based on the results of the vote,

- Kroger could weigh the significance to its shareholders of the issue raised by the proposal.

Similar scenarios play out among shareholders, company management, and the

SEC staff during each annual proxy season.

Prior to Congress's enactment of Section 14(a) of the Exchange Act,[4]

NCPPR would not have had the recourse it did to challenge Kroger's conclusion.

Owing to Congress's mandate in the Exchange Act to protect state-law shareholder

rights by a fair proxy disclosure process, along with its delegation to the Securities

---

[4]   Section 14, 15 U.S.C. § 78n.

and Exchange Commission) to adopt rules to protect shareholder interests thereunder, NCPPR was able to pursue its right to communicate its concerns to other shareholders of Kroger.

Many of ICCR's member shareholders enjoyed those same protections this past proxy season and in the many years that preceded it. Likewise, companies on the receiving end of shareholder proposals - including NAM's members - received valuable informal guidance from SEC staff to help them identify the potential risk of excluding certain proposals from their proxy statements. If a proposal ends up in the company's proxy statement, the voting results help the company assess whether the issue set forth in the proposal is potentially important to the company and its shareholders. It essentially serves as an "early-warning" system to help the company manage risk by identifying future financial, legal, and reputational risks.

This information-rich environment arose out of a congressional record evidencing inadequate, false and misleading information being provided to stockholders in connection with the voting of their shares. The result was Rule 14a-8, which has long been deemed by the courts to represent a proper exercise of the rulemaking authority conferred by Congress on the Commission under Section 14(a).[5]

---

[5]   *SEC v. Transamerica Corp.*, 163 F.2d 511, 518 (3d Cir. 1947), *cert. denied*, 332 U.S. 847 (1948) ("We entertain no doubt that [the shareholder proposal rule]

We set forth below the practical consequences of the shareholder proposal process that encourages parties proactively to engage and explore solutions. We also address the process itself as a means of demonstrating the efficiencies that have emerged as a result of more than three-quarters of a century of development and refinement based on input and experience from registrants and the investing public.

### A. Shareholder proposals: (i) lead to constructive dialogue between shareholders and management, (ii) often result in shareholders withdrawing their proposals based on productive dialogue, and (iii) serve as "early-warning" systems alerting companies to issues that could potentially lead to financial, legal, and reputational risks.

The engagements resulting from encounters such as the one between NCPPR and Kroger frequently lead to constructive dialogue between management and shareholders. Meaningful discussions without the time constraints of the proxy process are often a more productive way for the parties to engage.

NAM acknowledged the role of Rule 14a-8 in facilitating dialogue in its comment letter on the SEC's proposed amendments to the shareholder proposal rule:[6]

---

represents a proper exercise of the authority conferred by Congress on the Commission under Section 14(a).")

[6] Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, File No. S7-23-19 (Nov. 5, 2019) (the "Proposing Release").

Manufacturers know that a central factor to their success as publicly traded companies is a proxy process that enables smart business growth and strong investor returns. A well-calibrated proxy process allows company management to engage in a productive dialogue with investors, who are of course the ultimate owners of any publicly traded corporation, about key aspects of the business. The NAM is committed to supporting a proxy process that enables, rather than impedes, this vital investor-management dialogue, and we applaud the SEC's ongoing efforts to institute proxy reforms that benefit investors and issuers alike.[7]

Engagements designed to produce results are more than aspirational. Investors such as pension funds and asset managers are bound by fiduciary duties, and all money managers are stewards of their clients' assets. In carrying out their duties and exploring appropriate investments, money managers use a range of activities designed to manage risk to their portfolios and to protect long-term investment value. One of these activities is to use the shareholder resolution process. It is accordingly in the interests of the investing public to have an efficient and effective process to govern the filing of resolutions for a vote at annual meetings of shareholders.

The SEC's no-action process is a sensible approach that protects shareholder interests consistent with the fiduciary duty of care owed to clients and

---

[7]  Letter from NAM to the SEC commenting on File No. S7-23-19: Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8 at p. 4 (Feb. 3, 2020), available at https://www.sec.gov/comments/s7-23-19/s72319-6735509-207647.pdf.

beneficiaries. The current shareholder proposal process provides a framework for

company engagement as well as information to both shareholders and companies

about the level of shareholder support for various topics.

