No. 23-60230

---

UNITED STATES COURT OF APPEALS

FOR the FIFTH CIRCUIT

---

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NATHANIEL FISCHER;
PHILLIP ARONOFF,
*Petitioners,*
v.
SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

---

On Appeal from the United States District Court
for the Central District of California

Case No. 2:21-cv-02536-PSG-PLA

---

AMICUS CURIAE BRIEF OF CLIENTEARTH AND THE
SHAREHOLDER COMMONS

---

RUSHING McCARL LLP

Ryan McCarl, Cal. State Bar No. 302206
John Rushing, Cal. State Bar No. 331273
Davit Avagyan, Cal. State Bar No. 336350

Rushing McCarl LLP | 2219 Main St. No. 144 | Santa Monica, CA 90405
T: (310) 896-5082 | E: info@rushingmccarl.com

*Counsel for Amici ClientEarth and The Shareholder Commons*

# TABLE OF CONTENTS

Table of Contents ............................................................. i

Table of Authorities ...................................................... ii

Interest of Amici Curiae .............................................. 5

Amicus Curiae Brief of ClientEarth and The Shareholder Commons . 6

I.     Introduction ...................................................... 6

II.    Historical Background: The Origins of Rule 14a-8 ..................... 12

III.   NAM's arguments are built on flawed premises and
       unfounded factual assertions, as shown by both its
       mischaracterization of climate change as an ideological
       rather than financial concern and its conflation of
       management and shareholder interests. ...................................... 15

       A.    Because climate change is a systemic financial risk,
             it is also a material concern for all individual
             businesses. ................................................................ 23

       B.    Shareholders have strong interests in protecting
             investments from systemic risks like climate
             change, and their interests often diverge from those
             of management. .................................................... 28

Conclusion.................................................................. 31

Certificate of Service .................................................. 34

Certificate of Compliance ........................................ 35

# TABLE OF AUTHORITIES

## Cases

*JANA Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335 (Del. Ch. 2008) ....................................................................................7

Joy v. North, 692 F.2d 880 (2d Cir. 1982) ...........................................30

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................17

*Trinity v. Wal-Mart Stores, Inc.*, 792 F.3d 323 (3d Cir. 2015) .............7

## Statutes

29 U.S.C. Section 404(a)(1)(C) ............................................................28

7 C.F.R. § 10659 (1942) .......................................................................13

Unif. Prudent Investor Act § 3. ...........................................................28

## Other Authorities

Adolf Berle & Gardiner Means, *The Modern Corporation & Private Property*, 128-129 (1932, 1968). ....................................................12

Burton G. Malkiel, *A Random Walk Down Wall Street* (2015) ...........28

CFI Team, *Stranded Assets* (last accessed Sept. 12, 2023) .................23

Coral Davenpart, Heat Is Costing the U.S. Economy Billions in Lost Productivity, N.Y. Times (July 31, 2023) ..................................18

Fin. Stability Oversight Council, *Report on Climate Related Financial Risk 2021* 10 (2021)...............................................................17

Freshfields Bruckhaus Deringer LLP, *A Legal Framework for Impact* 27 (2021)...............................................................................31

Gallagher, *CEO and Executive Compensation Practices, 2020 Edition* ..............28

Hans Pörtber et al., *IPCC Sixth Assessment Report Summary for Policymakers* (2022). ...........................................................18

Jon Lukomnik & James P. Hawley, Moving Beyond Modern Portfolio Theory: Investing That Matters, Routledge (April 30, 2021)...............30

Kosmas Papadopoulos, *The Long View: The Role of Shareholder Proposals in Shaping U.S. Corporate Governance (2000-2018)*, Harv. L. Sch. Forum on Corp. Governance (Feb. 6, 2019) ..............................11

Laura Jaramillo et al., *Climate Challenges in Fragile and Conflict-Affected States* (2023) ...............................................................................18

Lucian Bebchuck, et al. , *Towards Board Declassification in One-Hundred S&P 500 and Fortune 500 Companies*..........................................11

Melissa Barbanell, *A Brief Summary of the Climate and Energy Provisions of the Inflation Reduction Act of 2022*, World Resources Inst. (Oct. 28 2022) ..........................................................................................24

Network for Greening the Financial System, *A Call for Action: Climate Change as a Source of Financial Risk* 4 (2019)..................................... 19, 20

Rachel Teo & Willemijn Verdegaal, Integrating Climate Scenario Analysis into Investment Management: A 2023 Update 23 (2023)...............................................................................................20

John Roe and Kosmas Papadopoulos, *2019 U.S. Executive Compensation Trends*, Harvard Law School Forum on Corporate Governance (April 16, 2019)....................................................................28

Sonali Paul, Glass Lewis recommends vote against Woodside Petroleum's climate plan, REUTERS (May 9, 2022) ...................... 25, 26

Staff of Div. of Corp. Fin., SEC, 96th Cong., 2d Sess., *Report On Corporate Accountability* 136 (Comm. Print 1980) ...............................7, 14

Stephen Davis, et al., *What They Do with Your Money* (2016) ..........................29

Steve Keen, *Loading the DICE Against Pensions*, 13 (2023) ...............................21

Subodh Mishra, *The Rise of Climate Litigation*, Harv. L. Sch. Forum on Corp. Governance (Mar. 3, 2022)...............................................................24

