No. 23-60230

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

Petition for Review from an Order of the Securities and Exchange
Commission

_____

## REPLY BRIEF FOR PETITIONERS

_____

GENE P. HAMILTON
REED D. RUBINSTEIN
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

R. TRENT MCCOTTER
  *Counsel of Record*
JONATHAN BERRY
MICHAEL BUSCHBACHER
JARED M. KELSON
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

*Counsel for Petitioners*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

### *National Center for Public Policy Research et al. v. SEC*

No. 23-60230

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. National Center for Public Policy Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Nathaniel Fischer

3. Phillip Aronoff

4. The Securities and Exchange Commission

5. Boyden Gray PLLC (formerly Boyden Gray & Associates PLLC)

6. R. Trent McCotter

7. Jonathan Berry

8. Michael Buschbacher

9. Jared M. Kelson

10. The Kroger Co. It is publicly traded under the ticker KR, and, according to public information, The Vanguard Group, Inc., owns 10% or more of its stock.

11. BlackRock Inc. It is publicly traded under the ticker BLK, and, according to public information, no publicly held corporation owns 10% or more of its stock.

12. American Express Co. It is publicly traded under the ticker AXP, and, according to public information, Berkshire Hathaway, Inc., owns 10% or more of its stock.

13. Apple Inc. It is publicly traded under the ticker AAPL, and, according to public information, no publicly held corporation owns 10% or more of its stock.

14. Alphabet Inc. It is publicly traded under the ticker GOOGL, and, according to public information, no publicly held corporation owns 10% or more of its stock.

15. Walgreens Boots Alliance Inc. It is publicly traded under the ticker WBA, and, according to public information, no publicly held corporation owns 10% or more of its stock.

16. Gene P. Hamilton

17.    Reed D. Rubinstein

18.    America First Legal Foundation

19.    Theodore J. Weiman

20.    Tracey A. Hardin

21.    Megan Barbero

22.    Michael A. Conley

23.    National Association of Manufacturers

24.    Lehotsky Keller Cohn LLP

25.    Steven P. Lehotsky

26.    Adam Steene

27.    Erica Klenicki

28.    Scott A. Keller

29.    Matthew H. Frederick

30.    Todd Disher

31.    Alexis Swartz

/s/ R. Trent McCotter
R. Trent McCotter
*Counsel of Record for Petitioners*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .........................................i

TABLE OF AUTHORITIES....................................................................v

INTRODUCTION AND SUMMARY .......................................................1

ARGUMENT .........................................................................................3

    I.    The SEC's Decision Was Arbitrary, Capricious, and
        Unconstitutional. ...................................................................3

        A.    Arbitrary and Capricious. .............................................3

        B.    Unconstitutional Viewpoint Discrimination. ................5

    II.    *Clarke* Confirms There Is a Reviewable Order. ....................8

        A.    *Clarke*'s Holdings. ..........................................................9

        B.    There Is a Final SEC Order.........................................12

        C.    Not Committed to Agency Discretion. ..........................26

    III.    The Parties' Dispute Is Capable of Repetition Yet Evading
        Review. ...................................................................................27

        A.    Capable of Repetition...................................................28

        B.    Yet Evading Review. ....................................................32

CONCLUSION ....................................................................................34

CERTIFICATE OF SERVICE...............................................................36

CERTIFICATE OF COMPLIANCE.......................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Clothing & Textile Workers Union v. SEC,*
  15 F.3d 254 (2d Cir. 1994) ................................................... 23

*Axon Enter., Inc. v. FTC*, 143 S. Ct. 890 (2023) ...................................... 20

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ................................... 6

*Clarke v. Commodity Futures Trading Commission,*
  74 F.4th 627 (5th Cir. 2023) ........................... 1–3, 8–19, 21, 25–26, 28

*Empower Texans, Inc. v. Geren,*
  977 F.3d 367 (5th Cir. 2020) ...................................................... 32–33

*Finer Foods, Inc. v. U.S. Dep't of Agric.,*
  274 F.3d 1137 (7th Cir. 2001) .............................................. 13

*Kixmiller v. SEC*, 492 F.2d 641 (D.C. Cir. 1974) ................................... 23

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
  567 U.S. 298 (2012) .............................................................. 28

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ............................. 24

*Med. Comm. for Hum. Rts. v. SEC,*
  432 F.2d 659 (D.C. Cir. 1970) ...................................... 19–20

*N.Y.C. Employees' Retirement System v. Dole Food Co.,*
  969 F.2d 1430 (2d Cir. 1992) .......................................... 33, 34

*Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.,*
  827 F.3d 51 (D.C. Cir. 2016) ............................................ 12

*Rollerson v. Brazos River Harbor Navigation Dist.,*
  6 F.4th 633 (5th Cir. 2021) ................................................ 27

*S. Cal. Aerial Advertisers' Ass'n v. FAA,*
 881 F.2d 672 (9th Cir. 1989)................................................ 12

*Seacoast Anti-Pollution League v. Costle,*
 572 F.2d 872 (1st Cir. 1978) .............................................. 13

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019)........................ 17

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............ 17

*Tosdal v. Northwestern Corp.,*
 440 F. Supp. 3d 1186 (D. Mont. 2020)................................ 33

*Trinity Wall St. v. Wal-Mart Stores, Inc.,*
 75 F. Supp. 3d 617 (D. Del. 2014) ...................................... 34

