No. 23-60230

# In the United States Court of Appeals for the Fifth Circuit

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

*Petitioners*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Petition for Review from an Order
of the Securities and Exchange Commission

## BRIEF OF AMICUS CURIAE PROFESSOR
## SEAN J. GRIFFITH IN SUPPORT OF INTERVENOR

Heather Gebelin Hacker
HACKER STEPHENS LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com
*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

No. 23-60230

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NATHANIEL FISCHER;
PHILLIP ARONOFF,

*Petitioners*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Petitioners | Counsel |
|---|---|
| • National Center for Public Policy Research<br>• Nathaniel Fischer<br>• Phillip Aronoff | Boyden Gray & Associates<br>• R. Trent Cotter<br>• Jonathan Berry<br>• Michael Buschbacher<br>• Jared M. Kelson<br>America First Legal Foundation<br>• Gene P. Hamilton |
| **Respondent** | **Counsel** |
| • Securities and Exchange Commission | Securities and Exchange Commission<br>• Theodore J. Weiman<br>• Megan Barbero<br>• Michael A. Conley<br>• Tracey A. Hardin |

| Intervenor | Counsel |
|---|---|
| • National Association of Manufacturers | Lehotsky Keller Cohn LLP<br>• Scott A. Keller<br>• Steven P. Lehotsky<br>• Matthew H. Frederick<br>• Todd Disher<br>• Alexis Swartz<br><br>NAM Legal Center<br>• Michael A. Tilghman II |
| **Interested Third Party** | |
| • The Kroger Co. | |
| *Amicus Curiae* | Counsel |
| • Professor Sean J. Griffith | Hacker Stephens LLP<br>• Heather Gebelin Hacker |

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Persons ............................................................. i

Table of Authorities ........................................................................... iv

Interest of *Amicus Curiae* .................................................................. 1

Summary of the Argument .................................................................. 2

Argument ........................................................................................ 3

    I.   The History of Rule 14a-8 Demonstrates That It Has Strayed Far from its Original, Modest Purpose. ........................................... 3

        A.   The Origins of Rule 14a-8 ................................................. 4

        B.   The Modern Shareholder Proposal Rule ........................... 10

    II.  Securities Regulation Is Not Exempt from Constitutional Review. .......... 14

    III. Rule 14a-8 Is Not an Anti-Fraud Rule. ...................................... 19

    IV. Rule 14a-8 Violates the First Amendment. ............................... 20

Conclusion ..................................................................................... 24

Certificate of Service ....................................................................... 25

Certificate of Compliance ................................................................. 25

# Table of Authorities

Page(s)

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................ 16

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
760 F.3d 18 (D.C. Cir. 2014) .................................................. 18

*Axon Enter., Inc. v. FTC,*
143 S. Ct. 890 (2023) .............................................................. 13

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................................................ 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ........................................................... 16, 23

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ................................................................ 16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
472 U.S. 749 (1985) ................................................................ 14

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978) ................................................................ 16

*Full Value Advisors, LLC v. SEC,*
633 F.3d 1101 (D.C. Cir. 2011) .............................................. 17

*Illinois ex. Rel. Madigan v. Telemarketing Assocs., Inc.,*
538 U.S. 600 (2003) ................................................................ 19

*Lovenheim v. Iroquois Brands, Ltd.,*
618 F. Supp. 554 (D.D.C. 1985) ....................................... 11, 14

*Lowe v. SEC,*
472 U.S. 181 (1985) ............................................................ 16-17

*Med. Comm. for Hum. Rts. v. SEC,*
432 F.2d 659 (D.C. Cir. 1970) .................................................. 8

*Nat'l Ass'n of Mfrs. v. SEC,*
748 F.3d 359 (D.C. Cir. 2014) ........................................... 17, 18

*Nat'l Ass'n of Mfrs. v. SEC,*
800 F.3d 518 (D.C. Cir. 2015) ........................................... 17, 18

*Nat'l Ass'n of Mfrs. v. SEC*,
956 F. Supp. 2d 43 (D.D.C. 2013) .................................................. 17

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ........................... 16, 19, 20, 22, 23

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) .................................................................. 14

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) ...................................................................... 15

*Peck v. Greyhound*,
97 F. Supp. 679 (S.D.N.Y. 1951) ............................................... 7

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................ 21, 22

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
487 U.S. 781 (1988) ............................................................ 19, 20

*Schneider v. New Jersey*,
308 U.S. 147 (1939) .................................................................. 19

*SEC v. Transamerica Corp.*,
163 F.2d 511 (3rd Cir. 1947) ...................................................... 6

*SEC v. Wall Street Publishing Institute*,
851 F.2d 365 (D.C. Cir. 1988) ................................................... 17

*Trinity Wall Street v. Wal-Mart Stores, Inc.*,
792 F.3d 323 (3d Cir. 2015) ...................................................... 12

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Couns., Inc.*,
425 U.S. 748 (1976) .................................................................. 16

*Zauderer v. Off. of Disciplinary Council of Sup. Ct. of Ohio*,
471 U.S. 626 (1985) ............................................................ 16, 23

## Statutes and Regulations

15 U.S.C. § 78(m) .................................................................. 17
15 U.S.C. § 78d-1(a) .............................................................. 12
15 U.S.C. § 78d-1(b) .............................................................. 12
15 U.S.C. § 78d-1(c) .............................................................. 12
15 U.S.C. § 78n(a) .................................................................. 3

17 C.F.R. § 200.30-1(f)(4) ................................................................ 12

17 C.F.R. §§ 240, 249b ..................................................................... 17

Conflict Minerals, 77 Fed. Reg. 56,274 (Sept. 12, 2012) ....................... 17