In that connection, productive dialogue often leads to withdrawal of

proposals in light of mutual agreement or ongoing collaborative engagement with

the company that promises to consider the issue or work towards implementation.

Indeed, withdrawals based on productive dialogue are commonplace rather than

representing an exception. For example, in 2023:

- ICCR members withdrew 63% of their proposals relating to diversity, equity and inclusion;

- ICCR members withdrew 51% of their proposals relating to climate transition and adherence to greenhouse gas emission reduction goals; and

- Other large institutional investors such as the New York State pension funds and CalPERS withdrew most of their proposals.

A growing number of companies recognize the benefits to the company of

considering and disseminating views and ideas that emanate from their

shareholders, thereby building productive relationships. There is a strong practice

of companies participating in meaningful proactive engagement with their

shareholders. These companies often avoid shareholder proposals due to those

relationships. However, when faced with a shareholder proposal, some companies

understand the benefits of embracing the proposals to further engage with and

8

benefit from the insights of their shareholders. And some, on occasion, recommend

in their proxy statement that shareholders vote *in favor of* a shareholder's proposal.

For example:

- Wendy's recommended a vote in favor of a 2021 shareholder resolution requesting a report on the protection of workers in the company's supply chain.

- IBM supported a 2021 resolution requesting an annual report "assessing IBM's diversity, equity and inclusion efforts.

- Also in 2021, GE recommended that shareholders vote in favor of the company producing a report "evaluating and disclosing if and how the company has met the criteria of the Net Zero indicator or whether it intends to revise its policies to be fully responsive to such indicator." GE reported in the proxy statement that it supports the goals of the Paris Agreement, that it is taking action, and that it recognizes shareholders' interest in climate change issues.

- Kellogg used its 2016 proxy statement to recommend that shareholders vote in favor of a resolution recognizing the company's commitment to animal welfare.

- Layne Christensen recommended that shareholders vote in favor of a resolutions requesting a sustainability report in 2011.

- Coca-Cola recommended nearly two decades ago in 2004 that shareholders support a proposal seeking a report on "the potential economic effects of the HIV/AIDS [and tuberculosis and malaria] on the Coca-Cola system's business," requesting that the report "highlight Coca-Cola's initiatives in response to the issue."

Whether proposals are withdrawn, included in the proxy statement, or even

excluded, the fact that a shareholder submits a proposal puts a company on notice

of an issue that, in some cases, is not yet on the company's radar. Shareholder

proposals thus provide insights into investor concerns and emerging issues, and help to identify potential risks before they become financial liabilities.

Management sometimes finds it helpful to encourage debate on topics of interest to business, employees, customers, and communities. Boards and management teams recognize that they benefit from shareholder feedback and information learned through dialogue with shareholders, whether spurred by or separate from the proposal process. Issuers regularly meet and share ideas on an informational and non-adversarial process with investors on issues of mutual concern.

Examples both recent and from the past illustrate the importance to companies of knowing about potential future risks in the form of shareholder proposals. ICCR members have, over the years, identified risks or opportunities that were only later acknowledged as having a material impact on the company's value. ICCR's members' proposals flagged predatory lending in the subprime market as early as 2000, and in 2007 shareholders again approached financial institutions asking for disclosures about the risks associated with subprime mortgage-backed securities..

Another example comes from a proposal put forth in the early 1990s, when ICCR members supported a shareholder resolution relating to phasing out chlorofluorocarbons (CFCs) sooner than the date the company had elected for

phase-out in the United States. When the company gave notice that it intended to exclude the proposal, the shareholder sued and prevailed at the trial court level. While the appeal was pending, the company voluntarily rolled back its phase-out date of the product. At the time the dangers of CFCs were not yet widely-known by the public, but have now been publicized and the product acknowledged as unsafe for both people and the environment. Had shareholders not raised the issue at the time they did, production might have been prolonged, and the negative impacts of the product might have been even more pervasive than they already are.

Other recurring issues raised by shareholders have included board diversity, supply chain awareness, and consideration of the downstream impacts of a company's own products. Each involved a timeline of steady, growing awareness that ultimately resulted in substantive changes in corporate practices. Board gender diversity has been a subject of shareholder proposals for over 30 years, and as of last year women made up at least 30% of the boards of 27% of U.S.-listed companies.[8]  Federal and state legislation and regulations have incorporated ideas proposed in shareholder resolutions, which reinforces their value. For example, the shareholder advisory vote or "say on pay" required by the Dodd-Frank Wall Street

---

[8]   A. McCoy, H. Fetter, and S. Teh, *Board Gender Diversity*, Harvard Law School Forum on Corporate Governance, May 29, 2022). Available at https://corpgov.law.harvard.edu/2022/05/29/board-gender-diversity/.