Susheela Peres da Costa & Paul Chandler, *Active Ownership 2.0: The Evolution Stewardship Urgently Needs* 5 (2019)........................................30

Swiss Re Institute, The Economics of Climate Change (2021) ......................20

The Shareholder Commons, *Climate Change and the Engagement Gap* (2022)..............................................................................................21

UNEP Fin. Initiative, *Why Environmental Externalities Matter to Institutional Investors* (2011)........................................................................29

Viviane Clement et al., Groundswell Part 2: Acting on Internal Climate Migration (2021) ..............................................................................18

Willy C. Shih, *Climate Regulations Are About to Disrupt Global Shipping*, Harv. Bus. Rev. (Oct. 21, 2022).....................................................24

Yann Chavaillaz et al., Exposure to Excessive Heat and Impacts on Labour Productivity Linked to Cumulative CO2 Emissions, Sci. Reps. (2019) ..................................................................................................18

## INTEREST OF AMICI CURIAE

Amici are nonprofit organizations with an interest in protecting the right of shareholders to encourage the companies in which they invest to guard against systemic risks. Amici have significant experience working at the intersection of securities law, corporate governance, and climate change, and both have strong interests in supporting shareholders' ability to protect their portfolios from potentially catastrophic systemic risks. Both engage in policy advocacy and work with shareholders who use their governance rights to reduce systemic risks (including climate risks). If NAM's views were accepted, much of this work would be jeopardized. Amici thus have a strong interest in the issues that bear on their core missions and expertise, and their perspective can help the Court understand the importance of these issues to shareholders.

AMICUS CURIAE BRIEF OF CLIENTEARTH AND THE SHAREHOLDER COMMONS

## I.    Introduction

Petitioner National Center for Public Policy Research (NCPPR) and Intervenor National Association of Manufacturers (NAM) implicitly ask this Court to weigh in on factual questions without the benefit of a factual record being developed at the district court or agency level.[1] NAM in particular seeks to strip shareholders of long-held rights on the basis of NAM's own untested and incorrect assertions about what issues matter to investors. If accepted at face value, NAM's arguments – and the misleading factual assumptions underpinning them – could lead to significant harm.

For example, NAM's brief asserts as fact the myth that climate and environmental risks are financially immaterial to shareholders and unrelated to the creation of shareholder value. On the contrary, such issues are critical to financial performance for both individual firms and the economy. NAM also conflates the interests of shareholders with those of company managers. This leads to a distorted presentation of the protections that Rule 14a-8 affords investors.

\* \* \*

Corporations are managed by directors and officers to benefit shareholders. While these fiduciaries have discretion in the day-to-day management of corporate affairs, they are ultimately subject to shareholders' annual

---

[1]    SEC Reply Br. at 47–52, 55–56, 63–65.

exercise of voting rights,[2] including their rights to propose and vote on resolutions.[3] Far from a radical proposition, shareholders' ability to exercise their ownership rights in this way is a core tenet of capitalism, embodied in decades of SEC rulemaking, and legal jurisprudence.

Congress adopted the Securities Exchange Act of 1934 to, among other things, protect shareholder voting rights. It tasked the SEC with ensuring that, when companies solicit proxies, shareholders will be informed about major policy questions to be decided at the annual general meeting.[4] The SEC rule at issue, 14a-8, does not confer new rights; it protects rights shareholders have always held.

NAM asks the Court to curtail these rights by eliminating Rule 14a-8. This would remove an important tool for holding company officers accountable and ensuring that shareholders' voices are heard on issues material to their investment decisions. A holding in NAM's favor would transfer power from investors (including working Americans saving for

---

[2]  *See JANA Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 340 (Del. Ch. 2008) ("Shareholders . . . may exercise their rights usually once a year by voting at the corporation's annual meeting.").

[3]  *Trinity v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 335 (3d Cir. 2015) ("A primary means to urge corporate reform is the shareholder proposal."); Staff of Div. of Corp. Fin., SEC, 96th Cong., 2d Sess., *Report On Corporate Accountability* 136 (Comm. Print 1980) ("The shareholder proposal procedure offers an opportunity for investors to present matters relating to the corporation to their fellow shareowners.").

[4]  SEC Reply Br. at 7, 57.

retirement) to managers whose interests and incentives may differ from those of the shareholders they serve.

NAM argues that the SEC has no right to require companies to include shareholder proposals in the proxy materials that they send to shareholders. In sweeping language more befitting an op-ed than an appellate brief supposedly raising issues of law, NAM asserts that companies are "overburden[ed]" by shareholder proposals,[5] which NAM characterizes as "activist proposals tend[ing] to focus on environmental, social, and governance ("ESG") matters"[6] that are "often contrary to the financial interests of investors."[7] In other words, NAM seeks to define the exercise of shareholders' property rights as an attack on shareholders' interests. And it would 'protect' shareholders by taking away a long-held right and giving management exclusive authority over which proposals are included in proxy statements. While this redistribution of rights may

---

[5]   NAM Br. at 12.

[6]   *Id.* at 14.