*Yarls v. Bunton*, 905 F.3d 905 (5th Cir. 2018) ...................... 29

*Yates v. United States*, 574 U.S. 528 (2015)........................... 20

**Statutes**

5 U.S.C. § 551(6)............................................................ 12–13

15 U.S.C. § 78d-1 ........................................ 2, 8, 15, 18, 20, 23

15 U.S.C. § 78y ......................................................... 8, 11

Pub. L. No. 94-29, 89 Stat. 97 (1975) .................................. 23

**Regulations**

17 C.F.R. § 202.1(d) ..................................................... 16, 22

17 C.F.R. § 202.3(a) .......................................................... 22

17 C.F.R. § 202.5 .............................................................. 23

17 C.F.R. § 240.14a-8 ....................................................... 24

17 C.F.R. § 240.14a-8(e) ................................................... 34

17 C.F.R. § 240.14a-8(g) ................................................... 21

17 C.F.R. § 240.14a-8(i) ........................................................... 7, 16, 17, 31

17 C.F.R. § 240.14a-8(j) ............................................................ 16, 21, 33

17 C.F.R. § 240.14a-8(k) ....................................................................... 21

17 C.F.R. § 240.14a-8(m) ...................................................................... 21

**Other Authorities**

*Statement of Informal Proposals for the Rendering of Staff
    Advice with Respect to Shareholder Proposals*, 41 Fed.
    Reg. 29,989 (July 20, 1976) ............................................................ 22, 25

57 Fed. Reg. 18,210 (Apr. 29, 1992) ..................................................... 22

S. Rep. No. 94-75 (1975) ........................................................................ 23

SEC Ann. Rep. (1939), https://www.sec.gov/files/1939.pdf .................... 24

Division of Corporation Finance, *Staff Legal Bulletin No.
    14A* (July 12, 2002), https://www.sec.gov/interps/legal/
    cfslb14a.htm ........................................................................................ 4

Division of Corporation Finance, *Staff Legal Bulletin No.
    14H* (Oct. 22, 2015), https://www.sec.gov/corpfin/staff-
    legal-bulletin-14h-shareholder-proposals ............................................ 32

Division of Corporation Finance, *Staff Legal Bulletin No.
    14L* (Nov. 3, 2021), https://www.sec.gov/corpfin/staff-legal-
    bulletin-14l-shareholder-proposals ................................................. 4, 31

Donna M. Nagy, *Judicial Reliance on Regulatory
    Interpretations in SEC No-Action Letters*, 83 Cornell L.
    Rev. 921 (1998) ................................................................................... 19

Howard L. Vickery III, *Judicial Review of Informal Agency
    Action: A Case Study of Shareholder Proposal No-Action
    Letters*, 28 Hastings L.J. 307 (1976), *available at*
    https://tinyurl.com/2p87arjj ................................................................. 21

Harwell Wells, *Shareholder Meetings and Freedom Rides: The Story of* Peck v. Greyhound, Harv. L. Sch. F. Corp. Gov. (Aug. 6, 2021), https://tinyurl.com/secgreyhound .........................5

## INTRODUCTION AND SUMMARY

Petitioners challenge the SEC's conclusion that their viewpoint-diversity shareholder proposal does not raise a matter of significant social policy concern. That conclusion is arbitrary, capricious, and violates the First Amendment. Pet.Br.20–38.

In response, the SEC offers only a desultory defense of its decision on the merits and instead asks this Court to vacate and remand. The Court should do so, but not before holding that the SEC's decision was illegal.

Rather than fully defend the merits, the SEC continues its strategy of trying to avoid judicial review altogether by insisting there is no final SEC order. SEC.Br.25–46. But a recent precedential decision of this Court emphatically rejected the arguments the SEC presents here.

In *Clarke v. Commodity Futures Trading Commission*, 74 F.4th 627 (5th Cir. 2023), issued after Petitioners filed their opening brief, this Court held that a nearly identical no-action letter qualifies as a final and reviewable agency decision. The SEC largely ignores *Clarke*, even though it was issued nearly two months before the SEC's brief was filed. And

1

when the SEC finally addresses *Clarke*, almost as an afterthought, it provides only an unpersuasive attempt at distinguishing it.

But trying to wish away bad precedent only confirms how devastating *Clarke* is to the SEC's jurisdictional arguments. And if anything, reviewability here is even stronger than in *Clarke* because the Exchange Act expressly deems final the type of decision made here. 15 U.S.C. § 78d-1(c). There was no such provision in *Clarke*.

The SEC's last-ditch effort at avoiding review is to claim this case is moot because Petitioners' shareholder proposal was included in Kroger's 2023 proxy materials. But Petitioners' dispute is with the SEC's treatment of their viewpoint-diversity shareholder proposal, and that legal issue is capable of repetition yet evading review. Petitioners have submitted the exact same proposal to nearly half a dozen companies, most of which *previously* sought no-action relief from the SEC for that proposal, and the SEC *always* granted those requests for no-action relief. To keep this case alive, there need only be a reasonable prospect that *one* company will seek such relief from the SEC again. Given prior practice, Petitioners easily meet that burden. The issue will also evade judicial review because the window for resolving such a suit is only 30 days.

# ARGUMENT

## I. THE SEC'S DECISION WAS ARBITRARY, CAPRICIOUS, AND UNCONSTITUTIONAL.

Petitioners' opening brief demonstrated that the SEC's grant of no-action relief against the viewpoint-diversity proposal was arbitrary, capricious, and unconstitutional. Pet.Br.20–38. In response, the SEC primarily asks for vacatur and remand, insisting there is "no administrative record that could enable substantive review." SEC.Br.46. But there were hundreds of pages of evidence and arguments submitted below. *See* JA1–217.

The Court should reject the decision below, then vacate and remand. *See Clarke*, 74 F.4th at 641–42.

### A. ARBITRARY AND CAPRICIOUS.

In response to Petitioners' claim that the SEC acted arbitrarily and capriciously by concluding that viewpoint diversity is not a matter of importance to society, the SEC claims that its decision below does not "explain[] the rationale for staff's views," so the Court allegedly lacks an adequate basis to review that decision. SEC.Br.46–47.

But during the proceedings below, there were multiple rounds of detailed briefing on the issue of whether the viewpoint-diversity proposal

raised a matter of significant social policy concern. JA7–10, 16–21, 28–30, 31–33, 50–53, 67–69. Petitioners also provided polling and statistics showing that viewpoint discrimination is a matter of exceptional societal importance. JA18–19.