Securities Exchange Act of 1934, § 14(a), Pub. L. No. 73-291, 48 Stat. 881,
    895 (1934) ................................................................................. 3


**Other Authorities**

2 Louis Loss, *Securities Regulation* 906 (2d ed. 1961) ........................... 6

20 Am. Jur. 2d Courts § 33 .............................................................. 15

Adoption of Amendments Relating to Proposals by Security Holders,
    Exchange Act Release No. 12,999, 41 Fed. Reg. 52,994 (Dec. 3, 1976) ........... 10

Donald E. Schwartz & Elliot J. Weiss, *An Assessment of the SEC's
    Shareholder Proposal Rule*, 65 Geo. L. J. 635 (1976) ......................... 8

Donald E. Schwartz, *Public-Interest Proxy Contest: Reflections on Campaign
    GM*, 69 Mich. L. Rev. 419 (1971) ........................................... 8, 9

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary
    Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765 (2004) ........ 21

Harwell Wells, *A Long View of Shareholder Power: From the Antebellum
    Corporation to the Twenty-First Century*, 67 Fla. L. Rev. 1033 (2015) ......... 7

Henry G. Manne, *Shareholder Social Proposals Viewed by an Opponent*, 24
    Stan. L. Rev. 481 (1972) ................................................. 9, 10

Herbert Marcuse, *Counter-Revolution and Revolt* 55-56 (1972) .................. 9

Lewis D. Gilbert, *An Independent Shareholder Appraisal*, 34 U. Det. L.J.
    558 (1957) ................................................................. 7

Lewis S. Black, Jr. & A. Gilchrist Sparks III, *The SEC as Referee—
    Shareholder Proposals and Rule 14a-8*, 2 J. Corp. L. 1 (1976) ............... 13

Milton H. Cohen, *"Truth in Securities" Revisited*, 79 Harv. L. Rev. 1340
    (1966) ...................................................................... 4

Milton V. Freeman, *An Estimate of the Practical Consequences of the
    Stockholder's Proposal Rule*, 34 U. Det. L. J. 549 (1957) ..................... 5

Mortimer M. Caplin, *Proxies, Annual Meetings and Corporate Democracy:
    The Lawyer's Role*, 37 Va. L. Rev. 653 (1951) ............................. 5, 6

Opinion of Baldwin B. Bane, Exchange Act Release No. 735, 1945 WL
    27415 (Jan. 3, 1945) ....................................................... 7

Roberta S. Karmel, *The First Amendment and Government Regulation of Financial Markets*, 55 Brook. L. Rev. 1 (1989) .................................................. 20

Ronald O. Mueller, et al., *Shareholder Proposal Developments During the 2023 Proxy Season* Section II.A, Harvard Law Sch. Forum on Corp. Governance (Aug. 3, 2023), https://corpgov.law.harvard.edu/2023/08/03/shareholder-proposal-developments-during-the-2023-proxy-season/ ........................................ 21-22

Sean J. Griffith, *What's Controversial About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876 (2023) ..................................................................................................... 20

SEC, Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021) https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals? .................................................................................... 13, 14, 21

Sheldon E. Bernstein & Henry G. Fischer, *The Regulation of the Solicitation of Proxies: Some Reflections on Corporate Democracy*, 7 U. Chi. L. Rev. 226 (1940) ...................................................................................................... 5

Solicitation of Proxies Under the Act, Exchange Act Release No. 3347, 7 Fed. Reg. 10,655–56 (Dec. 22, 1942) ........................................................ 5

Solicitation of Proxies, Exchange Act Release No. 4775, 17 Fed. Reg. 11,431 (Dec. 18, 1952)................................................................................ 7

Solicitations of Proxies, Exchange Act Release No. 7375, 1972 WL 125400 (Sept. 22, 1972) ............................................................................ 10

# Interest of Amicus Curiae

*Amicus curiae*[1] Sean J. Griffith is the T.J. Mahoney Chair in Business Law at Fordham Law School. Professor Griffith is an expert in corporate and securities law. He has taught at Columbia Law School, the University of Connecticut School of Law, New York University School of Law, and the University of Pennsylvania Law School. Professor Griffith received his law degree *magna cum laude* from the Harvard Law School, where he was a John M. Olin Fellow in Law and Economics. Professor Griffith has published dozens of books, chapters, and journal articles on corporate and securities law. These include a recently published article addressing the First Amendment issues arising from Securities and Exchange Commission (SEC) rules requiring companies to disclose environmental, social, and governance (ESG) matters as well as a draft article specifically addressing compelled speech in the context of the SEC's Shareholder Proposal Rule (Rule 14a-8). Professor Griffith thus has specific expertise in the issues raised by the parties in this case, particularly with regard to those issues raised by the *amici curiae* brief filed by a group of 12 law professors in support of the SEC.

---

[1] Pursuant to Rule 29(a)(4)(E), undersigned counsel affirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than *amicus curiae* or their counsel made a monetary contribution intended to fund the preparation and submission of this brief.