Reform and Consumer Protection Act and implemented by Commission regulation was introduced in the U.S. through shareholder proposals first submitted in 2007.[9]

Whether individuals agree with the requests or the outcomes, it is unquestionable that public awareness and discussions about alternatives are healthy. Competing proposals such as the ones filed with Kroger this year illustrate that fact: while NCPPR's proposal about discrimination based on viewpoint received only 1.88% of the vote, a proposal in the same proxy statement requesting a report on racial and gender pay gaps garnered a 51% majority.

Other examples include last year's Johnson & Johnson annual meeting, where one proposal requesting a third-party racial equity audit received 62.64% support, in contrast to a proposal seeking a racial equity audit to demonstrate that "anti-racist programs are themselves deeply racist." The latter secured only 2.74% of the vote. At a prior year's Home Depot annual meeting, a majority of shareholders – 62.77% - voted in favor of undertaking a racial equity audit. At this year's meeting, a shareholder's proposal to rescind the company's pursuit of the audit captured just 0.9%. Companies factor the level of shareholder votes demonstrating shareholder concerns into their risk-management programs.

---

[9] *See generally* P. Hodgson, "A Brief History of Say on Pay, IVEY BUSINESS JOURNAL (Sept./Oct. 2009). https://iveybusinessjournal.com/publication/a-brief-history-of-say-on-pay/.

A heightened awareness of the importance of certain issues to a company's current and future prospects has resulted in an increased number of shareholder proposals for which Rule 14a-8 and the staff's no-action process provide a mechanism to keep most of those matters from burdening the courts. Both NCPPR and NAM characterize an increase in the number of shareholder proposals as problematic. However, the increase is not indicative of a problem, but rather represents a growing understanding by institutional investors that strong governance and thoughtful management of environmental and social risks is a critical component of a company's long-term value creation.

An increase in the number of shareholder proposals does not signal the opening of any sort of floodgates that could cause any harm to corporate operations, as they represent but a tiny fraction of the engagements between companies and their shareholders. There are thousands of companies listed on U.S. exchanges. Relatively few of those companies receive shareholder proposals each year - the average Russell 3000 company receives one proposal every 7.7 years[10] - and even fewer companies challenge proposals as excludable. During the 2022-

---

[10] Jonas Kron, Brandon Rees, *Frequently Asked Questions About Shareholder Proposals*, Council of Institutional Investors Shareholder Advocacy Committee (based on data from Institutional Shareholder Services (ISS) and the Sustainable Investments Institute (Si2)).
https://www.cii.org/files/10_10_Shareholder_Proposal_FAQ(2).pdf

2023 proxy season, only some 112 companies,[11] including Kroger, submitted

notices of their intent to exclude a shareholder proposal.

**B.   Both shareholders and companies benefit from the
         shareholder proposal process.**

**1.   As a shareholder proponent, NCPPR relied on Rule 14a-8
        to protect its right to communicate with Kroger and with
        fellow shareholders, and had an opportunity to present its
        analysis to the SEC staff as to why Kroger may not
        lawfully exclude the proposal from its proxy statement.**

Kroger requested "no-action" relief from the staff in a letter dated February

16, 2023. Shareholders are not required to submit a letter to SEC staff responding

to a company's request for no-action relief, but they are entitled to do so. NCPPR

availed itself of that right and set forth its own views as to why Kroger should not

be permitted to exclude its proposal.

In a letter dated April 12, 2023, responding to Kroger's request for no-action

relief,[12] the SEC staff opined that there appeared to be "some basis" for the

company's view that NCPPR's proposal was excludable as dealing with ordinary

business matters. As a result, the staff indicated that it would not recommend to the

---

[11] *See* https://www.sec.gov/corpfin/2022-2023-shareholder-proposals-no-action?
and https://www.sec.gov/corpfin/shareholder-proposals-incoming? for lists of
the companies that submitted requests for "no-action" relief, along with the
staff's responses.