[7]   *Id.* at 16.

benefit an organization such as NAM, which is dominated by corporate managers,[8] it would harm the shareholders Congress intended to protect.[9]

---

[8] NAM's Board Chair is James Fitterling, the CEO and Chair of the publicly-traded Dow, Inc, and NAM's board includes many other leaders of public companies subject to the 14a-8 process. National Association of Manufacturers, *NAM Board of Directors*, https://www.nam.org/about/board-of-directors/ (visited Sept. 19, 2023). In 2023, 26% of the voting shareholders of Dow supported a proposal that its Chair and CEO positions be separated, which would have a direct impact on Mr. Fitterling. Dow Form 8-K (April 18, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/1751788/00011931252 3105102/d320753d8k.htm. In addition, 30% of voting shareholders (138 million shares valued at more than $7.4 billion as of the close of the market on September 15, 2023) voted for a proposal requesting a report on the impact of single use plastics on Dow's business. *Id.* Under the result Mr. Fitterling's NAM argues for, he could silence the holders of that $7.4 billion in stock, and, indeed, all the shareholders to whom he owes an unremitting duty of loyalty. In contrast, the Council of Institutional Investors, a coalition representing asset owners such as pension funds, endowments, and foundations with more than $8 trillion in investments and asset managers with more than $40 trillion in assets under management, maintains a policy priority of supporting the "[r]ight of shareholders to express their voice via proposals on company ballots." Council of Institutional Investors, *CII Advocacy Priorities*, https://www.cii.org/content.asp?contentid=312 (visited Sept. 19, 2023).

[9] Rule 14a-8 is authorized by 15 U.S.C. § 78, which contemplates promulgation of "such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Beyond the condescending suggestion that shareholders should be stripped of their rights for their own protection, NAM's arguments are also fatally flawed because they rest on false factual premises. Among these are: (1) that all issues lumped together under the heading of "ESG" are immaterial to investors (and so climate change – despite its real financial risks, as outlined below – is immaterial); and (2) the interests of a company's investors are indistinguishable from the interests of its management. The former is belied by the many proposals that have received broad shareholder approval and led to beneficial changes in

corporate practice,[10] while the latter conflicts with the congressional concerns underlying the Exchange Act. Recognizing the fundamental unsoundness of both premises shows the importance of protecting investors' right to access the proxy voting process and the danger of policies that allow management to usurp shareholders' rights.

At the very least, the Court should not weigh in on contested factual assertions (such as the materiality of climate to investors' financial interests, the burden of proxy solicitations on corporations, the motivations of shareholders when submitting proposals, and the behavior of proxy

---

[10] For example, shareholder proposals have been used to force the management of public companies to "declassify" their boards, giving shareholders the right to decide annually who would direct the management of the corporations they own, and to adopt many other governance practices favored by investors. *See, e.g.,* Lucian Bebchuck, et al., *Towards Board Declassification in One-Hundred S&P 500 and Fortune 500 Companies,* (documenting "58 successful declassification proposals, with average support of 81% of votes cast" at public companies during the 2012-2013 proxy season). *See also* Kosmas Papadopoulos, *The Long View: The Role of Shareholder Proposals in Shaping U.S. Corporate Governance (2000-2018)*, Harv. L. Sch. Forum on Corp. Governance (Feb. 6, 2019) ("Over the past three decades, shareholder proposals have transformed the corporate landscape in the U.S. by spurring the adoption of governance best practices. Annual director elections, majority vote rules for director elections, shareholder approval for poison pills, and proxy access bylaws are some of the critical governance practices that have become common practice thanks to investor support for shareholder proposal campaigns led by a wide variety of investors.").

advisory firms in recommending votes) where no factual record has been developed.

## II.     Historical Background: The Origins of Rule 14a-8

During the United States' first century, corporate capital was largely under the control of shareholders.[11] Shareholders could vote and deliberate at meetings to maintain corporate control. But as the U.S. economy became more complex, a greater portion of Americans' savings were invested in large corporations controlled by corporate managers.[12] As the number of shareholders increased, voting began to occur through proxies solicited by management, and these proxy solicitations often asked shareholders to consent to proposals based on little or no information. Before the adoption of the 1934 Securities Exchange Act, Berle and Means famously documented this separation of ownership from control,[13] including the use of the proxy mechanism, as follows:

> The direct manifestation of the shareholders' power . . . was and is his right to vote. . . .
>
> The growth of corporations, the dispersion of shareholders, the manifest impossibility for the vast majority of shareholders to attend meetings, have made the right to vote, in reality, a right

---

[11]  *See generally* H.R. 1493, 1821 & 2019 78 Cong. 1st Sess. (June 1943) (statement of Paul Frum).

[12]  *Id.*

[13]  Adolf Berle & Gardiner Means, *The Modern Corporation & Private Property*, 128-129 (1932, 1968).

> to delegate power to someone else . . . . The proxy machinery
> has thus become one of the principal instruments not by which
> a stockholder exercises power over the management of the
> enterprise, but by which his power is separated from him.

As the House Report regarding the original adoption of the Securities
Exchange Act (including Section 14 under which Rule 14a-8 is
promulgated) stated, "[o]wnership and control are in most cases largely
divorced."[14] This separation threatened the mechanism that underpinned a
market economy, because of the risk that corporate managers in control of
capital would use it to suit their own purposes, rather than to optimize
returns for savers.[15]

Congress crafted Section 14, which authorized the SEC to regulate proxy
solicitation, to address this concern.[16] In 1942, the Commission recognized
the need to give shareholders fair notice of proposals brought by fellow
shareholders by adopting the predecessor to Rule 14a-8.[17] Because

---

[14]  H.R. Rep. No. 73–1383, at 3 (1934).