Under the SEC's own regulations, the only correct outcome was to conclude that the proposal "raises issues with a broad societal impact, such that they transcend the ordinary business of the company," including "significant discrimination matters." Division of Corporation Finance, *Staff Legal Bulletin No. 14L* (*SLB-14L*) (Nov. 3, 2021), https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals; Pet.Br.27–31. The "presence of widespread public debate" only confirms that conclusion. Division of Corporation Finance, *Staff Legal Bulletin No. 14A* (*SLB-14A*) (July 12, 2002), https://www.sec.gov/interps/legal/cfslb14a.htm.

The SEC chose to reject those arguments and statistics to conclude, directly contrary to its own regulations, that "the Proposal relates to, and does not transcend, ordinary business matters." JA34. The Court should vacate that decision, hold that the record demonstrates the SEC's

conclusion is wrong under the SEC's regulations, and then remand for further proceedings.

## B.    UNCONSTITUTIONAL VIEWPOINT DISCRIMINATION.

The SEC has an unfortunate history of viewpoint discrimination in the context of no-action relief, even using that authority to block proposals about desegregation during the Civil Rights Era. *See* Harwell Wells, *Shareholder Meetings and Freedom Rides: The Story of* Peck v. Greyhound, Harv. L. Sch. F. Corp. Gov. (Aug. 6, 2021), https://tinyurl.com/secgreyhound.

In response to Petitioners' showing of viewpoint discrimination here, the SEC again claims the record is insufficient but then insists there was no such discrimination. SEC.Br.48–49. The SEC is wrong on both counts.

The administrative record contains reams of evidence demonstrating the SEC engaged in viewpoint discrimination. One need only compare the SEC's negative treatment of Petitioners' proposal with the SEC's blessing of the proposal in *CorVel Corp.*, 2019 WL 1640021 (SEC No-Action Decision June 5, 2019), which was worded the same except substituted "sexual orientation" and "gender identity" for

5

"viewpoint" and "ideology," *id.* at *1. Petitioners raised *CorVel* below nearly 40 times.

The SEC claims that the different treatment can be explained on the surprising theory that the Supreme Court first held Title VII covered sexual orientation and gender identity in 1998, not in 2020 when it decided *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). SEC.Br.49. Apparently, *Bostock* was much ado about nothing, and the circuits that disagreed with that view post-1998—including the Eleventh Circuit in *Bostock* itself—were flagrantly disregarding twenty-year-old Supreme Court precedent.

The SEC pivots to say that by 2019 some jurisdictions had already recognized employment-discrimination claims based on sexual orientation and gender identity, SEC.Br.50, but as Petitioners already explained, several jurisdictions protected *political affiliation* when Petitioners' proposal was considered below, so there is no reason to treat the two situations differently on that basis, Pet.Br.28–29. The SEC ignores this argument altogether.

Petitioners catalogued below that the SEC has historically granted no-action relief at a disproportionate rate against proposals commonly

associated with "conservative" views, on topics ranging from firearms to so-called "misinformation," with the effect so strong that it is apparent across aggregate statistics. *See, e.g.*, JA55–57. Again, the SEC tries to have it both ways by claiming those statistics are "flawed" but then asking the Court not to address them. SEC.Br.50–51.

The SEC next attacks a strawman, claiming Petitioners must be trying to initiate something akin to a "Section 1983/*Bivens* action" in circuit court. SEC.Br.51. But Petitioners are explaining why the SEC's grant of no-action relief accords with the agency's longstanding discrimination against conservative-aligned viewpoints. The SEC seems to think that if it discriminates broadly, this Court can never grant relief in any particular instance.

The SEC gets so turned around that it even declines to challenge Petitioners' argument that Rule 14a-8(i)(7) lacks "a clear standard" as required by Supreme Court precedent to avoid viewpoint discrimination. SEC.Br.51–52.[1] In that case, no administrative record is needed: the

---

[1] The SEC acknowledges that Petitioners argued below that Rule 14a-8(i)(7) "may be facially invalid under the First Amendment." SEC.Br.52.

Division's decision is unconstitutional because it is the necessary product of an unconstitutional rule.

\* \* \*

The Court should reject the SEC's decision, and vacate and remand.

## II. *CLARKE* CONFIRMS THERE IS A REVIEWABLE ORDER.

Seeking to avoid judicial scrutiny altogether, the SEC insists there is no "final order of the Commission" under 15 U.S.C. § 78y(a)(1). SEC.Br.25–46.

But this Court's recent precedential decision in *Clarke*—which held that a nearly identical no-action decision was reviewable—forecloses the SEC's arguments. If anything, that conclusion is even stronger here, as the Exchange Act expressly provides for "[f]inal[ity]" "for all purposes" once the Commission declines review, a statutory provision that was absent in *Clarke*. 15 U.S.C. § 78d-1(c); Part II.B.3, *infra*.

The SEC almost entirely ignores *Clarke*, addressing it only as an afterthought. SEC.Br.41. But burying adverse precedent can't make it go away.

## A.   *CLARKE*'S HOLDINGS.

In *Clarke*, this Court held that a no-action letter issued by the Commodity Futures Trading Commission was final agency action under the APA.[2] "[T]he whole point of … requesting [a] no-action letter" from the CFTC is "to obtain permission" and a "green light" before taking a potentially regulated action. 74 F.4th at 637. In *Clarke*, Victoria University sought a no-action decision from the CFTC to allow it to operate PredictIt, an online futures market. *Id.* at 633.

The CFTC's Division of Market Oversight ("DMO") issued a no-action letter, which said that DMO would "'not recommend that the Commission take any enforcement action'" if PredictIt continued operating, but DMO also noted that the letter "'represented the views of DMO only, and did not necessarily represent the positions or views of the Commission.'" *Id.* at 634 (cleaned up). The letter also "purported to 'retain the authority to condition further, modify, suspend, terminate or otherwise restrict the terms of the no-action relief.'" *Id.* (cleaned up).