## SUMMARY OF THE ARGUMENT

Professor Griffith, as *amicus curiae*, files this brief to respond to the arguments made in the *amici curiae* brief filed by a group of 12 law professors in support of the SEC. *See* Br. of First Amendment and Securities Law Scholars as Amici Curiae in Support of Respondent, Doc. 89-1 (filed Sept. 20, 2023) ("Scholars Br."). This brief first provides the Court with the historical context of Rule 14a-8, which is also relevant to Intervenor's argument that the modern Rule 14a-8 exceeds the SEC's statutory authority under the Securities and Exchange Act. *See* Part I *infra*. That history demonstrates that after many years of a narrow, focused rule simply designed to inform shareholders of planned action at the corporation's annual meeting, the SEC did an about-face and broadly expanded the Rule in the 1970s, allowing shareholder proposals to become a means of forcing corporations to advance the ideological agenda of social activists. *See* Part I.A *infra*. Under modern Rule 14a-8, the SEC grants itself vast discretion in forcing companies to include social policy proposals in their proxy materials. *See* Part I.B. *infra*.

This context also helps to reveal how the arguments made in the Scholars Brief are incorrect. The Rule's evolution shows that the law professors' argument that the First Amendment does not apply to securities regulation cannot be true. *See* Part II *infra*. It is disingenuous to rely, as the professors do, on a few lines of dicta from the 1970s and the early 1980s to support this claim when both the Rule and the relevant doctrinal paradigm for evaluating these issues was evolving then and for decades thereafter. Current doctrine shows that First Amendment principles are fully applicable to securities regulation. Rule 14a-8 is also not, as the professors claim, an anti-

fraud rule exempt from constitutional scrutiny. *See* Part III *infra*. Rule 14a-8 is a content-based regulation that compels speech. Whether the Court applies strict or intermediate scrutiny, Rule 14a-8 violates the First Amendment. *See* Part IV *infra*. As a result, the Court should determine that Rule 14a-8 is unenforceable because it violates the First Amendment.

**ARGUMENT**

## I.    The History of Rule 14a-8 Demonstrates That It Has Strayed Far from its Original, Modest Purpose.

No party in this matter has yet provided the Court with the history of Rule 14a-8. But this is important context for the Court because it shows how the Rule and the SEC's application of it have become unmoored from Congress's statutory authorization under section 14(a) of the Securities Exchange Act of 1934 (now codified at 15 U.S.C. § 78n(a)), which permits the SEC to regulate "proxy" solicitations "as necessary or appropriate in the public interest or for the protection of investors." Securities Exchange Act of 1934, § 14(a), Pub. L. No. 73-291, 48 Stat. 881, 895 (1934). The original version of the Rule hewed closely to the statutory purpose, simply requiring those soliciting proxies, usually the management, to include a description of all action proposed to be taken at the annual meeting or pursuant to the solicitation of proxies. But beginning in the 1960s and 1970s, activists worked to hijack this process to force corporations to participate in public debates of social and political issues.

The SEC did an about-face in the late 1970s and significantly broadened the rule to grant itself virtually unfettered discretion in deciding which matters of social policy could be forced onto corporate proxy materials, even when opposed by the management of the corporation itself. Given the SEC's broad discretion under its Rule in deciding whether a social policy is sufficient to "transcend" ordinary business matters or raises ethical or social issues of sufficient "breadth" to overcome objections to its relevance, it is unsurprising that the staff's determinations show significant ideological bias. Thus, what began as an effort to ensure that shareholders voting by proxy were informed of matters to be decided at the annual meeting has turned into an instrument by which the SEC and its staff compel corporations to speak on social and political issues in violation of their First Amendment rights.

### A.   The Origins of Rule 14a-8

Rule 14a-8, also known as the shareholder proposal rule, was promulgated under the SEC's authority to regulate the proxy solicitation process under Section 14a of the Securities and Exchange Act. Although the disclosures it called for largely duplicated those already required in the registration statement and annual report, Section 14a differed in requiring this information to be disseminated to shareholders, not merely filed with the SEC.[2]

As adopted, however, Section 14a contained an ambiguity. It clearly required the company to disseminate information concerning the election of directors and other

---

[2] Milton H. Cohen, *"Truth in Securities" Revisited*, 79 Harv. L. Rev. 1340, 1358 (1966).

matters *management* intended to raise at the annual meeting. But it was unclear whether Section 14a also required the company to disseminate information about resolutions *shareholders* intended to introduce at the annual meeting. By the late 1930s, the SEC had taken the position that it did.[3] And, in 1942, the SEC adopted the original version of the shareholder proposal rule to formalize its position.[4]

The 1942 version of the shareholder proposal rule required shareholder resolutions that were "a proper subject for action by the security holders" to be disclosed in management's proxy materials and provided shareholders with an opportunity to include a 100-word statement in support of the proposal.[5] State law controlled for purposes of determining what was a "proper subject" for shareholder proposals.[6] Because the Rule merely sought to ensure the communication of content deemed appropriate under state law, it added "nothing essential to the right of the shareholder to raise such a question at a meeting."[7]

---

[3] *See* Sheldon E. Bernstein & Henry G. Fischer, *The Regulation of the Solicitation of Proxies: Some Reflections on Corporate Democracy*, 7 U. Chi. L. Rev. 226, 233–34 (1940) ("It was apparently held in several cases, last year, that a proxy statement transmitted to stockholders by the management which failed to indicate that the management knew a stockholder would bring [a matter] before the meeting … would be misleading under some circumstances.").

[4] Solicitation of Proxies Under the Act, Exchange Act Release No. 3347, 7 Fed. Reg. 10,655–56 (Dec. 22, 1942).

[5] *Id.* at 10,656.

[6] Mortimer M. Caplin, *Proxies, Annual Meetings and Corporate Democracy: The Lawyer's Role*, 37 Va. L. Rev. 653, 670–71 (1951).

[7] Milton V. Freeman, *An Estimate of the Practical Consequences of the Stockholder's Proposal Rule*, 34 U. Det. L. J. 549, 550 (1957).