[12] Letter to Lyuba Goltser of Weil, Gotshal & Manges LLP from the Rule 14a-8
Review Team (April 12, 2023).

Commission that it commence an enforcement action against Kroger were the

company to exclude the proposal from its proxy statement. Though the

Commission could decide not to accept the staff's recommendation and choose to

pursue an enforcement action, Kroger would necessarily have gotten a sense from

the staff that its own analysis was on point.

Kroger's receipt of no-action relief did not interfere with NCPPR's potential

courses of action, as NCPPR retained its right to have a court of law decide

whether Kroger must include its shareholder proposal in the company's proxy

statement. NCPPR knew about its right to sue Kroger, and in fact did so in federal

district court in Ohio.[13] Kroger then voluntarily agreed to include the proposal in

its proxy statement, and NCPPR dismissed the case. Thus, protected by Rule

14a-8, NCPPR achieved its goal of communicating its concerns with Kroger and

NCPPR's fellow shareholders.

**2.    Companies likewise benefit from the shareholder proposal process, which enables companies to stay current on topics of importance to shareholders, and alerts management and the board to issues of potential future risk.**

Companies also benefit from the shareholder proposal process. In this case,

Kroger benefited from Rule 14a-8 and the staff's informal review process because

the staff concurred with Kroger's analysis that NCPPR's proposal did not

---

[13] *NCPPR v. Kroger,* No. 23-cv-00256 (S.D. Ohio).

transcend "ordinary business." Kroger nevertheless included the proposal in its proxy statement, no doubt in part because NCPPR sued Kroger to protect NCPPR's rights as a shareholder. In a cost-benefit analysis, it often makes sense simply to include a shareholder proposal in a company's proxy statement given the relatively low cost of doing so in the age of electronic communications.

Kroger was able to derive some benefit from having NCPPR's shareholder proposal on its ballot. Specifically: (a) the company is now aware of the issue; and (b) the results of the voting gives the company a sense of the proposal's importance to their shareholders. The 1.88% level of support also did not meet the minimum threshold in the rule for NCPPR to resubmit the proposal to Kroger next year. That fact is helpful to Kroger as it prepares for its next proxy season.

Nevertheless, there is no restriction on NCPPR's ability to submit a similar proposal to other companies. In addition, though NCPPR's proposal received only a small percentage of the vote, the organization's ability as a shareholder to share its views with the company and with other shareholders is invaluable.

NCPPR can also compare the results of its proposal with the percentage of the vote achieved by other proposals before the same body of shareholders represented at the meeting. While NCPPR's issue garnered only 1.88% of the vote, a different proposal in Kroger's proxy statement seeking a report on racial and

gender pay gaps succeeded in securing 51% of the shareholder vote.[14] Though voting results are not binding on a company – policy decisions are the exclusive domain of the board as fiduciaries and implementation belongs to management – a majority vote sends a strong signal to the company regarding the concerns of shareholders about issues of risk and long-term value.

Nevertheless, a proposal with little support should not simply be discounted and abandoned. A company might choose to flag such issues for further periodic review to assess whether interest in an issue is growing. New issues might initially garner little support yet gradually grow in importance and signal a potential risk to the company in the future.

Given the safeguards embedded in Rule 14a-8, and the lack of any other similar mechanism to encourage companies to engage, shareholder proposals have become an essential tool by which shareholders have an opportunity to highlight emerging risks to a company's management and its board. The history of how the current procedures evolved highlights the public policies that drove Congress and the SEC to where the process is today.

---

[14] Press Release, Arjuna Capital, A Majority of Kroger's Investors Vote for Racial & Gender Pay Equity Proposal at Annual Meeting (June 22, 2023).

### C. The shareholder proposal process has evolved over 75 years, arriving at the current balance in corporate-shareholder communications that permitted NCPPR to achieve its objective

The framework that enabled NCPPR to get its proposal before Kroger shareholders reflects the long-term evolution of the shareholder proposal process. A review of the SEC's refinement of that process over a 75-year period highlights why the courts are not an appropriate forum to rewrite the rule.