[15]  NAM appears to be unaware that Section 14 is intended to remedy this
separation, not reinforce it. NAM argues that corporate and securities
law should be interpreted to limit direct democracy because that is what
"separation of ownership from management means." NAM Br. at 4.

[16]  H.R. Rep. No. 73-1383, at 13 (1934) ("Fair corporate suffrage is an
important right that should attach to every equity security bought on a
public exchange. Managements of properties owned by the investing
public should not be permitted to perpetuate themselves by the misuse
of corporate proxies.").

[17]  7 C.F.R. § 10659 (1942).

shareholders could, under state law, propose matters relevant to corporate business at annual meetings, the Commission believed that fair corporate suffrage required that all shareholders receive notice of such matters when their proxies were solicited. As the D.C. Court of Appeals explained, "the rationale underlying this development was the Commission's belief that the corporate practice of circulating proxy materials which failed to make reference to the fact that a shareholder intended to present a proposal at the annual meeting rendered the solicitation inherently misleading."[18] SEC Staff described this history similarly, stating that "[t]he Senate Banking and Currency Committee recognized the need to provide not only for disclosure of matters management planned to present, but also for shareholders to be given 'reasonable opportunity to present their own proposals and views to fellow security holders.'"[19]

Thus, Rule 14a-8 is a deliberately crafted regulation that seeks to ensure that U.S. capital markets preserve the franchise rights of ordinary savers and other shareholders, and in so doing, allocate capital efficiently, rather than in a manner that serves the interests of corporate managers.

---

[18] *Medical Committee for Human Rights v. SEC,* 432 F.2d 659, 677 (D.C. Cir. 1970) (vacated as moot).

[19] SEC Staff Report on Corporate Accountability (1980) (citing S. Rep. No. 700, 85th Cong., 1st Sess., 3 (1957)).

### III.    NAM's arguments are built on flawed premises and unfounded factual assertions, as shown by both its mischaracterization of climate change as an ideological rather than financial concern and its conflation of management and shareholder interests.

As NAM frames it, the key issue in this case is whether the SEC may "compel a corporation to use its proxy statement to disseminate shareholders' speech about abortion, climate change, diversity, gun control, immigration, or other contentious issues unrelated to the corporation's core business or the creation of shareholder value."[20] The problem, per NAM, is that "each year, manufacturers are inundated with proposals from activist shareholders pushing their own agendas divorced from shareholder value creation, and companies must spend tens of millions of dollars addressing these proposals under Rule 14a-8."[21]

This would be troubling if true, but it isn't. The SEC's rules governing proxy solicitations ensure that proposals regarding immaterial, inconsequential, and redundant issues cannot be forced onto proxy statements.[22] Rule 14a-8 does not give shareholders new rights, nor does it impose substantial burdens on companies; it simply provides shareholders a fair opportunity to communicate to each other as permitted by the corporate law of the state in which each corporation was formed.

---

[20]   NAM Br. at 1.

[21]   *Id.* at 2.

[22]   *See* Rule 14a-8(i)(1–13) (listing thirteen bases on which companies can exclude shareholder proposals).

Focusing on the example of climate change-related resolutions, the below argument demonstrates that NAM asks the Court to make law on the basis of imaginary facts. In so doing, it seeks to eviscerate the governance rights of shareholders to benefit company managers like those who preside over NAM. This attack on shareholder rights would, if successful, make it more difficult for investors interested in long-term profitability and systemic strength to protect those interests, while making it easier for management to juice quarterly profits for their own benefit, take unwarranted risks, and externalize costs at the expense of shareholders. NAM's position is ecologically, economically, and legally unsound. It should be rejected.

* * *

NAM begins its brief with a list of issues that it claims are "divorced from shareholder value creation."[23] The alleged immateriality of these issues to investors underpins NAM's entire argument, but that immateriality is an unfounded factual assumption. To illustrate this conceptual flaw at the core of NAM's argument, we focus on one of the

---

[23] NAM Br. at 1–2.

listed items, climate change, which is material to nearly all investors and companies.[24]

As the Supreme Court acknowledged over a decade ago, "[t]he harms associated with climate change are serious and well recognized."[25] Such harms, and the risks climate change presents, have only been magnified in the intervening years.[26]

The changing climate is already altering weather patterns and increasing the frequency and severity of storms and wildfires, and these

---

[24] Amici are experts in the relation of environmental and financial concerns and so focus on such issues instead of on the other issues raised. In so doing, amici make no argument that climate (or the environment more broadly) is more or less likely to be material than the other issues NAM lists. Note, however, that NAM does not describe any supposedly immaterial "ESG"-related shareholder proposals in context or depth, and NAM's brief does not show that any immaterial or purely political proposals have been forced into proxy materials (or even proposed).