---

[2] Judge Duncan's opinion represented "the majority opinion" and thus the binding view of the Court. *Clarke*, 74 F.4th at 644 (Ho, J., concurring).

Eight years later, DMO rescinded the letter, and "various third parties … who claim to be negatively impacted" sued the CFTC. *Id.* at 635 & n.3.

The CFTC, like the SEC in this case, insisted that a no-action letter was "neither 'agency action' nor 'final.'" *Id.* at 636. This Court rejected both arguments. *First*, "[t]he no-action letter qualifies as agency action under the APA" because agency action "has a broad sweep" and "'is meant to cover comprehensively every manner in which an agency may exercise its power.'" *Id.* at 637 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). Because the letter effectively "allow[ed]" PredictIt to operate, it was a "form of permission" and therefore a "license" under the APA. *Id.*

*Second*, the Court held that the letter was final because (a) it was the consummation of the agency process, and (b) it resulted in legal consequences. It marked the consummation of the agency's decisionmaking process because no "further agency review" was possible. *Id.* at 638. And it yielded legal consequences because it "withdrew some of the CFTC's discretion" by agreeing not "to bring enforcement proceedings against the holder of [the] no-action letter." *Id.* at 638 & n.6.

Again, the "whole point" of seeking no-action relief was to obtain that "green light," *id.* at 637, which itself was a legal consequence.

The no-action letter was reviewable even though it stated only that DMO staff would not *recommend* enforcement and even though it did not bind "the Commission or other Commission staff," or even the recipient itself. *Id.* at 637, 638 n.6. It was also "irrelevant" that the CFTC might "'reverse course'" at some future point. *Id.* at 639.

*Clarke* also rejected the CFTC's argument that the no-action letter was committed to agency discretion. "This case does not challenge an agency's discretionary decision to enforce (or not enforce) the law." *Id.* Rather, it challenges "a regulatory instrument (the no-action letter) that ensured the DMO would not recommend that the agency enforce the [Commodity Exchange Act] against PredictIt." *Id.*

As explained next, *Clarke* directly controls here and dictates that the SEC's no-action decision below is a final order under 15 U.S.C. § 78y(a)(1).

**B.    THERE IS A FINAL SEC ORDER.**

**1.    THERE IS AN SEC ORDER.**

The Exchange Act does not define "order," and "[c]ourts sometimes have construed 'order' for purposes of special review statutes more expansively than its definition in the APA" to review even "informal" decisions. *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 55 (D.C. Cir. 2016); Pet.Br.47. That background principle militates in favor of finding an order here if there is any doubt.

But even if the APA's definition of "order" applies (as the SEC contends, SEC.Br.27), then that just confirms that *Clarke*—which construed the APA—dictates there is an order here.

"[T]he APA defines 'order' broadly." *S. Cal. Aerial Advertisers' Ass'n v. FAA*, 881 F.2d 672, 675 (9th Cir. 1989). It includes "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but *including licensing*." 5 U.S.C. § 551(6) (emphasis added).

Petitioners' opening brief explained why the Division's no-action decision in this case is an order under the APA's definition. Pet.Br.47–49. That outcome is now dictated by *Clarke*, which held that a no-action

letter is a "license" under the APA. 74 F.4th at 637. Applying § 551(6), courts have held that, under the APA, "[a] license is an order" *by definition. Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872, 875 n.4 (1st Cir. 1978) (citing § 551(6) ("...including licensing")); *see Finer Foods, Inc. v. U.S. Dep't of Agric.*, 274 F.3d 1137, 1139 (7th Cir. 2001) (holding an agency's suspension of a company's license is an "order" under the APA). In sum: because *Clarke* says the no-action letter is a license, it is necessarily an order, as Petitioners have contended. That settles the matter.

The SEC never addresses *Clarke*'s holding on the definition of an order, perhaps because there is no way to distinguish it. Indeed, just like the no-action letter in *Clarke*, the no-action order here was a form of "permission" and a "green light" to Kroger to exclude NCPPR's viewpoint-diversity proposal. 74 F.4th at 637; Pet.Br.42–46.

The SEC instead spends most of its time arguing that the no-action decision cannot be a Commission order because it is allegedly not "final." SEC.Br.27–32. As explained next, *Clarke* also squarely forecloses the SEC's arguments on that point.

13

## 2.    THE SEC ORDER IS FINAL.

*Clarke* held that a no-action letter issued by a subordinate division of an agency is final when no further agency review is available. *Clarke* relied on the APA's requirements for finality: "'(A) the action must mark the consummation of the agency's decisionmaking process'" and "'(B) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Clarke*, 74 F.4th at 637. Even assuming this framework applies here, *see* Pet.Br.41–42, it provides a "pragmatic" inquiry "colored by the APA's embodiment of the 'basic presumption of judicial review,'" 74 F.4th at 637–38.

**Consummation.** Like the SEC here, *see* SEC.Br.27, 41, the CFTC in *Clarke* argued that its no-action decision was not the consummation of any agency decisionmaking and could not be an order of the agency because it was issued by a subordinate division, rather than by the Commissioners themselves, and merely recommended against enforcement, 74 F.4th at 638.

But *Clarke* held that the CFTC was answering the wrong question. For the consummation prong, all that must be shown is that the challenged agency action is not "'subject to further agency review.'" *Id.* In

14

*Clarke*, that was true because there was no way to appeal DMO's no-action decision to the CFTC Commissioners themselves. *Id.*

Here, the SEC's no-action decision is likewise not "subject to further agency review" because, as the SEC acknowledges, Petitioners asked the Commissioners to review the Division's no-action decision, *see* 15 U.S.C. § 78d-1(c), and the Commissioners declined, SEC.Br.14. Petitioners even asked the Division itself to reconsider and to present the matter to the Commissioners, and those requests were declined, too. *Id.*

Having exhausted every conceivable administrative avenue, Petitioners easily satisfy the consummation prong. Indeed, because they asked for—and were denied—full Commission review, consummation is even clearer here than in *Clarke* itself, where the CFTC Commissioners were never provided with the opportunity to review DMO's letter.