Unfortunately, because few if any states had clear rules about what sorts of shareholder proposals were appropriate under state law, the SEC soon assumed a quasi-judicial role in deciding between valid and invalid shareholder resolutions.[8] The idea that shareholder resolutions would be limited to situations where they were *expressly authorized*, either by state statute or corporate charter, was soon rejected by courts and replaced by the opposite proposition. *See SEC v. Transamerica Corp.*, 163 F.2d 511 (3rd Cir. 1947), *cert. denied*, 332 U.S. 847 (1948) (holding that a corporate bylaw could not inhibit operation of the shareholder proposal rule where the subject was one "in respect to which stockholders have the right to act under [state corporate law]"). Shareholders could now propose resolutions concerning any matter reasonably related to the business and affairs of the company that state corporate law did not *expressly reserve* for the board of directors.[9]

Early versions of the shareholder proposal rule were clear, however, that proper subjects for shareholder action were limited to matters touching on the business or financial performance of the company. The SEC emphasized in 1946 that "[i]t [i]s not the intent of [the shareholder proposal rule] to permit stockholders to obtain the

---

[8] 2 Louis Loss, *Securities Regulation* 906 (2d ed. 1961) ("Inevitably the Commission, while purporting to find and apply a generally nonexistent state law, has been building up a 'common law' of its own as to what constitutes a ′proper subject′ for shareholder action.").

[9] Caplin, *supra* n. 6, at 671–72 ("[I]t would seem that today a 'proper subject' for shareholder action could be any matter reasonably related to the business affairs or management of the company-provided only that such matter, by statute or decision, or by charter or by-law, be not delegated exclusively to the Board of Directors….").

consensus of other stockholders with respect to matters which are of a general political, social or economic nature. Other forums exist for the presentation of such views."[10] Then, in 1952, in response to a proposal urging the Greyhound Bus Company to discontinue segregated seating in southern states,[11] the SEC amended the rule to give companies express grounds to exclude shareholder proposals made "primarily for the purpose of promoting general economic, political, racial, social, or similar causes."[12] Even as corporate gadflies increasingly seized upon the rule to petition for corporate change, the changes they sought invariably targeted what scholars of corporate law now call agency costs—reforms designed to curb management excess and render managers more accountable to shareholders.[13]

---

[10] Opinion of Baldwin B. Bane, Exchange Act Release No. 735, 1945 WL 27415 (Jan. 3, 1945).

[11] *See Peck v. Greyhound*, 97 F. Supp. 679 (S.D.N.Y. 1951). The episode is summarized in Harwell Wells, *A Long View of Shareholder Power: From the Antebellum Corporation to the Twenty-First Century*, 67 Fla. L. Rev. 1033, 1081–82 (2015).

[12] Solicitation of Proxies, Exchange Act Release No. 4775, 17 Fed. Reg. 11,431, 11,433 (Dec. 18, 1952) (permitting exclusion if proposal is submitted "primarily for the purpose of promoting general economic, political, racial, religious, social or similar causes").

[13] *See, e.g.*, Lewis D. Gilbert, *An Independent Shareholder Appraisal*, 34 U. Det. L.J. 558 (1957) (discussing matters appropriate for shareholder proposals and focusing on such items as the location of shareholder meetings, approval of the auditing firm, disclosure of the results of director elections, cumulative voting, the inclusion of independent directors on the board, and management compensation).

Widespread use of the shareholder proposal rule to propound a social agenda did not emerge until the late 1960s and early 1970s.[14] In 1968, at the height of the Vietnam War, a human rights group holding shares of Dow Chemical Company submitted a proposal urging the board to prevent the company from making napalm. *Med. Comm. for Hum. Rts. v. SEC*, 432 F.2d 659, 662 (D.C. Cir. 1970), *vacated*, 404 U.S. 403 (1972). Although the proponents acknowledged that their motivation was primarily moral, they also claimed that the manufacture and sale of napalm for use in the Vietnam War was bad for business, allegedly because it prevented the company from recruiting quality employees. *Id.* After an SEC no-action letter approved the company's exclusion of the proposal, the D.C. Circuit reversed, holding that because the social concern arose directly from a company product, it could not be excluded without doing violence to what the court described as "corporate democracy." *Id.* at 676.

Anti-war proposals aimed at chemical companies and weapons manufacturers were soon joined by other leftist proposals aimed at industrial and financial companies more broadly.[15] The agenda items were a hodgepodge of environmental, labor,

---

[14] Donald E. Schwartz & Elliot J. Weiss, *An Assessment of the SEC's Shareholder Proposal Rule*, 65 Geo. L. J. 635, 637 n. 11 (1976) ("Although shareholder proposals raising social issues were not unknown prior to 1970, almost all proposals before that date dealt with corporate governance or corporate-shareholder relations.").

[15] *See, e.g.*, Donald E. Schwartz, *Public-Interest Proxy Contest: Reflections on Campaign GM*, 69 Mich. L. Rev. 419, 422–23 (1971) (documenting Campaign GM in the context of other shareholder proposals).

race, and gender issues.[16] What unified them was an agreement as to tactics—to use shareholder power within corporations to influence national policy. As described by Professor Schwartz, who also participated in the campaign against General Motors ("Campaign GM"):

> [A] new tactic was adopted by some dissenters who saw corporations to be the core of the problem. They analogized corporations to the state, and saw them as the maker of economic policy. To affect national policy, the dissenters concluded, required them to influence economic policy, and this in turn meant that they had to work within the organizations that make such policies. Therefore, the plan evolved to oppose corporate policies not as outsiders, but as participants in the process.[17]

The tactic, in other words, was to leverage the corporation as an instrument of social change, a part of what others have characterized as the "long march through the institutions."[18] The shareholder proposal was thus seized upon as a way to force corporations to serve, or at least publicize, a set of social or political goals.[19]

---

[16] Henry G. Manne, *Shareholder Social Proposals Viewed by an Opponent*, 24 Stan. L. Rev. 481, 487–88 (1972).