The SEC's report to the 79th Congress in 1945 referenced the fact that stockholders are entitled to include their own proposals along with their "brief statement in support of the proposal." The report further noted that the SEC's experience since it adopted the shareholder proposal rules led it to conclude that:

> the rules have already made a contribution to the revitalization of the democratic process in the conduct of corporate affairs. The protection received by investors under these rules and the opportunities afforded them for active participation in the affairs of the company may well be the occasion for the development among stockholders themselves of the leadership necessary for further advance along these lines.[15]

For over 75 years, courts have uniformly recognized the validity of Rule 14a-8 pursuant to the authority conferred by Congress on the SEC under Exchange Act Section 14(a). This enactment by Congress has served to instill an essential

---

[15] *See generally* Tenth Annual Report of the Securities and Exchange Commission, H.R. Doc. No. 158, 79th Cong., 1st Sess. 68-72 (1945).

level of investor confidence in the market that ensures companies an influx and maintenance of the capital they need in order to operate.

In a 1947 challenge to the then-current version of the shareholder proposal rule, the Third Circuit acknowledged that "[i]t was the intent of Congress to require fair opportunity for the operation of corporate suffrage" due to the fact that "[t]he control of great corporations by a very few persons was the abuse at which Congress struck in enacting Section 14(a)." *Transamerica*, 163 F.2d at 518. The court recognized that shareholders are the beneficial owners of the corporation, which "is run for the benefit of its stockholders and not for that of its managers." *Id*. at 517-18. Accordingly, regardless of the cost to the corporation of complying with the shareholder proposal rule,[16] "accurate information as to what transpires respecting the corporation is an absolute necessity if stockholders are to act for their joint interest. If stockholders cannot act together, they cannot act effectively." *Id*.

To facilitate a means for providing non-binding guidance as to whether a company might be justified in excluding a proposal, in 1976 the Division of Corporation Finance instituted an informal procedure. Under that process, an issuer

---

[16] Transamerica represented that compliance with the proxy rules would cost the company $20,000 annually, which in today's dollars is approximately $274,162. According to the court, the benefits of ensuring disclosure to and access by shareholders outweigh the costs of compliance, as substantial as they are.

may submit an analysis to the division's staff setting forth the company's reasons for concluding that the proposal falls within one of the exclusions set forth in the rule. A member of the division staff then reviews the proposal in light of the company's analysis.[17] The staff person either concurs in the company's analysis that there is a basis for excluding the proposal, or indicates that they do not concur. A concurrence is traditionally accompanied by a statement that the staff does not intend to recommend that the Commission seek enforcement action if the company excludes the proposal – hence the term "no action."

The staff's indication of an intent to recommend enforcement action is not binding on anyone: not the staff person, not any other person on the staff, and not the Division of Enforcement or the Commission itself. If, on the other hand, the staff finds no basis to concur with the company's analysis as to why the proposal falls within one of the enumerated exclusions, the company excludes the proposal

---

[17] *Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals,*" Securities Exchange Act Release No. 12,599, 41 Fed. Reg. 29,989 (July 7, 1976). "It is important to note that the staff's no-action responses to Rule 14a-8(j) submissions reflect only informal views. The determinations reached by the staff in connection with these submissions do not and cannot adjudicate the merits of a company's position with respect to the proposal. Only a court, such as a U.S. District Court, can decide whether a shareholder proposal can be excluded from a company's proxy materials."

See generally https://www.sec.gov/corpfin/informal-procedures-regarding-shareholder-proposals.

at its own risk of an SEC enforcement action. The informal review also does not

definitively determine whether the materials comply with the proxy rules. In that

connection, in issuing no-action letters:

> the Commission and its staff do not purport in any way to issue
> 'rulings' or 'decisions' on shareholder proposals management
> indicates it intends to omit, and they do not adjudicate the merits of
> a management's posture concerning such a proposal. As a result,
> the informal advice and suggestions emanating from the staff in this
> area *are not binding on either managements or proponents*.

*Statement of Informal Procedures* (emphasis supplied).

Were it not for that procedure, the only legal remedy for parties to test their

respective views would have been in court. Not only would that be an expense for

companies, it would clog the court system with emergency motions to meet annual

meeting deadlines. Absent expedited treatment, it would also interfere with the

annual meeting process given the time constraints associated with those meetings.

There is a private right of action for a shareholder to sue the company in

court.[18] It is the courts - and not the SEC or its staff - that are "the formal and

binding adjudicator[s] of Rule 14a-8's implementation of section 14(a)."