[25] *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

[26] *See* Fin. Stability Oversight Council, *Report on Climate Related Financial Risk 2021* 10 (2021) ("The intensity and frequency of extreme weather and climate-related disaster events are increasing and already imposing substantial economic costs. Such costs to the economy are expected to increase further as the cumulative impacts of past and ongoing global emissions continue to drive rising global temperatures and related climate changes, leading to increased climate-related risks to the financial system.").

changes are expected to intensify as the earth warms.[27] Such changes are likely to depress the economy generally and elevate risks for individual companies for several interrelated reasons. These changes will be especially devastating if rapid action is not taken.

More frequent and intense extreme weather events linked to climate change have already caused billions of dollars of excess losses from natural disasters in the last decade.[28] Such losses are only expected to increase with global temperatures. Rising temperatures are also expected to dampen productivity,[29] exacerbate global conflicts,[30] and drive large-scale migration.[31] All these can lead to disruptions in supply chains, labor

---

[27] Hans Pörtber et al., *IPCC Sixth Assessment Report Summary for Policymakers* (2022).

[28] *See* Adam B. Smith, *U.S. Billion Dollar Weather and Climate Disasters in Historical Context*, Climate.Gov (Jan. 8, 2021), https://www.climate.gov/disasters2020.

[29] *See* Coral Davenpart, Heat Is Costing the U.S. Economy Billions in Lost Productivity, N.Y. Times (July 31, 2023), https://www.nytimes.com/2023/07/31/climate/heat-labor-productivity-climate.html (explaining that excess heat is already costing billions of dollars of lost productivity); Yann Chavaillaz et al., Exposure to Excessive Heat and Impacts on Labour Productivity Linked to Cumulative CO2 Emissions, Sci. Reps. (2019) (examining expected increases in lost productivity as global temperature continues to rise).

[30] Laura Jaramillo et al., *Climate Challenges in Fragile and Conflict-Affected States* (2023) (IMF analysis showing climate change likely to worsen conflicts and increase instability in affected areas).

[31] *See, e.g.,* Viviane Clement et al., Groundswell Part 2: Acting on Internal Climate Migration (2021).

availability, and consumption levels. Furthermore, "[f]eedback loops between the financial system and the macroeconomy could further exacerbate these impacts and risks."[32] For example, where assets used for collateral lose value because of increased physical risks, lending in hard-hit regions might be restricted.[33] This combination of accelerating harms, negative feedback loops, and increased uncertainty about future physical and economic conditions is a present and growing threat not limited to specific businesses, regions, or industries.

As a recent report from an association of major central banks explains, "climate change will affect all agents in the economy (households, businesses, governments), across all sectors and geographies."[34] Estimates vary, but economists on whom major financial institutions rely expect substantial and worsening material harm to the global economy over the next few decades if emissions stay on their current trajectory or are

---

[32]  Network for Greening the Financial System, *A Call for Action: Climate Change as a Source of Financial Risk* at 14 (2019) (hereinafter NFGS).

[33]  *Id.*

[34]  *See* NFGS, *supra* note 32, at 4.

otherwise not rapidly drawn down in the near term.[35] This projected harm is in addition to that which is already occurring.

These projections are more than enough to trigger alarm, but they understate the incentives for long-term investors (like pension funds) to focus on (and attempt to mitigate) climate risks. Lower-probability but more extreme climate-change effects are plausible, and the potential for breaching tipping points that would result in nonlinear acceleration of harms means that risk-averse investors have strong reasons to price in higher costs for climate change.[36] There is also growing concern among both economists and climate scientists that the economic models most commonly relied on to assess climate risk substantially underestimate both

---

[35]  *See, e.g.*, Rachel Teo & Willemijn Verdegaal, Integrating Climate Scenario Analysis into Investment Management: A 2023 Update 23 (2023) (analysis from GIC, a Singapore sovereign wealth fund that manages assets valued at $690 billion, predicting that failure to address climate will reduce compound returns on an average portfolio by 30% over the next 40 years, compared to returns in an economy that successfully achieves net zero); Swiss Re Institute, The Economics of Climate Change (2021) (report from Swiss Re, one of the world's largest insurers, estimating a 10% loss to the global economy by 2050 absent climate change mitigation).

[36]  *See* NFGS, *supra* note 32, at 4 ("The risks [associated with climate change] will likely be correlated and potentially aggravated by tipping points, in a non-linear fashion. This means the impacts could be much larger, and more widespread and diverse than those of other structural changes.").

the likelihood of catastrophic harms and the magnitude of loss in the most likely scenarios.[37]

In other words, financial analysts broadly agree that absent rapid decarbonization, climate change will cause – and is already causing – significant systemic harm to the economy. The only question is the depth and extent of that inevitable damage. Shareholders who must bear this risk are naturally concerned with understanding and minimizing future losses, including by pushing the companies in which they invest to robustly consider climate change in their plans.