**Legal Consequences.** *Clarke* held that the CFTC's no-action letter had legal consequences because it "withdrew some of the CFTC's discretion" to "bring enforcement proceedings against the holder of a no-action letter." *Clarke*, 74 F.4th at 638 & n.6. Moreover, the recipient could "'rely'" on that "advisory opinion," even though it was subject to rescission and stated only the DMO's opinion, not the full CFTC's views. *Id.* at 638.

The same is true for the SEC's no-action decision here. The Division withdrew some of its discretion by stating that it would not recommend enforcement action if Kroger excluded NCPPR's viewpoint-diversity proposal. JA34. And Kroger—like any recipient of no-action relief—could rely on that decision as a "green light" to exclude NCPPR's proposal. *Clarke*, 74 F.4th at 637–38. That is the "whole point" of seeking such relief in the first place. *Id.* at 637; *see* JA34 (agreeing with Kroger that there is "some basis for your view that [Kroger] may exclude the Proposal under Rule 14a-8(i)(7)").

The SEC claims *Clarke* was different because the CFTC regulations note that a recipient can "rely" on a no-action decision. SEC.Br.41–42 (citing 17 C.F.R. § 140.99(a)(2)). But that is no distinction at all.

*First*, the SEC's regulations likewise indicate that no-action decisions "can be relied upon" in many instances. 17 C.F.R. § 202.1(d).

*Second*, the SEC's regulations also make clear that "prior Division letters" granting or denying no-action relief will be considered relevant precedent, confirming that not only can recipients rely on those letters, but so can other companies and even the *Division itself*. 17 C.F.R. § 240.14a-8(j)(2)(ii).

16

*Third*, even if the SEC's regulations were silent, the SEC's no-action decisions themselves make clear that the recipients can rely on them to exclude a proposal. The decision here told Kroger: "There appears to be some basis for your view that [Kroger] may exclude the Proposal under Rule 14a-8(i)(7)" because it "relates to, and does not transcend, ordinary business matters." JA34. Like in *Clarke*, that gave the "green light" to move ahead. 74 F.4th at 637.

*Fourth*, recipients can rely on the Division's no-action decisions because they are "'applied by the agency in a way that indicates [they will be] binding'" within the agency itself. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015); Pet.Br.46. Out of the thousands of such decisions issued by the Division over the decades, the SEC claims only four or five times has the Commission ever voiced the slightest disagreement. SEC.Br.25. The decisions thus serve, "in practice," SEC.Br.46, as "'a norm or safe harbor by which to shape [recipients'] actions,'" *Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019). There was no such historic pattern of reliance in *Clarke*.

The SEC proceeds to re-raise a bevy of arguments that were all expressly rejected in *Clarke*. The SEC first insists there can be no "final

order of the Commission" because the no-action decision was issued by and binds only the Division, not the Commissioners themselves. SEC.Br.27, 28 n.5, 41–42. Even if that were true (as noted above, it is not), it is irrelevant under *Clarke*, which unequivocally held that it "does not change our analysis" that a no-action decision "'represents the position only of the Division that issued it'" and "'binds only the issuing Division.'" *Clarke*, 74 F.4th at 638 n.6. The SEC tellingly declines to address that holding.[3]

The SEC similarly argues that a recipient can ignore a letter, SEC.Br.28, 42, but again *Clarke* rejected the relevance of the fact that a recipient "'is free to continue unabated with or without any staff no-action relief.'" *Clarke*, 74 F.4th at 638. Again, the SEC declines to address that holding.

The SEC also argues there can be no legal consequences from a no-action decision because the SEC "might" change its mind down the road regarding whether a proposal is properly excluded. SEC.Br.28, 42. But *Clarke* held it was "irrelevant" that the CFTC might "'reverse course'" at

---

[3] Indeed, the Commissioners' act of declining review made the Division's decision the "[f]inal[]" act "of the Commission" "for all purposes." 15 U.S.C. § 78d-1(c); *see* Part II.B.3, *infra*.

some future point. *Clarke*, 74 F.4th at 639. And yet again, the SEC declines to address that holding.

For these reasons, *Clarke* forecloses each of the SEC's arguments and dictates that the SEC's no-action decision is final.

In addition to the grounds provided in *Clarke*, there are numerous other bases for finding legal consequences resulting from SEC no-action decisions. *First*, some courts give deference to SEC no-action decisions,[4] which is a form of "legal consequences," Pet.Br.43 & n.12. Citing a case declining to give full-blown *Chevron* deference, the SEC claims its no-action decisions "'do[] not bind the courts,'" SEC.Br.43, but the SEC doesn't respond to Petitioners' argument that even lesser forms of deference suffice as a "legal consequence," Pet.Br.43–44.

*Second*, the SEC's no-action process has the hallmarks of a formal adjudicatory proceeding. In allowing review of such decisions, the D.C. Circuit described it as "an adversary encounter" between "two interested private parties," where the SEC "formally decides among conflicting adversary claims premised on detailed legal arguments." *Med. Comm. for*

---

[4] *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters*, 83 Cornell L. Rev. 921, 977–85 (1998).

*Hum. Rts. v. SEC*, 432 F.2d 659, 669–70, 675 (D.C. Cir. 1970); *see* Pet.Br.44. The SEC erroneously claims that such formality applies only when the Commissioners themselves undertake review, SEC.Br.31, but that is wrong because *Medical Committee* held that it is the SEC's "procedural regulations governing proxy proposals"—which apply at the Division-level—that "incorporate the basic theory of an adversary encounter" as to render the decisions "amenable to judicial review." *Med. Comm.*, 432 F.2d at 669–71.

### 3.    SECTION 78D-1(C) CONFIRMS REVIEWABILITY.

This Court's precedents establish all required reviewability elements here, and that is sufficient to resolve the matter. The Exchange Act's statutory finality provision further confirms reviewability.