[17] Schwartz, *supra* n. 15, at 422 (citations omitted). Schwartz, a Professor at Georgetown University Law Center who also served as counsel to the Campaign GM movement, celebrated the shareholder proposal as a weapon of the "corporate guerilla fighter." *Id.* at n. *.

[18] "The long march through the institutions" was a phrase used by student activists to describe a tactic of entering institutions in order to turn them to leftist ends. *See* Herbert Marcuse, *Counter-Revolution and Revolt* 55-56 (1972).

[19] As one commentator noted in the early days of this movement:

> [T]he real importance of corporate activism does not lie in lengthy shareholder meetings or cosmetic business changes. The real significance of these moves can only be understood in terms of a broadly-

## B.  The Modern Shareholder Proposal Rule

The modern era of the rule began when the SEC made an about-face on social policy proposals. The agency reversed course in two rule changes issued during the 1970s. First, in 1972, the SEC softened the basis for excluding social proposals by limiting the exclusion to proposals that are "not significantly related to the business of the issuer" or are "not within the control of the issuer."[20] As a result of the change, proposals (like the Dow Chemical proposal) that raised broad issues of social policy but that were nevertheless directly connected to a product or practice of the company would no longer be excludable. Then, in 1976, the SEC issued an interpretive release holding that the "ordinary business" exclusion would apply only to proposals involving "business matters that are mundane in nature and do not involve any substantial policy or other considerations."[21] As a result, matters that might otherwise be excludable as "ordinary business"—for example, the manufacture or sale of a product and the hiring, firing, and promotion of employees—could be elevated to non-excludable status by connecting them to broader social or political concerns.

---

waged propaganda war…. The battles in this war may be fought on many grounds, *including matters like shareholder social proposals*, but the victories and defeats are measured by the amount of hostile or unflattering publicity one side scores against the other.

Manne, *supra* n. 16, at 492–93 (emphasis added).

[20] Solicitations of Proxies, Exchange Act Release No. 7375, 1972 WL 125400 (Sept. 22, 1972) (stating that the Commission's goal was "to replace the subjective terms of the provision with objective standards to the extent feasible and thereby create greater certainty in the application of the rule.").

[21] Adoption of Amendments Relating to Proposals by Security Holders, Exchange Act Release No. 12,999, 41 Fed. Reg. 52,994, 52,997-98 (Dec. 3, 1976).

Thus, the shareholder proposal rule at the end of the 1970s was the exact opposite of the shareholder proposal rule that opened that decade. Rather than allowing shareholder proposals to be excluded because they promoted general social concerns, the SEC now treated proposals challenging ordinary business practices as non-excludable precisely because they invoked general social concerns.

Judicial decisions construing the modern shareholder proposal rule have extended the rule's receptiveness to issues of social policy. For example, in *Lovenheim v. Iroquois Brands, Ltd.,* a federal district court held that a proposal motivated by animal rights concerns relating to the mistreatment of geese in producing *foie gras* could not be excluded in spite of clearly failing the quantitative tests relating to relevance. 618 F. Supp. 554 (D.D.C. 1985). The relevance exception provided for the exclusion of proposals about matters that accounted for less than 5% of the company's total assets or less than 5% of its net earnings and gross sales as long as the proposal was "not otherwise significantly related to the issuer's business." *Id.* at 557. Although the company's sale of *foie gras* accounted for far less than 5%, the court relied on a 1970s-era statement of the SEC that the relevance test "should [not] be hinged solely on the economic relativity of a proposal" to hold that the rule's "otherwise significantly related" language allowed for the consideration of non-quantitative factors, including a proposal's "ethical and social significance," and that, given the "ethical and social significance" of the animal rights issues raised by the shareholder, the proposal could not be excluded. *Id.* at 560.

Other decisions have excluded particular proposals while preserving the ability of social issues to transcend ordinary business concerns. For example, in *Trinity Wall*

*Street v. Wal-Mart Stores, Inc.,* the Third Circuit allowed the retailer to exclude a proposal relating to the sale of firearms but nevertheless articulated a standard by which social proposals could avoid exclusion. 792 F.3d 323 (3d Cir. 2015). According to this framework, courts first ask whether the subject matter of a proposal relates to ordinary business operations and second, if it does, whether the proposal raises a significant policy issue that "transcends" ordinary business operations. *Id.* at 345. Obviously, considerable discretion resides in the determination of whether a social policy issue is transcendent and therefore non-excludable.

Under current practice, companies invoking the ordinary business, relevance, or any of the eleven other bases for excluding shareholder proposals apply to the SEC's Division of Corporate Finance for a "no action" determination—that is, a staff commitment to take no action if the company excludes the proposal.[22] Staff "no action" decisions are quasi-judicial. Prior rulings serve as persuasive authority but are not binding. Staff decisions are appealable to the Commission,[23] but if the Commission declines review (as is often the case), the staff ruling becomes a final order of the Commission, appealable in federal court.[24] As a result, if the staff issues "no action"

---

[22] The SEC delegated authority to administer Rule 14a-8 to the Division of Corporate Finance. *See* 15 U.S.C. § 78d-1(a); 17 C.F.R. § 200.30-1(f)(4).