---

[18] See generally *Roosevelt v. Du Pont*, 958 F.2d 416 (D.C. Cir. 1992), concluding
that Congress intended that there be a private right of action for shareholders
who believe a company has wrongfully excluded their shareholder proposals.
Where warranted because a case appears to have merit and there is sufficient
time to consider the matter in advance of an upcoming meeting of shareholders,
a court of appeals will expedite review of a lower court finding that a proposal
may be excluded.

*Roosevelt*, 958 F.2d at 424. And when matters relating to the exclusion of shareholder proposals do reach the court, the courts do not exercise a *Chevron* level of deference with respect to staff no-action letters. The concept of deference "is not applicable here, for ... the staff's no-action letter ... [does not] rank[ ] as an agency adjudication or rulemaking." *Id.* n.19.

The SEC prominently discloses that whether a public company may properly exclude a shareholder proposal from its proxy statement is a matter to be decided exclusively by the courts, as neither the SEC nor its staff renders decisions in such matters. The event that entitles an aggrieved shareholder to sue a company directly is the company's notice to the SEC and the shareholder - pursuant to Rule 14a-8 - that the company intends to exclude the shareholder's proposal from the company's proxy statement.

At that point the shareholder's right to sue the company is ripe. Without the notice provision of the rule, the shareholder proponent might not learn about the potential threat to its right to have its proposal included in the company's proxy materials. Or it might learn about it in an untimely manner. For non-proponent shareholders, that series of actions could eventually result in a violation of their ability to exercise their voting rights.

The suit is a direct challenge to a company's decision to omit a resolution. It is not a review of agency action. Rather, it is brought by the shareholder proponent

directly against the company threatening to omit the shareholder's proposal. By bringing suit, the proponent can seek to have the court resolve the issue in the proponent's favor prior to the shareholder meeting so that the company has time to include the proposal in its proxy statement. The 80-day prior notice provision anticipates this potential outcome by requiring the company simultaneously to provide the reasons it believes it is entitled to exclude the proposal.[19]

The evolution of Rule 14a-8 over the years demonstrates the benefits of the SEC's deliberate, ongoing refinement of the shareholder proposal process. For example, as the proxy process evolved, there arose a competing concern that some communications among shareholders might fall within the definition of a "solicitation," thereby triggering the requirement that the shareholder file its own proxy statement.[20]

The SEC's response was to amend the proxy rules to safeguard shareholders' right to the corporate franchise. Whereas the prior rules "created unnecessary regulatory impediments to communication among shareholders and

---

[19] Rule 14a-8(j).

[20] By 1956, a "solicitation" could include "'any communication which could be viewed as being 'reasonably calculated' to influence a shareholder to give, deny or revoke a proxy." Regulation of Communications Among Shareholders, Exchange Act Release No. 31,326, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) § 85,051, at 83,357 (Oct. 16, 1992).

others and to the effective use of shareholder voting rights,"[21] the 1992 amendments to the proxy rules enabled shareholders to make public announcements and to communicate with one another without being deemed to have committed a violation. The rules thus "foster[ed] the free and unrestrained expression of views ... by the removal of any regulatory cost, burden or uncertainty that could have the effect of deterring the free expression of views by disinterested shareholders who do not seek [proxy] authority for themselves."[22]

Though many investors and companies successfully engage voluntarily throughout the year on a wide range of issues outside of the shareholder proposal process, there are times when it becomes necessary or appropriate to rely on the rule and file a resolution. However, given that participation outside the shareholder proposal process is voluntary, Rule 14a-8 continues to provide the protections for

---

[21] *Id*. At 83,355. The amendments were designed to: (1) "eliminate unnecessary regulatory obstacles to the exchange of views and opinions by shareholders and others concerning management performance and initiatives presented for a vote of shareholders"; (2) "lower the regulatory costs of conducting a regulated solicitation by management, shareholders and others by minimizing regulatory costs related to the dissemination of solicitation materials"; and (3) "remove unnecessary limitations on shareholders' use of their voting rights, and improve disclosures to shareholders in the context of a solicitation as well as in the reporting of voting results." *Id*. At 83,353.

[22] *Id*.

shareholders for which Congress enacted the statute pursuant to which the rule was

adopted.