Moreover, misaligned incentives mean that, in many cases, company management is unlikely to pursue systemically optimal climate plans absent external direction to do so. This is in part because company managers, like those who control NAM, do not share the same risk profile as their investors. Elite corporate managers are usually compensated with large amounts of company equity, so an outsized amount of their assets are

---

[37] Steve Keen, *Loading the DICE Against Pensions*, 13 (2023) ("the empirical components of the vast majority of climate change economic papers are based on scientifically false assumptions. These assumptions drastically underestimate the damages that climate change could do to the economy."); *see also* The Shareholder Commons, *Climate Change and the Engagement Gap,* 34 (2022) ("tipping point science misapprehension in the economic models would require an adjustment by a factor of more than 8x in calculating the social cost of carbon") (citation omitted).

invested in the companies they manage.[38] If operating their companies in a manner that contributes to systemic climate (or other) risks can increase short-term company value, they may prioritize their own financial interest ahead of systemic impacts. But the majority of shareholders in such companies are generally diversified investors who bear those externalized costs through the effect that those companies have on the economy and the value of diversified portfolios. Many of these shareholders, particularly those invested in pension plans and other retirement funds, have long-term investment horizons and are more concerned with stable growth than short-term performance. Such shareholders are particularly threatened by management decisions that maximize immediate corporate profits at the expense of long-term systemic strength, and shareholder resolutions are a key means for investors to exercise their rights and elevate concerns.

Rule 14a-8 ensures that all shareholders from whom management solicits proxies will have the benefit of learning about other shareholders' concerns and perspectives. Climate-related resolutions do not reflect political interference; they are examples of healthy investor stewardship.

---

[38] Managers also have incentives to externalize costs and focus on short-term profits insofar as their own compensation and advancement prospects are tied to immediate company performance rather than systemic stability.

## A.    Because climate change is a systemic financial risk, it is also a material concern for all individual businesses.

Individual companies face both business-specific and general risks from climate change. General risks derive from the inherent difficulties associated with operating in a depressed or slower-growing economy. Specific risks include physical risks (such as increased risks of floods and wildfires), transition and operational risks (such as higher insurance rates, stranded assets,[39] and disrupted supply chains as a result of regulatory or market changes), reputational risks (such as damage to brands perceived as insufficiently sustainable), and litigation risks (such as lawsuits against companies that fail to curb emissions and litigation against fiduciaries who ignore climate risks).

These risks are not remote or speculative. As discussed above, physical effects of climate change already cause substantial harm. Likewise, government intervention and legal action are actively shaping transition risks (and opportunities). Recent years have seen significant public

---

[39] Per the Corporate Finance Institute, "Stranded assets are assets that are unable to earn their original economic return due to changes in the landscape in which the assets operate." CFI Team, *Stranded Assets* (last accessed Sept. 12, 2023). Stranded assets are particularly salient in the context of climate risk. Physical impacts of climate change might strand assets, for example, when natural disasters (made more frequent and severe due to climate change) destroy facilities. Regulatory or market changes may also strand assets, such as when prices for renewables drop sufficiently to make a fossil-fuel plant uncompetitive or when regulations require phasing out of a given technology.

investment in renewable energy technology,[40] new regulations regarding energy efficiency and greenhouse gas emissions,[41] and increasing amounts of climate change-related litigation.[42] Whatever the efficacy or wisdom of any given regulation, businesses must prepare for and adapt to a changing regulatory landscape as well as a changing physical environment.

In short, companies that fail to adequately plan for the risks associated with climate change expose their investors to substantial harm. If management fails to plan for climate change and energy transition — perhaps because their compensation is tied to short-term financial performance — shareholders must take it upon themselves to protect their interests.

NAM's decontextualized soundbites minimizing shareholders' climate concerns wholly ignore these business realities. In fact, although NAM characterizes shareholder proposals relating to climate as unconnected to the creation of shareholder value, its brief only provides a single example

---

[40]  *See, e.g.*, the tax incentives and other public funding available in the Inflation Reduction Act. Melissa Barbanell, *A Brief Summary of the Climate and Energy Provisions of the Inflation Reduction Act of 2022*, World Resources Inst. (Oct. 28 2022), https://www.wri.org/update/brief-summary-climate-and-energy-provisions-inflation-reduction-act-2022.

[41]  *See, e.g.*, Willy C. Shih, *Climate Regulations Are About to Disrupt Global Shipping*, Harv. Bus. Rev. (Oct. 21, 2022), https://hbr.org/2022/10/climate-regulations-are-about-to-disrupt-global-shipping.

[42]  Subodh Mishra, *The Rise of Climate Litigation*, Harv. L. Sch. Forum on Corp. Governance (Mar. 3, 2022), https://corpgov.law.harvard.edu/2022/03/03/the-rise-of-climate-litigation/.

of an allegedly unreasonable climate consideration — one not even related to a shareholder proposal — and on closer examination, that example shows that climate-related planning is highly salient to investors.

NAM's example concerns a recommendation from a proxy advisor to "reject an oil and gas company's climate plan."[43] NAM ridicules the advisor for "fault[ing] the company for not having a good enough plan to get its customers to stop buying its own product."[44] In so stating, NAM relies on a verbatim citation from a letter sent by a group of conservative attorneys general that does not provide economic analysis. The letter appears based on a short news article (rather than the proxy advisor's report or the underlying climate plan it analyzed) which stated that proxy advisor Glass Lewis criticized the company's climate plan for not doing enough to "reduce customers' emissions."[45]

The article did not quote Glass Lewis's report, however, and seems to have inaccurately substituted the phrase "customers' emissions" for the

---

[43]  NAM Br. at 16.

[44]  *Id.* at 16–17.