Under 15 U.S.C. § 78d-1(c), entitled "Finality of Delegated Action,"[5] the Commission's act of declining review means that the Division's decision "shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission." § 78d-1(c); *Axon Enter., Inc. v.*

---

[5] The SEC overlooks the express statutory declaration of "[f]inality" contained within § 78d-1(c)'s heading. SEC.Br.42 n.9; *see Yates v. United States*, 574 U.S. 528, 540 (2015) (statutory "headings" "supply cues" about what Congress "intend[ed]").

*FTC*, 143 S. Ct. 890, 898 (2023) ("[I]f no such review has occurred [by the Commission], the [subordinate's] ruling itself becomes the decision of the Commission."). There was no such statutory guarantee of "[f]inality" in *Clarke*.

"Section 78d-l(c) … does not require an explicit statement that a delegation of authority is being made pursuant to section 78d-1."[6] Rather, "a general delegation of responsibility to the SEC staff is sufficient for the review provisions of section 78d-1 to apply."[7]

The SEC has "by published order or rule" delegated the Rule 14a-8 review process to the Division. § 78d-1(a). In fact, there are numerous such rules. *First*, Rule 14a-8 itself, which was issued by the Commission, refers half a dozen times to the prescribed roles of Division "staff" and to "prior Division letters." 17 C.F.R. § 240.14a-8(g), (j), (j)(2), (k), (m)(2).

*Second*, numerous Commission rules in 17 C.F.R. Part 202—which the SEC has agreed governs the Rule 14a-8 review process, ECF37 at 28–29—delegate the no-action process to the Division's staff. Sections 202.1

---

[6] Howard L. Vickery III, *Judicial Review of Informal Agency Action: A Case Study of Shareholder Proposal No-Action Letters*, 28 Hastings L.J. 307, 349 (1976), *available at* https://tinyurl.com/2p87arjj.

[7] *Id.*

and 202.2 expressly authorize the "rendering of advice and assistance by the *Commission's staff* to members of the public," 17 C.F.R. § 202.1(d) (emphasis added), including providing "informal administrative interpretations of the applicable statute or rule," *id.* § 202.2. The Commission even requires proxy materials (including shareholder proposals) to be directly "routed to the Division of Corporation Finance," 17 C.F.R. § 202.3(a), which means the "handling of proxy filings is delegated to the [D]ivision," Vickery, *supra*, at 349.

A separate Commission order even makes clear that it is handing off this power to the Division, and "the Commission itself [will be involved] only in those relatively rare cases where unusual problems exist and the staff or an interested person requests it."[8]

Removing all doubt, the SEC now concedes that § 78d-1—the delegation statute—is "currently listed among the[] authorizing statutes" for *all* of Part 202, including the provisions cited above. SEC.Br.38. The Commission itself made that change 30 years ago, *see* 57 Fed. Reg. 18,210, 18,216 (Apr. 29, 1992), and it remains in place now, so it is

---

[8] *See Statement of Informal Proposals for the Rendering of Staff Advice with Respect to Shareholder Proposals*, 41 Fed. Reg. 29,989, 29,989 (July 20, 1976).

irrelevant whether there was previously a delegation "in 1946," SEC.Br.38.[9]

For all these reasons, the Rule 14a-8 no-action process has been delegated to the Division, which means § 78d-1 applies and requires the Division's decision be treated as the "[f]inal[]" decision "of the Commission" itself because the Commission declined review. § 78d-1(c).

In response, the SEC extensively relies on *Kixmiller v. SEC*, 492 F.2d 641 (D.C. Cir. 1974); *see* SEC.Br.26–31, but Congress effectively overruled that decision just one year later by amending § 78d-1 so that it would cover review of the Division's "informal adjudication[s]"—e.g., no-action letters—which had not been the case at the time of *Kixmiller*, S. Rep. No. 94-75, at 140 (1975); Pub. L. No. 94-29, § 25(2), 89 Stat. 97, 163 (1975) (codified as amended at 15 U.S.C. § 78d-1(b)(3)).[10]

---

[9] The SEC claims that perhaps the Commission meant to cite § 78d-1 only for 17 C.F.R. § 202.5. SEC.Br.38. But § 78d-1 is nonetheless listed as authority for the entirety of Part 202. In any event, § 202.5 provides staff with authority to notify parties "that it will not recommend the commencement of an enforcement proceeding," § 202.5(d), which is what the Division does each time it provides no-action relief under Rule 14a-8. This just confirms the Rule 14a-8 process was delegated.

[10] The SEC also cites *Amalgamated Clothing & Textile Workers Union v. SEC*, 15 F.3d 254 (2d Cir. 1994); SEC.Br.25–32, but the briefing in that

(*footnote continued on next page*)

The SEC also cryptically states that no-action decisions are "not issued pursuant to any Commission function." SEC.Br.33. But § 78d-1's definition of Commission "function" is incredibly broad and includes "hearing, determining, ordering, certifying, reporting, or *otherwise acting as to any work, business, or matter*." § 78d-1(a) (emphasis added). That certainly includes no-action decisions, which involve "hearing" parties' briefing prescribed by Rule 14a-8(j), "determining" the application of the Rule to the proposal, and "acting" as to a "matter" presented "to the Commission," 17 C.F.R. § 240.14a-8. In fact, the task of advising parties as to the disclosure of shareholder proposals was originally one of the Commission's own functions. *See, e.g.*, 5 SEC Ann. Rep. 60, 62 (1939), https://www.sec.gov/files/1939.pdf.

To the extent the SEC means the Division has *inherent* power to issue no-action decisions, that contradicts precedent holding that federal agencies have no inherent authority because they are "literally" powerless "unless and until Congress confers power upon [them]." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

---

case never cited § 78d-1, and it appears the petitioner there never attempted to comply with it, so the court was likely unaware of it.