[23] 15 U.S.C. § 78d-1(b) (providing that "the Commission shall retain a discretionary right to review the action" of staff delegees).

[24] *See* 15 U.S.C. § 78d-1(c) ("If the right to exercise such review is declined, or if no such review is sought within the time stated in the rules promulgated by the Commission, then the action of any such division of the Commission, individual Commissioner, administrative law judge, employee, or employee board, shall, for all

relief, the proponent bears the burden of appeal. If the staff declines "no action" relief, the company may either appeal or risk defending an SEC enforcement action. In either case, given the cost of further proceedings, both the shareholders submitting proposals and corporations seeking to exclude them very often accede to the initial ruling, and staff determinations are effectively final.[25]

The staff's current approach to the "ordinary business" and "relevance" exemptions is outlined in Staff Legal Bulletin 14L ("SLB 14L").[26] According to SLB 14L, the staff no longer insists on a nexus between the social policy and the company's business operations in deciding whether to apply the ordinary business exclusion.[27] Instead, the staff considers only the "significance" of the social policy issue, asking "whether the proposal raises issues with a broad societal impact, such that they transcend the ordinary business of the company."[28] Similarly, with regard to "social and ethical" exception to the "relevance" exemption, SLB 14L reaffirmed

_____

purposes, including appeal or review thereof, be deemed the action of the Commission."); *see also Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 898 (2023) ("if no such review has occurred [by the Commission], the [delegee's] ruling itself becomes the decision of the Commission.").

[25] Lewis S. Black, Jr. & A. Gilchrist Sparks III, *The SEC as Referee—Shareholder Proposals and Rule 14a-8*, 2 J. Corp. L. 1, 10 (1976) ("For all practical purposes, the Staff's decision with respect to any particular proposal is final.").

[26] SEC, Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021) https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals?.

[27] The staff rejected its prior approach requiring a nexus between the company's business and the social policy in question involved the staff in irrelevant questions and led to inconsistent determinations. *Id.* at Section B.2.

[28] *Id.*

the holding of *Lovenheim*. According to the staff, "proposals that raise issues of broad social or ethical concern related to the company's business may not be excluded, even if the relevant business falls below the economic thresholds of [the relevance exclusion]."[29] The staff thus claims for itself the discretion to determine not only social "significance" but also the "breadth" of social and ethical issues.

Given the staff's expansive (and self-created) discretion in deciding whether a social policy is sufficiently "significant" to transcend ordinary business concerns or raises ethical or social issues of sufficient "breadth" to overcome quantitative challenges to its relevance, it would not be surprising if the staff's determinations showed ideological bias. And indeed, that is precisely what the Petitioners have found.[30]

## II.    Securities Regulation Is Not Exempt from Constitutional Review.

The law professor *amici* suggest that proxy statement regulation is presumptively constitutional because securities regulation somehow lies beyond the bounds of First Amendment review. The only doctrinal support for this view comes from a few old lines of dicta in which the Court lists, without any analysis, the regulation of proxy statements as an acceptable form of speech regulation. *See* Scholars Br. at 17 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978), *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758, n.5 (1985)). Dicta, of course, lacks

---

[29] *Id.* at Section C.

[30] *See* Pet. Br. at 36 (citing study showing that the SEC grants no-action relief allowing the exclusion of conservative social-issue proposals at a significantly higher rate (50%) than the general rate at which is provides no-action relief for social-issue proposals (31%)).

precedential authority. 20 Am. Jur. 2d Courts § 33 ("Obiter dictum is not binding and does not become the law."). And these statements appear without analysis and therefore lack even persuasive authority.

The one time the suggestion appears in case law *with* analysis is an instance that undermines the professors' argument. In *Pacific Gas & Electric Company v. Public Utilities Commission of California* (*PG&E*), Justice Stevens' dissent pointed to numerous restrictions of speech routinely upheld in the commercial context. 475 U.S. 1, 36 (1986) (Stevens, J., dissenting) ("In my view, this requirement differs little from regulations applied daily to a variety of commercial communications that have rarely been challenged—and to my knowledge never invalidated—on First Amendment grounds."). Among these, he listed SEC Rule 14a-8, which he expressly compared to the access order in *PG&E*. *Id.* at 39–40 (Stevens, J., dissenting). The crux of Justice Stevens' argument was that since Rule 14a-8 had never been found unconstitutional, then by analogy, the access order in *PG&E* was not unconstitutional either. But Justice Stevens was writing in *dissent*—a dissent that no other Justice joined. The presumption should thus be reversed: Because of the close parallel between Rule 14a-8 and the access order that the Court found unconstitutional in *PG&E*, then, by analogy, Rule 14a-8 is likely unconstitutional also.

Ultimately, the professors rely on absence of evidence (no cases have yet invalidated Rule 14a-8) as evidence of absence (of First Amendment inapplicability to Rule 14a-8). This is not just logical fallacy. The argument also disregards the fact, explained above, that the evolution of the rule as an instrument to compel speech on social and political matters did not emerge until the 1970s. At that time, the relevant

First Amendment doctrine had not yet evolved. The Court did not begin to protect "purely commercial" speech until 1976. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Couns., Inc.*, 425 U.S. 748 (1976). And what is now described as the "commercial speech doctrine" emerged in piecemeal fashion with major cases in 1980, 1985, and 2018. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980); *Zauderer v. Off. of Disciplinary Council of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*). Similarly, the cases recognizing corporate speech rights under the First Amendment were decided in the same era. The seminal case recognizing corporate speech rights was not decided until 1978. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978). It was reaffirmed in 2010, with other important cases addressing the First Amendment rights of corporations decided as recently as 2014 and 2023. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). It is disingenuous to rely on a few lines of dicta from the 1970s and the early 1980s when the relevant doctrinal paradigm was still undergoing active evolution at that time and for decades later.