**II. This case is not the place to seek changes to Rule 14a-8 outside the APA, nor is there a basis to challenge the rule on constitutional principles.**

    **A. The shareholder proposal process under Rule 14a-8 already facilitates a flexible range of communication alternatives and outcomes from which NCPPR and NAM's members have benefited, and this case is not the place to seek agency rule changes outside the APA.**

ICCR respectfully submits that this case is not an appropriate forum to seek

a rule change. The Administrative Procedures Act serves that function.

There is also no case or controversy because the remedy of having Kroger

include NCPPR's shareholder proposal has already been achieved. The district

court – and not the court of appeals – is the proper forum for challenging what a

proponent deems an improper decision to exclude its shareholder proposal. NCPPR

knew that fact, availed itself of that remedy, and then appropriately dismissed its

case once Kroger agreed to include NCPPR's shareholder proposal in its proxy

statement. The matter is now fully resolved. There is no further case or controversy

that would allow NCPPR access to this Court. NAM presents no independent case

or controversy that would entitle it to intervene.

Had NCPPR's shareholder proposal been excluded from the proxy

statement, and were the Kroger annual meeting still ahead of us on the calendar,

then NCPPR would arguably have a matter to pursue in a district court. However, even then, the sole remedy available to NCPPR would have been to have Kroger include the proposal in its proxy statement. There would be no avenue, as NCPPR has requested in its petition for review to this Court, to have the SEC review the staff's guidance, as such a remedy would have no impact.

The SEC does not adjudicate whether a shareholder proposal is excludable under Rule 14a-8. If the SEC Commissioners believes that a company has wrongly excluded a shareholder proposal from its proxy statement, they can vote to commence an enforcement action if the Commission decides that its limited resources are best used in that manner. The SEC would need to take that issue to a court to decide the issue of excludability, just as an aggrieved shareholder would need to do the same.

Given the role of shareholders as providers of capital, adversarial relationships do no one any good. Companies understand their obligation to disclose information to both prospective investors and existing shareholders as a condition to selling shares to the public. The proxy process – including the publication of shareholder proposals – is part of the landscape of taking on public company status. If compliance is too burdensome, the company can choose to go private and acquire its capital elsewhere.

**B.    The proxy rules serve a substantial governmental interest, leaving no basis for a constitutional challenge.**

It is within the power of Congress to regulate, through the mails and interstate commerce, procedural and disclosure rules relating to the corporate-shareholder proxy proposal process. Accordingly, even if this Court were able to overcome the other hurdles in this case to reach the constitutional issue, the Court should determine that the SEC has authority to issue Rule 14a-8, and that the rule is constitutional.

Rule 14a-8 is squarely within the SEC's statutory mandate to require adequate disclosure relating to the proxy process. *Transamerica*, 163 F.2d at 518. The related proxy disclosure rules thus advance a "substantial interest" to be achieved by the disclosure. *Central Hudson Gas & Elec. Svc. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). *See Barr v. American Assoc. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) ("[T]he courts have generally been able to distinguish impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech.")

As demonstrated above, the disclosure requirements of the SEC associated with its mandate to oversee the proxy disclosure process meet that burden.

## CONCLUSION

For the foregoing reasons, ICCR requests that this Court grant the SEC's request that NCPPR's petition and NAM's claims be dismissed.


September 20, 2023                    Respectfully Submitted,

                                     /s/  Beth-ann Roth

                                     Beth-ann Roth
                                     Richard A. Kirby

                                     R|K INVEST LAW, PBC
                                     1725 I St. NW Ste 300
                                     Washington, DC 20006
                                     (202) 664-7171

                                     *Counsel for Amicus Curiae*
                                     *Interfaith Center on Corporate Responsibility*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,247 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman font size 14.

Date:  September 20, 2023                /s/  Beth-ann Roth

Beth-ann Roth
R|K INVEST LAW, PBC
1725 I St. NW Ste 300
Washington, DC 20006
(202) 664-7171

*Counsel for Amicus Curiae*
*Interfaith Center on Corporate Responsibility*

# CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.


Date:  September 20, 2023          /s/  Beth-ann Roth

                                    Beth-ann Roth
                                    R|K INVEST LAW, PBC
                                    1725 I St. NW Ste 300
                                    Washington, DC 20006
                                    (202) 664-7171

                                    *Counsel for Amicus Curiae*
                                    *Interfaith Center on Corporate Responsibility*