[45]  Sonali Paul, *Glass Lewis recommends vote against Woodside Petroleum's climate plan*, REUTERS (May 9, 2022), https://www.reuters.com/business/energy/glass-lewis-recommends-vote-against-woodside-petroleums-climate-plan-2022-05-09/.

technical term "Scope 3 emissions."[46] Reading the full article, one learns that Glass Lewis's concern was not that the company was insufficiently trying "to get its customers to stop buying its own product" but that the company's plan "lag[ged] efforts by other oil and gas companies on tackling customers' emissions."[47] That is, Glass Lewis was worried that the company was taking undue risk by falling behind industry norms relating to an area of increasing regulatory and market pressure. Indeed, more and more jurisdictions require Scope 3 reporting, many corporations require contracting partners to include Scope 3 emissions in climate plans, and companies with high or poorly monitored Scope 3 emissions face heightened litigation risk.[48]

Further, its critique of insufficient Scope 3 planning was only one aspect of Glass Lewis' broader assessment that the company's plan "lack[ed] substance." Glass Lewis also worried about the "company's dependence on

---

[46] "Scope 3 emissions are the result of activities from assets not owned or controlled by the reporting organization, but that the organization indirectly affects in its value chain." EPA, *Scope 3 Inventory Guidance* (updated Aug. 3, 2023), https://www.epa.gov/climateleadership/scope-3-inventory-guidance (visited Sept. 12, 2023).

[47] *Id.*

[48] *See, e.g.,* PWC, *What you really need to know about Scope 3 emissions and your business,* https://www.pwc.com/us/en/services/esg/library/scope-3-emissions.html (visited Sept. 12, 2023); Mark Segal, *California Lawmakers Pass Bill Requiring Companies to Disclose Full Value Chain Emissions,* ESG Today (September 12, 2023), https://www.esgtoday.com/california-lawmakers-pass-bill-requiring-companies-to-disclose-full-value-chain-emissions/ (visited Sept. 12, 2023).

carbon offsets," and noted that the company provided insufficient details about its plans to "spend its stated green project investment target of $5 billion."[49] This analysis, and Glass Lewis' recommendation against approving the company's climate plan, is consistent with ordinary consideration of material risks. It is completely rational for an investor (or in this case a proxy advisor) to worry when a company in a highly regulated industry is out-of-step with its peers, relies on controversial risk-mitigation measures like carbon offsetting, and fails to provide clarity about its planned expenditures.

In short, NAM's best attack on climate-related proposals uses a citation of a paraphrase of a recommendation about a plan a company itself put forward, removes all context, and asks the Court to accept this caricature as evidence of ESG run amok. Actual examination of NAM's example, however, shows a firm analyzing a *management* proposal and making a recommendation geared to protecting investors by staying in step with competitors. This points precisely to the danger here – that NAM's misrepresentations will lead the Court to a position that harms investors and makes it harder for markets to properly function.

---

[49]  Paul, *supra* note 41.

**B.** **Shareholders have strong interests in protecting investments from systemic risks like climate change, and their interests often diverge from those of management.**

Shareholders in public companies typically diversify to reap the increased returns available from risky securities while reducing that risk.[50] Indeed, federal law requires fiduciaries of federally regulated retirement plans to "diversify[] the investments of the plan[s]."[51] Similar rules govern other investment fiduciaries.[52] Managers — since compensation packages often include stock options — tend to have assets more concentrated in the businesses they run.[53] This concentration, along with understandable career

---

[50] *See generally* Burton G. Malkiel, *A Random Walk Down Wall Street* (2015).

[51] 29 U.S.C. Section 404(a)(1)(C).

[52] *See, e.g.,* Unif. Prudent Investor Act § 3.

[53] *See* John Roe and Kosmas Papadopoulos, *2019 U.S. Executive Compensation Trends*, Harvard Law School Forum on Corporate Governance (April 16, 2019), https://corpgov.law.harvard.edu/2019/04/16/2019-u-s-executive-compensation-trends/ ("The proportion of stock-based compensation as a percentage of total [executive] pay continues to increase, crossing the threshold of 50 percent of total pay for large companies for the first time this year."); Gallagher, *CEO and Executive Compensation Practices, 2020 Edition* at 11, https://www.ajg.com/us/-/media/files/gallagher/us/news-and-insights/ceo-executive-compensation-practices-report-2020.pdf ("In 2018 and 2019, stock awards constituted 63% of total NEO [the CEO, CFO and three additional highest paid officers] pay in the S&P 500 . . . .").

concerns,[54] creates a divergence in interest with respect to systemic risks and externalization of costs. Diversified shareholders therefore represent a critical voice for preserving economic stability in the face of idiosyncratically driven, but systemically felt, risk, such as that associated with climate change.

For diversified investors, the most important factor determining return is not how individual companies in a portfolio perform relative to other companies ("alpha"), but how the market itself performs ("beta").[55] Beta is determined chiefly by the performance of the economy overall because the value of the investable universe is equal to the portion of the productive economy that the companies in the market represent. Accordingly, over the long run, diversified portfolios rise and fall with GDP.[56]

While they do not ignore alpha, sophisticated investors recognize that "the impact of the market return driven by systematic risk swamps virtually any possible scenario created by skillful analysis or trading or

---

[54] *See supra* note 38.