The SEC alternatively argues § 78d-1 applies only when Division decisions "carry[] legal force." SEC.Br.34. But that is exactly what *Clarke* established: no-action decisions carry legal consequences, even when issued only by a subordinate Division. *See* Part II.B.2, *supra.*

The SEC similarly suggests there is a delegation only when the Division directly "act[s] in place of the Commission itself" and "speak[s] for the Commission." SEC.Br.35. That novel language is not in § 78d-1 and should be rejected. But even if the SEC's invented text were a requirement, the regulations and orders described above clearly indicate the Commission expects the Division to "act in [its] place" and "speak for" it in the realm of no-action decisions by handling those matters without further Commission involvement, 41 Fed. Reg. at 29,989, and the Commission indeed treats those decisions as almost sacrosanct within the SEC, *see* Part II.B.2, *supra.*

Finally, even if the Commission never delegated no-action power to the Division, the only part of the SEC even arguably authorized to issue such decisions would be the Commission itself, whose decisions are directly reviewable under § 78y. Pet.Br.50. The SEC cannot have it both ways by claiming it can issue no-action relief but that the decisions aren't

attributable to *any* part of the agency. The SEC labels this is a "startling about-face." SEC.Br.35. It is certainly understandable that the SEC would be "startl[ed]" upon realizing that it loses even under its own theory.

### C.   NOT COMMITTED TO AGENCY DISCRETION.

The SEC next claims the challenged order is unreviewable as a purely discretionary decision. SEC.Br.39–40. *Clarke* devoted an entire section to rejecting that argument, *see* 74 F.4th at 639, and again the SEC never bothers to address that holding even once. As *Clarke* explained, Petitioners do not challenge "an agency's discretionary decision to enforce (or not enforce) the law" but rather challenge "a regulatory instrument (the no-action letter) that ensured the [Division] would not recommend that the agency" bring an enforcement action against the letter's recipient. *Id.*

That conclusion is even more obvious here because, as Petitioners' opening brief explained, the Division's no-action letter not only announced a decision not to recommend enforcement but made a finding that "the Proposal relates to, and does not transcend, ordinary business

26

matters," and that Kroger therefore had a basis for excluding it. Pet.Br.53–54.

Nor does the SEC ever dispute Petitioners' argument that even if this were viewed as a discretionary decision, the bar on reviewing such decisions does not apply to constitutional claims, which Petitioners undoubtedly bring here. Pet.Br.54 (citing *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 644 (5th Cir. 2021)).

The SEC acknowledges there is also no bar "where the agency itself has issued regulations that provide judicially manageable standards for review" of the agency's decision. Pet.Br.54; *Rollerson*, 6 F.4th at 644. The SEC claims it didn't "express[] a view on the Kroger letter" at all, so there could be no misapplication of its own standard. SEC.Br.39. But the SEC did express a view. The no-action decision said that "the Proposal relates to, and does not transcend, ordinary business matters," and thus Kroger had a "basis" to exclude it. JA34.

## III.  THE PARTIES' DISPUTE IS CAPABLE OF REPETITION YET EVADING REVIEW.

As a final attempt at avoiding judicial scrutiny, the SEC claims this case must be dismissed as moot because Kroger included the viewpoint-diversity proposal in its 2023 proxy materials and that granting the

Petition would therefore not provide any relief to Petitioners. SEC.Br. 18–25. That is wrong because the legal dispute between Petitioners and the SEC is capable of repetition yet evading review.

Indeed, presumably the reason this Court almost immediately issued an administrative stay—and repeatedly ordered it to remain in place—was to prevent this dispute from evading review due to the short timelines at issue. ECF10-2, 29-2, 106-2 (Orders imposing and maintaining the administrative stay).

## A.    CAPABLE OF REPETITION.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012) (cleaned up). As *Clarke* explained, "[p]ost-filing events do not moot a case as long as the parties have a concrete interest, however small, in the outcome of the litigation." *Clarke*, 74 F.4th at 636 (cleaned up).

"That is true here" because the "parties continue to spar over whether" the viewpoint-diversity proposal falls within the significant-social-policy-concern exception, *id.*, and Petitioners have numerous pending requests to include this very same proposal in other proxy

statements. Many of those companies previously sought no-action relief against that very same proposal, which the SEC granted *every single time*. Pet.Br.58. To keep this case alive, Petitioners need only show a "'reasonable expectation'" that *one* such company will again seek no-action relief against the viewpoint-diversity proposal. *Yarls v. Bunton*, 905 F.3d 905, 911 (5th Cir. 2018). The sworn evidentiary record here more than surpasses that threshold.

The SEC previously acknowledged that submitting the same proposal could avoid mootness if there were a reasonable probability the SEC would again grant no-action relief. ECF37 at 20. The SEC now backtracks and hypothesizes that perhaps every company will decline to seek no-action relief from the SEC, and that even if companies did seek such relief, maybe the SEC would suddenly deny it every time. SEC.Br.23–24.

But that is wild speculation by the SEC, unsupported by any declarations contradicting Petitioners' sworn statements. There is a pattern of major companies—including BlackRock, Salesforce.com, Alphabet (Google), and Apple—seeking no-action relief against this exact same proposal over a period of *years*. Pet.Br.17. Contrary to the SEC's

speculation, nothing material has changed since then. Those issuers all sought no-action relief even though it resulted in significant attorney "costs" to deal with the SEC and even though the proposals were likely to receive only modest "support" in the end, as is the case with most proposals. SEC.Br.23. There is no reason to believe companies will suddenly evaluate those costs and risks so differently that there is not even a reasonable prospect that a *single* company will seek no-action relief.[11]

The SEC's claim that it might suddenly change its position is, if anything, even more speculative. There is a 100% uniform pattern of the SEC *granting* no-action relief against the viewpoint-diversity proposal when asked, over a period of several years. Pet.Br.17–18. Even in its briefing to this Court, the SEC declines to admit it was wrong. It would be particularly inappropriate to find mootness based on the SEC's unsworn and entirely non-committal hypothesis that it might change its mind in the future.

---

[11] The SEC notes that the viewpoint-diversity proposal is procedurally barred at Kroger for several years, but that bar does not apply to any other company. SEC.Br.22.