In any event, even if there were an absence of evidence in the 1970s, there is certainly not now. Recent jurisprudence shows that First Amendment principles are fully applicable to securities regulation. For example, in *Lowe v. SEC*, the Court relied on a statutory exemption to avoid deciding the constitutional question but noted that "it is difficult to see why the expression of an opinion about a marketable security should not . . . be protected" under the First Amendment. 472 U.S. 181, 210 n.58

(1985). Lower courts have been even less willing to give the SEC a constitutional free pass. For instance, in *SEC v. Wall Street Publishing Institute*, the D.C. Circuit noted that "it would be an overstatement to assert that the First Amendment does not limit regulation in the securities field." 851 F.2d 365, 373 (D.C. Cir. 1988); *see also Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011) (concluding that while securities law "involves a 'different balance of concerns' and 'calls for different applications of First Amendment principles,'" those principles still apply) (citation omitted). Most recently, the D.C. Circuit demonstrated its willingness to apply First Amendment principles to securities laws in the "conflict minerals" cases. *See Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43 (D.D.C. 2013) (*NAM I*); *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014) (*NAM II*); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) (*NAM III*).

The conflict minerals cases involved a First Amendment challenge to regulations[31] requiring public companies to disclose whether they used or traded in certain raw materials originating from the Democratic Republic of the Congo. The district court upheld the regulations in *NAM I*, finding that *Zauderer* did not apply because the regulations were not merely aimed at preventing misleading or deceptive speech. 956 F. Supp. 2d 43. The D.C. Circuit reversed, invalidating the regulations under *Central Hudson*, while also adding that the disclosures likely did not qualify as "uncontroversial" under *Zauderer*. *NAM II*, 748 F.3d at 371. The court noted that "[b]y

---

[31] Conflict Minerals, 77 Fed. Reg. 56,274 (Sept. 12, 2012) (codified at 17 C.F.R. §§ 240, 249b). The regulations were promulgated by the SEC under the authority of the Dodd-Frank Act of 2010. 15 U.S.C. § 78(m).

compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment." *Id.* Notably, even though *NAM I* and *NAM II* reached different results, both courts found the application of First Amendment principles to SEC rulemaking unproblematic, and both held that *Zauderer* did not apply because the regulations in question went beyond preventing misleading or deceptive speech, differing only on their application of *Central Hudson*.

After an *en banc* decision in a different case holding that *Zauderer* applied to disclosure mandates that went beyond preventing misleading or deceptive speech,[32] the D.C. Circuit revisited *NAM II* and reaffirmed, this time basing its conclusion exclusively on the ground that the requisite disclosure was not "uncontroversial" under *Zauderer*. *NAM III*, 800 F.3d at 527. ("However persuasive we might find the intervenors' argument, we see no way to read *AMI* except as holding that—to quote *AMI*—*Zauderer* 'requires the disclosure to be of purely factual and uncontroversial information about the good or service being offered.' We are therefore bound to follow that holding." (citation omitted)).

The conflict minerals cases are especially instructive to show that the law professors' assertion is incorrect. Once the First Amendment was raised, the D.C. Circuit did not treat the securities laws as somehow immune to First Amendment challenge. The "out of bounds" argument is discussed nowhere in the opinions and was apparently never raised in court. Instead, the court focused on the question of

---

[32] *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014).

whether the rules were "uncontroversial" under *Zauderer* and, finding controversy, applied *Central Hudson*'s intermediate scrutiny, which the rules failed to satisfy. Thus, there is no reason to suppose that the First Amendment is wholly inapplicable to securities regulation. And as the Supreme Court has recently noted, the Court "has been reluctant to mark off new categories of speech for diminished constitutional protection." *NIFLA*, 138 S. Ct. at 2372 (citation omitted).

## III.    Rule 14a-8 Is Not an Anti-Fraud Rule.

The professors also contend that securities regulation is entitled to First Amendment deference because it regulates fraud. Scholars Br. at 17. But a regulatory apparatus is not immune from First Amendment scrutiny merely because it contains rules aimed at preventing fraud. And in any event, Rule 14a-8 is not an anti-fraud rule.

It is true that "the First Amendment does not shield fraud." *Illinois ex. Rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003). But the fact that fraud is not protected does not mean that the rules proscribing fraud need not comport with the Constitution. Merely identifying a rule as being aimed at fraud-prevention does not insulate it from First Amendment review. *See, e.g,. Schneider v. New Jersey*, 308 U.S. 147, 164–65 (1939) (holding unconstitutional a prior restraint aimed at preventing fraud); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988) (holding unconstititional rules categorizing certain types of charitable solicitations as fraudulent).

Further, Rule 14a-8 is *not* an anti-fraud rule. As explained above, Rule 14a-8 is a procedural rule aimed at ensuring that shareholders receive information about all items to be acted upon at the annual meeting. Securities regulation does contain anti-

fraud rules—for example, Rule 14a-9. But Rule 14a-8 is not one of them. The mere fact that securities regulation contains some anti-fraud rules does not insulate the whole of securities regulation from First Amendment review.