[55] Stephen Davis, et al., *What They Do with Your Money* (2016) ("[a]ccording to widely accepted research, alpha is about one-tenth as important as beta [and] drives some 91 percent of the average portfolio's return.").

[56] UNEP Fin. Initiative, *Why Environmental Externalities Matter to Institutional Investors*, Appendix IV (2011) https://www.unepfi.org/fileadmin/documents/universal_ownership_full .pdf.

portfolio construction."[57] In other words, financial return to most investors is mainly governed by the performance of the economy as a whole rather than that of individual companies.

But the actions of individual companies can significantly reduce beta and thus harm diversified portfolios (as well as the economy and the public more broadly). PRI, an investor initiative whose members have $121 trillion in assets under management, issued a report describing corporate practices that can boost individual company returns while threatening the economy and diversified investors' returns.[58] These practices included a company externalizing costs onto others, resulting in a negative net result for diversified investors when "the costs across the rest of the portfolio (or market/economy) outweigh the gains to the company"; and a company or sector obtaining a regulation that favors its interests over others, which "can impair broader economic returns" when the regulation "hinders the development" of other companies or sectors.[59]

Because they are more impacted by beta than alpha, diversified investors need ways to protect themselves against cost-externalizing and

---

[57] Jon Lukomnik & James P. Hawley, *Moving Beyond Modern Portfolio Theory: Investing That Matters*, Chapter 5, Routledge (April 30, 2021); ("Beyond MPT"); *cf. Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982) ("Given mutual funds and similar forms of diversified investment, courts need not bend over backwards to give special protection to shareholders who refuse to reduce the volatility of risk by not diversifying.").

[58] Susheela Peres da Costa & Paul Chandler, *Active Ownership 2.0: The Evolution Stewardship Urgently Needs* 5 (2019).

[59] *Id.*

system-destabilizing practices. The shareholder proposal is an important tool to facilitate such protection. A recent report[60] addressing fiduciary duty of investment trustees in eleven jurisdictions, including the United States, confirms the importance of the beta stewardship that shareholder proposals facilitate:

> System-wide risks are the sort of risks that cannot be mitigated simply by diversifying the investments in a portfolio. They threaten the functioning of the economic, financial and wider systems on which investment performance relies. If risks of this sort materiali[z]ed, they would therefore damage the performance of a portfolio as a whole and all portfolios exposed to those systems.

Eliminating Rule 14a-8 would deny shareholders the effective use of a key corporate law tool to address systemic risks, threatening systemic degradation of investor returns and the American economy by dangerously insulating corporate management from systemic stewardship and shareholder input.

## CONCLUSION

In falsely portraying financially-driven risk management as ideological intervention and conflating the interests of managers with those of shareholders, NAM casts shareholder proposals as harmful when they are

---

[60] Freshfields Bruckhaus Deringer LLP, *A Legal Framework for Impact* 27 (2021).

actually an important tool for shareholder protection. This kind of factual distortion shows how important it is to base judicial decisions on well-developed factual records, not on assertions raised for the first time at the appellate level.

NAM's desired outcome — disposing of Rule 14a-8 — undercuts fundamental tenets of capitalism and free markets by devolving power from the owners of corporations to their management. Furthermore, by lumping climate change into the undifferentiated bucket of "ESG issues" and summarily declaring all such issues immaterial to investors, NAM asks this Court to create dangerous and factually unmoored precedent.

The Court should reject NAM's arguments and preserve the rights of shareholders (and the SEC's ability to facilitate and protect those rights). It should decline NAM's invitation to create a court-imposed rule defining which issues matter to investors — and, in so doing, override the considered judgment of both investors themselves and an agency tasked with protecting their interests. With respect to climate change, NAM's characterization is dead wrong, and the Court would harm investors if it impeded shareholders' ability to manage climate-related risks.

Dated: September 20, 2023

Respectfully submitted,

                    **Rushing McCarl LLP**
                    Ryan McCarl (Cal. SBN 302206)
                    John Rushing (Cal. SBN 331273)
                    Davit Avagyan (Cal. SBN 336350)

                    By: Ryan McCarl

                    *Counsel for Amici Curiae ClientEarth and*
                    *The Shareholder Commons*

## CERTIFICATE OF SERVICE

On September 20, 2023, this brief was served via ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

Dated: September 20, 2023

Respectfully submitted,

**Rushing McCarl LLP**

Ryan McCarl (Cal. SBN 302206)

John Rushing (Cal. SBN 331273)

Davit Avagyan (Cal. SBN 336350)

By: Ryan McCarl

*Counsel for Amici Curiae ClientEarth and*
*The Shareholder Commons*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7) and Fifth Circuit Rule 29.3, I certify that the attached amicus brief is proportionally spaced and uses a 14-point typeface. The brief contains 5,789 words and 27 pages, including footnotes but excluding the table of contents and table of authorities, certifications, attorney signatures, and caption page. This document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype.

Dated: September 20, 2023

Respectfully submitted,

**Rushing McCarl LLP**

Ryan McCarl (Cal. SBN 302206)

John Rushing (Cal. SBN 331273)

Davit Avagyan (Cal. SBN 336350)

By: Ryan McCarl

*Counsel for Amici Curiae ClientEarth and The Shareholder Commons*