Further, there is no difference between the analysis the SEC conducted for the viewpoint-diversity proposal below and the analysis it will apply to Petitioners' viewpoint-diversity proposal when companies seek no-action relief in the future, thereby confirming that they all implicate the same legal dispute. The SEC has formally announced that it "is no longer taking a company-specific approach to evaluating the significance of a policy issue under Rule 14a-8(i)(7)." *SLB-14L, supra.* After all, the entire point is that such proposals "transcend the ordinary business of the company," and thus *cannot* be company-specific. *Id.* It therefore doesn't matter to which specific company Petitioners submit their viewpoint-diversity proposal. *See* SEC.Br.24 n.3.

The SEC again tries to backpedal, suggesting that prior no-action decisions are not binding precedent for future proposals. SEC.Br.24–25 & n.3. That is a red herring because it is the SEC's *regulations* that require it to conduct the same analysis of the significance of a policy issue regardless of which company is at issue—and *that* particular determination is the legal dispute between Petitioners and the SEC that will continue to arise. *See SLB-14L, supra.* And on that score, the SEC has concluded this proposal is excludable every time.

31

The SEC also wrongly suggests this same legal issue could be resolved "in a private suit against" the particular company at issue. SEC.Br.20. Such a suit would not bind the SEC, which has already declined to follow a Third Circuit decision in a private-suit case where the SEC disagreed with that court's holding. *See* Division of Corporation Finance, *Staff Legal Bulletin No. 14H* (Oct. 22, 2015), https://www.sec.gov/corpfin/staff-legal-bulletin-14h-shareholder-proposals.

## B.   Yet Evading Review.

This Court has stated that a dispute will evade review unless it will "receive *complete* judicial review," meaning "there must be enough time for the Supreme Court to review" the matter. *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020) (cleaned up).

Here, the period during which there was a final SEC order but before the company filed its proxy statement was—at the absolute most— only 30 days.[12] That timeline is typical. Needless to say, 30 days is not enough time to "receive *complete* judicial review" up to and including

---

[12] The Division granted no-action relief on April 12, 2023, and Kroger filed its proxy statement on May 12, 2023.

review by the Supreme Court. *Empower Texans*, 977 F.3d at 370 (cleaned up). This case proves it, as Petitioners sought emergency relief simultaneous to filing the Petition, but there was not even time to obtain a substantive merits ruling from an emergency panel.

The SEC notes that in a handful of private suits between the shareholder proponents and companies (i.e., where the SEC was not a party), courts have issued preliminary relief before the company released its proxy statement. SEC.Br.19–21. But obtaining relief from a trial court isn't "'*complete* judicial review'" up to the Supreme Court. *Empower Texans*, 977 F.3d at 370.

In any event, none of the SEC's cases involved a suit against the SEC, for which the timeline is shorter than a private suit involving just the proponent and the company. A shareholder proponent seeking to sue the company[13] can do so at least as early as when the company seeks no-action relief with the SEC, which is at least 80 days before the proxy statement is issued. *See* 17 C.F.R. § 240.14a-8(j). And a company seeking

---

[13] This is what happened in *Tosdal v. Northwestern Corp.*, 440 F. Supp. 3d 1186 (D. Mont. 2020), and *N.Y.C. Employees' Retirement System v. Dole Food Co.*, 969 F.2d 1430 (2d Cir. 1992), which the SEC cites, SEC.Br.21.

to sue the shareholder for declaratory relief[14] has even longer: a suit may commence as soon as the shareholder submits the proposal, which will be at least 120 days before the proxy statement is issued. *See* 17 C.F.R. § 240.14a-8(e)(2). Compare that to the 30-day maximum timeline that Petitioners face once the Commissioners decline review.

Tellingly, even in the private cases the SEC cites, none of the courts conducted even one round of proceedings in less than 42 days.[15] No wonder courts hold that this is a classic scenario for the capable-of-repetition-yet-evading-review doctrine. *See, e.g.*, *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 75 F. Supp. 3d 617, 627 (D. Del. 2014).

## CONCLUSION

The Court should grant the Petition, vacate, and remand.[16]

---

[14] This is what happened in the SEC's other cited case. *See* SEC.Br.21 (citing *Express Scripts Holding Co. v. Chevedden*, 2014 WL631538 (E.D. Mo. Feb. 18, 2014)).

[15] *See N.Y.C. Employees'*, 969 F.2d at 1435.

[16] The SEC claims in passing that NCPPR "does not meet the venue requirements." SEC.Br.5. The argument is undeveloped and forfeited, and also foreclosed by this Court's precedent. *Glob. Van Lines, Inc. v. ICC*, 691 F.2d 773, 774 n.1 (5th Cir. 1982); *see* Order, *Texas v. SEC*, No. 23-60079 (5th Cir. May 26, 2023) (rejecting same SEC argument). Also, the SEC doesn't challenge venue for the other Petitioners.

October 3, 2023                    Respectfully submitted,

                                   /s/ R. Trent McCotter
                                   R. TRENT MCCOTTER
                                     *Counsel of Record*
                                   JONATHAN BERRY
                                   MICHAEL BUSCHBACHER
                                   JARED M. KELSON
                                   BOYDEN GRAY PLLC
                                   801 17th Street NW, Suite 350
                                   Washington, DC 20006
                                   202-706-5488
                                   tmccotter@boydengray.com

                                   GENE P. HAMILTON
                                   REED D. RUBINSTEIN
                                   AMERICA FIRST LEGAL FOUNDATION
                                   611 Pennsylvania Ave SE #231
                                   Washington, DC 20003
                                   (202) 964-3721
                                   gene.hamilton@aflegal.org

                                   *Counsel for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of this Court using the CM/ECF system, which will serve all parties automatically.

October, 3, 2023                    <u>/s/ R. Trent McCotter</u>

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a) because it contains 6,482 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

October 3, 2023                    /s/ R. Trent McCotter