Putting this obfuscation aside, securities regulation affects "speech" under any common sense understanding of the term. As one commentator notes, "[s]ecurities regulation is essentially the regulation of speech."[33] Application of First Amendment principles does not necessarily destroy securities regulation. Most SEC disclosure rules likely pass constitutional muster.[34] But Rule 14a-8 does not.

## IV.   Rule 14a-8 Violates the First Amendment.

Under Rule 14a-8, the SEC compels corporations to publish and distribute shareholder proposals. As described above, the SEC discriminates based on content to decide whether a proposal can be excluded or must be included. This content-based discrimination also operates specifically to compel speech focusing on controversial social and political matters.

The Supreme Court has long held that the First Amendment is violated both when speech is restricted and when it is compelled. "By compelling individuals to speak a particular message," the government "'alte[rs] the content of [their] speech.'" *NIFLA*, 138 S. Ct. at 2371 (quoting *Riley*, 487 U.S. at 795). Although the

---

[33] Roberta S. Karmel, *The First Amendment and Government Regulation of Financial Markets*, 55 Brook. L. Rev. 1, 1 (1989).

[34] *See generally* Sean J. Griffith, *What's Controversial About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876, 917–43 (2023).

content of shareholder proposals is initially drafted by shareholders (or, more realistically, by political advocacy groups), the compulsion to include that content in the company's proxy statement results from an exercise of SEC discretion. Through the application of a set of exceptions and exceptions-to-the-exceptions incorporating significant regulatory discretion, *see* Part I.B *supra*, the SEC determines the content of the proposals a company must include. Through this process, the SEC earns the moniker, "Content Regulation Commission."[35]

The structure of the rule and the SEC's application of it also regulate the content of speech in a way that is clearly not "content neutral." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (defining content-based laws as those making "distinctions based on the message a speaker conveys."). As described above, *see* Part I.B *supra*, Rule 14a-8 selects for proposals that "raise issues of broad social or ethical concern related to the company's business,"[36] and for proposals that "raise[] issues with a broad societal impact, such that they transcend the ordinary business of the company."[37] As a result, a substantial majority of shareholder proposals now raise controversial issues of social policy.[38] It is no longer true, as it once was, that Rule 14a-8

---

[35] Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1778 (2004).

[36] SLB 14L, *supra* n. 26, at Section C.

[37] *Id.* at Section B.2.

[38] *See* Ronald O. Mueller, et al., *Shareholder Proposal Developments During the 2023 Proxy Season* Section II.A, Harvard Law Sch. Forum on Corp. Governance (Aug. 3, 2023), https://corpgov.law.harvard.edu/2023/08/03/shareholder-pro-

merely facilitates intra-corporate communications. *See* Part I *supra*. The Rule has become a weapon of propaganda.

Content-based speech regulations are subject to strict scrutiny. Such regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "This stringent standard reflects the fundamental principle that governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 576 U.S. at 163). To satisfy strict scrutiny, the SEC must show that compelling corporations to provide access to their proxy materials for shareholders with an ideological axe to grind is the least restrictive means of protecting the proxy process. Even if the government's interest in the original enactment of 14a-8 is compelling—that is, ensuring that shareholders receive a description of all action proposed to be taken at the annual meeting—the SEC cannot show that Rule 14a-8, in its modern form, is the least restrictive means of doing so. Providing preferential treatment to shareholders advancing social causes or political agendas in no way protects the integrity of the proxy process—in many ways, it perverts it.

The law professor *amici* argue that the deferential standard of *Zauderer* applies here. Scholars Br. at 21-29. It is true that some commercial speech can be regulated

---

posal-developments-during-the-2023-proxy-season/ (finding that shareholders submitted 889 proposed resolutions in 2023, of which 582 or 65% raised questions issues of social policy).

to protect consumers. *See, e.g., Zauderer*, <u>471 U.S. at 651</u>; *Cent. Hudson*, <u>447 U.S. at 563</u>. In that context, regulations compelling speech receive deferential review provided that the speech they compel is "purely factual and uncontroversial." *Zauderer*, <u>471 U.S. at 651</u>. As explained above, however, Rule 14a-8 compels controversial speech under the plain meaning of that word. The law professor *amici* assert a definition for controversy that would limit its meaning to disclosures that are unrelated to the speaker's products or services, thus implying that disclosures related to the speaker's products and services cannot count as controversial. Scholars Br. at 25. The *amici* claim this definition is supported by Supreme Court precedent. *Id.* (citing *NIFLA*, <u>138 S. Ct. at 2372</u>). But *NIFLA does not* limit the meaning of controversy to the products or services of the speaker. Rather, it defines "controversy" independently, without regard to whether the speech is linked to goods or services. *NIFLA*, <u>138 S. Ct. at 2372</u> (stating that the subject of the speech is "abortion, anything but an 'uncontroversial' topic.").

Moreover, even if *NIFLA* could somehow be read to support such a limitation, forcing speech that is not directly relevant to the company's products and services is precisely what Rule 14a-8 does. As explained above, through the exceptions to the "ordinary business matter" and "relevance" exemptions, Rule 14a-8 selects for social issues on which members in society disagree and the proposals often have little or no connection to the company's products or services.

Because Rule 14a-8 specifically selects for controversial speech, it cannot receive deferential review under *Zauderer*. Instead, the SEC must demonstrate that the Rule

is the least restrictive means of protecting the proxy process. This is a standard Rule 14a-8 cannot meet.

## Conclusion

The Court should hold that Rule 14a-8 is unenforceable because it violates the First Amendment.

Respectfully submitted.

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
Hacker Stephens LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

On October 5, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6431 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the program used for the word count).

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER