# Ex. A

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Lyuba Goltser**
lyuba.goltser@weil.com

February 23, 2024

<u>SUBMITTED ONLINE</u> (www.sec.gov/forms/shareholder-proposal)
Office of Chief Counsel
Division of Corporation Finance
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Re:     The Kroger Co.
        **2024 Annual Meeting Omission of Shareholder Proposal of the National Center for Public Policy Research**
        **Securities Exchange Act of 1934 – Rule 14a-8**

Ladies and Gentlemen:

This letter is submitted on behalf of The Kroger Co. (the "<u>Company</u>" or "<u>Kroger</u>"), pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"). The Company has received the shareholder proposal (the "<u>2024 Proposal</u>") submitted by the National Center for Public Policy Research (the "<u>Proponent</u>") for inclusion in the Company's form of proxy, proxy statement and other proxy materials (together, the "<u>2024 Proxy Materials</u>") for its 2024 annual meeting of shareholders (the "<u>2024 Annual Meeting</u>"). In reliance on Rule 14a-8 under the Exchange Act, the Company intends to omit the 2024 Proposal from the 2024 Proxy Materials for the reasons discussed below. We respectfully request the concurrence of the Staff of the Division of Corporation Finance (the "<u>Staff</u>") of the Securities and Exchange Commission (the "<u>Commission</u>") that no enforcement action will be recommended if the Company omits the 2024 Proposal from the 2024 Proxy Materials.

Pursuant to Rule 14a-8(j), we have:

- Electronically submitted this letter with the Staff no later than eighty (80) calendar days before the Company intends to file the 2024 Proxy Materials in definitive form with the Commission; and
- Concurrently sent copies of this correspondence to the Proponent.

Rule 14a-8(k) and Staff Legal Bulletin No. 14D (November 7, 2008) ("<u>SLB 14D</u>") provide that stockholder proponents are required to send companies a copy of any correspondence that the

proponents elect to submit to the Commission or the Staff. Accordingly, we are taking this opportunity to inform the Proponent that if the Proponent elects to submit additional correspondence to the Commission or the Staff with respect to the 2024 Proposal, a copy of that correspondence should be sent at the same time to the undersigned on behalf of the Company pursuant to Rule 14a-8(k) and SLB 14D.

## THE PROPOSAL

The Company received the 2024 Proposal, accompanied by a cover letter from the Proponent, via FedEx on May 10, 2023.

The 2024 Proposal states:

### RESOLVED

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

The 2024 Proposal, along with a statement in support of the 2024 Proposal (the "2024 Supporting Statement"), are attached to this letter as Exhibit A.

## BASES FOR EXCLUSION

We hereby respectfully request that the Staff concur in Kroger's view that it may exclude the 2024 Proposal from the 2024 Proxy Materials pursuant to:

- Rule 14a-8(i)(12), because the 2024 Proposal addresses substantially the same subject matter as – and is, in fact, word for word, textually identical to – a shareholder proposal (submitted by the same Proponent) that was included in the Company's 2023 proxy materials for its 2023 annual meeting of shareholders (the "2023 Proposal") and did not receive the support necessary for resubmission; and
- Rule 14a-8(i)(7), because the 2024 Proposal deals with matters relating to Kroger's ordinary business operations, noting that the Staff has previously concurred with the Company's 2023 No Action Request (as defined below) relating to the 2023 Proposal, as explained further below.

# BACKGROUND

## The 2023 Proposal

On December 21, 2022, the Proponent submitted the 2023 Proposal for inclusion in the Company's proxy materials for the 2023 annual meeting of shareholders (the "2023 Annual Meeting"). The 2023 Proposal requested that Kroger issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. On February 16, 2023, Kroger submitted a no action request to the Staff, requesting relief pursuant to Rule 14a-8(i)(7) (the "2023 No Action Request"). Subsequent correspondence was submitted to the Staff. On April 12, 2023, the Staff issued a response (the "2023 No Action Decision") that the Staff would not recommend enforcement action to the Commission if Kroger omitted the 2023 Proposal from its 2023 proxy materials for the 2023 Annual Meeting (the "2023 Proxy Materials"), citing that there appears to be some basis for Kroger's view that it may exclude the 2023 Proposal pursuant to the ordinary business exception under Rule 14a-8(i)(7).

On April 13, 2023, the Proponent submitted a petition for review to the Commission of the Staff's 2023 No Action Decision, and on April 14, 2023, the Proponent also submitted a request for the Staff to reconsider the 2023 No Action Decision and present it to the Commission for the Commission's review (together, the "Proponent's Reconsideration Request"). The Commission denied the Proponent's Reconsideration Request. Subsequently, on April 28, 2023, the Proponent petitioned the United States Court of Appeals for the Fifth Circuit for review of the Staff's 2023 No Action Decision and moved for an emergency stay. On May 1, 2023, the Proponent also sued Kroger in the United States Southern District of Ohio, Western Division: Cincinnati, requesting declaratory and injunctive relief compelling Kroger to include the 2023 Proposal with its 2023 Proxy Materials (the "Kroger Ohio Action"). Notably, the Proponent never served the Company with notice of the Kroger Ohio Action. In light of Kroger's then impending filing date for its 2023 Proxy Materials, and its desire not to use additional Company and shareholder resources, Kroger included the 2023 Proposal in its 2023 Proxy Materials and informed the Proponent of the same on May 19, 2023. The 2023 Proxy Materials, which included the 2023 Proposal, were filed with the Commission on May 12, 2023.

At the Company's 2023 Annual Meeting on June 22, 2023, the 2023 Proposal received 1.88% of the vote (calculated in the manner required by Rule 14a-8(i)(12)), as reported in the Company's Current Report on Form 8-K filed on June 23, 2023.

The 2023 Proposal and 2023 Supporting Statement, 2023 No Action Request (and all related correspondence), 2023 No Action Decision, the Proponent's Reconsideration Request, the Form 8-K and relevant excerpts from the Company's 2023 Proxy Materials are included in Exhibit B hereto. We have not included the Kroger Ohio Action as an exhibit to this letter.

**The 2024 Proposal**

On May 10, 2023, prior to the Company's 2023 Annual Meeting, the Proponent submitted the 2024 Proposal via FedEx, attached as <u>Exhibit A</u> hereto. The 2024 Proposal is, in form and substance, and word-for-word, textually identical to the 2023 Proposal. The 2024 Proposal submission did not include any documentary evidence of the Proponent's ownership of Company shares. Accordingly, within 14 calendar days of receipt of the 2024 Proposal as required by Rule 14a-8(f), the Company properly sought verification of stock ownership and other documentary support from the Proponent, by sending the Proponent a notice, dated May 19, 2023 via email, informing the Proponent of the deficiency (the "<u>Deficiency Notice</u>"). The Deficiency Notice and correspondence relating to the 2024 Proposal is included in <u>Exhibit C</u> hereto.

On May 19, 2023, in response to the Company's Deficiency Notice and the Company's inclusion of the 2023 Proposal in the 2023 Proxy Materials, Sarah Rehberg, on behalf of the Proponent, informed Kroger via email that, "In light of the decision to include our 2023 proposal in the Kroger proxy statement, we withdraw the identical 2024 proposal dated May 10." *See* <u>Exhibit C</u>. Subsequently, on May 25, 2023, Scott Shepard, on behalf of the Proponent emailed Kroger, notifying the Company that "[w]e do not withdraw that shareholder proposal for the 2024 season." *See* <u>Exhibit C</u>. On May 31, 2023, the Proponent responded to the Company's Deficiency Notice and provided the requested evidentiary proof of ownership of Company stock. As noted above, the Company held its 2023 Annual Meeting on June 22, 2023, at which the 2023 Proposal received 1.88% of the vote.

The Company's Rule 14a-8 shareholder proposal deadline in connection with its 2024 Annual Meeting was January 13, 2024. On January 17, 2024, the Company sent a letter to the Proponent requesting that the Proponent voluntarily withdraw the 2024 Proposal, noting that the 2023 Proposal, which is identical to the 2024 Proposal, was included in the Company's 2023 Proxy Materials and received 1.88% support. The Company subsequently followed up with the Proponent by email on January 29, 2024 and January 31, 2024. On January 31, 2024, Scott Shepard replied indicating that the Proponent "may well withdraw, and I don't want to waste any of Kroger's time, but as we're suing the SEC staff re: pretty much every aspect of the no-action process, we may be obliged to force you to attempt no-action for litigation purposes." On February 5, 2024, Scott Shepard, on behalf of the Proponent, informed the Company that the Proponent would not withdraw the 2024 Proposal, stating "we firmly believe that your primary ground for exclusion this year was improperly granted last year by the Staff. Additionally, we fundamentally believe that the Staff's thresholds also violate the SEC's basic duties by effectively placing the renewal of proposals in the hands not of final shareholders but instead of giant investment houses misusing the power of other people's money and unregulated proxy advisory services." *See* <u>Exhibit C</u> for correspondence relating to the 2024 Proposal.

In light of (1) the Proponent's refusal to voluntarily withdraw the 2024 Proposal, which is identical to the 2023 Proposal, even though the 2023 Proposal received less than 5% of the vote (receiving a low 1.88%) at the 2023 Annual Meeting in accordance with Rule 14a-8(i)(12), and

4

(2) the Staff's previous concurrence with Kroger's view that the Company may omit the 2023 Proposal pursuant to Rule 14a-8(i)(7), the Company hereby respectfully requests the Staff's concurrence in the view that the 2024 Proposal may be excluded from the 2024 Proxy Materials.

## ANALYSIS

1. **The 2024 Proposal May Be Excluded Under Rule 14a-8(i)(12)(i) Because It Addresses Substantially The Same Subject Matter As A Shareholder Proposal That Was Included in the Company's Proxy Materials Within The Preceding Five Years, And is In Fact Identical to That Proposal, And That Proposal Did Not Receive The Support Necessary For Resubmission**

   a.    **Overview of Rule 14a-8(i)(12)**

   Under Rule 14a-8(i)(12)(i), a stockholder proposal that "addresses substantially the same subject matter as a proposal, or proposals, previously included in the company's proxy materials within the preceding five calendar years" may be excluded from the proxy materials "if the most recent vote occurred within the preceding three calendar years and the most recent vote was . . . [l]ess than 5 percent of the votes cast if previously voted on once.

   The Commission has indicated that the condition in Rule 14a-8(i)(12) that the shareholder proposals addresses "substantially the same subject matter" does not mean the previous proposal(s) and the current proposal must be exactly the same. Although the predecessor to Rule 14a-8(i)(12) required a proposal to be "substantially the same proposal" as prior proposals, the Commission amended the rule in 1983 to permit exclusion of a proposal that "deals with substantially the same subject matter." The Commission explained the reason and meaning of the revision, stating:

   > [A]n appropriate response to counter the abuse of the security holder proposal process by certain proponents who make minor changes in proposals each year so that they can keep raising the same issue despite the fact that other shareholders have indicated by their votes that they are not interested in that issue.

   Exchange Act Release No. 20091 (Aug. 16, 1983) (the "1983 Release"). *See also* Exchange Act Release No. 19135 (Oct. 14, 1982), in which the Commission stated that Rule 14a-8 "was not designed to burden the proxy solicitation process by requiring the inclusion of such proposals."

   The Staff has confirmed numerous times that Rule 14a-8(i)(12) does not require that the stockholder proposals or their requested actions be identical in order for a company to exclude the later submitted proposal. Instead, pursuant to the Commission's statement in the 1983 Release, when considering whether proposals deal with or address substantially the same subject matter, the Staff has focused on the "substantive concerns." Consistent with this approach, the Staff has

concurred with the exclusion of a proposal under Rule 14a-8(i)(12) when it shares the same substantive concerns even if the proposal differs in scope from a prior proposal.[1]

In the case of the 2023 Proposal and the 2024 Proposal at issue here, the proposals are in fact, in form and substance, word-for-word textually identical.

### b.    The 2024 Proposal is Identical to the Proposal That Was Previously Included in the Company's 2023 Proxy Materials

The Company has, within the past five years, specifically last year in 2023, included in its proxy materials the identical shareholder proposal from the same Proponent requesting that the Company issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The Company included the same proposal and statement in support thereof in its 2023 Proxy Materials, filed with the Commission on May 12, 2023. The 2024 Proposal, attached as Exhibit A, and the 2023 Proposal, attached as Exhibit B, not only address substantially the same subject matter, but are in fact, in both form and substance, textually identical.

### c.    The 2023 Proposal Did Not Receive the Shareholder Support Necessary to Permit Resubmission

Where a previous proposal (or proposals) addressed substantially the same subject matter as a current proposal, a company may exclude the current proposal under Rule 14a-8(i)(12) if the percentage of shareholder votes cast for the most recent previous proposal falls below certain

---

[1] See, e.g., The PNC Financial Services Group, Inc. (avail. Feb. 28, 2023) (concurring with the exclusion of a proposal requesting a "report on the company's due diligence process to identify and address environmental and social risks related to financing companies producing controversial weapons and/or with business activities in conflict-affected and high-risk areas" because it addressed substantially the same subject matter as two earlier proposals requesting a report "assessing the effectiveness of PNC's Environmental and Social Risk Management (ESRM) systems at managing risks associated with lending, investing, and financing activities within the nuclear weapons industry"); Apple Inc. (avail. Nov. 20, 2018) (concurring with the exclusion of a proposal requesting that the company review its policies related to human rights to assess whether it needed to adopt and implement additional policies because it dealt with substantially the same subject matter as one prior proposal requesting that the company establish a board committee on human rights and a second prior proposal requesting that the board amend the company's bylaws to require a board committee on human rights); Apple Inc. (Eli Plenk) (avail. Dec. 15, 2017) (concurring with the exclusion of a proposal requesting that the company prepare a report assessing the feasibility of integrating sustainability metrics, including metrics regarding diversity among senior executives, into performance measures of the CEO because it dealt with substantially the same subject matter as two earlier proposals requesting that the company adopt an accelerated recruitment policy requiring the company to increase the diversity of senior management and its board of directors); The Coca Cola Co. (avail. Jan. 18, 2017) (concurring with the exclusion of a proposal requesting a report identifying the number of Israel/Palestine employees who were Arab and non-Arab because it dealt with substantially the same subject matter as a prior proposal requesting that the company implement a set of "Holy Land" equal employment principles); Exxon Mobil Corp. (avail. Mar. 7, 2013) (concurring with the exclusion of a proposal requesting that the company review its facilities' exposure to climate risk and issue a report to stockholders because it dealt with substantially the same subject matter as three prior proposals requesting that the company establish a committee or a task force to address issues relating to global climate change); Pfizer Inc. (AFSCME Employees Pension Plan et al.) (avail. Jan. 9, 2013) (concurring with the exclusion of a proposal seeking disclosure of the company's lobbying policies and expenditures because it dealt with substantially the same subject matter as two prior proposals seeking disclosure of contributions to political campaigns, political parties, and attempts to influence legislation); Saks Inc. (avail. Mar. 1, 2004) (concurring with the exclusion of a proposal requesting that the board of directors implement a code of conduct based on International Labor Organization standards, establish an independent monitoring process, and annually report on adherence to such code because it dealt with substantially the same subject matter as one prior proposal that was nearly identical to the proposal at issue and a second prior proposal requesting a report on the company's vendor labor standards and compliance mechanism).

6

thresholds, and the shareholder meeting for the current proposal occurs within three years of the most recent previous proposal. The 2023 Proposal was included in the Company's 2023 Proxy Materials and, as discussed above, the Company is of the view that the 2023 Proposal deals with substantially the same subject matter – and is in fact, textually identical with – the 2024 Proposal.

Assuming the Staff concurs with the Company's view that the 2024 Proposal and the 2023 Proposal address substantially the same subject matter because they are in fact identical, the Company may exclude the 2024 Proposal from its 2024 Proxy Materials under Rule 14a-8(i)(12)(i) if the 2023 Proposal received less than 5% of the vote when it was voted upon. The voting calculation under Rule 14a-8(i)(12) requires consideration of votes for and votes against a proposal; abstentions and broker non-votes are not included. *See* Staff Legal Bulletin 14 (July 13, 2001) ("<u>SLB 14</u>"). SLB 14 provides the following formula for calculating the voting percentage for purposes of Rule 14a-8(i)(12): Votes for the 2023 Proposal / (Votes Against the 2023 Proposal + Votes for the 2023 Proposal) = Voting Percentage. As reported in the Company's Current Report on Form 8-K filed on June 23, 2023, attached as <u>Exhibit B</u> hereto, which reported the results of the voting on the proposals submitted to shareholders at the Company's 2023 Annual Meeting, the Company's shareholders cast 10,458,817 votes in favor of, and 544,893,409 votes against the 2023 Proposal. Under the methodology provided for in SLB 14, the 2023 Proposal received 1.88% of the vote: 10,458,817 / (10,458,817 + 544,893,409) = 10,458,817 / 555,352,226 = 0.01883276. Thus, the 2023 Proposal failed to receive 5% of the votes for purposes of Rule 14a-8(i)(12)(i) at the Company's 2023 Annual Meeting.

In sum, the Company is of the view that all of the requirements for excluding the 2024 Proposal pursuant to Rule 14a-8(i)(12)(i) are present:

- The 2024 Proposal addresses substantially the same subject matter as – and is, in fact, textually identical to – the 2023 Proposal;
- The Company included the 2023 Proposal in its proxy materials within the preceding 5 calendar years, specifically in the 2023 Proxy Materials;
- The 2023 Proposal received less than 5% of the vote the last (and only) time it was submitted to the Company's shareholders (1.88% at the 2023 Annual Meeting); and
- The 2024 Proposal was submitted for a meeting (the 2024 Annual Meeting) to be held within 3 calendar years of the most recent submission of the 2023 Proposal.

Accordingly, the Company is of the view that it may properly exclude the 2024 Proposal in reliance on Rule 14a-8(i)(12)(i).

**2. The 2024 Proposal Also May Be Excluded Pursuant to Rule 14a-8(i)(7) Because the Proposal Deals with Matters Relating to the Company's Ordinary Business Operations**

The Company respectfully repeats the same basis for exclusion that it presented for the 2023 Proposal, for which the Staff determined that there was a basis for Kroger's view that the 2023 Proposal related to, but did not transcend, ordinary business matters.

7

Rule 14a-8(i)(7) permits the omission of a shareholder proposal dealing with matters relating to a company's "ordinary business operations." According to the Commission's release accompanying the 1998 amendments to Rule 14a-8, the underlying policy of the ordinary business exclusion is "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting." Release No. 34-40018 (May 21, 1998) (the "1998 Release").

In the 1998 Release, the Commission identified the two central considerations underlying the general policy for the ordinary business exclusion. The first consideration relates to the subject matter of the proposal. The Commission stated that, "[c]ertain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* Examples of the tasks cited by the Commission include "management of the workforce." *Id.* The second consideration relates to the "degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *Id.; see also* Staff Legal Bulletin No. 14L (Nov. 3, 2021) ("SLB 14L"). The term "ordinary business" is rooted in the fundamental "corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations." 1998 Release (citing Release No. 12999 (Nov. 22, 1976)).

The Commission has stated that a proposal requesting the dissemination of a report is excludable under Rule 14a-8(i)(7) if the substance of the proposal involves a matter of ordinary business of the company. *See* Exchange Act Release No. 34-20091 (Aug. 16, 1983) (the "1983 Release") ("[T]he staff will consider whether the subject matter of the special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable under Rule 14a-8(c)(7)."); *see also Netflix, Inc.* (Mar. 14, 2016) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested a report describing how company management identifies, analyzes and oversees reputational risks related to offensive and inaccurate portrayals of Native Americans, American Indians and other indigenous peoples, how it mitigates these risks and how the company incorporates these risk assessment results into company policies and decision-making, noting that the proposal related to the ordinary business matter of the "nature, presentation and content of programming and film production").

In accordance with the policy considerations underlying the ordinary business exclusion, the Staff consistently has permitted exclusion of proposals under Rule 14a-8(i)(7) that relate to management of a company's workforce. *See* 1998 Release (excludable matters "include the management of the workforce, such as the hiring, promotion, and termination of employees"); *see also, e.g., Walmart, Inc.* (Apr. 8, 2019) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested the company's board prepare a report evaluating discrimination risk from the company's policies and practices for hourly workers taking medical leave, noting that the proposal "relates generally to the [c]ompany's management of its workforce"); *Yum! Brands, Inc.* (Mar. 6, 2019) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that sought to prohibit the company from engaging in certain employment practices, noting that "the [p]roposal relates generally to the [c]ompany's policies concerning its employees").

8

In particular, the Staff has permitted exclusion of proposals under Rule 14a-8(i)(7) that are substantially similar to the 2024 Proposal, including proposals submitted after the publication of SLB 14L in November 2021. For example, in *Blackrock, Inc.* (Apr. 4, 2022), as supported by SLB 14L, the Staff permitted exclusion under Rule 14a-8(i)(7) of a proposal submitted by the Proponent that asked for a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy. This was consistent with *American Express Company* (Feb. 26, 2021)[*] and *Apple Inc.* (Dec. 20, 2019, recon. denied Jan. 17, 2020), where the Staff permitted exclusion under Rule 14a-8(i)(7) of proposals submitted by the Proponent that asked for a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy. In *Apple Inc.*, the Staff noted that the proposal "does not transcend the [c]ompany's ordinary business operations." *See also, e.g.*, *Alphabet Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020)* (permitting exclusion under Rule 14a-8(i)(7) of a proposal requesting a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy); *salesforce.com, Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020)* (same); *CVS Health Corp.* (Feb. 27, 2015) (permitting exclusion under Rule 14a-8(i)(7) of a proposal requesting that the company amend its equal employment opportunity policy (or equivalent policy) to "explicitly prohibit discrimination based on political ideology, affiliation or activity" because the proposal "relates to [the company's] policies concerning its employees."); *The Walt Disney Company* (Nov. 24, 2014, recon. denied Jan. 5, 2015) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested the company's board consider the possibility of adopting anti-discrimination principles protecting employees' right to "engage in legal activities relating to the political process, civic activities and public policy without retaliation in the workplace" as relating to the ordinary business matter of "policies concerning [the company's] employees.").

In this instance, the 2024 Proposal focuses on Kroger's management of its workforce and policies concerning employees, both of which the Staff has routinely considered to be ordinary business matters. In the 2023 No Action Decision dated April 12, 2023, the Staff concurred with the Company's view that the 2023 Proposal related to, and did not transcend, ordinary business matters.

The 2024 Proposal at issue is identical with the 2023 Proposal, as explained above. The 2024 Proposal requests a report "detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from [Kroger's] written equal employment opportunity (EEO) policy." In addition, the 2024 Proposal's Supporting Statement claims that "shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance." When read together, the 2024 Proposal's resolved clause and 2024 Supporting Statement clearly articulate a concern with the ordinary business matters of how Kroger manages its workforce through employee policies. Decisions with

---

[*] Citations marked with an asterisk indicate Staff decisions issued without a letter.

respect to the management of employees and the substance of policies relating to the relationship between Kroger and its employees are at the heart of Kroger's business as the nation's largest supermarket retailer, and are so fundamental to its day-to-day operations that they cannot, as a practical matter, be subject to direct shareholder oversight. Notably, as of February 2024, Kroger employed over 414,000 full- and part-time employees across 35 states and the District of Columbia; managing this workforce is fundamentally ordinary business. Therefore, consistent with the precedent described above and with the Staff's 2023 No Action Decision, the 2024 Proposal may be excluded under Rule 14a-8(i)(7) as relating to Kroger's ordinary business operations.

We note that a proposal may not be excluded under Rule 14a-8(i)(7) if it is determined to focus on a significant policy issue. The fact that a proposal may touch upon a significant policy issue, however, does not preclude exclusion under Rule 14a-8(i)(7). Instead, the question is whether the proposal focuses primarily on a matter of broad public policy versus matters related to the company's ordinary business operations. *See* 1998 Release; Staff Legal Bulletin No. 14E (Oct. 27, 2009). The Staff has consistently permitted exclusion of shareholder proposals where the proposal focused on ordinary business matters, even though it also related to a potential significant policy issue. For example, in *PetSmart, Inc.* (Mar. 24, 2011), the proposal requested that the company's board require suppliers to certify that they had not violated certain laws regulating the treatment of animals. Those laws affected a wide array of matters dealing with the company's ordinary business operations beyond the humane treatment of animals, which the Staff has recognized as a significant policy issue. In permitting exclusion under Rule 14a-8(i)(7), the Staff noted the company's view that "the scope of the laws covered by the proposal is 'fairly broad in nature from serious violations such as animal abuse to violations of administrative matters such as record keeping.'" *See also, e.g.*, *CIGNA Corp.* (Feb. 23, 2011) (permitting exclusion under Rule 14a-8(i)(7) when, although the proposal addressed the potential significant policy issue of access to affordable health care, it also asked CIGNA to report on expense management, an ordinary business matter); *Capital One Financial Corp.* (Feb. 3, 2005) (permitting exclusion under Rule 14a-8(i)(7) when, although the proposal addressed the significant policy issue of outsourcing, it also asked the company to disclose information about how it manages its workforce, an ordinary business matter).

In this instance, even if the 2024 Proposal were to touch on a potential significant policy issue, the 2024 Proposal's overwhelming concern with how Kroger manages its workforce through employee policies demonstrates that the 2024 Proposal's focus is on ordinary business matters. Moreover, the Staff previously has determined that the identical proposal was excludable in the 2023 No Action Decision, as well as that a nearly identical proposal did not transcend the company's ordinary business operations in *Blackrock* (Apr. 4, 2022). Therefore, even if the 2024 Proposal could be viewed as touching upon a significant policy issue, its focus is on ordinary business matters.

WEIL:\98981282\3\57387.0001

Accordingly, we request that the Staff, pursuant to its prior response to the identical proposal in 2023, concur with our view that the 2024 Proposal should be excluded from Kroger's 2024 Proxy Materials pursuant to Rule 14a-8(i)(7) as relating to its ordinary business operations.

## CONCLUSION

For the foregoing reasons, please confirm that the Staff will not recommend any enforcement action to the Commission if the 2024 Proposal is omitted from the 2024 Proxy Materials.

Should the Staff disagree with our conclusions regarding the omission of the 2024 Proposal, or should any additional information be desired in support of the Company's position, we would appreciate an opportunity to confer with the Staff concerning these matters prior to the issuance of the Staff's Rule 14a-8 response.

If we can provide additional correspondence to address any questions that the Staff may have with respect to this no-action request, please do not hesitate to call me at 212-310-8048 or contact me via email at lyuba.goltser@weil.com.

Very truly yours,

Lyuba Goltser
Partner

Enclosures

cc:

Christine Wheatley
Stacey Heiser
The Kroger Co.

Scott Shepard
National Center for Public Policy Research

# EXHIBIT A

2024 Proposal



May 10, 2023

**Via FedEx to**

Corporate Secretary
The Kroger Co.
1014 Vine Street
Cincinnati, Ohio 45202-1100

Dear Sir/Madam,

I hereby submit the enclosed shareholder proposal ("Proposal") for inclusion in the Kroger (the "Company") proxy statement to be circulated to Company shareholders in conjunction with the next annual meeting of shareholders. The Proposal is submitted under Rule 14(a)-8 (Proposals of Security Holders) of the United States Securities and Exchange Commission's proxy regulations.

I submit the Proposal as the Deputy Director of the Free Enterprise Project of the National Center for Public Policy Research, which has continuously owned Company stock with a value exceeding $2,000 for at least 3 years prior to and including the date of this Proposal and which intends to hold these shares through the date of the Company's 2024 annual meeting of shareholders. A proof of ownership letter is forthcoming.

Pursuant to interpretations of Rule 14(a)-8 by the Securities & Exchange Commission staff, I initially propose as a time for a telephone conference to discuss this proposal June 1, 2023 or June 2, 2023 from 1-4 p.m. eastern. If that proves inconvenient, I hope you will suggest some other times to talk. Please feel free to contact me at ▮▮▮▮▮▮▮▮▮▮ so that we can determine the mode and method of that discussion.

Copies of correspondence or a request for a "no-action" letter should be sent to me at the National Center for Public Policy Research, 2005 Massachusetts Ave. NW, Washington, DC 20036 and emailed to █████████████████

Sincerely,

Sarah Rehberg

cc:            Scott Shepard, FEP Director
Enclosures:    Shareholder Proposal

## EEO Policy Risk Report

**RESOLVED**

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

**SUPPORTING STATEMENT**

Kroger does not explicitly prohibit discrimination based on viewpoint or ideology in its written EEO policy.

Kroger's lack of a company-wide best practice EEO policy sends mixed signals to company employees and prospective employees and calls into question the extent to which individuals are protected due to inconsistent state policies and the absence of a relevant federal protection. Approximately half of Americans live and work in a jurisdiction with no legal protections if their employer takes action against them for their political activities or discriminates on the basis of viewpoint in the workplace.

Companies with inclusive policies are better able to recruit the most talented employees from a broad labor pool, resolve complaints internally to avoid costly litigation or reputational damage, and minimize employee turnover. Moreover, inclusive policies contribute to more efficient human capital management by eliminating the need to maintain different policies in different locations.

There is ample evidence that individuals with conservative viewpoints may face discrimination at Kroger.

Kroger recently kowtowed to leftwing social media criticism by removing patriotic and Second Amendment related paraphernalia from store shelves. For instance, after someone complained on Twitter about a drink sleeve that stated, "Arms Change, Rights Don't", the Company reportedly recalled the items.[1] Kroger's subsidiary grocery store, Harris Teeter, likewise complied with liberal demands to pull "Freedom Series" items from its shelves, removing items that read, "Give me liberty or give me death" and "America, love it or leave it."[2]

While removing patriotic items from its stores, Kroger has simultaneously pushed a leftwing social agenda. Published in 2021, the Company released an "allyship guide" that told employees

---

[1] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

[2] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

to use "inclusive language" and celebrate transgender holidays.[3] Defining terms such as "non-binary," "transgender," and "pansexual," the guide asserts that, "Some people's morality can be a barrier to accepting LGBTQ+ people."[4]

Removing pro-America items from store shelves while publishing "allyship" training guides for staff certainly raise concerns over how Kroger treats employees with diverse points of view, particularly those who disagree with the Company's blatant leftwing actions. This places the Company in reputational, legal, and financial risk, as evidenced by a recent settlement with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs.[5]

Presently, shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance.

We recommend that the report evaluate risks including, but not limited to, negative effects on employee hiring and retention, as well as litigation risks from conflicting state and company anti-discrimination policies.

---

[3] https://www.breitbart.com/social-justice/2022/08/31/kroger-allyship-guide-tells-employees-to-celebrate-trans-holidays-support-bail-fund/
[4] https://www.thekrogerco.com/wp-content/uploads/2021/03/AAPI-Allyship-Guide_v3.2-External-merged.pdf
[5] https://news.yahoo.com/kroger-pay-180k-lawsuit-over-162047710.html

 **UBS**

**UBS Financial Services Inc.**
1000 Harbor Blvd
3rd Floor
Weehawken, NJ 07086

ubs.com/fs

Confirmation

Office of the Secretary
Kroger Company

5/31/2023

# Confirmation: Information regarding the account of The National Center for Public Policy Research

Dear Sir or Madam,

The following client has requested that UBS Financial Services Inc provide you with a letter of reference to confirm it's banking relationship with our firm.

As of 5/31/2023, The National Center for Public Policy Research holds, and has held continuously since May 10th, 2020 more than $2000 of Kroger Company common stock.

**Disclosure**
Please be aware this account is a securities account, not a "bank" account. Securities, mutual funds and other non-deposit investment products are not FDIC-insured or bank guaranteed and are subject to market fluctuation. The assets in the account, including cash balances, may also be subject to the risk of withdrawal and transfer.

**Questions**
If you have any questions about this information, please contact the UBS Wealth Advice Center at 877-827-7870.

UBS Financial Services is a member firm of the Securities Investor Protection Corporation (SIPC).

Sincerely,

Evan Yeaw
Head Wealth Advice Center Operations
UBS Financial Services

UBS Financial Services Inc. is a subsidiary of UBS AG

*Page 1 of 1*

# EXHIBIT B

2023 Proposal



December 21, 2022

**Via FedEx to**

Corporate Secretary
The Kroger Co.
1014 Vine Street
Cincinnati, Ohio 45202-1100

Dear Sir/Madam,

I hereby submit the enclosed shareholder proposal ("Proposal") for inclusion in the Kroger (the "Company") proxy statement to be circulated to Company shareholders in conjunction with the next annual meeting of shareholders. The Proposal is submitted under Rule 14(a)-8 (Proposals of Security Holders) of the United States Securities and Exchange Commission's proxy regulations.

I submit the Proposal as the Coordinator of the Free Enterprise Project of the National Center for Public Policy Research, which has continuously owned Company stock with a value exceeding $2,000 for at least 3 years prior to and including the date of this Proposal and which intends to hold these shares through the date of the Company's 2023 annual meeting of shareholders. A proof of ownership letter is forthcoming.

Pursuant to interpretations of Rule 14(a)-8 by the Securities & Exchange Commission staff, I initially propose as a time for a telephone conference to discuss this proposal January 10, 2022 or January 11, 2022 from 1-4 p.m. eastern. If that proves inconvenient, I hope you will suggest some other times to talk. Please feel free to contact me at █████████████████ so that we can determine the mode and method of that discussion.

Copies of correspondence or a request for a "no-action" letter should be sent to me at the National Center for Public Policy Research, 2005 Massachusetts Ave. NW, Washington, DC 20036 and emailed to

Sincerely,

Sarah Rehberg

cc:          Scott Shepard, FEP Director
Enclosures:   Shareholder Proposal

## EEO Policy Risk Report

**RESOLVED**

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

**SUPPORTING STATEMENT**

Kroger does not explicitly prohibit discrimination based on viewpoint or ideology in its written EEO policy.

Kroger's lack of a company-wide best practice EEO policy sends mixed signals to company employees and prospective employees and calls into question the extent to which individuals are protected due to inconsistent state policies and the absence of a relevant federal protection. Approximately half of Americans live and work in a jurisdiction with no legal protections if their employer takes action against them for their political activities or discriminates on the basis of viewpoint in the workplace.

Companies with inclusive policies are better able to recruit the most talented employees from a broad labor pool, resolve complaints internally to avoid costly litigation or reputational damage, and minimize employee turnover. Moreover, inclusive policies contribute to more efficient human capital management by eliminating the need to maintain different policies in different locations.

There is ample evidence that individuals with conservative viewpoints may face discrimination at Kroger.

Kroger recently kowtowed to leftwing social media criticism by removing patriotic and Second Amendment related paraphernalia from store shelves. For instance, after someone complained on Twitter about a drink sleeve that stated, "Arms Change, Rights Don't", the Company reportedly recalled the items.[1] Kroger's subsidiary grocery store, Harris Teeter, likewise complied with liberal demands to pull "Freedom Series" items from its shelves, removing items that read, "Give me liberty or give me death" and "America, love it or leave it."[2]

While removing patriotic items from its stores, Kroger has simultaneously pushed a leftwing social agenda. Published in 2021, the Company released an "allyship guide" that told employees

---

[1] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

[2] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

to use "inclusive language" and celebrate transgender holidays.[3] Defining terms such as "non-binary," "transgender," and "pansexual," the guide asserts that, "Some people's morality can be a barrier to accepting LGBTQ+ people."[4]

Removing pro-America items from store shelves while publishing "allyship" training guides for staff certainly raise concerns over how Kroger treats employees with diverse points of view, particularly those who disagree with the Company's blatant leftwing actions. This places the Company in reputational, legal, and financial risk, as evidenced by a recent settlement with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs.[5]

Presently, shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance.

We recommend that the report evaluate risks including, but not limited to, negative effects on employee hiring and retention, as well as litigation risks from conflicting state and company anti-discrimination policies.

---

[3] https://www.breitbart.com/social-justice/2022/08/31/kroger-allyship-guide-tells-employees-to-celebrate-trans-holidays-support-bail-fund/
[4] https://www.thekrogerco.com/wp-content/uploads/2021/03/AAPI-Allyship-Guide_v3.2-External-merged.pdf
[5] https://news.yahoo.com/kroger-pay-180k-lawsuit-over-162047710.html

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Lyuba Goltser**
lyuba.goltser@weil.com

February 16, 2023

VIA E-MAIL (shareholderproposals@sec.gov)
U.S. Securities and Exchange Commission
Division of Corporation Finance
Office of Chief Counsel
100 F Street, N.E.
Washington, DC 20549

Re:       **The Kroger Co.**
**2023 Annual Meeting Omission of Shareholder Proposal of the National Center for Public Policy Research**
**Securities Exchange Act of 1934 – Rule 14a-8**

Ladies and Gentlemen:

This letter is submitted on behalf of our client, The Kroger Co. (the "Company" or "Kroger"), pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Company has received the shareholder proposal and related correspondence attached as Exhibit A hereto (the "Proposal") submitted by the National Center for Public Policy Research (the "Proponent") for inclusion in the Company's form of proxy, proxy statement and other proxy materials (together, the "Proxy Materials") for its 2023 annual meeting of shareholders (the "2023 Annual Meeting"). In reliance on Rule 14a-8 under the Exchange Act, the Company intends to omit the Proposal from the Proxy Materials pursuant to Rule 14a-8(i)(7) (ordinary business operations).

We respectfully request the concurrence of the Staff of the Division of Corporation Finance (the "Staff") of the Securities and Exchange Commission (the "Commission") that no enforcement action will be recommended if the Company omits the Proposal from the Proxy Materials. Pursuant to Rule 14a-8(j), this letter is being filed with the Commission no later than eighty (80) calendar days before the Company intends to file the Proxy Materials in definitive form with the Commission.

Pursuant to Section C of Staff Legal Bulletin No. 14D (November 7, 2008) ("SLB 14D"), the Company has submitted this letter and the related exhibits to the Staff via email to shareholderproposals@sec.gov. Also, in accordance with Rule 14a-8(j), a copy of this letter and related exhibits is being simultaneously provided by email on this date to the Proponent informing it of the Company's intention to exclude the Proposal from the Proxy Materials.

The Company agrees to promptly forward to the Proponent any Staff response to the Company's no-action request that the Staff transmits to the Company by mail, email and/or facsimile.  Rule 14a-8(k) and SLB 14D provide that a shareholder proponent is required to send to the company a copy of any correspondence which the proponent elects to submit to the Commission or the Staff.  Accordingly, the Company hereby informs the Proponent that the undersigned on behalf of the Company is entitled to receive from the Proponent a concurrent copy of any additional correspondence submitted to the Commission or the Staff relating to the Proposal.

## I.    The Proposal

The Company received the Proposal, accompanied by a cover letter from the Proponent, via FedEx on December 21, 2022.

The Proposal states:

> **RESOLVED**
>
> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

The cover letter and the Proposal, along with a statement in support of the Proposal (the "Supporting Statement"), are attached to this letter as Exhibit A.

## II.    Basis for Exclusion

We hereby respectfully request that the Staff concur in Kroger's view that it may exclude the Proposal from the 2023 Proxy Materials pursuant to Rule 14a-8(i)(7) because the Proposal deals with matters relating to Kroger's ordinary business operations.

**The Proposal May be Excluded Pursuant to Rule 14a-8(i)(7) Because the Proposal Deals with Matters Relating to the Company's Ordinary Business Operations.**

Rule 14a-8(i)(7) permits the omission of a shareholder proposal dealing with matters relating to a company's "ordinary business operations." According to the Commission's release accompanying the 1998 amendments to Rule 14a-8, the underlying policy of the ordinary business exclusion is "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting." Release No. 34-40018 (May 21, 1998) (the "1998 Release").

In the 1998 Release, the Commission identified the two central considerations underlying the general policy for the ordinary business exclusion.  The first consideration relates to the subject

matter of the proposal. The Commission stated that, "[c]ertain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* Examples of the tasks cited by the Commission include "management of the workforce." *Id.* The second consideration relates to the "degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *Id.; see also* Staff Legal Bulletin No. 14L (Nov. 3, 2021) ("SLB 14L"). The term "ordinary business" is rooted in the fundamental "corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations." 1998 Release (citing Release No. 12999 (Nov. 22, 1976)).

The Commission has stated that a proposal requesting the dissemination of a report is excludable under Rule 14a-8(i)(7) if the substance of the proposal involves a matter of ordinary business of the company. *See* Exchange Act Release No. 34-20091 (Aug. 16, 1983) (the "1983 Release") ("[T]he staff will consider whether the subject matter of the special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable under Rule 14a-8(c)(7)."); *see also Netflix, Inc.* (Mar. 14, 2016) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested a report describing how company management identifies, analyzes and oversees reputational risks related to offensive and inaccurate portrayals of Native Americans, American Indians and other indigenous peoples, how it mitigates these risks and how the company incorporates these risk assessment results into company policies and decision-making, noting that the proposal related to the ordinary business matter of the "nature, presentation and content of programming and film production").

In accordance with the policy considerations underlying the ordinary business exclusion, the Staff consistently has permitted exclusion of proposals under Rule 14a-8(i)(7) that relate to management of a company's workforce. *See* 1998 Release (excludable matters "include the management of the workforce, such as the hiring, promotion, and termination of employees"); *see also, e.g.*, *Walmart, Inc.* (Apr. 8, 2019) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested the company's board prepare a report evaluating discrimination risk from the company's policies and practices for hourly workers taking medical leave, noting that the proposal "relates generally to the [c]ompany's management of its workforce"); *Yum! Brands, Inc.* (Mar. 6, 2019) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that sought to prohibit the company from engaging in certain employment practices, noting that "the [p]roposal relates generally to the [c]ompany's policies concerning its employees").

In particular, the Staff has permitted exclusion of proposals under Rule 14a-8(i)(7) that are substantially similar to the Proposal, including proposals submitted after the publication of SLB 14L in November 2021. For example, in *Blackrock, Inc.* (Apr. 4, 2022), as supported by SLB 14L, the Staff permitted exclusion under Rule 14a-8(i)(7) of a proposal submitted by the Proponent that asked for a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy. This was consistent with

*American Express Company* (Feb. 26, 2021)[*] and *Apple Inc.* (Dec. 20, 2019, recon. denied Jan. 17, 2020), where the Staff permitted exclusion under Rule 14a-8(i)(7) of proposals submitted by the Proponent that asked for a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy. In *Apple Inc.*, the Staff noted that the proposal "does not transcend the [c]ompany's ordinary business operations." *See also, e.g.*, *Alphabet Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020)* (permitting exclusion under Rule 14a-8(i)(7) of a proposal requesting a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity policy); *salesforce.com, Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020)* (same); *CVS Health Corp.* (Feb. 27, 2015) (permitting exclusion under Rule 14a-8(i)(7) of a proposal requesting that the company amend its equal employment opportunity policy (or equivalent policy) to "explicitly prohibit discrimination based on political ideology, affiliation or activity" because the proposal "relates to [the company's] policies concerning its employees."); *The Walt Disney Company* (Nov. 24, 2014, recon. denied Jan. 5, 2015) (permitting exclusion under Rule 14a-8(i)(7) of a proposal that requested the company's board consider the possibility of adopting anti-discrimination principles protecting employees' right to "engage in legal activities relating to the political process, civic activities and public policy without retaliation in the workplace" as relating to the ordinary business matter of "policies concerning [the company's] employees.").

In this instance, the Proposal focuses on Kroger's management of its workforce and policies concerning employees, both of which are ordinary business matters. In particular, the Proposal requests a report "detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from [Kroger's] written equal employment opportunity (EEO) policy." In addition, the Proposal's Supporting Statement claims that "shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance." When read together, the Proposal's resolved clause and Supporting Statement clearly articulate a concern with the ordinary business matters of how Kroger manages its workforce through employee policies. Decisions with respect to the management of employees and the substance of policies relating to the relationship between Kroger and its employees are at the heart of Kroger's business as the nation's largest supermarket retailer, and are so fundamental to its day-to-day operations that they cannot, as a practical matter, be subject to direct shareholder oversight. Notably, as of January 2022, Kroger employed over 420,000 full- and part-time employees across 35 states and the District of Columbia; managing this workforce is fundamentally ordinary business. Therefore, consistent with the precedent described above, the Proposal may be excluded under Rule 14a-8(i)(7) as relating to Kroger's ordinary business operations.

We note that a proposal may not be excluded under Rule 14a-8(i)(7) if it is determined to focus on a significant policy issue. The fact that a proposal may touch upon a significant policy issue, however, does not preclude exclusion under Rule 14a-8(i)(7). Instead, the question is

---

[*] Citations marked with an asterisk indicate Staff decisions issued without a letter.

whether the proposal focuses primarily on a matter of broad public policy versus matters related to the company's ordinary business operations. *See* 1998 Release; Staff Legal Bulletin No. 14E (Oct. 27, 2009). The Staff has consistently permitted exclusion of shareholder proposals where the proposal focused on ordinary business matters, even though it also related to a potential significant policy issue. For example, in *PetSmart, Inc.* (Mar. 24, 2011), the proposal requested that the company's board require suppliers to certify that they had not violated certain laws regulating the treatment of animals. Those laws affected a wide array of matters dealing with the company's ordinary business operations beyond the humane treatment of animals, which the Staff has recognized as a significant policy issue. In permitting exclusion under Rule 14a-8(i)(7), the Staff noted the company's view that "the scope of the laws covered by the proposal is 'fairly broad in nature from serious violations such as animal abuse to violations of administrative matters such as record keeping.'" *See also, e.g.*, *CIGNA Corp.* (Feb. 23, 2011) (permitting exclusion under Rule 14a-8(i)(7) when, although the proposal addressed the potential significant policy issue of access to affordable health care, it also asked CIGNA to report on expense management, an ordinary business matter); *Capital One Financial Corp.* (Feb. 3, 2005) (permitting exclusion under Rule 14a-8(i)(7) when, although the proposal addressed the significant policy issue of outsourcing, it also asked the company to disclose information about how it manages its workforce, an ordinary business matter).

In this instance, even if the Proposal were to touch on a potential significant policy issue, the Proposal's overwhelming concern with how Kroger manages its workforce through employee policies demonstrates that the Proposal's focus is on ordinary business matters. Moreover, the Staff previously has determined that a nearly identical proposal did not transcend the company's ordinary business operations in *Blackrock* (Apr. 4, 2022). Therefore, even if the Proposal could be viewed as touching upon a significant policy issue, its focus is on ordinary business matters.

Accordingly, the Proposal should be excluded from Kroger's Proxy Materials pursuant to Rule 14a-8(i)(7) as relating to its ordinary business operations.

## III.    Conclusion

For the foregoing reasons, please confirm that the Staff will not recommend any enforcement action to the Commission if the Proposal is omitted from the Proxy Materials.

Should the Staff disagree with our conclusions regarding the omission of the Proposal, or should any additional information be desired in support of the Company's position, we would appreciate an opportunity to confer with the Staff concerning these matters prior to the issuance of the Staff's Rule 14a-8 response.

If we can provide additional correspondence to address any questions that the Staff may have with respect to this no-action request, please do not hesitate to call me at 212-310-8048 or contact me via email at lyuba.goltser@weil.com.

Very truly yours,

Lyuba Goltser
Partner

Enclosures

cc:

Christine Wheatley
Stacey Heiser
The Kroger Co.

Sarah Rehberg
National Center for Public Policy Research

6



March 2, 2023

**Via email: shareholderproposals@sec.gov**

Office of Chief Counsel
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

**RE: Stockholder Proposal of the National Center for Public Policy Research, Securities Exchange Act of 1934 – Rule 14a-8**

Ladies and Gentlemen,

This correspondence is in response to the letter of Lyuba Goltser on behalf of The Kroger Co. (the "Company") dated February 16, 2023, requesting that your office (the "Commission" or "Staff") take no action if the Company omits our Shareholder Proposal (the "Proposal") from its 2023 proxy materials for its 2023 annual shareholder meeting.

## RESPONSE TO KROGER'S CLAIMS

Our Proposal asks the Company to:

> issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

The Company seeks to exclude our Proposal from the 2023 Proxy Materials pursuant to Rule 14a-8(i)(7) because it claims the Proposal concerns the Company's ordinary business operations.

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 2

Under Rule 14a-8(g), the Company bears the burden of persuading the Staff that it may omit our Proposal. The Company has failed to meet that burden.

Additionally, if the Staff determines to issue the Company relief, that act would raise significant constitutional and administrative law issues.

Should the Staff nonetheless find our Proposal omissible, we intend to seek reconsideration of that decision from the SEC Commissioners. We mention this now to avoid any possibility of a reprise of the developments in *BlackRock, Inc.* (avail. Apr. 4, 2022; *reconsideration denied* May 4, 2022) in which proceeding we indicated to BlackRock and to the Staff our intention to seek reconsideration within approximately 15 minutes of receiving the Staff's decision that our proposal in that proceeding was omissible, and yet by some set of events still not fully clear to us, the Staff allowed BlackRock to unilaterally block our request for reconsideration. The Staff did this by delaying its omissibility decision for an inordinate time, long enough for BlackRock purportedly to have been able to begin its printing process within the 15-odd minutes between the issuance of the Staff's letter and our indication of our intent to seek reconsideration, and then agreeing with BlackRock that this unilateral act by BlackRock barred Commission reconsideration of the Staff's omissibility determination. We think the behavior of the Staff last year, whatever the specific details, demonstrated the arbitrariness, capriciousness and bias of its processes and determinations, and underscored the structural flaws that characterize the entire no-action review process.

Relatedly, we ask that any information pertinent to this proceeding, conveyed between the Company and the Staff by any means whatever, promptly be conveyed to us as well, as required by section G.9 of SLB No. 14.[1] This particularly applies to any communications by the Company or any representative of the Company to the Staff of its plans or schedule for printing proxy materials, and includes phone calls, which cannot be used to evade the transparency requirements and are generally discouraged by SEC Staff under section G.10.[2]

Finally, we ask the Staff to render its no-action determination in light of our stated intention to seek reconsideration, and to issue it with sufficient timeliness to avoid functionally denying us a reconsideration opportunity that is facially a part of this review system.

---

[1] https://www.sec.gov/pdf/cfslb14.pdf; https://www.sec.gov/corpfin/staff-legal-bulletin-14d-shareholder-proposals; https://www.sec.gov/interps/legal/cfslb14.htm
[2] https://www.sec.gov/interps/legal/cfslb14.htm

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 3

## Analysis

### Part I. Our Proposal does not implicate the ordinary business operations of the company, and it is a matter of substantial policy concern so that it transcends ordinary-business analysis.

#### A. Rule 14a-8(i)(7).

The Company seeks permission to omit our Proposal on the ground of Rule 14a-8(i)(7), the ordinary business exception. The exception, in its entirety, permits exclusion of a proposal "[i]f the proposal deals with a matter relating to the company's ordinary business operations."[3]

The initial rule does not flesh out this provision at all. It has, though, been amended. One of those amendments, made in 1998, was restated and explained in a Staff Legal Bulletin (SLB) in 2002. There the Staff explained that:

> [t]he fact that a proposal relates to ordinary business matters does not conclusively establish that a company may exclude the proposal from its proxy materials. …[P]roposals that relate to ordinary business matters but that focus on 'sufficiently significant social policy issues … would not be considered to be excludable because the proposals would transcend the day-to-day business matters.'[4]

As the amendment itself explained, in detail particularly relevant to our considerations here:

> The policy underlying the ordinary business exclusion rests on two central considerations. The first relates to the subject matter of the proposal. Certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight. Examples include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers. *However, proposals relating to such matters but focusing on sufficiently significant social policy issues (__e.g., significant discrimination matters__) generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote.*[5]

There matters stood until 2017. That fall, Staff issued a bulletin ("SLB 14I") recognizing that corporate boards would likely have some insight into whether issues raised in shareholder

---

[3] 17 C.F.R. § 240.14a-8(i)(7).

[4] *Staff Legal Bulletin* No. 14A (July 12, 2002) (quoting *Amendments to Rules on Shareholder Proposals, Exchange Act Release* No. 40018 (May 21, 1998), *available at* https://www.sec.gov/rules/final/34-40018.htm) (last accessed Feb. 15, 2023).

[5] *Amendments to Rules on Shareholder Proposals, Exchange Act Release* No. 40018 (May 21, 1998) (emphasis added) ("*Amendments to Rules*"), *available at* https://www.sec.gov/rules/final/34-40018.htm (last accessed Feb. 15, 2023).

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 4

proposals were of sufficiently substantial importance to transcend the category of ordinary business operations.[6] It therefore invited corporations, in arguing for an ordinary business exception, to include in support of their claims details of their boards' analyses of the shareholder proposals and the underlying policy significance of those proposals.[7] Staff expanded this guidance further in 2018 ("SLB 14J") and suggested that in demonstrating its board's analysis of the substantiality of an issue, a company should be expansive in its communications with the Staff.[8] In doing so, Staff welcomed details about particulars such whether the company had already addressed the issue in some manner, including the difference – or the delta – between the proposal's specific request and the actions the company has already taken, and an analysis of whether the delta presented a significant policy issue for the company.[9] Additional Staff guidance appeared again in the fall of 2019 ("SLB 14K"), wherein Staff underscored the value of the 2018 "delta analysis."[10]

Then most recently, on November 3, 2021, Staff reverted to the aforementioned 1998 guidance by rescinding SLB 14I, SLB 14J, and SLB 14K following "a review of staff experience applying the guidance in them."[11] Relevantly, of the rescinded bulletins, Staff said an "undue emphasis was placed on evaluating the significance of a policy issue to a particular company at the expense of whether the proposal focuses on a significant social policy…." Staff went on to explain that it was prospectively realigning its "approach for determining whether a proposal relates to 'ordinary business' with the standard the Commission initially articulated in 1976, which provided an exception for certain proposals that raise significant social policy issues, and which the Commission subsequently reaffirmed in the 1998 Release."[12] The Staff explained that it:

> will no longer focus on determining the nexus between a policy issue and the company, but will instead focus on the social policy significance of the issue that is the subject of the shareholder proposal. In making this determination, the staff

---

[6] *See Staff Legal Bulletin* No. 14I (Nov. 17, 2017), *available at* https://www.sec.gov/interps/legal/cfslb14i.htm (Feb. 15, 2023) ("A board acting in this capacity and with the knowledge of the company's business and the implications for a particular proposal on that company's business is well situated to analyze, determine and explain whether a particular issue is sufficiently significant because the matter transcends ordinary business and would be appropriate for a shareholder vote.").

[7] *See id.* ("Accordingly, going forward, we would expect a company's no-action request to include a discussion that reflects the board's analysis of the particular policy issue raised and its significance. That explanation would be most helpful if it detailed the specific processes employed by the board to ensure that its conclusions are well-informed and well-reasoned.").

[8] *See Staff Legal Bulletin* No. 14J (Oct. 23, 2018), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14j-shareholder-proposals (last accessed Feb. 15, 2023).

[9] *Id.*

[10] *See Staff Legal Bulletin* No. 14K (Oct. 16, 2019), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14k-shareholder-proposals (last accessed Feb. 15, 2023).

[11] *See Staff Legal Bulletin* No. 14L (Nov. 3, 2021), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals (last accessed Feb. 15, 2023).

[12] *Id.*

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 5

will consider whether the proposal raises issues with a broad societal impact, such
that they transcend the ordinary business of the company.[13]

The staff in particular emphasized that "proposals squarely raising human capital management
issues with a broad societal impact would not be subject to exclusion solely because the
proponent did not demonstrate that the human capital management issue was significant to the
company."[14] Our proposal raises exactly such an issue: whether current Company policies and
practices raise risks as a result of a discriminatory workplace. Further, the Staff's longstanding
position is that "the presence of widespread public debate" must be considered in determining
whether the issue transcends ordinary business operations.[15]

### B. The Proposal does not relate to the Company's ordinary business and raises issues of significant social policy so as to exempt it from omission on such grounds.

Our Proposal requests the Company "issue a public report detailing the potential risks associated
with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity (EEO)
policy." Nowhere, despite the Company's claims to the contrary, does the Proposal seek to
manage the Company's workforce. It instead seeks the issuance of a report gauging the risk of
not prohibiting discrimination – a request that has been consistently recognized by the Staff as an
appropriate request that either does not inappropriately interfere with workforce management or
implicates such significant social policy issues as to transcend that concern. *See, e.g., Levi
Strauss & Co.* (avail. Feb. 10, 2022), *The Walt Disney Co.* (avail. Jan. 19, 2022), *Amazon.com,
Inc.* (avail. Apr. 7, 2021).

These decisions are manifestly correct. If following the issuance of the report the Company
elects to change certain practices, that is a wholly separate matter left up to the Company. The
mere practice of ascertaining information on the risk of the Company's failure to protect its
workforce against discrimination does not seek to direct business operations themselves, but
rather seeks a review of the impacts or effects thereof.

In support of its claim that our Proposal seeks inappropriately to manage the Company's
workforce, the Company cites *Walmart, Inc.* (avail. Apr. 8, 2019) and *Yum! Brands, Inc.* (avail.
Mar. 6, 2019), but neither is applicable. The proposal in *Walmart* was concerned with whether
Walmart's policies and practices for hourly workers taking absences from work for personal or
family illness resulted in discrimination. In doing so, the proposal concerned the company's
handling of a very specific employee benefit: sick leave. The proposal in *Yum Brands!* similarly
concerned itself with specific terms of employment and whether the company could require
employees to participate in mandatory arbitration, and non-compete and non-disclosure

---

[13] *See Staff Legal Bulletin* No. 14L (Nov. 3, 2021), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals (last accessed Feb. 15, 2023).

[14] *Id.*

[15] *See Staff Legal Bulletin* No. 14A (Jul. 12, 2002), *available at* https://www.sec.gov/interps/legal/cfslb14a.htm (last accessed Feb. 27, 2023).

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 6

agreements. Unlike the proposals in *Walmart* and *Yum Brands!*, our Proposal does not relate to a specific employee benefit or a term of employment. We just ask for a risk-management review of a failure to forbid discrimination – a report of just the sort found non-omissible in *Levi Strauss*, *Disney Co.*, *Amazon.com*, and *CorVel Corp.* (avail. June 5, 2019) (the proposal in *CorVel* being the one upon which our Proposal here was explicitly modeled – indistinguishable except for the type of discrimination on which the proposals focus) and many other proceedings in recent years.

Moreover, the opinions in *Walmart* and *Yum! Brands* were issued before the substantial changes instituted by SLB 14L, changes which significantly privilege proposals that seek to address concerns of workforce management and potential discrimination such as those raised in our Proposal. That bulletin is particularly relevant here. In it, the Staff emphasized that "proposals squarely raising human capital management issues with a broad societal impact would not be subject to exclusion solely because the proponent did not demonstrate that the human capital management issue was significant to the company,"[16] thus underscoring the special propriety of "raising human capital management issues with broad societal impact."

That is exactly what our Proposal does – and in fact all that our proposal does. We seek an audit and report that will let shareholders know whether and to what extent the Company has recognized the importance to the Company of including a wide diversity of opinion and viewpoint, and of protecting employees from discrimination because of their willingness to express unpopular (with company management) viewpoints at the Company to the same extent that opinions that are popular (with company management) are protected – the former being the most valuable viewpoints exactly because they are non-dominant, and therefore insightful and challenging – and protecting their freedom to hold them outside of the Company without retaliation or harassment.

The Company rightly notes that our Proposal is essentially identical to proposals that we submitted before the changes wrought by SLB 14L, and that before those changes our proposal was considered "not [to] transcend the [c]ompany's ordinary business operations." *Apple Inc.* (Dec. 20, 2019, *reconsid. denied* Jan. 17, 2020). But the analysis under which that and similar determinations were made has been swept away by SLB 14L.

Whatever the merit of those decisions then, it surely cannot stand under the rules established by SLB 14L. As we have noted, SLB 14L especially privileges proposals that raise concerns of "human capital management issues with a broad societal impact,"[17] while Rule 14a-8(i)(7) challenges have been particularly disfavored when brought against proposals that raise "significant discrimination matters" for more than 20 years.[18] That's exactly what, and only what, our Proposal raises. The Company does not argue, because it could not, that discrimination on the basis of race or sex or sexual orientation – whether for or against groups that companies honor with the label "diverse" – implicates substantial policy concerns while viewpoint

---

[16] *Id.*

[17] *Id.*

[18] *Amendments to Rules*, *supra* note 3.

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 7

discrimination does not. And it does not, because it cannot, argue that viewpoint discrimination is not now an issue of significant public concern; in fact, it is an issue of overwhelming concern for the approximately half of the country experiencing that discrimination throughout their lives. Barring discrimination against Americans based on their political views even has a pedigree in civil rights law. Though political views remain an emerging field in federal nondiscrimination law, the civil rights laws of numerous states already treat political affiliation or political activities as protected characteristics.[19] Accordingly, political views are well within the scope of established civil rights and are socially significant, as evidenced by their codification in law.

The only post-SLB 14L precedent cited by the Company is the Staff's decision in *BlackRock, Inc.* (Apr. 4, 2022; *reconsideration denied* May 4, 2022). We not only believe that proceeding to have been wrongly decided in light of SLB 14L, but as previously discussed, we believe the Staff's engineering of that process to deny us review of its determination in that proceeding by the Commission demonstrated the arbitrariness, capriciousness and bias of its processes and determinations, and underscored the structural flaws that characterize the entire no-action review process. Our intent in this proceeding is to achieve that Commission review, or to lay bare those systemic flaws.

The overriding reason why the Staff's decision in *BlackRock, Inc.* last spring was manifestly in error is that viewpoint and ideological discrimination, the issue raised by our Proposal, is most certainly an issue of significant social policy concern, and so under SLB 14L is not amenable to exclusion on ordinary-business grounds. Polls in recent years demonstrate that individuals holding viewpoints other than liberal often feel discriminated against. For instance, a March 2021 *The Economist/*YouGov poll reveals that 45% of conservatives polled feel that conservatives are discriminated against "a great deal" and 34% of conservatives feel that conservatives are discriminated against "a fair amount;" only 21% feel that conservatives are not discriminated against "much" or "at all."[20] Similarly, in a 2019 Hill-HarrisX survey, "78 percent of GOP respondents said that they believe that conservatives have to deal with discriminatory behavior from other Americans," with the "plurality of Republicans, 31 percent, sa[ying] that conservatives face 'a lot' of discrimination."[21] The same survey found that "just 16 percent of Democrats said that liberals face a lot of discrimination from society."[22]

In fact, we have been sounding the alarm over viewpoint and ideology discrimination for years, yet these concerns have been – and continue to be – ignored by the Staff. Take, for instance, our December 4, 2020 Request for Reconsideration of the decision to omit our proposal from the 2021 Walgreens Boots Alliance, Inc. shareholder meeting. In that request we outlined the growing issue of individuals being "cancelled" for expressing his or her viewpoint and how this

---

[19] See, e.g., D.C. Code § 2-1402.11; N.Y. Lab. Law § 201-d; Wash. Rev. Code. Ann. § 42.17A.495(2).
[20] *The Economist*/YouGov Poll, Mar. 20-23, 2021, available at:
https://docs.cdn.yougov.com/5v6z1pywv7/econTabReport.pdf (last accessed Mar. 10, 2022).
[21] The Hill, *Poll: Republicans more likely to see 'a lot' of discrimination against conservatives than Democrats see against liberals,* Mar. 8, 2019, available at: https://thehill.com/hilltv/what-americas-thinking/433259-poll-republicans-more-likely-to-see-a-lot-of-discrimination (last accessed Mar. 10, 2022).
[22] *Id.*

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 8

particular issue is "at the very top of any list of the most important issues currently affecting – and threatening – our culture."[23]  In that request we also discuss the rise in calls by government officials for discrimination on the basis of viewpoint and public participation.[24] As we explained, there have been calls by current and former members of congress and presidential administrations effectively seeking revenge against those individuals who have dared to participate in democracy in ways that displease them.[25]

A Pew Research Center survey conducted in June 2020 found that "roughly three-quarters of U.S. adults say it is very (37%) or somewhat (36%) likely that social media sites intentionally censor political viewpoints that they find objectionable. Just 25% believe this is not likely the case."[26] According to the survey, "Majorities in both major parties believe censorship is likely occurring, but this belief is especially common – *and growing* – among Republicans. Nine-in-ten Republicans and independents who lean toward the Republican Party say it's at least somewhat likely that social media platforms censor political viewpoints they find objectionable."[27] (emphasis added).

Despite the dismissal of such concerns by those with a leftwing worldview, the veracity of these concerns was finally proven true when Elon Musk released the "Twitter Files" detailing the company's extensive efforts to "shadow ban" and otherwise censor conservatives and others not sharing the same left-of-center worldview. "A new [Twitter Files] investigation reveals that teams of Twitter employees build blacklists, prevent disfavored tweets from trending, and actively limit the visibility of entire accounts or even trending topics — all in secret, without informing users," journalist Bari Weiss shared with the public.[28] Weiss then shared examples of Twitter censoring -- and thereby discriminating against – users based on viewpoint and ideology. These examples include Stanford's Dr. Jay Bhattacharya, who Twitter secretly placed on a "Trends Blacklist" to prevent his tweets from trending because he argued that Covid lockdowns would harm children; popular conservative talk show host Dan Bongino, who Twitter placed on a "Search Blacklist;" and Turning Point USA's Charlie Kirk, who Twitter set his account to "Do Not Amplify."[29]

---

[23] *See* Request for Reconsideration of November 25, 2020 Decision Permitting Walgreens Boots Alliance, Inc. to Exclude Stockholder Proposal of the National Center for Public Policy Research, Securities Exchange Act of 1934 – Rule 14a-8, Section V (December 4, 2020), included herein as an attachment.

[24] *Id.* at Section IV.

[25] *Id.*

[26] https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/

[27] https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/

[28] https://twitter.com/bariweiss/status/1601008766861815808?s=20&t=-e4ic59DaLSa3Q0eE9ZPIA; https://nypost.com/2022/12/08/suppression-of-right-wing-users-exposed-in-latest-twitter-files/

[29] https://twitter.com/bariweiss/status/1601008766861815808?s=20&t=-e4ic59DaLSa3Q0eE9ZPIA; https://nypost.com/2022/12/08/suppression-of-right-wing-users-exposed-in-latest-twitter-files/; https://thehill.com/opinion/civil-rights/3770581-elon-musk-shows-shadow-banning-of-conservatives-no-conspiracy-theory/

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 9

The evidence therefore shows that viewpoint and ideology discrimination are indeed an issue of significant social policy concern that transcends ordinary business. In an increasingly polarized political age, risks associated with political viewpoint and ideology are highly significant. On one hand, businesses increasingly deal with public scrutiny and risks based on the politics of those they do business with.[30] On the other hand, businesses face public scrutiny and risks for choosing not to do business with groups based on their political affiliations.[31]

Our Proposal takes no position on the proper balance of these risks, except that the balance reached should be applied objectively. But it is undeniable that they are significant—and are growing in their significance—in our society today. A straightforward and objective approach would recognize our Proposal addresses a matter of immense social significance.

Absent any credible explanation by the Staff to the contrary, it appears that the only reason the Staff has refused to agree with this assessment is because it, as a matter of personal policy preference, or perhaps unconscious or even conscious bias, does not object to viewpoint and ideology discrimination of the sort that too many companies have indulged in over the past few years. But this personal policy preference, bias, or whatever it may be, does not and cannot alter the standard set forth in SLB 14L by the Staff itself, and that the Staff is now bound to faithfully apply. Proposals that "focus on sufficiently significant social policy issues" that "transcend the ordinary business operations" of the company are not excludable under Rule 14a-8(i)(7). And in SLB 14L, the Staff reiterated this position by citing "[m]atters related to employment discrimination" as an example of an issue that "may rise to the level of transcending the company's ordinary business operations."[32]

The precedent the Company cites to in favor of its argument that our Proposal should nonetheless be found omissible do not abide by this standard. It cites *PetSmart, Inc.* (avail. Mar. 24, 2011), *CIGNA Corp.* (avail. Feb. 23, 2011), and *Capital One Financial Corp.* (avail. Feb. 3, 2005). Such pre-SLB 14L precedent is irrelevant to the analysis at hand. As SLB 14L points out, "Under this realigned approach, proposals that the staff previously viewed as excludable because they did not appear to raise a policy issue of significance *for the company* [rather than in general] may no longer be viewed as excludable under Rule 14a-8(i)(7)" (emphasis added). Consequently, these proceedings cannot be used to find our Proposal excludable on grounds our Proposal somehow inappropriately relate to the Company's ordinary business because these proceedings do not apply the appropriate standard to determine whether a proposal transcends the ordinary business of a company.

---

[30] *See, e.g.,* Jessica Piper and Zach Montellaro, *Corporations gave $10M to election objectors after pledging to cut them off*, Politico (Jan. 6, 2023) https://www.politico.com/news/2023/01/06/corporations-election-objectors-donations-00076668.

[31] *See, e.g.,* Lydia Beyoud & Nushin Huq, *Texas Puts Banks in Tight Spot with New Law Backing Gunmakers,* Bloomberg Law (Sept. 1, 2021) https://news.bloomberglaw.com/banking-law/texas-puts-banks-in-tight-spot-with-new-law-backing-gunmakers.

[32] Staff Legal Bulletin No. 14L, supra at n.5.

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 10

But as we point out in our Supporting Statement, there is ample evidence that individuals with conservative viewpoints or ideologies may face discrimination at the Company, such that even without the significant changes made by SLB 14L, our proposal would be non-omissible. Kroger removed patriotic and Second Amendment related paraphernalia from store shelves; it released an "allyship guide" that told employees to celebrate transgender holidays,[33] and asserted that, "[s]ome people's morality can be a barrier to accepting LGBTQ+ people;"[34] and it reached a settlement with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs.[35]

Finally, the Company argues that even if our Proposal is on a matter of social policy significance, our Proposal may be excluded because it relates to matters of ordinary business. As we have demonstrated, our proposal does not raise proper ordinary-business objections, but even if we hadn't, the argument is both an incorrect statement of Staff guidance and an inaccurate characterization of our Proposal. After the Staff determines that the subject matter of a proposal transcends ordinary business matters, that is the end of the inquiry. The Staff does not then assess whether the proposal merely "touches upon" or "focuses" on ordinary business matters.

Accordingly, the Company has offered no Rule 14a-8(i)(7) grounds on which the Staff may omit our Proposal, and there are none. The only distinction between our Proposal and the proposals in *Levi Strauss, Disney Co.*, *Amazon.com*, and *CorVel* is that our Proposal focuses on discrimination on the basis of viewpoint or ideology while those earlier proposals focused on discrimination on other, also pernicious, grounds. The Staff cannot allow or refuse to allow omission of materially indistinguishable proposals on the grounds that the Staff itself dislikes discrimination on some grounds, but doesn't mind that same discrimination on other grounds. And as there is no other way to distinguish these proposals, our Proposal is not omissible.

***Part II. Issuing relief to the Company would raise serious constitutional and administrative law concerns.***

For the reasons discussed above, our Proposal's merits under Commission and Staff rules, interpretations, guidance, and precedent require that Staff deny the Company's request for relief. If the Staff elects to issue relief to the Company despite its clear merits, the Staff's decision would raise a host of constitutional and administrative law issues.

   A. ***The Company is asking the Staff to discriminate on the basis of viewpoint in violation of the First Amendment.***

Our Proposal relates to nondiscrimination against individuals on the basis of viewpoint or ideology—a matter of objectively significant social policy concern. By urging the Staff to issue

---

[33] https://www.breitbart.com/social-justice/2022/08/31/kroger-allyship-guide-tells-employees-to-celebrate-trans-holidays-support-bail-fund/
[34] https://www.thekrogerco.com/wp-content/uploads/2021/03/AAPI-Allyship-Guide_v3.2-External-merged.pdf
[35] https://news.yahoo.com/kroger-pay-180k-lawsuit-over-162047710.html

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 11

relief for the Proposal regardless, the Company invites the Staff to itself discriminate based on viewpoint against our Proposal.

It is well-established that the government cannot engage in viewpoint discrimination. *Matal v. Tam*, 137 S. Ct. 1744 (2017); *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). This principle prevents governments from regulating speech "because of the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995). And the Supreme Court defines "the term 'viewpoint' discrimination in a broad sense." *Matal*, 137 S. Ct. at 1763. This is because "[v]iewpoint discrimination is a poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring).

The rule against viewpoint discrimination prevents allowing speech based on one "political, economic, or social viewpoint" while disallowing other views on those same topics. *Id.* at 831. It also prohibits excluding views that the government deems "unpopular," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or because of a perceived hostile reaction to the views expressed, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

Here, the Company invites the Staff to engage in viewpoint discrimination by issuing relief on our Proposal. Our Proposal requests an audit of the potential risks associated with omitting "viewpoint" and "ideology" from its written EEO policy. The Staff has routinely denied no-action relief to similar requests focusing on risks from discrimination on other grounds. *See, e.g.*, *McDonald's Corp.*, (avail. Apr. 5, 2022) (audit analyzing the adverse impact of the Company's policies and practices on the civil rights of Company stakeholders), *Levi Strauss & Co.* (Feb. 10, 2022), *The Walt Disney Co.*, (Jan. 19, 2022), *Amazon.com* (Apr. 7, 2021). And in *Corvel Corp.* (June 5, 2019), the Staff denied relief for a proposal that was substantially identical to our Proposal. The only difference is the proposal requested a report detailing the potential risks associated with omitting "sexual orientation" and "gender identity" from its written EEO policy. Our Proposal is the same, except our Proposal focuses on discrimination based on "viewpoint" and "ideology." So if the Staff opts to issue relief to exclude our Proposal, one might reasonably conclude that it could only do so because of its opinion of the distinctive political *views* our Proposal expresses.

The Staff—and the Commission—needs a principled basis for such a distinction. The Company proposes none. As the Supreme Court has explained, to avoid viewpoint discrimination the government must have "narrow, objective, and definite" standards to prevent officials from covertly discriminating based on viewpoint through subjective and unclear terms. *Forsyth Cnty., Ga.*, 505 U.S. at 131. And here, the Staff has complete discretion to determine what "issues" are significant and even to censor on the same issue when they are presented by speakers with different political or religious views.

The easiest course would be for the Staff to deny relief to the Company, and avoid making such a weighty decision. But if the Staff chooses to discriminate against the viewpoint expressed by the Proposal, that would highlight a new and significant issue with Staff Legal Bulletin 14L, and indeed, the 1998 Release. It would provide a clear demonstration of how the Staff's open-ended

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 12

discretion in determining which views count as "socially significant" may be facially invalid
under the First Amendment.

### B.    The Company is asking the Staff to take arbitrary and capricious action under the Administrative Procedure Act.

The Company identifies no reasonable basis for distinguishing between our Proposal and other
anti-discrimination proposals. As a result, the Company's request for relief invites the Staff to
take arbitrary and capricious action.

Under the Administrative Procedure Act (APA), agency action that is "arbitrary and capricious"
may be set aside. 5 U.S.C. § 706(2)(A). The Supreme Court has succinctly explained that "[t]he
APA's arbitrary and capricious standard requires that agency action be reasonable and
reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see
also Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50
(1983). Under this precedent, in order for action to be reasonable and reasonably explained, the
agency must at least consider the record before it and rationally explain its decision. *See FCC*,
141 S. Ct. at 1160.

Additionally, where an agency seeks to change its position from a prior regime, it must "display
awareness that it is changing position," "show that there are good reasons for the new policy"
and provide an even "more detailed justification" when the "new policy rests upon factual
findings that contradict those which underlay its prior policy," and "take[ ] into account"
"reliance interests" on the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515
(2009).

Given the Staff's longstanding precedent permitting the consideration of shareholder proposals
relating to nondiscrimination matters, issuing relief to the Company would undoubtedly be a
change in its position. Yet if the Staff issued relief for our Proposal, it would allow a proposal
that focuses on significant discrimination to be excluded. At a bare minimum, the Staff—or the
Commission—would have to explain its reasoning for the reversal in position to comply with the
APA.

For the above reasons and others, the Staff's decision on our Proposal is an important action.
Most often, the Staff's decision to issue relief is the final action by the Commission in dealing
with a particular shareholder proposal. While the Commission may also affirm the Staff's
decision to issue relief, the vast majority of relief decisions are made by the Staff without formal
review. Significant legal consequences also flow from these decisions because they help
determine whether or not the Company will be able to exclude the proposal. It is undeniable that
companies treat the no-action process as a safe harbor. And the reality is that by issuing relief,
the Staff provides companies with a legal defense in any potential court action. What's more,
issuing relief is at the core the Commission's complex regulatory scheme, and the authority of
the Commission and Staff to issue relief is expressly indicated by Rule 14a-8. *See* Rule 14a-8(j).

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 13

In sum, the Company is asking the Staff to tread in precarious waters by issuing relief to a well-supported Proposal given the APA's requirements for reasoned decisionmaking. The safer and more prudent course would be for the Staff to deny the Company's request.

### C.  The Company is requesting relief the Staff lacks statutory authority to issue.

If the Staff elects to issue relief for our Proposal, it would raise significant concerns that the Staff is acting beyond its statutory authority. The Proposal is a permissible subject for stockholder concern under state law. If the Staff acted to block our Proposal, the Staff would be reaching beyond what they are authorized to do.

Section 14(a) of the Exchange Act prohibits anyone from "solicit[ing] any proxy" "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). While this authority might be read "broadly," "it is not seriously disputed that Congress's central concern [in enacting § 14(a)] was with disclosure." *Business Roundtable v. SEC*, 905 F.2d 406, 410 (D.C. Cir. 1990). The purpose of Section 14(a) was to ensure that investors had "adequate knowledge" about the "financial condition of the corporation . . . [and] the major questions of policy, which are decided at stockholders' meetings." S. Rep. No. 792 at 12 (1934). While Section 14(a) gave the Commission authority to compel investor-useful disclosures, the substantive regulation of stockholder meetings was left to the "firmly established" state-law jurisdiction over corporate governance. *Business Roundtable*, 905 F.2d at 413 (internal citation omitted). Recognizing that state law provides the "confining principle" to Section 14(a)'s otherwise "vague 'public interest' standard," the United States Court of Appeals for the District of Columbia Circuit has held that "the Exchange Act cannot be understood to include regulation of" "the substantive allocation" of corporate governance that is "traditionally left to the states." *Business Roundtable v. SEC*, 905 F.2d at 407, 413 (internal citation omitted). Issuing relief under Rule 14a-8 would exceed this limit by regulating the substantive considerations and outcomes of corporate stockholder meetings, which are properly matters for state law.

### i.  Substantive regulation of corporations' proxy statements.

Issuing relief under Rule 14a-8 would regulate the substance of corporate governance because it would regulate the substantive matters that a corporation is required to include in its proxy statement. Under state law, corporate directors tasked with soliciting proxies have "a fiduciary duty to disclose all facts germane" to items presented for stockholders' consideration. *Smith v. VanGorkom*, 488 A.2d 858, 890 (Del. 1986). For an annual meeting, this duty requires that a corporation include a shareholder proposal in its proxy statement if the shareholder proposal will be presented for consideration at the corporation's annual meeting. In turn, a shareholder proposal may be presented for consideration at the corporation's annual meeting if the proposal is a proper subject for action by the corporation's stockholders. *See CA, Inc. v. AFSCME Emps. Pension Plan*, 953 A.2d 277 (Del. 2008). A proposal is a proper subject for action by stockholders if it is within the scope or reach of the stockholders' power to adopt, *id.* at 232, but stockholders do not have the power to adopt proposals that would cause the board of directors to

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 14

breach its fiduciary duties, *see Paramount Commc'ns Inc. v. Time Inc.,* 1989 WL 79880, at *30 (Del. Ch. July 14, 1989), *aff'd,* 571 A.2d 1140, (Del. 1990) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares.").

Issuing relief under Rule 14a-8 would displace this system of state law by subjecting the Proposal to additional requirements to be included in the corporation's proxy statement.[36] The current Rule 14a-8 goes far further. Specifically, Rule 14a-8 provides that a corporation may exclude proposals that relate to the company's "ordinary business operations." And the SEC has further interpreted Rule 14a-8, via sub-regulatory guidance, to permit the exclusion of proposals that do not "transcend the day-to-day business matters" of the corporation, 1998 Release, or which insufficiently "raise[] issues with a broad societal impact," Division of Corporation Finance, Staff Legal Bulletin No. 14L, *supra*.

These additional limits go beyond the limits of the state law proper-subject requirement. A proposal that fails to sufficiently raise an issue "with a broad societal impact" may nonetheless be within stockholders' power to adopt and consistent with the board of directors' fiduciary duties. But issuing relief under Rule 14a-8 would authorize the Company to exclude such a proposal, even though state law would allow it to be considered. That is not what Congress gave the Commission power to do under Section 14(a).

### ii. *Substantive regulation of stockholder meetings.*

Issuing relief under Rule 14a-8 would also regulate the substance of corporate governance because it would regulate the substantive issues that a corporation considers at its stockholder meetings. The matters that may be validly brought before stockholders at a corporation's meetings of stockholders are exclusively governed by state law. "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479 (1977) (emphasis in original). Section 14(a) makes no such express requirement. Section 14(a) provides general language that Congress understood to merely authorize disclosure requirements that ensures investors have "adequate knowledge" of the "major questions of policy . . . decided at stockholders' meetings." S. Rep. No. 792, *supra*. It does not provide the authority for the SEC to regulate *which* questions must be decided at a corporation's stockholder meetings. Yet issuing relief under Rule 14a-8 would regulate the substantive aspects of stockholder meetings in at least two ways.

*First,* even though Rule 14a-8 applies primarily to the content of a corporation's proxy statement, its regulation of the proxy statement has the eminently predictable *effect* of regulating the stockholder meeting for which proxies are solicited. Today, substantially all stockholder

---

[36] To be sure, one provision of the current Rule 14a-8, (i)(1), mirrors the state law requirement that a shareholder proposal must be a proper subject for action by stockholders. But that is not what the Company has raised here.

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 15

voting is conducted by proxy. "Because most shareholders do not attend public company shareholder meetings in person, voting occurs almost entirely by the use of proxies that are solicited before the shareholder meeting, thereby resulting in the corporate proxy becoming 'the forum for shareholder suffrage.'" *Concept Release on the Proxy System*, SEC Release No. 34-62495 (July 24, 2010) (quoting *Roosevelt v. E.I duPont de Nemours & Co.*, 958 F.2d 416, 422 (D.C. Cir. 1992)). As a practical matter, if a stockholder proposal is excluded from the corporation's proxy statement, it is functionally unavailable for consideration at a stockholder meeting. Not many stockholders would be aware of the proposal, nor would many be able to vote on it. To be sure, a stockholder proponent could pay for his own proxy forms to be distributed. But that is hardly a remedy given the complex realities of the modern proxy system. With Rule 14a-8, the Commission has clearly put its thumb on the scale, allowing some stockholders to access the corporate proxy statement, but not others, on bases untethered to state law. By permitting the exclusion from corporate proxy statements of proposals otherwise valid for consideration under state law, Rule 14a-8 not only regulates the content of the proxy statement—it regulates which proposals are considered by the vast majority of stockholders, and therefore the content and outcomes of corporations' stockholder meetings.

*Second*, Rule 14a-8 goes beyond the regulation of proxy statements to directly regulate what stockholders may consider at stockholder meetings. Specifically, Rule 14a-8 compels the consideration of its permissible proposals by compelling their inclusion in the corporation's form of proxy. If a proposal meets the Rule's requirements, Rule 14a–8(a) provides that "a company *must* include a shareholder's proposal in its proxy statement and . . . its form of proxy" for a stockholder meeting. Rule 14a-8 (emphasis added). In turn, if a proposal is on the form of proxy, it must be considered at the relevant stockholder meeting. Under federal law, a corporation's "form of proxy" must include the matters to be voted on at the meeting. *See, e.g.*, 17 C.F.R. § 240a-4(a) ("[T]he form of proxy . . . shall identify clearly and impartially each separate matter intended to be acted upon"). By requiring the inclusion of a proposal on the proxy card, Rule 14a-8 compels consideration of the proposal at a stockholder meeting. If the corporation were to put a proposal on its form of proxy, but not consider the proposal at the meeting, its form of proxy may be unlawfully misleading. Rule 14a-8 therefore requires a corporation to consider a shareholder proposal at its annual meeting even if it could lawfully exclude the shareholder proposal under state law. *See SEC v. Transamerica Corp.*, 163 F.2d 511, 518 (3d Cir. 1947) (stating that, assuming a corporate bylaw excluding shareholder proposals was valid under state law, Rule 14a-8 would invalidate the bylaw).

By intruding upon the substantive affairs of corporate governance "traditionally left to the states," issuing relief under Rule 14a-8 would exceed the Commission's—and the Staff's—lawful authority under Section 14(a). As a result, issuing relief to the Company would raise serious concerns about the validity of the Staff's action.

## Conclusion

Given the precedent in *Levi Strauss*, *Disney Co.*, *Amazon.com* and *CorVel Corp.*, the Company's proposed grounds for exclusion on the basis of the ordinary business exception fall short. Our

Office of the Chief Counsel
Division of Corporation Finance
March 2, 2023
Page 16

Proposal seeks only a report about the risks associated with a failure to prohibit discrimination, not in any way the management of the Company, and the Staff has unquestionably declared discrimination against employees to be of significant social policy interest.

As such, the Company has failed to meet its burden that it may exclude our Proposal under Rule 14a-8(g). Therefore, based upon the analysis set forth above, we respectfully request that the Staff reject the Company's request for a no-action letter concerning our Proposal.

If the Staff nonetheless decides to issue relief to the Company, that action would raise significant constitutional and administrative law concerns that "involve matters of substantial importance and where the issues are novel or highly complex" invoking Commission review under 17 C.F.R. § 202.1(d).

A copy of this correspondence has been timely provided to the Company. If we can provide additional materials to address any queries the Commission may have with respect to this letter, please do not hesitate to call us at (202) 507-6398 or email us at sshepard@nationalcenter.org and at srehberg@nationalcenter.org.

Sincerely,

Scott Shepard
FEP Director

Sarah Rehberg
National Center for Public Policy Research

cc:    Lyuba Goltser, Weil, Gotshal & Manges LLP (lyuba.goltser@weil.com)

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax


**Lyuba Goltser**
lyuba.goltser@weil.com

March 8, 2023

VIA E-MAIL (shareholderproposals@sec.gov)
U.S. Securities and Exchange Commission
Division of Corporation Finance
Office of Chief Counsel
100 F Street, N.E.
Washington, DC 20549

Re:        **The Kroger Co. – 2023 Annual Meeting**
           **Supplement to Letter Dated February 16, 2023**
           **Relating to Shareholder Proposal of the National Center for Public Policy**
           **Research**

Ladies and Gentlemen:

We refer to our letter dated February 16, 2023 (the "No-Action Request"), submitted on behalf of our client, The Kroger Co. (the "Company" or "Kroger"), pursuant to which we requested that the Staff of the Division of Corporation Finance (the "Staff") of the U.S. Securities and Exchange Commission (the "Commission") concur with the Company's view that the shareholder proposal and supporting statement (the "Proposal") submitted by the National Center for Public Policy Research (the "Proponent") may be excluded from the proxy materials to be distributed by Kroger in connection with its 2023 annual meeting of shareholders (the "Proxy Materials").

This letter is in response to the letter to the Staff, dated March 2, 2023, submitted by the Proponent (the "Proponent's Letter"), and supplements the Company's No-Action Request. In accordance with Rule 14a-8(j), a copy of this letter is also being sent to the Proponent simultaneously.

The Proponent's Letter misinterprets the Staff's guidance and precedent with regard to the ordinary business exclusion of Rule 14a-8(i)(7). In particular, the Proponent's Letter erroneously asserts that the Proposal is comparable to other proposals where the Staff denied requests for relief under the ordinary business exclusion. The examples cited in the Proponent's Letter relate to racial discrimination and gender and sexual orientation discrimination and have a broad societal impact such that they were determined by the Staff to transcend ordinary business matters. *See, e.g.*, *Levi Strauss & Co.* (Feb. 10, 2022); *The Walt Disney Co.* (Jan. 19, 2022);

*CorVel Corporation* (June 5, 2019).[1] The Proponent, however, does not cite any instances where the Staff has determined that the issue of viewpoint and ideological discrimination raised by the Proposal transcends ordinary business matters for purposes of Rule 14a-8(i)(7). As explained in more detail in the Company's No-Action Request, the Staff has consistently permitted the exclusion of proposals raising the issue of viewpoint and ideological discrimination as relating to ordinary business. *See BlackRock, Inc.* (Apr. 4, 2022); *American Express Company* (Feb. 26, 2021); *Apple Inc.* (Dec. 20, 2019, recon. denied Jan. 17, 2020); *Alphabet, Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020); *salesforce.com, Inc.* (Apr. 9, 2020, recon. denied Apr. 22, 2020); *CVS Health Corp.* (Feb. 27, 2015); *The Walt Disney Company* (Nov. 24, 2014, recon. denied Jan. 5, 2015).

The Proponent's Letter attempts to argue that recent Staff decisions reiterating the view that such proposals are excludable as relating to the company's ordinary business should be reversed due to the publication of Staff Legal Bulletin No. 14L (Nov. 3, 2021) ("SLB 14L"), which rescinded certain Staff guidance from 2017 through 2019 relating to the ordinary business exclusion. The Proponent's argument is misguided for several reasons. First, SLB 14L does not expressly rescind all Staff no-action decisions relating to 14a-8(i)(7) reached between 2017 and 2019. Second, the Staff's position on matters raised by the Proposal pre-dates the rescinded guidance. For example, in *The Walt Disney Company* (Nov. 24, 2014, recon. denied Jan. 5, 2015), the Staff permitted the exclusion of a substantially similar proposal requesting the board consider the possibility of adopting anti-discrimination principles that protect employees' right to "engage in legal activities relating to the political process, civic activities and public policy without retaliation in the workplace." In its no-action response letter, the Staff noted that the proposal related to the ordinary business matter of "policies concerning [the company's] employees." Finally, since the publication of SLB 14L, the Staff has continued to permit the exclusion of proposals raising the issue of viewpoint and ideological discrimination as relating to ordinary business. *See BlackRock* (Apr. 4, 2022). Accordingly, the publication of SLB 14L does not alter this long-standing position.

Moreover, following the publication of SLB 14L, the Staff has continued to permit the exclusion of proposals that "touch upon" significant social policy issues but primarily relate to ordinary business matters, even when the subject relates to human capital matters. *See Amazon.com, Inc.* (Apr. 8, 2022); *Dollar Tree, Inc.* (May 2, 2022); *Apple, Inc.* (Jan. 3, 2023). In these instances, proposals implicating human capital management issues were determined not to

---

[1] In *Levi Strauss & Co.* (Feb. 10, 2022), the Staff declined to permit exclusion under Rule 14a-8(i)(7) of a proposal requesting that the board commission a racial-equity audit analyzing the company's impacts on civil rights and non-discrimination. In *The Walt Disney Co.* (Jan. 19, 2022), the Staff declined to permit exclusion under Rule 14a-8(i)(7) of a proposal requesting that the board commission a workplace non-discrimination audit analyzing the company's impacts, including the impacts arising from company-sponsored or promoted employee training, on civil rights and non-discrimination in the workplace. In *Amazon.com* (Apr. 7, 2021), the Staff declined to permit exclusion under Rule 14a-8(i)(7) of a proposal requesting that the board commission a racial equity audit analyzing the company's impacts on civil rights, equity, diversity and inclusion, and the impacts of those issues on the company's business. In *CorVel Corporation* (June 5, 2019), the Staff declined to permit exclusion under Rule 14a-8(i)(7) of a proposal requesting the company issue a public report detailing the potential risks associated with omitting "sexual orientation" and "gender identity" from its written equal employment opportunity policy.

WEIL:\99039132\6\57387.0001

transcend the company's ordinary business matters.[2] Under SLB 14L, a proposal can overcome the ordinary business exception only if the proposal "focuses on a significant social policy issue." Here, even if the Proposal could be viewed as touching upon a significant policy issue, the Proposal, together with the supporting statement, clearly focus on the Company's operational decisions regarding the reporting of its EEO policies, which are inherently ordinary business matters relating to the management of its workforce, which is at the heart of the Company's business. For these reasons, the Proposal should be excluded from Kroger's 2023 Proxy Materials pursuant to Rule 14a-8(i)(7) as relating to its ordinary business operations.

Should the Staff disagree with the conclusions set forth in this letter, or should any additional information be desired in support of Kroger's position, we would appreciate the opportunity to confer with the Staff concerning these matters prior to the issuance of the Staff's response. Please do not hesitate to call me at 212-310-8048 or contact me via email at lyuba.goltser@weil.com.

Very truly yours,

Lyuba Goltser

cc:

Christine Wheatley
Stacey Heiser
The Kroger Co.

Scott Shepard
Sarah Rehberg
National Center for Public Policy Research

---

[2] In *Amazon.com, Inc.* (Apr. 8, 2022), the Staff permitted exclusion of a proposal that requested that the company report on its workforce turnover rates and the effects of labor market changes that have resulted from the COVID-19 pandemic, including an assessment of the impact of workforce turnover on the company's diversity, equity and inclusion. In *Dollar Tree* (May 2, 2022), the Staff permitted exclusion of a proposal that requested a report from the company's board of directors on risks to the company's business strategy in the face of labor market pressure, particularly as it related to the company's lowest paid employees. In *Apple, Inc.* (Jan. 3, 2023), the Staff permitted exclusion of a proposal that requested a report from the company's board of directors to assess the effects of Apple's return-to-office policy on employee retention and the company's competitiveness.

3



March 9, 2023


<u>**Via email: shareholderproposals@sec.gov**</u>

Office of Chief Counsel
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549


**RE: Stockholder Proposal of the National Center for Public Policy Research, Securities Exchange Act of 1934 – Rule 14a-8**


Ladies and Gentlemen,

This correspondence is in response to the supplemental letter of Lyuba Goltser on behalf of The Kroger Co. (the "Company") dated March 8, 2023, requesting that your office (the "Commission" or "Staff") take no action if the Company omits our shareholder proposal (the "Proposal") from its 2023 proxy materials for its 2023 annual shareholder meeting.


**RESPONSE TO KROGER'S SUPPLEMENTAL CLAIMS**

The Company argues in its supplemental letter that our reply "erroneously asserts that [our] Proposal is comparable to other proposals where the Staff denied requests for relief under the ordinary business exclusion." In doing so, the Company underscores the very reason for our Proposal, as it effectively admits that the Company finds discrimination against employees on some grounds to be less pernicious – and therefore not "comparable" – to discrimination based on other grounds.

But the question is not whether one type of discrimination is somehow worse than another. The question is whether the proposal "focus[es] on sufficiently significant social policy issues" that "transcend the ordinary business operations" of the company; our Proposal does.

Office of the Chief Counsel
Division of Corporation Finance
March 9, 2023
Page 2

It does not matter, despite the Company's claims to the contrary, whether we cite to any instances where the Staff has already determined that the issue of viewpoint and ideological discrimination raised by our Proposal transcends ordinary business. The Company again raises the issue of the Staff's decision last year in *BlackRock, Inc.* (Apr. 4, 2022; reconsideration denied May 4, 2022), but as we have previously made clear, we believe that proceeding to have been wrongly decided in light of SLB 14L. The Staff's decision in *BlackRock* effectively carves out a special exception for viewpoint and ideology discrimination, discrimination that the Staff apparently does not believe to be a significant social policy issue despite the fact that, as discussed in our initial reply letter, the civil rights laws of numerous states already treat political affiliation or political activities as protected characteristics, meaning political views are indeed socially significant.[1]

Furthermore, as we likewise point out in our March 2 reply letter, polling in recent years has revealed that the vast majority of conservatives feel discriminated against. Now those *not* holding conservative viewpoints or ideologies may be quick to dismiss the reporting of such discrimination for whatever reason, but these claims should not be and cannot be dismissed as somehow less genuine or less believable than claims by individuals claiming to have experienced discrimination based on other pernicious grounds of discrimination such as race or sex. Accordingly, we believe *BlackRock* to have been decided in error, and that the Staff's refusal in that proceeding to present its decision and our Proposal to the Commission for reconsideration was, like its underlying decision in that proceeding, an error. We have filed this proceeding to give the Staff an opportunity to correct one or the other of those errors.

The Company also claims our argument regarding the validity of pre-SLB 14L precedent is misguided, but insofar as pre-14L precedent is incompatible with 14L, it is completely true that such precedent is no longer operative. Our reply simply states the obvious and does so using the plain language of SLB 14L, which asserts that in post-SLB 14L proceedings, the Staff will "focus on the social policy significance of the issue that is the subject of the shareholder proposal. In making this determination, the staff will consider whether the proposal raises issues with a broad societal impact, such that they transcend the ordinary business of the company."[2]

Finally, despite the Company's claims to the contrary, our Proposal does not merely "touch upon" a significant social policy issue. What our Proposal merely "touches upon," as we explained in our initial no-action reply letter, are the ordinary-business details of human capital management – in exactly the same way that other proposals regarding other discrimination issues of profound public interest and public-policy significance have done. Viewpoint and ideology discrimination is indisputably the focus of our Proposal – not the inherent management of the Company's workforce – unless, of course, the Company is asserting that discriminating based on viewpoint and ideology is inherent to the management of its workforce. But we do not believe

---

[1] See, e.g., D.C. Code § 2-1402.11; N.Y. Lab. Law § 201-d; Wash. Rev. Code. Ann. § 42.17A.495(2).

[2] *See Staff Legal Bulletin* No. 14L (Nov. 3, 2021), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals (last accessed Mar. 9, 2023).

Office of the Chief Counsel
Division of Corporation Finance
March 9, 2023
Page 3

the Company is intending to make such a point, but if it did, it would thereby underscore that its deep and systemic discrimination on this front is of the greatest public moment.

Therefore, based upon the analysis set forth above and contained in our March 2 no-action reply, we respectfully request that the Staff reject the Company's request for a no-action letter concerning our Proposal.

A copy of this correspondence has been timely provided to the Company. If we can provide additional materials to address any queries the Commission may have with respect to this letter, please do not hesitate to call us at (202) 507-6398 or email us at sshepard@nationalcenter.org and at srehberg@nationalcenter.org.

Sincerely,

Scott Shepard
FEP Director

Sarah Rehberg
National Center for Public Policy Research

cc:    Lyuba Goltser, Weil, Gotshal & Manges LLP (lyuba.goltser@weil.com)



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

April 12, 2023

Lyuba Goltser
Weil, Gotshal & Manges LLP

Re:    The Kroger Co. (the "Company")
       Incoming letter dated February 16, 2023

Dear Lyuba Goltser:

This letter is in response to your correspondence concerning the shareholder proposal (the "Proposal") submitted to the Company by the National Center for Public Policy Research for inclusion in the Company's proxy materials for its upcoming annual meeting of security holders.

The Proposal requests the Company issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity policy.

There appears to be some basis for your view that the Company may exclude the Proposal under Rule 14a-8(i)(7). In our view, the Proposal relates to, and does not transcend, ordinary business matters. Accordingly, we will not recommend enforcement action to the Commission if the Company omits the Proposal from its proxy materials in reliance on Rule 14a-8(i)(7).

Copies of all of the correspondence on which this response is based will be made available on our website at https://www.sec.gov/corpfin/2022-2023-shareholder-proposals-no-action.

Sincerely,

Rule 14a-8 Review Team

cc:    Sarah Rehberg
       National Center for Public Policy Research

# BOYDEN GRAY & ASSOCIATES PLLC
## 801 17TH STREET, NW, SUITE 350
## WASHINGTON, DC 20006
## (202) 955-0620

April 13, 2023
via electronic mail

The Honorable Gary Gensler
Chair
Securities and Exchange
  Commission
100 F Street, NE
Washington, DC 20549

The Honorable Hester M. Peirce
Commissioner
Securities and Exchange
  Commission
100 F Street, NE
Washington, DC 20549

The Honorable Caroline A. Crenshaw
Commissioner
Securities and Exchange
  Commission
100 F Street, NE
Washington, DC 20549

The Honorable Mark T. Uyeda
Commissioner
Securities and Exchange
  Commission
100 F Street, NE
Washington, DC 20549

The Honorable Jaime Lizárraga
Commissioner
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

      **Re:** ***The Kroger Co. (National Center for Public Policy Research) (Apr. 12, 2023)***

Dear Chair Gensler and Commissioners:

The National Center for Public Policy Research (the "National Center") has requested that we submit, on their behalf, this petition for review of the decision of the staff of the Division of Corporation Finance (the "Staff") by letter yesterday, April 12, 2023 (the "Staff Decision"), pursuant to Rule 14a-8(i)(7) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), that The Kroger Co. (the "Company") may exclude the National Center's shareholder proposal (the "Proposal") from its proxy materials for the Company's 2023

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 2

Annual Meeting of Shareholders (the "2023 Annual Meeting"). The record for the Staff Decision has been appended to this petition.

By this petition, the National Center requests that the Commission reverse the Staff Decision and provide the Commission's views on the lawfulness of Rule 14a-8(i)(7) and any currently applicable Commission or Staff interpretation or guidance under Rule 14a-8(i)(7) as applied to the Proposal. As described herein, the Staff Decision unlawfully provided the Company with relief to exclude the Proposal by discriminating on the basis of viewpoint in violation of the First Amendment of the United States Constitution, taking arbitrary and capricious action under the Administrative Procedure Act, and acting in excess of statutory authority. The Commission should reverse the Staff Decision and resolve the important questions it raises.

Under the Exchange Act, the National Center is entitled to Commission review because the Staff Decision adversely affects the National Center and was the outcome of an informal adjudication.

Under the authorities provided herein, the Commission may review the Staff Decision *sua sponte* or upon receipt of this petition. The Exchange Act provides that one member of the Commission may call up the Staff Decision for review.

The National Center urges the Commission reverse the Staff Decision as soon as possible so that the Proposal may be considered at the Company's 2023 Annual Meeting. However, if the Commission is unable to review the Staff Decision before the Company finalizes its proxy statement, the National Center requests that the Commission still consider and reverse the Staff Decision even if its consideration extends beyond the 2023 Annual Meeting. The Commission's review is not time-barred, and resolution of these important issues will provide the National Center and other market participants with valuable guidance in future proxy seasons.

The National Center's analysis on these matters follows:

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 3

## ANALYSIS

The Rule 14a-8 shareholder proposal no-action process is mired in the inconsistent application of the "significant social policy" exception. In its present state, the Staff's interpretation of Rule 14a-8(i)(7) directs the Staff to determine whether a proposal raises a "sufficiently significant social policy issue" by evaluating the "broad societal impact" of the issues it raises.[1] While there might be an objective way to apply this standard, the way the Staff has implemented it is irrational at best. The Staff inexplicably determines that some political views are sufficiently significant, while others are not. That is viewpoint discrimination, which the First Amendment categorically bars. Under the Staff's current approach, liberal and conservative shareholder proponents alike are left subject to the Staff's unstated whims for which political views have "broad societal impact." All participants in the shareholder proposal process are harmed by the inconsistent and opaque application of this standard.

The Staff Decision is a prime example of the inconsistent application of the significant social policy exception and resulting viewpoint discrimination.

For years, the Staff have found employment civil rights non-discrimination proposals to be significant social policy that transcend ordinary business matters. For example, in 2019 the Staff determined that a proposal that requested a company "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity (EEO) policy" transcended ordinary business matters.[2] But in the Staff Decision, the Staff determined a proposal that was identical, except it substituted "viewpoint" and "ideology" for "sexual orientation" and "gender identity," did not transcend ordinary business matters. In other words, the Staff found that discrimination on the basis of sexual orientation and gender identity had sufficient

---

[1] Division of Corporation Finance, Staff Legal Bulletin No. 14L (Nov. 3, 2021).

[2] *See CorVel Corp.* (June 5, 2019).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 4

"significance" and "societal impact" under Rule 14a-8(i)(7), while discrimination on the basis of viewpoint and ideology did not.

In doing so, the Staff Decision committed a classic act of viewpoint discrimination. The First Amendment's bar on viewpoint discrimination prevents the government from allowing speech based on one "political, economic, or social viewpoint" while disallowing other views on those same topics. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995). But the Staff did just that. Despite comparable levels of social significance, the Staff privileged a viewpoint opposing discrimination on the basis sexual orientation and gender identity while disadvantaging a viewpoint opposing discrimination on the basis of viewpoint and ideology. That is a clear violation of the First Amendment.

Because of the unlawfulness of the Staff Decision under the First Amendment and other authorities, the National Center requests that the Commission reverse the Staff Decision and provide its views on the lawfulness of Rule 14a-8(i)(7) and any currently applicable Commission or Staff interpretation or guidance under Rule 14a-8(i)(7) as applied to the Proposal.

If the Staff or the Commission is concerned that the consistent application of the significant social policy exception would result in the proxy consideration of too many political-issue proposals, then the Commission or Staff should revise its interpretation of Rule 14a-8(i)(7) rather than fail to apply its current interpretation consistently.

The Commission has clear authority to review the Staff Decision. Indeed, under the Exchange Act, the National Center is entitled to review of the Staff Decision. By reviewing the Staff Decision, the Commission can correct the unlawful action below and provide guidance that will help to create greater consistency for market participants in the application of the significant social policy exception.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 5

# I.    The Commission Has Authority to Review the Staff Decision *Sua Sponte.*

The Exchange Act provides the Commission the right to review the Staff Decision because it is an action undertaken with the Commission's delegated power. Commission regulation provides that the Commission may review the Staff Decision *sua sponte*, and no other authority limits the Commission's discretion to do so. Under the Exchange Act, any single member of the Commission may bring such action before the Commission for review.[3]

### A.    *The Exchange Act Provides the Commission the Right to Review the Staff Decision.*

Section 4A of the Exchange Act states that the Commission "shall retain a discretionary right to review" "any action" of a division of the Commission that has been delegated the Commission's functions.[4]

The Commission has delegated the functions of Rule 14a-8 to the Division of Corporation Finance (the "Division"). Title 17, Section 200.30-1 of the Code of Federal Regulations delegates to the Director of the Division the function of "authoriz[ing] the use of forms of proxies, proxy statements, or other soliciting material" under the Exchange Act.[5] This delegation plainly includes Rule 14a-8, which is issued under the Exchange Act and involves the Commission's review of such proxy materials.[6]

---

[3] Exchange Act, § 4A(b) (15 U.S.C. 78d–1(b)) ("The vote of one member of the Commission shall be sufficient to bring any such action before the Commission for review.").

[4] Exchange Act, § 4A(a) (15 U.S.C. 78d-1(a)) ("With respect to the delegation of any of its functions . . . the Commission shall retain a discretionary right to review the action of any such division of the Commission.").

[5] 17 C.F.R. § 200.30-1(f)(4).

[6] Moreover, the regulation includes Rule 14a-8 in its delegation by providing that the Director must authorize proxy materials within the time periods provided for in Rule 14a-8, which are specific to the Rule's shareholder proposal

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 6

Because the Commission has delegated Rule 14a-8 to the Division under Section 4A of the Exchange Act, the Commission retains the right to review "any action" taken by the Division under Rule 14a-8. That includes the Staff Decision. The Staff Decision is an action: it is a letter from the "Rule 14a-8 Review Team" of the Division that applies Rule 14a-8(i)(7) to the Company's no-action request. By making and issuing the Staff Decision, the Division has acted, and the Staff Decision may be reviewed by the Commission. Accordingly, the Commission may bring the Staff Decision to the Commission's review by "[t]he vote of one member of the Commission."[7]

### B. *No Other Authority Limits the Commission's Discretion to Review the No-Action Decision.*

The Commission retains the right to review the delegated functions of its divisions under the Exchange Act, and that includes Rule 14a-8. That clear statutory authority should be the start and end of the matter. But for the avoidance of any doubt, the Commission also did not limit its review via any other authority, in Rule 14a-8 or otherwise.

### i. Rule 14a-8.

Rule 14a-8 does not give the Staff an independent or exclusive role in determining whether the Commission may review its actions. In fact, Rule 14a-8 does not expressly state the Commission or the Staff's respective roles in the shareholder proposal process at all. And nowhere

---

consideration process. *See id.* ("To authorize the use of forms of proxies, proxy statements, or other soliciting material within periods of time less than that prescribed in . . . 240.14a-8(d)."). There would be no reason to provide that the Director shall authorize proxy materials within this time period other than to comply with, and therefore have the Division carry out, Rule 14a-8.

[7] Exchange Act, § 4A(b) (15 U.S.C. § 78d–1(b)); *cf.* Daniel M. Gallagher, SEC Comm'r, Why is the SEC Wavering on Waivers? Remarks at the 37th Annual Conference on Securities Regulation and Business Law at n.24, Feb. 13, 2015, https://www.sec.gov/news/speech/021315-spc-cdmg#_ftnref24.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 7

does the Rule provide who the "Commission staff" must be—whether the Staff or the staff of the commissioners.

Rule 14a-8 provides for "when a company must include a shareholder's proposal in its proxy statement."[8] The Rule provides for the process by which a shareholder may submit a proposal and the company seek to exclude the proposal from its proxy statement, and the substantive bases for valid exclusion by the company. The Rule's clearest mention of the Commission's and staff's roles in that process is only an implication that the Commission or staff may make some kind of determination as to the proper exclusion of a proposal. Rule 14a-8(g) provides, in question-and-answer form:

> "Question 7: Who has the burden of *persuading the Commission or its staff* that my proposal can be excluded? Except as otherwise noted, the burden is on the company . . . "[9]

In the rest, the Rule provides in multiple places that companies and proponents are to submit their reasons for exclusion or inclusion "to the Commission."[10] It also provides that the "staff may permit the company to" submit its filing to the Commission late. The Rule then provides that a proponent may respond to the company's arguments by sending "to the Commission" the proponent's response. By providing that the proponent should submit any response "as soon as possible" because "[t]his way, the Commission staff will have to time to fully consider your submission before it issues its response" the Rule only implies a response by the Commission staff, though it does not state to whom or as to what decision.

In sum, the Rule requires that filings be submitted to the Commission, implies that the "Commission or staff" may make some

---

[8] Rule 14a-8.

[9] Rule 14a-8(g) (emphasis added).

[10] *See* Rule 14a-8 (introductory matter), Rule 14a-8(i)(9) (referring to "[a] company's submission to the Commission"); Rule 14a-8(j) (stating the company "must file its reasons with the Commission"); Rule 14a-8(k) (referring to shareholder submission "to the Commission" and "to us").

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 8

kind of determination as to whether a proposal may be excluded, and implies the staff may make some kind of response to either the company, the proponent, or both. None of this clearly grants the Staff with an independent or exclusive role. To the contrary, the Rule provides for the possibility that either or both of the "Commission or staff" may make a determination regarding a proposal. The staff could be the Staff, but they could also be the staff of the commissioners or other staff. The staff "response" implied by Rule 14a-8(k) has no prescribed content or addressee. The fact that the Rule requires all submissions be sent "to the Commission" and that the Rule is issued by the Commission (and elsewhere refers to "us") additionally suggests that the Rule does not authorize an independent role for the Staff.

Rule 14a-8 does not vest the Staff with an independent or exclusive role that precludes *sua sponte* Commission review. Nor does any other binding Commission regulation.

> ii.      17 C.F.R. § 202.1(d).

An existing Commission regulation providing for the review of Staff matters by the Commission confirms that the Commission may review the Staff Decision *sua sponte*.

Title 17, Section 202.1(d) of the Code of Federal Regulations describes the conditions under which the staff of any division will submit matters to the Commission for a statement by the Commission. It implies that the Commission may request staff presentation of a matter. And it does not delegate to the Staff any exclusive function regarding Rule 14a-8 or limit the Commission's right of review under the Exchange Act.

The regulation provides that the Commission may review the Staff's decision by requesting that the Staff present the matter to the Commission. It provides that "the staff, upon request or on its own motion, will generally present questions to the Commission" that meet certain criteria (which, in the case of the Staff Decision, are already

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 9

met, *see infra* Part IV).[11] While the rule does not expressly provide *who* makes the request, the Commission is almost certainly eligible to do so. The Staff's presentation to the Commission "upon request" is distinct from the Staff's presentation "on its own motion." The regulation therefore must refer to a request by an entity outside the Staff. Outside the staff, the Commission is the only other actor mentioned in the same sentence. And the only non-Staff actors discussed in the entire Code section who could make a request are the Commission and "members of the general public dealing with the Commission." But the rule does not limit the authority to make a request to the general public. Nor would that make good sense, either, since the Commission would be in at least as good of a position as the public to determine whether certain matters before the Staff raise issues that would benefit from Commission review.

The regulation provides the process by which the Staff may present questions to the Commission for review and envisions that the Commission may request review itself. It does not purport to modify the Exchange Act's provision that "[t]he vote of one member of the Commission shall be sufficient to bring any such action before the Commission for review"[12] (nor could it do so, given that a statutory provision could not be modified by a regulation).

> iii.    The 1976 Release.

The Commission also did not limit its review authority in its 1976 Statement of Informal Procedures for the Rendering of Staff Advice With Respect to Shareholder Proposals (the "1976 Release").[13] Though language in the 1976 Release might appear to limit the opportunities for the Commission to review a staff decision, the Release is only a description of informal procedures, and the Commission may change those procedures at any time to exercise its statutory powers.

---

[11] 17 C.F.R. § 202.1(d).

[12] 15 U.S.C. § 78d–1.

[13] Release No. 34-12599, 41 Fed. Reg. 29,989, 29,991 (July 20, 1976).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 10

The 1976 Release provides that while "examination ordinarily is made by the staff," there may be "participation by the Commission itself," albeit "only in those relatively rare cases where unusual problems exist and the staff or an interested person requests it."[14] While this language clearly envisions Commission participation, on its face, it does not appear to provide for *sua sponte* Commission review since it states that such review occurs "only" when the issues presented are unusual and the Staff or an interested person requests it. However, the 1976 Release is a statement of informal staff procedures and may be modified or bypassed by the Commission at any time. The 1976 Release provides that "[t]here are no formal procedures applicable to such proposals" for Commission review.[15] Given its emphasis on informality, the Release may have been a description of what generally happens in the Rule 14a-8 review process, rather than a binding procedure for when the Commission may review. In light of the superior authorities that permit Commission to request presentation by the Staff[16] and "retain a discretionary right of review,"[17] the better reading of the 1976 Release is that it does not limit the Commission's *sua sponte* review.

C.     *The Commission Has Inherent Authority to Review the No-Action Decision.*

Even if the Commission interpreted its existing regulations to limit its authority to review the Staff Decision, the Commission retains residual discretion to review Staff actions. In general, agencies retain discretion to modify procedural rules. As the Supreme Court has stated, "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."[18] This discretion is confirmed by the Commission's reservation of its authority from its delegation of functions to the Division, which provides that the Division has such delegated functions

---

[14] 41 Fed. Reg. 29,990.

[15] 41 Fed. Reg. 29,991.

[16] 17 C.F.R. 202.1(d).

[17] 15 U.S.C. § 78d–1.

[18] *Am. Farm Lines v. Black Ball Freight Serv.*, 297 U.S. 532, 538–39 (1970).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 11

except as "the Commission orders otherwise."[19] In order to review the
Staff Decision *sua sponte*, the Commission could informally order the
Staff to present the matter or the Commission could take it up directly.

## II.     The Commission Has the Authority to Review the No-Action Decision Upon Request by the National Center.

Even if the Commission lacked authority to review the Staff
Decision *sua sponte*, the Commission has authority to review it upon
request by an interested person. As the proponent in the Staff Decision,
the National Center is undoubtedly an interested person. And either by
the National Center's March 30, 2023 request to the Staff for
presentation to the Commission or by this petition, the National Center
has requested the Commission's review. These requests thereby trigger
the Commission's additional authority to review the Staff decision.

The Exchange Act, 17 C.F.R. § 202.1(d), and the 1976 Release
each provide for Commission review upon request by an interested
person. The Exchange Act provides that "the Commission shall retain a
discretionary right to review the action upon its own initiative *or upon
the petition of a party to or intervenor in such action*."[20] 17 C.F.R.
§ 202.1(d) provides that the staff will present an action to the
Commission "upon request," and the relevant non-Staff parties
mentioned in the regulation are the Commission or "members of the
public dealing with the Commission."[21] The 1976 Release provides for
"participation by the Commission itself . . . in those relatively rare cases
where unusual problems exist and the staff or an *interested person
requests it*."[22]

The National Center is an interested person within the meaning
of each authority because the National Center is the proponent of the
Proposal. In the Exchange Act, the National Center is a "party to" the
Staff Decision. In 17 C.F.R. § 202.1(d), the National Center is a

---

[19] 17 C.F.R. § 200.30-1.
[20] 15 U.S.C. 78d–1(b) (emphasis added).
[21] 17 C.F.R. § 202.1(d).
[22] 41 Fed. Reg. 29,990 (emphasis added).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 12

"member[] of the general public dealing with the Commission." And
while the 1976 Release does not define "interested person," it later
refers to "[p]roponents and other interested persons,"[23] which implies
the proponent of a proposal is an interested person.

This interpretation of the Commission's authorities is also
confirmed by Commission practice. In previous cases, the Commission
appears to have reviewed Staff decisions by requesting that the Staff
present them to the Commission only *after* the proponent petitioned the
Commission directly for review. In *Cracker Barrel Old Country Store,
Inc.*, 1993 WL 11016 (Jan. 15, 1993), the Commission reviewed the
Staff's decision in a proposal after the proponent petitioned the
Chairman directly. The proponent did not request that the Staff present
its decision to the Commission in its letter to the Chairman or in
correspondence with the Staff.[24] Instead, the proponent asked only that
the Commission "review the staff decision."[25] Responding to the
proponent's request, the Commission Secretary stated that the Staff
presented the decision to the Commission for review, and the
Commission affirmed the Staff's decision. Notably, the Staff did not
present the decision to the Commission for review until after the
proponent's letter was sent to the Commission requesting the
Commission's review.[26] The same sequence of events has also repeated
itself in the Commission's review of several other proposals. *See, Archer-
Daniel-Midland Co.* (Aug. 22, 1991); *Amalgamated Clothing & Textile
Workers Union v. SEC*, 15 F.3d 254 (2d Cir. 1994); *Medical Comm. for
Hum. Rts. v. SEC*, 432 F.2d 659, 663 (D.C. Cir. 1970) *vacated as moot*,
404 U.S. 403 (1972). In each case, the proponent petitioned the
Chairman or the Commission directly and, where there is evidence of
Staff presentation at all, the Staff did not present the decision to the
Commission for review until after the proponent petitioned the

---

[23] 41 Fed Reg. 29,991.

[24] *See Cracker Barrel Old Country Store, Inc.*, Fed. Sec. L. Rep. P 76,418 (Oct.
13, 1992).

[25] *Cracker Barrel Old Country Store, Inc.*, 1993 WL 11016, at *2 (Jan. 15,
1993).

[26] *See* Br. for the SEC, *New York City Emps. Ret. Sys. v. SEC*, 843 F. Supp.
858 (2d Cir. 1994).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 13

Chairman. Given the relative dearth of Staff presentation of matters to the Commission for review, the most probable explanation of this sequence is that the Commission directed, requested, or, by some other manner convinced the Staff to present the decision to the Commission. Of course, it is possible that the Staff, of its own motion, presented the decisions to the Commission only *coincidentally* after the proponents petitioned the Commission directly. But that coincidence in each instance seems unlikely. On balance, the Commission's practice seems to support the Commission's authority to review the Staff Decision if the National Center requests it.

### III.   The Commission May Review the Staff Decision at Any Time Prior to the 2024 Proxy Season.

The National Center urges the Commission to review the Staff Decision as soon as possible so that the Proposal may be considered at the Company's 2023 Annual Meeting. However, in the event that the Commission's review is not possible prior to the Company finalizing its proxy statement, the Commission is not time-barred from reviewing and acting on the Staff Decision even after the Company's 2023 Annual Meeting has occurred.

As the United States District Court for the District of Delaware has recognized, "the short duration of the proxy season makes full litigation on the merits of a shareholder proposal before an annual meeting close to impossible."[27] For that reason, shareholder proposals under Rule 14a-8 are subject to the "capable of repetition, yet evading review" exception to mootness in the federal courts.[28] Under that exception, a court may decide the proposal's validity not only after the company has printed its proxy materials, but even after the company's annual meeting has occurred.[29] The court may order declaratory relief that applies to the completed meeting because it affects the "almost

---

[27] *Trinity Wall Street v. Wal-Mart Stores, Inc.*, 75 F. Supp. 3d 617, 625 (D. Del. 2014).
[28] *Id.*
[29] *Id.*

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 14

certain[]" repetition of the dispute during the next year's proxy season.[30]

The same logic applies to the Commission's decision to review the Staff Decision. The Commission has discretion as to how it reviews the Staff Decision, and such review need not affect the Company's 2023 Annual Meeting. For example, the Commission could reverse the Staff Decision without bringing an enforcement action. And if the Commission determined to bring an enforcement action, the Commission could determine to seek only prospective relief.

Additional considerations support the Commission's review outside of the Company's 2023 Annual Meeting. The value of the Commission's review would transcend the importance of any singular no-action proceeding. When the Commission corrects an erroneous Staff no-action decision, it not only achieves the right outcome in the individual matter but provides guidance to the Staff and market participants for future decisions. Here, Commission review would contribute to the resolution of cross-cutting issues. The same important constitutional, statutory, and regulatory concerns raised by the Staff Decision are present in multiple proposals. *See, e.g., American Express (Nat'l Ctr. for Pub. Pol'y Rsch.)* (Mar. 9, 2023), *JPMorgan Chase & Co. (David Bahnsen)* (Mar. 21, 2023), *JPMorgan Chase & Co. (Nat'l Ctr. for Pub. Pol'y Rsch.)* (Mar. 21, 2023). Rest assured, these concerns will continue to underlie future Staff decisions, too. Commission review would be valuable because it would help resolve matters of substantial importance for proposals beyond the Staff Decision.

For these reasons, the Commission may review the Staff Decision at any time prior to the 2024 proxy season.

**IV.   The Commission Should Review and Reverse the Staff Decision to Resolve Fundamental Questions Regarding Rule 14a-8(i)(7) and the Issues of Constitutional and Statutory Authority the Decision Presents, Among Other Reasons.**

---

[30] *Id.* at 628.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 15

The Staff Decision is a prime example of the inconsistent application of the significant social-policy exception and resulting viewpoint discrimination. Because it is not the only such example either, reversal by the Commission would serve the important purpose of clarifying the significant social policy exception and putting the Staff on notice for the risk of viewpoint discrimination in the future.

The Staff Decision was also arbitrary and capricious under the Administrative Procedure Act and not authorized by the Exchange Act. For these and other reasons, the Commission should avoid these issues by reversing the Staff Decision.

>    A.    *The National Center is Entitled to Commission Review of the*
>          *Staff Decision.*

The Commission should review the Staff Decision because the Exchange Act requires it to do so. Section 4A of the Exchange Act provides that a "party shall be entitled to review by the Commission" if it "is adversely affected by action at a delegated level" that occurs under the Exchange Act in a case of informal adjudication.[31] The National Center meets each of these requirements regarding the Staff Decision.

The National Center is adversely affected by the Staff Decision. The Staff Decision disadvantages the National Center in its ability to have its proposal considered at the Company's 2023 Annual Meeting. By issuing relief to the Company, the Staff Decision gives the Commission's imprimatur to the Company's exclusion of the proposal. Courts give deference to the Staff's interpretations of Rule 14a-8(i)(7) and no-action decisions.[32] The Staff Decision thereby stacks the deck against the National Center if it seeks relief in court from the Company's wrongful exclusion of the Proposal.

The Staff Decision is also the product of an informal adjudication. The Exchange Act provides that review is available for action which is "in a case of adjudication, as defined in [the Administrative Procedure

---

[31] 15 U.S.C. § 78d–1.
[32] *See Trinity Wall Street*, 792 F.3d at 342 n.11; *Tosdal v. Nw. Corp.*, 440 F. Supp. 3d 1186, 1194 (D. Mont. 2020).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 16

Act], not required by this chapter to be determined on the record after notice and opportunity for hearing."[33] The cited portion of the Administrative Procedure Act defines such adjudication as the "agency process for the formulation of an order," otherwise referred to as informal adjudication.[34] In turn, "order" means "the whole or part of a final disposition . . . of an agency in a matter other than rule making."[35] The Staff Decision is an order since it is at least part of the Commission's disposition of a matter that was not a rulemaking. And the Rule 14a-8 process is the process by which the Staff Decision was issued, making it an informal adjudication. The Exchange Act therefore entitles the National Center to Commission review of the Staff Decision.

To be sure, this aspect of the Exchange Act does not appear to have been applied to Rule 14a-8 yet. The 1976 Release suggests "there is no 'right' to such Commission consideration" of a staff no-action decision.[36] But this non-binding informal statement cannot be reconciled with the Exchange Act, the Administrative Procedure Act, and the modern reality that courts afford deference to staff no-action decisions.

B.    *The Staff Decision Was an Incorrect Application of Rule 14a-8(i)(7).*

Upon review, the Commission should reverse the Staff Decision. The Staff Decision was an incorrect application of Rule 14a-8(i)(7) that failed to appreciate the social significance of employment discrimination on the basis of viewpoint and reversed or inconsistently applied key Staff precedents. The National Center incorporates herein its arguments presented to the Staff in the no-action proceedings appended.

The Proposal requests that the Company issue a public report detailing the potential risks associated with omitting "viewpoint" and

---

[33] Exchange Act, §4A(b) (15 U.S.C. 78d-1(b)).
[34] 5 U.S.C. § 551(7).
[35] 5 U.S.C. § 551(6).
[36] 41 Fed. Reg. at 29,991.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 17

"ideology" from its equal employment opportunity policy. The Proposal's Supporting Statement notes its concern for risks related to the "company-wide" lack of consideration for "employees with diverse points of view," as evidenced by the Company's release of an "'allyship guide' that told employees to use 'inclusive language' and celebrate transgender holidays," and its statement that "[s]ome people's morality can be a barrier to accepting LGBTQ+ people," among other patterns of business conduct that suggest a lack of consideration for current and prospective employees' viewpoints in company-wide strategy.

We would like to highlight two points:

*First*, the Proposal focuses squarely on the issue of ideological conformity in corporate America and its impacts on the workforce, which is one of the hottest subjects in politics today. The rise of "woke capital" has become a major political issue that drives current public policy debates.[37] According to a recent Society for Human Resource Management study, the percentage of American workers who say they have experienced political affiliation bias in the workplace *doubled* from 2019 to 2022.[38] As a result, advocates increasingly call for new laws to protect workers from discrimination on the basis of political and ideological viewpoints.[39] The right of viewpoint expression is increasingly relevant to civil rights law. The civil rights laws of numerous states already treat political affiliation or political activities as protected characteristics. *See, e.g.*, D.C. Code § 2-1402.11; N.Y. Lab. Law § 201-d; Wash. Rev. Code. Ann. § 42.17A.495(2). By an objective

[37] *See, e.g.*, Timothy Noah, *Prepare for a New Republican War on "Woke" Capital*, The New Republic (Nov. 9, 2022) https://newrepublic.com/article/168607/republican-majority-war-woke-capital.
[38] Allen Smith, *Political Affiliation Bias Strains Some Workplaces*, Soc'y for Hum. Res. Mgmt. (Oct. 5, 2022), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/political-affiliation-bias-strains-some-workplaces.aspx.
[39] *See* Vivek Ramaswamy & Jed Rubenfeld, *The New Woke Discrimination Demands a New Law*, Wall St. J. (Nov. 15, 2022), https://www.wsj.com/articles/the-new-discrimination-demands-a-new-law-civil-rights-act-political-views-content-viewpoint-corporations-hostile-workplace-supreme-court-11668538745;

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 18

measure, the issue of viewpoint discrimination in the workplace is
clearly socially significant.

*Second*, the Staff Decision reversed key precedent without
explanation.  The Commission's and Staff's interpretations of the
"significant social policy exception" of Rule 14a-8(i)(7) repeatedly cite
discrimination in civil-rights matters as the prototypical examples of
significant social policy issues that transcend ordinary business
matters. For example, the Commission's 1998 Release explained that
proposals "focusing on sufficiently significant social policy issues (e.g.,
*significant discrimination matters*) generally would not be considered to
be excludable." Exchange Act Release No. 40018, 63 Fed. Reg. 29106,
29108 (May 21, 1998) (the "1998 Release") (emphasis added). Issues like
"significant discrimination matters" would not be excludable precisely
"*because* the proposals would transcend the day-to-day business
matters." *Id.* (emphasis added). And in Staff Legal Bulletin No. 14L, the
Staff reiterated this position by citing "[m]atters related to *employment*
discrimination" as an example of an issue that "may rise to the level of
transcending the company's ordinary business operations." Staff Legal
Bulletin No. 14L, *supra* at n.5 (emphasis added). Neither the
Commission nor the Staff have since repudiated these positions.

Consistent with this well-established guidance, the Staff has
consistently denied relief requests from companies seeking to exclude
proposals that relate to discrimination in civil rights matters. *See, e.g.*,
*Levi Strauss & Co.* (Feb. 10, 2022) (audit analyzing the company's
impact on civil rights and non-discrimination); *McDonald's Corp.* (Apr.
5, 2022) (audit analyzing the "adverse impact" of the company's policies
and practices on the civil rights of "company stakeholders");
*Amazon.com, Inc. (New York State Common Retirement Fund)* (Apr. 7,
2021). And in *CorVel Corp.* (June 5, 2019), the Staff directly applied this
principle to matters of employment discrimination by determining that
a proposal that requested that a company "issue a public report
detailing the potential risks associated with omitting 'sexual
orientation' and 'gender identity' from its written equal employment
opportunity (EEO) policy" transcended ordinary business matters.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 19

In the Staff Decision, the Staff reversed itself. It reversed its precedents concerning the evident social significance of civil-rights discrimination in *Levi Strauss & Co., McDonald's Corp.*, and *Amazon.com, Inc.* And it reversed its *CorVel Corp.* precedent. The Staff found the Proposal—which was identical to the proposal in *CorVel Corp.*, except it substituted "viewpoint" and "ideology" for "sexual orientation" and "gender identity"—did not transcend ordinary business matters. The Staff made this determination even though, at the time it decided *CorVel Corp.*, the Supreme Court had not held that sexual orientation and gender identity were protected characteristics under Title VII of the Civil Rights Act.[40] In other words, when the Staff decided *CorVel Corp.*, sexual orientation and gender identity had roughly the same level of protection under Title VII that viewpoint and ideology still do. However, that lower level of protection did not prevent the Staff from finding the *CorVel Corp.* proposal significant. It should have been no barrier to the Proposal either.

The Proposal evidently focused on an issue of significant social policy, but the Staff Decision nonetheless permitted its exclusion. That was the wrong outcome. The Commission should reverse it. And if the Staff or the Commission is concerned that the consistent application of the significant social-policy exception would result in too many political-issue proposals being considered, then the Commission or Staff should revise its interpretation of Rule 14a-8(i)(7) rather than fail to apply its current interpretation consistently.

C.    *The Staff Decision Was Unconstitutional Viewpoint Discrimination by the Staff.*

The Proposal relates to the significant social policy concern of the use of discrimination on the basis of viewpoint and ideology. By evaluating whether the Proposal's political and social view about discrimination is a matter of sufficiently significant social policy concern, the Staff Decision itself discriminated based on viewpoint.

---

[40] *Compare CorVel Corp.* (June 5, 2019) *with Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 20

It is well-established that the government cannot engage in viewpoint discrimination. *See Matal v. Tam*, 137 S. Ct. 1744 (2017); *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). This principle prevents governments from regulating speech "because of the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995). And the Supreme Court defines "the term 'viewpoint' discrimination in a broad sense." *Matal*, 137 S. Ct. at 1763. This is because "[v]iewpoint discrimination is a poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring).

The rule against viewpoint discrimination prevents allowing speech based on one "political, economic, or social viewpoint" while disallowing other views on those same topics. *Rosenberger*, 515 U.S. at 831. It also prohibits excluding views that the government deems "unpopular," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or because of a perceived hostile reaction to the views expressed, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

Here, the Staff has engaged in viewpoint discrimination by issuing relief on the Proposal. As discussed *supra* Part IV.B, the Staff has routinely denied no-action relief to similar requests in *Levi Strauss & Co.* (Feb. 10, 2022) (audit analyzing the company's impact on civil rights and non-discrimination); *McDonald's Corp.* (Apr. 5, 2022) (audit analyzing the "adverse impact" of the company's policies and practices on the civil rights of "company stakeholders"); *Amazon.com, Inc. (New York State Common Retirement Fund)* (Apr. 7, 2021), and a nearly identical proposal in *CorVel Corp.* (June 5, 2019). But the Staff Decision gave relief to the Company for the Proposal despite its focus on the same issue of employment discrimination—albeit from a different viewpoint.

The Staff—and the Commission—needs a principled basis for such a distinction. But it has provided none. As the Supreme Court has explained, to avoid viewpoint discrimination the government must have "narrow, objective, and definite" standards to prevent officials from covertly discriminating based on viewpoint through subjective and

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 21

unclear terms. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). And here, the Staff has complete discretion to determine what "issues" are significant or have "broad societal impact" and even to censor on the same issue when they are presented by speakers with certain political views.

Indeed, over time, the results of that discretion have become clear. The Staff Decision is part of a broader and concerning trend that strongly suggests viewpoint discrimination.

In *Mastercard, Inc.* (Apr. 22, 2022), the Staff denied relief for a proposal requesting that the company issue a report describing if and how it "intends to reduce the risk associated with the processing of payments involving its cards and/or electronic payment system services for the sale and purchase of untraceable firearms, including 'Buy, Build, Shoot' firearm kits, components and/or accessories used to assemble privately made firearms known as 'Ghost Guns.'" But in *American Express Co. (Nat'l Ctr. for Pub. Pol'y Rsch.)* (Mar. 9, 2023), the Staff gave the company relief for a proposal that was identical but substituted "firearms" for "untraceable firearms" and the examples included thereunder. The only basis for the difference between the proposal was a difference in public-policy views about gun sales. Where the *Mastercard, Inc.* proponent indicated its concern for the "risk to society" from "gun violence" and related "risks associated with the nature of the untraceable firearms business," the *American Express Co.* proponent was concerned with risks to limiting "responsible gun ownership" and harms and risks from the company's accommodation "of the anti-Second Amendment lobby."

In *Alphabet Inc. (W. Andrew Mims Trust)* (Apr. 12, 2022), the Staff denied relief for a proposal requesting the company commission a report evaluating the company's policies "to address misinformation and disinformation across its platforms," citing to content moderation policies designed to prevent "attempt[s] to interfere with elections or

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 22

civic processes."[41] But in *AT&T Inc.* (Mar. 15, 2023), the Staff gave the
company relief for a proposal that requested the company publish a
report evaluating risks related to its platform management after it
"shutdown [a] conservative news network" "following a concerted
campaign by liberal activists," who claimed the company was
"consistently giving airtime to conspiracy and misinformation" such as
"conservative conspiracy theories . . . that the 2020 presidential election
was stolen."[42] In other words, the Staff permitted a proposal that
expressed concern that the company did too little to combat
"misinformation," but not a proposal that expressed concern that the
company did too much to combat "misinformation."

      And in the 2021 proxy season, the Staff permitted the
consideration of a landmark series of proposals requesting corporations
to "balance [the] interests of shareholders [and] stakeholders . . .
allowing the corporation to protect communities, even when it reduces
financial return to shareholders in the long run." *See Alphabet Inc.*
(Apr. 16, 2021), *Broadridge Fin. Solutions, Inc.* (Sept. 22, 2021)
(focusing on non-pecuniary "public benefit" company policy); *Tractor
Supply Co.* (Mar. 9, 2021) (same); *3M Co.* (Mar. 9, 2021) (same). In each
proceeding, the Staff found the proposals to focus on a significant social
policy issue that transcended ordinary business matters. But in
*JPMorgan Chase & Co. (Nat'l Ctr. for Pub. Pol'y Rsch.)* (Mar. 23, 2023),
the Staff found a proposal that focused on the *risks* of "non-pecuniary"
considerations in corporate governance to be non-significant.

      These are not isolated instances of bias. The trend is significant
enough that it can be picked up in the aggregate statistics. As the
Society for Corporate Governance observed in a recent comment
submitted to the Commission, in the 2022 proxy season the Staff

---

      [41] *See* GOOGLE & YOUTUBE, *Information quality & content moderation* at 7,
https://blog.google/documents/83/information_quality_content_moderation_white_pa
per.pdf/, *cited in Alphabet Inc. (W. Andrew Mims Trust)* (Apr. 12, 2022), Ex. A at
n.4.
      [42] *See* Matthew S. Schwartz, *DirectTV to drop One America News Network*,
NPR (Jan. 15, 2022), https://www.npr.org/2022/01/15/1073407803/directv-to-drop-
one-america-news-network, *cited in AT&T Inc.* (Mar. 15, 2023), Ex. A at n.1.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 23

granted no-action relief in 50 percent of the instances where relief was requested on "anti-ESG" proposals—like the National Center's—compared with 38 percent across all proposals. The gap further widened when considering only social/political proposals, where the Staff granted relief at 50 percent rate for proposals from anti-ESG" proponents, as compared with 31 percent across all social/political proposals considered by the Staff.[43] By the National Center's own account, in the 2020 and 2021 proxy seasons, the Staff gave relief to companies to exclude every single proposal submitted by a conservative organization, while denying relief to companies for about a third of all other proposals in those years.

In other words, the way that the Staff has been applying the significant social policy exception in recent years appears to suggest that pro-ESG viewpoints are "significant," but anti-ESG viewpoints are *in*significant. If that is what is happening, that is flatly unconstitutional under the First Amendment. The Commission should reverse each such instance of this occurring, starting with the Staff Decision.

What's more, the Staff Decision—especially in the context of these broader trends—provides a clear demonstration of how the Staff's open-ended discretion in determining which views count as significant may be facially invalid under the First Amendment. The Commission's guidance would be especially helpful in curing the Staff's flawed approach.

D. *The Staff Decision Was Arbitrary and Capricious Agency Action under the Administrative Procedure Act.*

The Staff has identified no reasonable basis for distinguishing between the Proposal and other proposals that address employment

---

[43] Letter from C. Edward Allen, Vice President, Soc'y for Corp. Governance, to Vanessa A. Countryman, Secretary, Securities and Exchange Comm'n, Sept. 13, 2022, *available at* https://www.sec.gov/comments/s7-20-22/s72022-20142742-308679.pdf.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 24

discrimination on protected characteristics. As a result, the Staff Decision is arbitrary and capricious action.

Under the Administrative Procedure Act (APA), agency action that is "arbitrary and capricious" may be set aside. 5 U.S.C. § 706(2)(A). The Supreme Court has succinctly explained that "[t]he APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Under this precedent, in order for action to be reasonable and reasonably explained, the agency must at least consider the record before it and rationally explain its decision. *See FCC,* 141 S. Ct. at 1160.

Additionally, where an agency seeks to change its position from a prior regime, it must "display awareness that it is changing position," "show that there are good reasons for the new policy" and provide an even "more detailed justification" when the "new policy rests upon factual findings that contradict those which underlay its prior policy," and "take[ ] into account" "reliance interests" on the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Given the Staff's recent precedent permitting the consideration of shareholder proposals relating to employment non-discrimination, *see supra* Part IV.B, issuing relief to the Company was a change in its position. At a bare minimum, the Staff—or the Commission—would have to explain its reasoning for the reversal in position to comply with the APA. But the Staff gave none.

The Staff Decision is agency action. Most often, the Staff's decision to issue relief is the final action by the Commission in dealing with a particular shareholder proposal. The Exchange Act provides that if the Commission fails to review the action, then the Staff's action is "deemed the action of the Commission."[44] Significant legal consequences also flow from these decisions because they help determine whether or not the Company will be able to exclude the proposal. It is undeniable that

---

[44] Exchange Act, § 4A (15 U.S.C. § 78d–1).

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 25

companies treat the no-action process as a safe harbor. And the reality is that by issuing relief, the Staff provides companies with a legal defense in any potential court action. As discussed *supra* Part IV.A, courts provide no-action decisions with deference.

With the Staff Decision, the Staff has raised complex matters concerning the Commission's compliance with the Administrative Procedure Act. The Commission's compliance with this fundamental aspect of agency process is a matter of substantial importance and should be reviewed. Upon review, the Commission should reverse the Staff Decision to avoid the Staff's own unreasoned explanation reversal of its position.

### E.    The Staff Decision Was Not Authorized by the Exchange Act.

By issuing the Staff Decision, the Staff has acted beyond what Congress has authorized it to do. The Exchange Act does not confer upon the Commission or the Staff the authority to intrude upon substantive matters of corporate governance traditionally governed by state law. But that is what Rule 14a-8 and specifically Rule 14a-8(i)(7) purport to do. The Staff therefore had no authority to issue the Staff Decision.

The Exchange Act may be construed to authorize a version of Rule 14a-8 that compels the inclusion of only those shareholder proposals that would be otherwise valid under state law. That would render Rule 14a-8(i)(7) and the Commission and Staff's current interpretations of it unlawful. In the alternative, the Exchange Act does not authorize Rule 14a-8. Either finding would be grounds for reversing the Staff Decision.

### i.    The Exchange Act Does Not Authorize Rule 14a-8(i)(7).

Section 14(a) of the Exchange Act prohibits anyone from "solicit[ing] any proxy" "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). While this authority uses "broad[]" language, "it is not seriously disputed that Congress's central concern [in enacting § 14(a)] was with

disclosure." *Bus. Roundtable v. SEC*, 905 F.2d 410 (D.C. Cir. 1990). In enacting the Exchange Act, Congress expressly rejected a "federal corporation law" that would replace existing state law with a grant of authority to the SEC to regulate corporate governance.[45] Instead, Congress empowered the SEC to require that public companies disclose relevant information to investors. As the Senate report for the Exchange Act provides, the purpose of Section 14(a) was to ensure that investors had "adequate knowledge" about the "financial condition of the corporation . . . [and] the major questions of policy, which are decided at stockholders' meetings." S. Rep. No. 792, at 12 (1934).

By contrast, while Section 14(a) gave the Commission authority to compel disclosures of existing information, the substantive regulation of stockholder meetings was left to the "firmly established" state-law jurisdiction over corporate governance. *Bus. Roundtable*, 905 F.2d at 411, 413 (internal citation omitted). Interpreting the "broad[]" language of Section 14(a)'s otherwise "vague 'public interest' standard," in *Business Roundtable v. SEC*, the D.C. Circuit held that "the Exchange Act cannot be understood to authorize the regulation of" "the substantive allocation of powers" in matters of "corporate governance traditionally left to the states." *Id.* 407, 413 (internal citation omitted). Applying this limit, the Court held unlawful a Commission rule that prohibited listed companies from having more than one vote per share of common stock. The Court noted that "state law will govern the internal affairs of the corporation" such as the allocation of votes among the common stock. *Id.* at 412. Under state law, shareholders could generally opt to create common-stock voting structures outside of the one-vote, one-share structure. The Commission's rule therefore "directly interfere[d] with the substance of what the shareholders may enact" and "prohibit[ed] certain reallocations of voting power and certain capital structures" that were otherwise valid under state law. *Id.* at 411. The Court concluded that such direct regulation of state law was not authorized by the Exchange Act.

---

[45] *See* Stephen M. Bainbridge, *The Scope of the SEC's Authority Over Shareholder Voting Rights*, UCLA Rsch. Paper No. 07-16, tinyurl.com/mw2nf9um.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 27

Though the language of Section 14(a) of the Exchange Act is broad, the reach of its authority has a clear limit against state law. Section 14(a) does not authorize the Commission to impose upon matters of corporate governance traditionally governed by state law.

Rule 14a-8(i)(7) exceeds this limit because it compels the inclusion of (and thereby permits the exclusion) of shareholder proposals on bases beyond that required by state law, and in doing so interferes with the operation of state corporate law.

State law provides a robust system for regulating the content of shareholder proposals. Under state law, a shareholder proposal presented for consideration at the corporation's annual meeting must be a proper subject for action by the corporation's stockholders. *See, e.g.*, *CA, Inc. v. AFSCME Emps. Pension Plan*, 953 A.2d 227 (Del. 2008); Mich. Comp. Laws Ann. § 450.2404 (West); N.C. Gen. Stat. Ann. § 55-7-01; *see also* Jill E. Fisch, *From Legitimacy to Logic: Reconstructing Proxy Regulation*, 46 Vand. L. Rev. 1129, 1136 (1993) ("Presence at the annual meeting carries with it certain common-law rights, such as the right to nominate a candidate for the board of directors or to propose resolutions or transactions within the authority of the shareholders, such as a shareholder resolution or bylaw amendment."). A proposal is a proper subject for action by stockholders if it is within the scope or reach of the stockholders' power to adopt, *CA, Inc.*, 953 A.2d at 232, but stockholders do not have the power to adopt proposals that would cause the board of directors to breach its fiduciary duties, *see Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *30 (Del. Ch. July 14, 1989), *aff'd*, 571 A.2d 1140, (Del. 1990) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares.").

If Rule 14a-8 were construed to be consistent with the Exchange Act's "disclosure" purpose and principle of non-interference with state corporate law, it would merely compel that companies disclose in their proxy materials those shareholder proposals that were otherwise valid under state corporate law. In fact, that is what the early Commission

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 28

interpreted the Exchange Act to authorize when it issued the first version of the Rule. As a contemporary director of the Division stated, the Rule originally required only disclosures of "such matters relating to the affairs of the company concerned as are proper subjects for stockholders' action under the laws of the state under which it is organized." Opinion of Baldwin B. Bane, Director of the Division of Corporate Finance, Exchange Act Release No. 3638, 1945 SEC LEXIS 233, *2 (Jan. 3, 1945).

Construed in this way consistent with the Exchange Act, Rule 14a-8 leaves the regulation of the substantive content of shareholder proposals to state law. The Rule provides only that shareholder proposals otherwise valid under state law must be disclosed in the company's proxy materials. State law provides for the substance of which proposals companies consider at their annual meetings; the Rule compels disclosure of whatever it is that they consider.

Rule 14a-8(i)(7) distorts the Exchange Act's "disclosure" purpose by tilting the playing field for shareholder proposals with certain content. Specifically, Rule 14a-8(i)(7) provides that a corporation may exclude proposals that relate to a company's "ordinary business operations." And the SEC has further interpreted Rule 14a-8, via sub-regulatory guidance, to permit the exclusion of proposals that do not "transcend the day-to-day business matters" of the corporation or which insufficiently "raise[] issues with a broad societal impact." *See* Exchange Act Release No. 40018, 63 Fed. Reg. 29106, 29108 (May 21, 1998) (the "1998 Release"); Staff Legal Bulletin No. 14L, *supra*. As discussed *supra* IV.B, the Commission and Staff's interpretation of Rule 14a-8(i)(7) has the effect of creating a substantive and viewpoint-based rule. Under the current interpretation of Rule 14a-8(i)(7), proposals that focus on certain kinds of discrimination—like racial quotas—must be considered, while proposals that focus on the other kinds of socially significant discrimination may be excluded from corporate proxy statements.

This goes far beyond what the Exchange Act authorizes the Commission to do. A proposal that fails to sufficiently raise an issue of "significant social policy" and of "a broad societal impact" may

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 29

nonetheless be within stockholders' power to adopt. But issuing relief on the basis of Rule 14a-8(i)(7) helps the Company to exclude such a proposal, even though state law would allow it to be considered at the annual meeting. In this way, Rule 14a-8(i)(7) interferes with the substance of state corporate law by advancing stockholders' consideration of proposals with certain corporate governance characteristics, but not others. If the Exchange Act authorizes the Commission to compel the inclusion of shareholder proposals otherwise valid under state corporate law, the Commission may not then compel only those proposals that have certain substantive corporate-governance content. But that is what Rule 14a-8(i)(7) does.

The Staff Decision relied on Rule 14a-8(i)(7) in granting the Company relief. Because Rule 14a-8(i)(7) is unlawful, the Staff Decision should be reversed.

   ii.  The Exchange Act Does Not Authorize Rule 14a-8.

Rule 14a-8(i)(7) unlawfully distorts the content of companies' proxy statements to exclude proposals otherwise valid under state law. But Rule 14a-8—the full Rule—goes further still and regulates what may be considered at the annual meeting itself. This is an independent and alternative basis for reversing the Staff Decision, which would leave the issue of whether the Proposal must be included in the Company's proxy materials exclusively under state law (and not the Commission's interpretation of state law).

The matters that may be validly brought before shareholders at a corporation's shareholder meetings are exclusively governed by state law. "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (emphasis in original). Section 14(a) makes no such express requirement. Section 14(a) provides general language that Congress understood to merely authorize disclosure requirements that ensures

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 30

investors have "adequate knowledge" of the "major questions of policy . . . decided at stockholders' meetings." S. Rep. No. 792, *supra*. It does not provide the authority for the SEC to regulate *which* questions must be decided at a corporation's stockholder meetings.

Rule 14a-8 goes beyond the regulation of proxy statements to directly regulate what stockholders may consider at stockholder meetings. Specifically, Rule 14a-8 compels the consideration of some proposals by compelling their inclusion in the corporation's form of proxy. If a proposal meets the Rule's requirements, Rule 14a–8(a) provides that "a company *must* include a shareholder's proposal in its proxy statement and . . . its form of proxy" for a stockholder meeting. Rule 14a-8 (emphasis added). In turn, if a proposal is included on the form of proxy, it must be considered at the relevant stockholder meeting. Under federal law, a corporation's "form of proxy" must include the matters to be voted on at the meeting. *See, e.g.*, 17 C.F.R. § 240a-4(a) ("[T]he form of proxy . . . shall identify clearly and impartially each separate matter intended to be acted upon"). By requiring the inclusion of a proposal on the form of proxy, Rule 14a-8 compels consideration of the proposal at a stockholder meeting. If a corporation did not consider the proposal at the meeting, its form of proxy may be unlawfully misleading. Rule 14a-8 therefore requires a corporation to consider a shareholder proposal at its annual meeting even if it could lawfully exclude the shareholder proposal under state law. *See SEC v. Transamerica Corp.*, 163 F.2d 511, 518 (3d. Cir. 1947) (stating that, assuming a corporate bylaw excluding shareholder proposals was valid under state law, Rule 14a-8 would invalidate the bylaw).

By providing relief to the Company, the Staff Decision provided relief the Staff did not have the authority to give. The Exchange Act does not authorize the Staff to compel the Company to include the Proposal, so it has no authority to provide relief to the Company for the Company's failure to include the Proposal. The Commission should reverse the Staff's unauthorized action and leave the issue of whether the Proposal must be included in the Company's proxy materials to state law.

Re: *The Kroger Co. (National Center for Public Policy Research)*
April 13, 2023
Page 31

## Conclusion

For the foregoing reasons, the Commission should reverse the Staff Decision.

A copy of this correspondence has been timely provided to the Company. If we can provide additional materials to address any queries the Commission may have with respect to this letter, please do not hesitate to contact us.

Sincerely,

Jonathan Berry
R. Trent McCotter
BOYDEN GRAY &
ASSOCIATES
801 17th Street NW, Ste. 350
Washington, DC 20006
█████████████████████
█████████████████████

cc:    Scott Shepard
       Lyuba Goltser



April 14, 2023


<u>**Via email: shareholderproposals@sec.gov**</u>

Office of Chief Counsel
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

> **RE:** **Request for Staff Reconsideration and Presentation to Commission for Review of April 12, 2023 Decision Permitting the Kroger Co. to Exclude Stockholder Proposal of the National Center for Public Policy Research, Securities Exchange Act of 1934 – Rule 14a-8**

Dear Ladies and Gentlemen,

By the letter dated April 12, 2023 (the "No-Action Decision"), the staff of the Division of Corporation Finance (the "Staff") stated it would not recommend enforcement action to the Securities and Exchange Commission (the "Commission") if the Kroger Co. (the "Company") were to omit our shareholder proposal (the "Proposal") from its 2023 proxy materials in reliance on Rule 14a-8(i)(7). We at the National Center for Public Policy Research respectfully request that the Staff reconsider the No-Action Decision and present it to the Commission for the Commission's review. We make this request because the Staff erred in its decision and because the No-Action Decision involves matters of substantial importance that warrant review by the Commission. These matters include viewpoint discrimination by the Staff under the First Amendment of the United States Constitution, arbitrary and capricious agency action, action in excess of the Commission's statutory authority under the Exchange Act, and incorrect application of Rule 14a-8(i)(7) by the Staff.

We submit that the Commission should reverse the No-Action Decision and provide the Commission's views on the lawfulness of Rule 14a-8(i)(7) and any currently applicable Commission or Staff interpretation or guidance under Rule 14a-8(i)(7) as it relates to our Proposal.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 2

Finally, if the Staff were to fail to present the No-Action Decision to the Commission, that would be an independent basis for finding arbitrary and capricious or otherwise unlawful action.

We respectfully request that the Division of Corporation Finance forward to the Commission this petition for review.

**I.      The Staff must present the No-Action Decision to the Commission for review because it involves fundamental questions of constitutional and statutory authority that are novel, highly complex, and beyond the Staff's competency to resolve.**

Commission regulations provide that the Staff will present a no-action decision to the Commission for the Commission's review that "involve[s] matters of substantial importance and where the issues are novel or highly complex." 17 C.F.R. § 202.1(d). The Staff's No-Action Decision raises fundamental questions about the continuing viability of the Staff's interpretation and application of Rule 14a-8(i)(7) and, even more importantly, its validity under the United States Constitution, Administrative Procedure Act, and the Commission's authority under the Exchange Act. These questions are plainly beyond the Staff's competence to resolve and must be presented to the Commission.

**A.      The No-Action Decision involves a question of substantial importance because the Staff erred as a matter of law in its application of Rule 14a-8(i)(7).**

Our March 2 reply and March 9 supplemental letters explain that the Proposal does not relate to the Company's ordinary business, and that the Company has failed to meet its burden to demonstrate that it does. *See* Letter from Scott Shepard & Sarah Rehberg, National Center for Public Policy Research, to the Staff (Mar. 2, 2023) (the "NCPPR Response Letter"); Letter from Scott Shepard & Sarah Rehberg, National Center for Public Policy Research, to the Staff (Mar. 9, 2023) (the "NCPPR Supplemental Response Letter"). As explained in those letters, our Proposal does not seek to manage the Company's workforce. It seeks only the issuance of a report gauging the risk of not prohibiting discrimination – a request that has been consistently recognized by the Staff as an appropriate request that either does not inappropriately interfere with workforce management or implicates such significant social policy issues as to transcend that concern. We incorporate those arguments by reference herein, and explain below how the Staff erred in the No-Action Decision.

**1.      The Staff incorrectly determined that discrimination based on viewpoint and ideology, including political and religious orientation, is not a significant social policy concern.**

The Staff's No-Action Decision granting the Company's no-action request fails to recognize the clearly significant social policy issue raised by our Proposal. Although our March 2 and March 9 letters explain how our Proposal raises an issue of social policy significance, we believe those points bear repeating.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 3

Indeed, polls in recent years demonstrate that individuals holding viewpoints other than liberal often feel discriminated against. For instance, a March 2021 *The Economist/*YouGov poll reveals that 45 percent of conservatives polled feel that conservatives are discriminated against "a great deal" and 34 percent of conservatives feel that conservatives are discriminated against "a fair amount;" only 21 percent feel that conservatives are not discriminated against "much" or "at all."[1] Similarly, in a 2019 Hill-HarrisX survey, "78 percent of GOP respondents said that they believe that conservatives have to deal with discriminatory behavior from other Americans," with the "plurality of Republicans, 31 percent, sa[ying] that conservatives face 'a lot' of discrimination."[2] The same survey found that "just 16 percent of Democrats said that liberals face a lot of discrimination from society."[3]

Likewise, a Pew Research Center survey conducted in June 2020 found that "roughly three-quarters of U.S. adults say it is very (37%) or somewhat (36%) likely that social media sites intentionally censor political viewpoints that they find objectionable. Just 25% believe this is not likely the case."[4] According to the survey, "Majorities in both major parties believe censorship is likely occurring, but this belief is especially common – *and growing* – among Republicans. Nine-in-ten Republicans and independents who lean toward the Republican Party say it's at least somewhat likely that social media platforms censor political viewpoints they find objectionable."[5] (emphasis added).

Despite the dismissal of such concerns by those with a leftwing worldview, the veracity of these concerns was proven unquestionably true when Elon Musk released the "Twitter Files" detailing the company's extensive efforts to "shadow ban" and otherwise censor conservatives and others not sharing the same left-of-center worldview. "A new [Twitter Files] investigation reveals that teams of Twitter employees build blacklists, prevent disfavored tweets from trending, and actively limit the visibility of entire accounts or even trending topics – all in secret, without informing users," journalist Bari Weiss shared with the public.[6] Weiss then shared examples of Twitter censoring – and thereby discriminating against – users based on viewpoint and ideology. These examples include Stanford's Dr. Jay Bhattacharya, who Twitter secretly placed on a "Trends Blacklist" to prevent his tweets from trending because he argued that Covid lockdowns would harm children; popular conservative talk show host Dan Bongino, who Twitter placed on

[1] *The Economist*/YouGov Poll, Mar. 20-23, 2021, available at:
https://docs.cdn.yougov.com/5v6z1pywv7/econTabReport.pdf (last accessed Mar. 10, 2022).
[2] The Hill, *Poll: Republicans more likely to see 'a lot' of discrimination against conservatives than Democrats see against liberals,* Mar. 8, 2019, available at: https://thehill.com/hilltv/what-americas-thinking/433259-poll-republicans-more-likely-to-see-a-lot-of-discrimination (last accessed Mar. 10, 2022).
[3] *Id.*
[4] https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/
[5] https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/
[6] https://twitter.com/bariweiss/status/1601008766861815808?s=20&t=-e4ic59DaLSa3Q0eE9ZPIA; https://nypost.com/2022/12/08/suppression-of-right-wing-users-exposed-in-latest-twitter-files/

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 4

a "Search Blacklist;" and Turning Point USA's Charlie Kirk, whose account Twitter set to "Do Not Amplify."[7]

These concerns are increasingly relevant to the workplace. According to a recent Society for Human Resource Management study, the percentage of American workers who say they have experienced political affiliation bias in the workplace *doubled* from 2019 to 2022.[8] As a result, advocates increasingly call for new laws to protect workers from discrimination on the basis of political and ideological viewpoints.[9] The right of viewpoint expression is increasingly relevant to civil rights law. The civil rights laws of numerous states already treat political affiliation or political activities as protected characteristics.[10]

The evidence therefore shows that viewpoint and ideology discrimination are indeed an issue of significant social policy concern that transcends ordinary business. In an increasingly polarized political age, risks associated with political viewpoint and ideology are highly significant. Those *not* holding conservative viewpoints or ideologies may be quick to dismiss allegations of such discrimination in the workplace either because they do not feel their sting or because they think such discrimination useful, but these validated claims should not be and cannot be dismissed as somehow less genuine or less believable than claims by individuals claiming to have experienced the same discrimination based on other pernicious grounds of discrimination such as race or sex. It is therefore clear, regardless of what ideological or political persuasion one holds, that the issue of viewpoint discrimination is a significant social policy issue.

Absent any credible explanation by the Staff to the contrary, it appears that the only reason the Staff has refused to agree with this assessment is because it, as a matter of personal policy preference, or perhaps unconscious or even conscious bias, does not object to viewpoint and ideology discrimination of the sort that too many companies have indulged in over the past few years. But this personal policy preference, bias, or whatever it may be, does not and cannot alter the standard set forth in SLB 14L by the Staff itself, and that the Staff is now bound to apply faithfully. Proposals that "focus on sufficiently significant social policy issues" that "transcend the ordinary business operations" of the company are not excludable under Rule 14a-8(i)(7). And in SLB 14L, the Staff reiterated this position by citing "[m]atters related to employment discrimination" as an example of an issue that in particular "may rise to the level of transcending

---

[7] https://twitter.com/bariweiss/status/1601008766861815808?s=20&t=-e4ic59DaLSa3Q0eE9ZPIA; https://nypost.com/2022/12/08/suppression-of-right-wing-users-exposed-in-latest-twitter-files/; https://thehill.com/opinion/civil-rights/3770581-elon-musk-shows-shadow-banning-of-conservatives-no-conspiracy-theory/

[8] Allen Smith, *Political Affiliation Bias Strains Some Workplaces*, Soc'y for Hum. Res. Mgmt. (Oct. 5, 2022), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/political-affiliation-bias-strains-some-workplaces.aspx.

[9] *See* Vivek Ramaswamy & Jed Rubenfeld, *The New Woke Discrimination Demands a New Law*, Wall St. J. (Nov. 15, 2022), https://www.wsj.com/articles/the-new-discrimination-demands-a-new-law-civil-rights-act-political-views-content-viewpoint-corporations-hostile-workplace-supreme-court-11668538745;

[10] *See, e.g.*, D.C. Code § 2-1402.11; N.Y. Lab. Law § 201-d; Wash. Rev. Code. Ann. § 42.17A.495(2).

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 5

the company's ordinary business operations."[11] That is exactly what our Proposal does and the Staff erred in finding otherwise.

### 2.     *The Staff reversed key precedent without explanation.*

In the No-Action Decision, the Staff reversed key precedent without explanation. Prior to the No-Action Decision, the Staff's recent precedent denied exclusion requests under Rule 14a-8(i)(7) for proposals that request a risk-management review of a failure to forbid discrimination, a request that has been consistently recognized by the Staff as an appropriate request that either does not inappropriately interfere with ordinary business or implicates such significant social policy issues as to transcend that concern. *See, e.g., Levi Strauss & Co.* (avail. Feb. 10, 2022), *The Walt Disney Co.* (avail. Jan. 19, 2022), *Amazon.com, Inc.* (avail. Apr. 7, 2021), *CorVel Corp.* (avail. June 5, 2019) (the proposal in *CorVel* being the one upon which our Proposal here was explicitly modeled – indistinguishable except for the type of discrimination on which the proposals focus) and many other proceedings in recent years. But the No-Action Decision reverses course by deciding that our Proposal, which also focuses on discrimination – in this instance, viewpoint and ideology-based discrimination – was excludable.

The Staff reversed its *CorVel Corp.* precedent. In the No-Action Decision, the Staff found our Proposal—which was identical to the proposal in *CorVel Corp.*, except it substituted "viewpoint" and "ideology" for "sexual orientation" and "gender identity"—did not transcend ordinary business matters. The Staff made this determination even though, at the time it decided *CorVel Corp.*, the Supreme Court had not held that sexual orientation and gender identity were protected characteristics under Title VII of the Civil Rights Act.[12] In other words, when the Staff decided *CorVel Corp.*, sexual orientation and gender identity had roughly the same level of protection under Title VII that viewpoint and ideology still do. However, that lower level of protection did not prevent the Staff from finding the *CorVel Corp.* proposal significant. It should have been no barrier to our Proposal either.

In addition to the string of precedent permitting a risk-management review of a failure to forbid discrimination, the Staff recently denied no-action relief to JPMorgan Chase & Co. for a proposal that requests a report evaluating risks including political viewpoint discrimination. *See JPMorgan Chase & Co. (David Bahnsen)* (avail. Mar. 21, 2023). In that proceeding, JPMorgan Chase & Co. argued that the proposal was "particularly concerned about recent evidence of religious and political discrimination, which, to our knowledge, the Staff has not determined to be significant policy issues." *JPMorgan Chase & Co. (David Bahnsen)* (Mar. 21, 2023) at 9 (internal quotation omitted). To support this argument, JPMorgan Chase & Co. specifically cited the Staff's decision last year to omit our proposal from BlackRock's 2022 proxy statement (a proposal that is *identical* to our Proposal):

---

[11] Staff Legal Bulletin No. 14L, supra at n.5.
[12] *Compare CorVel Corp.* (June 5, 2019) *with Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020).

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 6

> Notably, in *BlackRock, Inc.* (Apr. 4, 2022, *recon. denied* May 2, 2022), the Staff permitted exclusion under Rule 14a-8(i)(7) of a proposal that requested a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from the company's written equal employment opportunity (EEO) policy, where the supporting statement claimed that company employees were at risk of political discrimination. In permitting exclusion, the Staff noted that "the [p]roposal relates to, and does not transcend, ordinary business matters."

*Id.* Rather than concurring with JPMorgan Chase & Co., the Staff instead determined that the proposal "transcends ordinary business matters." *Id.* at 1.

Consequently, the Staff's decision in *JPMorgan Chase & Co. (David Bahnsen)* created new precedent that effectively reversed its decision in *BlackRock, Inc.* (Apr. 4, 2022, *recon. denied* May 2, 2022), acknowledged the social policy significance of viewpoint and ideology discrimination, and should cause the Staff to reconsider the No-Action Decision. Our Proposal and the Company's arguments against it are materially similar to that in *JPMorgan Chase & Co. (David Bahnsen)*. Like the viewpoint-discrimination proposal in *JPMorgan Chase & Co. (David Bahnsen)*, the Proposal here raises concerns over how the Company prevents discrimination towards employees based on their ideology or viewpoint, just as the *JPMorgan Chase & Co. (David Bahnsen)* proposal focused on the denial of banking services based on political viewpoint. Under the Staff's new precedent, the Proposal is evidently a matter of significant social policy and must not be excluded on the basis of Rule 14a-8(i)(7). Indeed, the Staff provided no reason to support its conclusion that the viewpoint discrimination proposal in *JPMorgan Chase & Co. (David Bahnsen)* was a significant social policy that "transcends ordinary business matters," while our Proposal "does not transcend[] ordinary business matters." In our view, there is none.

> **B.    The No-Action Decision raises fundamental questions of constitutional and statutory authority that are of substantial importance, and which raise issues that are novel and highly complex.**

The No-Action Decision raises fundamental questions of constitutional and statutory authority that are of substantial importance, and which raise issues that are novel and highly complex. These issues go to whether the Staff has the power to issue the No-Action Decision *at all*. As such, the Staff is plainly unfit to resolve these questions and must submit them to the Commission for review.

> **1.    Constitutional authority.**

The Proposal relates to the significant social policy concern of companies discriminating against employees on the basis of viewpoint and ideology, especially against conservative viewpoints. By evaluating whether the Proposal's political viewpoint is a matter of sufficiently significant social policy concern, the Staff itself discriminates based on viewpoint.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 7

It is well-established that the government cannot engage in viewpoint discrimination. *See Matal v. Tam*, 137 S. Ct. 1744 (2017); *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). This principle prevents governments from regulating speech "because of the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 820 (1995). And the Supreme Court defines "the term 'viewpoint' discrimination in a broad sense." *Matal*, 137 S. Ct. at 1763. This is because "[v]iewpoint discrimination is a poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring).

The rule against viewpoint discrimination prevents allowing speech based on one "political, economic, or social viewpoint" while disallowing other views on those same topics. *Rosenberger*, 515 U.S. at 831. It also prohibits excluding views that the government deems "unpopular," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or because of a perceived hostile reaction to the views expressed, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

Here, the Staff has engaged in viewpoint discrimination by issuing relief on the Proposal. The Proposal requests a report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written EEO policy. As discussed *supra*, the Staff has routinely denied no-action relief to similar requests in *Levi Strauss & Co.* (Feb. 10, 2022), *The Walt Disney Co.* (Jan. 19, 2022), *Amazon.com, Inc.* (Apr. 7, 2021), and *CorVel Corp.* (June 5, 2019). If the Staff continues to exclude our Proposal, one might reasonably conclude that it could only do so because of its opinion of the political implications of the Proposal. Here, that would be the Proposal's highlighting of ample evidence that individuals with conservative or religious viewpoints or ideologies may face discrimination. But that is no less valid a perspective in the marketplace of ideas than those expressed in the proposals from the precedents cited above, which asked companies to review the risks of other forms of discrimination. In effect, the Staff has determined a proposal to be significant if the Staff itself dislikes the grounds for discrimination, but *insignificant* if it doesn't mind that same discrimination on other grounds.

The Staff—and the Commission—needs a principled basis for such a distinction. The Company proposes none. As the Supreme Court has explained, to avoid viewpoint discrimination the government must have "narrow, objective, and definite" standards to prevent officials from covertly discriminating based on viewpoint through subjective and unclear terms. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). And here, the Staff has complete discretion to determine what "issues" are significant and even to censor on the same issue when they are presented by speakers with certain political views.

Indeed, the No-Action Decision is part of a broader and concerning trend that supports our claim of viewpoint discrimination. As the Society for Corporate Governance observed in a recent comment submitted to the Commission, in the 2022 proxy season the Staff granted no-action relief in 50 percent of the instances where relief was requested on "anti-ESG," or conservative proponents' proposals like our Proposal, compared with a 38 percent success rate across all proposals. The gap further widened when considering only social/political proposals, where the Staff granted relief at 50 percent rate for excluding proposals from "anti-ESG" proponents, as

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 8

compared with 31 percent across all social/political proposals considered by the Staff.[13] The way that the Staff has been applying Rule 14a-8(i)(7)'s "significant social policy" exception appears to suggest that the left's political viewpoints are "significant," but conservative viewpoints are *in*significant. If that is what is happening, that is flatly unconstitutional under the First Amendment.

The No-Action Decision—especially in the context of these broader trends—provides a clear demonstration of how the Staff's open-ended discretion in determining which views count as "socially significant" may be facially invalid under the First Amendment. That is a matter of substantial importance and requires Commission review.

### 2.    *Validity under the Administrative Procedure Act.*

The Staff has identified no reasonable basis for distinguishing between the Proposal and other proposals addressing the significant issue of discrimination by companies. As a result, the No-Action Decision is arbitrary and capricious action.

Under the Administrative Procedure Act (APA), agency action that is "arbitrary and capricious" may be set aside. 5 U.S.C. § 706(2)(A). The Supreme Court has succinctly explained that "[t]he APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Under this precedent, in order for action to be reasonable and reasonably explained, the agency must at least consider the record before it and rationally explain its decision. *See FCC*, 141 S. Ct. at 1160.

Additionally, where an agency seeks to change its position from a prior regime, it must "display awareness that it is changing position," "show that there are good reasons for the new policy" and provide an even "more detailed justification" when the "new policy rests upon factual findings that contradict those which underlay its prior policy," and "take[] into account" "reliance interests" on the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Given the Staff's recent precedent permitting the consideration of shareholder proposals relating to discrimination, and viewpoint discrimination in particular, *see supra* Part I.A.2, issuing relief to the Company would undoubtedly be a change in its position. At a bare minimum, the Staff—or the Commission—would have to explain its reasoning for the reversal in position to comply with the APA.

For the above reasons and others, the Staff's decision on the Proposal is an important action. Most often, the Staff's decision to issue relief is the final action by the Commission in dealing

---

[13] Letter from C. Edward Allen, Vice President, Soc'y for Corp. Governance, to Vanessa A. Countryman, Secretary, Securities and Exchange Comm'n, Sept. 13, 2022, *available at* https://www.sec.gov/comments/s7-20-22/s72022-20142742-308679.pdf.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 9

with a particular shareholder proposal. While the Commission may also affirm the Staff's
decision to issue relief, the vast majority of relief decisions are made by the Staff without formal
review. Significant legal consequences also flow from these decisions because they help
determine whether or not the Company will be able to exclude the proposal. It is undeniable that
companies treat the no-action process as a safe harbor. And the reality is that by issuing relief,
the Staff provides companies with a legal defense in any potential court action. What's more,
issuing relief is at the core the Commission's complex regulatory scheme, and the authority of
the Commission and Staff to issue relief is expressly indicated by Rule 14a-8. *See* Rule 14a-8(j).

With the No-Action Decision, the Staff have raised complex matters concerning the
Commission's compliance with the Administrative Procedure Act. The Commission's
compliance with this fundamental aspect of agency process is a matter of substantial importance
and should be reviewed.

### 3.     *Statutory authority.*

By issuing the Staff Decision, the Staff has acted beyond what Congress has authorized it to do.
The Exchange Act does not confer upon the Commission or the Staff the authority to intrude
upon substantive matters of corporate governance traditionally governed by state law. But that is
what Rule 14a-8 and specifically Rule 14a-8(i)(7) purport to do. The Staff therefore had no
authority to issue the Staff Decision.

The Exchange Act may be construed to authorize a version of Rule 14a-8 that compels the
inclusion of only those shareholder proposals that would be otherwise valid under state law. That
would render Rule 14a-8(i)(7) and the Commission and Staff's current interpretations of it
unlawful. In the alternative, the Exchange Act does not authorize Rule 14a-8. Either finding
would be grounds for reversing the Staff Decision.

### i.     *The Exchange Act Does Not Authorize Rule 14a-8(i)(7).*

Section 14(a) of the Exchange Act prohibits anyone from "solicit[ing] any proxy" "in
contravention of such rules and regulations as the Commission may prescribe as necessary or
appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). While
this authority uses "broad[]" language, "it is not seriously disputed that Congress's central
concern [in enacting § 14(a)] was with disclosure." *Bus. Roundtable v. SEC*, 905 F.2d 410 (D.C.
Cir. 1990). In enacting the Exchange Act, Congress expressly rejected a "federal corporation
law" that would replace existing state law with a grant of authority to the SEC to regulate
corporate governance.[14] Instead, Congress empowered the SEC to require that public companies
disclose relevant information to investors. As the Senate report for the Exchange Act provides,
the purpose of Section 14(a) was to ensure that investors had "adequate knowledge" about the

---

[14] *See* Stephen M. Bainbridge, *The Scope of the SEC's Authority Over Shareholder Voting Rights*, UCLA Rsch.
Paper No. 07-16, tinyurl.com/mw2nf9um.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 10

"financial condition of the corporation . . . [and] the major questions of policy, which are decided at stockholders' meetings." S. Rep. No. 792, at 12 (1934).

By contrast, while Section 14(a) gave the Commission authority to compel disclosures of existing information, the substantive regulation of stockholder meetings was left to the "firmly established" state-law jurisdiction over corporate governance. *Bus. Roundtable*, 905 F.2d at 411, 413 (internal citation omitted). Interpreting the "broad[]" language of Section 14(a)'s otherwise "vague 'public interest' standard," in *Business Roundtable v. SEC*, the D.C. Circuit held that "the Exchange Act cannot be understood to authorize the regulation of" "the substantive allocation of powers" in matters of "corporate governance traditionally left to the states." *Id*. 407, 413 (internal citation omitted). Applying this limit, the Court held unlawful a Commission rule that prohibited listed companies from having more than one vote per share of common stock. The Court noted that "state law will govern the internal affairs of the corporation" such as the allocation of votes among the common stock. *Id*. at 412. Under state law, shareholders could generally opt to create common-stock voting structures outside of the one-vote, one-share structure. The Commission's rule therefore "directly interfere[d] with the substance of what the shareholders may enact" and "prohibit[ed] certain reallocations of voting power and certain capital structures" that were otherwise valid under state law. *Id*. at 411. The Court concluded that such direct regulation of state law was not authorized by the Exchange Act.

Though the language of Section 14(a) of the Exchange Act is broad, the reach of its authority has a clear limit against state law. Section 14(a) does not authorize the Commission to impose upon matters of corporate governance traditionally governed by state law.

Rule 14a-8(i)(7) exceeds this limit because it compels the inclusion of (and thereby permits the exclusion) of shareholder proposals on bases beyond that required by state law, and in doing so interferes with the operation of state corporate law.

State law provides a robust system for regulating the content of shareholder proposals. Under state law, a shareholder proposal presented for consideration at the corporation's annual meeting must be a proper subject for action by the corporation's stockholders. *See, e.g.*, *CA, Inc. v. AFSCME Emps. Pension Plan*, 953 A.2d 227 (Del. 2008); Mich. Comp. Laws Ann. § 450.2404 (West); N.C. Gen. Stat. Ann. § 55-7-01; *see also* Jill E. Fisch, *From Legitimacy to Logic: Reconstructing Proxy Regulation*, 46 Vand. L. Rev. 1129, 1136 (1993) ("Presence at the annual meeting carries with it certain common-law rights, such as the right to nominate a candidate for the board of directors or to propose resolutions or transactions within the authority of the shareholders, such as a shareholder resolution or bylaw amendment."). A proposal is a proper subject for action by stockholders if it is within the scope or reach of the stockholders' power to adopt, *CA, Inc.*, 953 A.2d at 232, but stockholders do not have the power to adopt proposals that would cause the board of directors to breach its fiduciary duties, *see Paramount Commc'ns Inc. v. Time Inc.,* 1989 WL 79880, at *30 (Del. Ch. July 14, 1989), *aff'd*, 571 A.2d 1140, (Del. 1990) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares.").

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 11

If Rule 14a-8 were construed to be consistent with the Exchange Act's "disclosure" purpose and principle of non-interference with state corporate law, it would merely compel that companies disclose in their proxy materials those shareholder proposals that were otherwise valid under state corporate law. In fact, that is what the early Commission interpreted the Exchange Act to authorize when it issued the first version of the Rule. As a contemporary director of the Division stated, the Rule originally required only disclosures of "such matters relating to the affairs of the company concerned as are proper subjects for stockholders' action under the laws of the state under which it is organized." Opinion of Baldwin B. Bane, Director of the Division of Corporate Finance, Exchange Act Release No. 3638, 1945 SEC LEXIS 233, *2 (Jan. 3, 1945).

Construed in this way consistent with the Exchange Act, Rule 14a-8 leaves the regulation of the substantive content of shareholder proposals to state law. The Rule provides only that shareholder proposals otherwise valid under state law must be disclosed in the company's proxy materials. State law provides for the substance of which proposals companies consider at their annual meetings; the Rule compels disclosure of whatever it is that they consider.

Rule 14a-8(i)(7) distorts the Exchange Act's "disclosure" purpose by tilting the playing field for shareholder proposals with certain content. Specifically, Rule 14a-8(i)(7) provides that a corporation may exclude proposals that relate to a company's "ordinary business operations." And the SEC has further interpreted Rule 14a-8, via sub-regulatory guidance, to permit the exclusion of proposals that do not "transcend the day-to-day business matters" of the corporation or which insufficiently "raise[] issues with a broad societal impact." *See* Exchange Act Release No. 40018, 63 Fed. Reg. 29106, 29108 (May 21, 1998) (the "1998 Release"); Staff Legal Bulletin No. 14L, *supra*. As discussed *supra* IV.B, the Commission and Staff's interpretation of Rule 14a-8(i)(7) has the effect of creating a substantive and viewpoint-based rule. Under the current interpretation of Rule 14a-8(i)(7), proposals that focus on certain kinds of discrimination—like racial quotas—must be considered, while proposals that focus on the other kinds of socially significant discrimination may be excluded from corporate proxy statements.

This goes far beyond what the Exchange Act authorizes the Commission to do. A proposal that fails to sufficiently raise an issue of "significant social policy" and of "a broad societal impact" may nonetheless be within stockholders' power to adopt. But issuing relief on the basis of Rule 14a-8(i)(7) helps the Company to exclude such a proposal, even though state law would allow it to be considered at the annual meeting. In this way, Rule 14a-8(i)(7) interferes with the substance of state corporate law by advancing stockholders' consideration of proposals with certain corporate governance characteristics, but not others. If the Exchange Act authorizes the Commission to compel the inclusion of shareholder proposals otherwise valid under state corporate law, the Commission may not then compel only those proposals that have certain substantive corporate-governance content. But that is what Rule 14a-8(i)(7) does.

The Staff Decision relied on Rule 14a-8(i)(7) in granting the Company relief. Because Rule 14a-8(i)(7) is unlawful, the Staff Decision should be reversed.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 12

### ii.    *The Exchange Act Does Not Authorize Rule 14a-8.*

Rule 14a-8(i)(7) unlawfully distorts the content of companies' proxy statements to exclude proposals otherwise valid under state law. But Rule 14a-8—the full Rule—goes further still and regulates what may be considered at the annual meeting itself. This is an independent and alternative basis for reversing the Staff Decision, which would leave the issue of whether the Proposal must be included in the Company's proxy materials exclusively under state law (and not the Commission's interpretation of state law).

The matters that may be validly brought before shareholders at a corporation's shareholder meetings are exclusively governed by state law. "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (emphasis in original). Section 14(a) makes no such express requirement. Section 14(a) provides general language that Congress understood to merely authorize disclosure requirements that ensures investors have "adequate knowledge" of the "major questions of policy . . . decided at stockholders' meetings." S. Rep. No. 792, *supra*. It does not provide the authority for the SEC to regulate *which* questions must be decided at a corporation's stockholder meetings.

Rule 14a-8 goes beyond the regulation of proxy statements to directly regulate what stockholders may consider at stockholder meetings. Specifically, Rule 14a-8 compels the consideration of some proposals by compelling their inclusion in the corporation's form of proxy. If a proposal meets the Rule's requirements, Rule 14a–8(a) provides that "a company *must* include a shareholder's proposal in its proxy statement and . . . its form of proxy" for a stockholder meeting. Rule 14a-8 (emphasis added). In turn, if a proposal is included on the form of proxy, it must be considered at the relevant stockholder meeting. Under federal law, a corporation's "form of proxy" must include the matters to be voted on at the meeting. *See, e.g.*, 17 C.F.R. § 240a-4(a) ("[T]he form of proxy . . . shall identify clearly and impartially each separate matter intended to be acted upon"). By requiring the inclusion of a proposal on the form of proxy, Rule 14a-8 compels consideration of the proposal at a stockholder meeting. If a corporation did not consider the proposal at the meeting, its form of proxy may be unlawfully misleading. Rule 14a-8 therefore requires a corporation to consider a shareholder proposal at its annual meeting even if it could lawfully exclude the shareholder proposal under state law. *See SEC v. Transamerica Corp.*, 163 F.2d 511, 518 (3d. Cir. 1947) (stating that, assuming a corporate bylaw excluding shareholder proposals was valid under state law, Rule 14a-8 would invalidate the bylaw).

By providing relief to the Company, the Staff Decision provided relief the Staff did not have the authority to give. The Exchange Act does not authorize the Staff to compel the Company to include the Proposal, so it has no authority to provide relief to the Company for the Company's failure to include the Proposal. That is an issue that goes to the very heart of the Exchange Act and should require Commission review for resolution.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 13

## II. The Staff's failure to present the No-Action Decision to the Commission would be arbitrary and capricious, or otherwise unlawful.

The Staff have a duty to present questions of substantial importance and which raise issues that are novel or highly complex to the Commission. The Staff's failure to perform that duty would be arbitrary and capricious, unlawful, and, as applied to our Proposal, call into question the validity of the Commission's regulation governing the Commission's review. If the Commission's regulations permit the Staff to determine that the above constitutional and statutory concerns are not matters of substantial importance and novel or highly complex, then those regulations have serious problems.

The Commission's regulations provide that the Staff "will generally" present a no-action decision to the Commission for the Commission's review that "involve[s] matters of substantial importance and where the issues are novel or highly complex." 17 C.F.R. § 202.1(d). The best interpretation of this language is that, if a no-action decision involves issues of substantial importance and is novel or highly complex, there is a strong presumption that the Staff will present the matter to the Commission. If the Staff determines not to present the matter to the Commission, it must be based on an exception to the "general" requirement of presentation. As applied here, no exception the Staff has previously made is available for our Proposal. As a result, the Staff must present the decision to the Commission. Otherwise, the Staff would have to create a new exception to the requirement of presentation, which would independently raise additional administrative law issues since, as discussed below, the Commission has already established those limited exceptions.

The regulation provides that the Staff "will generally" present such matters to the Commission. Though the term "will" suggests a command, the term "generally" implies the existence of exceptions to that command. Read in this way, the most plausible interpretation of "will generally" in the regulation is that the Staff must present such matters to the Commission unless there is an exception available. This interpretation is supported by two additional facts. First, the regulation supplies the textual inference that "will generally" is not entirely discretionary. The regulation's directive that "[t]he staff . . . will generally present" certain questions contrasts with its proviso, later on in the same sentence, that the Commission's granting of review is "entirely within its discretion." 17 C.F.R. § 202.1(d). If the Staff's decision to present a no-action decision to the Commission were discretionary, the regulation would have provided as much. Second, the Commission has interpreted the regulation to mean that while there is no "requirement" for the Staff to present a matter to the Commission, the Staff "endeavors to forward *all* such requests to the Commission, provided that they are received sufficiently far in advance of the scheduled printing date for the management's definitive proxy materials to avoid a delay in the printing process." 1976 Interpretative Release, 41 Fed. Reg. at 29991. As the Commission describes, the regulation's directive that the Staff 'will generally" present substantially important and novel or complex matters to the Commission means such matters will be presented unless the Staff provides an exception.

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 14

The Commission's interpretation also limits the Staff's available exceptions. Specifically, the only example the Commission's interpretation provides where the Staff would *not* present the matter to the Commission is based on timing. The Commission has stated that the Staff will present such matters to the Commission, "provided that they are received sufficiently far in advance of the scheduled printing date for the management's definitive proxy materials to avoid a delay in the printing process." *Id*. This interpretation suggests the Staff will present such matters to the Commission unless the Commission's review would impose upon the *timing* of the applicable company's proxy meeting. It provides no basis for any other exception.

Here, there is no time-based reason for the Staff not to present the No-Action Decision to the Commission. The Company has not yet published its proxy materials. Nor has the Company provided a scheduled printing date for its proxy materials. By contrast, we provided the Staff and the Company advance notice of our intent to seek the Staff's presentation to the Commission for review. *See* NCPPR Response Letter at 2, 16. The Company has had ample time since receiving this notice to notify us and the Staff if Commission review would conflict with their planned printing schedule. On this accounting of time-related issues, the equities favor the Staff's presentation of the No-Action Decision to the Commission.

Nonetheless, even if the Staff were to determine that submitting the No-Action Decision to the Commission for review risks causing a "delay in the printing process," the Staff should still present it to the Commission to resolve the important matters it raises. "[T]he short duration of the proxy season makes full litigation on the merits of a shareholder proposal before an annual meeting close to impossible." *Trinity Wall Street v. Wal-Mart Stores, Inc.*, 75 F. Supp. 3d 617, 625 (D. Del. 2014). That is why, in the court system, shareholder proposals are subject to the "capable of repetition, yet evading review" exception to mootness. *Id*. Under that exception, a court may evaluate the proposal's validity not only after the company has printed its proxy materials, but even after the company's annual meeting has completed. *Id*. The court may order relief that, while it decides the current-year's meeting, only affects future meetings, rather than attempting to unwind a printing or meeting that has already occurred. *Id*. at 634–35. Similarly, Commission review need not affect the Company's printing process. The Commission has discretion as to its disposition of the matter. Any ultimate enforcement by the Commission in court against the Company's wrongful exclusion of our Proposal would also be subject to the mootness doctrine, its exceptions, and availability of prospective relief. The Company's 2023 annual meeting is not reason enough for the Staff to fail to present a matter of substantial importance to the Commission when the Commission could require action applicable to its 2024 annual meeting.

The short duration of the proxy season should also affect the Staff's construction of the "printing-delay" exception. Given the short timeframe for review, too liberal a construction of the 1976 Interpretative Release's printing-delay exception would deny *any* Commission review. That would swallow the rule that the Staff "will generally" present certain no-actions decisions to the Commission and prevent the Commission from being presented with the questions of substantial importance that its regulations require. The ultimate reason why it is important the Commission be presented with such matters is more than a concern for reaching the proper

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 15

outcome in a particular no-action proceeding. It is for ensuring the Commission's review of the
no-action process generally and across all proceedings. The Commission's resolution of a no-
action decision helps to provide guidance to other Staff decisions, both in current and future
proxy seasons. Here, the same important constitutional, statutory, and regulatory concerns are
present in multiple proposals the Staff has already acted on or is currently considering. *See, e.g.*,
*American Express (National Center for Public Policy Research)* (avail. Mar. 9, 2023),
*JPMorgan Chase (David Bahnsen)* (avail. Mar. 21, 2023), *JPMorgan Chase (National Center
for Public Policy Research)* (avail. Mar. 21, 2023). Commission review would be valuable to
resolving matters of substantial importance in proposals beyond the No-Action Decision.

However, if the Staff opts for a blinkered view of the 1976 Interpretative Release's printing-
delay exception to Commission review, that would also independently be arbitrary and
capricious or otherwise unlawful. As discussed above, the Staff cannot interpret 17 C.F.R. §
202.1(d) to deny presentation to the Commission of matters of substantial importance. But that is
precisely what the Staff has done in the past. Each time that we have requested Commission
review, the Staff has responded by denying our request and stating that the Company had already
begun printing its proxy materials – if, that is, it provided any explanation for its decision at all.
*See, e.g.*, *BlackRock, Inc. (National Center for Public Policy Research)* (avail. Apr. 4, 2022,
*recon. denied* May 2, 2022). The Staff's conduct was especially egregious last year in
*BlackRock, Inc.* As we recounted in the NCPPR Response Letter, in last year's *BlackRock, Inc.*
proceeding, we told the Staff and the applicable company of our intention to seek reconsideration
within approximately 15 minutes of receiving the Staff's no-action decision. Yet even that notice
was apparently insufficient. The Staff denied our request after the company testified that it began
printing its proxy materials "[i]mmediately upon receiving the No-Action Letter." Letter from
Marc S. Gerber, Skadden, Arps, Slate, Meagher & Flom LLP, to the Staff (Apr. 13, 2022) at 2.
How the Company was able to respond "immediately," without arbitrary *ex parte*
communication with the Staff remains unclear to us. But if the printing-delay exception does not
permit Commission review under these circumstances, it is difficult to imagine circumstances
under which it would. Either the printing-delay exception must allow for greater Commission
review than what we have been given, or it arbitrarily denies interested persons the ability to
participate in the review process. The Staff should not rely on it here.

If the No-Action decision raises questions of substantial importance and issues that are novel or
highly complex, then the Staff must present it to the Commission. And as discussed above, the
No-Action Decision undeniably does. Failing to present the No-Action Decision to the
Commission would be independently arbitrary and capricious and unlawful under the 1976
Interpretative Release.

## Conclusion

Given the guidance offered by SLB 14L and relevant precedent, our Proposal should have been
found by the Staff to include a non-omissible issue of significant policy concern that transcends
ordinary business matters. We therefore ask the Staff to reconsider the No-Action decision and

Office of the Chief Counsel
Division of Corporation Finance
April 14, 2023
Page 16

the Commission to reverse the decision of the Staff and to deny the Company's no-action
request.

Thank you to the Staff and the Commission for their time and consideration. A copy of this
correspondence has been timely provided to the Company. If we can provide additional materials
to address any queries the Commission may have with respect to this letter, please do not hesitate
to call us at (202) 507-6398 or email us at sshepard@nationalcenter.org and at
srehberg@nationalcenter.org.

Sincerely,

Scott Shepard
Director

Sarah Rehberg
Free Enterprise Project
National Center for Public Policy Research

cc:     Lyuba Goltser, Weil, Gotshal & Manges LLP (lyuba.goltser@weil.com)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934

Date of Report: **June 22, 2023**
(Date of earliest event reported)



# The Kroger Co.
(Exact name of registrant as specified in its charter)

| **Ohio** | **No. 1-303** | **31-0345740** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1014 Vine Street**
**Cincinnati, OH 45202**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **(513) 762-4000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock $1.00 par value per share | KR | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.07        Submission of Matters to a Vote of Security Holders.**

On June 22, 2023, the Company held its 2023 Annual Meeting of Shareholders (the "Annual Meeting"). At the close of business on April 24, 2023, the record date for determination of shareholders entitled to vote at the Annual Meeting, there were 717,648,391 common shares of the Company issued and outstanding. At the Annual Meeting, the shareholders elected eleven directors to serve until the annual meeting in 2024, or until their successors have been elected and qualified; approved the Company's executive compensation on an advisory basis; selected one year as the frequency of approval of executive compensation on an advisory basis; ratified the selection of PricewaterhouseCoopers LLP as the Company's independent auditor for fiscal year 2023; rejected a shareholder proposal regarding a report on the public health costs from sale of tobacco products; rejected a shareholder proposal regarding listing of charitable contributions of $10,000 or more; rejected a shareholder proposal regarding a report on the recyclability of packaging; approved a shareholder proposal regarding a report on racial and gender pay gaps; and rejected a shareholder proposal regarding a report on EEO policy risks.

The final results are as follows:

| Director Election Proposal | | | |
|---|---|---|---|
| | **For** | **Against** | **Broker Non-Votes** |
| Nora A. Aufreiter | 550,994,680 | 7,063,845 | 62,743,072 |
| Kevin M. Brown | 551,745,614 | 6,282,346 | 62,743,072 |
| Elaine L. Chao | 549,974,681 | 7,884,932 | 62,743,072 |
| Anne Gates | 538,200,136 | 19,936,704 | 62,743,072 |
| Karen M. Hoguet | 551,774,892 | 6,255,720 | 62,743,072 |
| W. Rodney McMullen | 514,099,199 | 39,598,221 | 62,743,072 |
| Clyde R. Moore | 520,920,720 | 37,112,409 | 62,743,072 |
| Ronald L. Sargent | 520,272,177 | 37,846,932 | 62,743,072 |
| J. Amanda Sourry Knox | 550,062,046 | 8,004,869 | 62,743,072 |
| Mark S. Sutton | 549,854,432 | 8,254,131 | 62,743,072 |
| Ashok Vemuri | 551,601,263 | 6,348,221 | 62,743,072 |

| Other Proposals | | | | **Broker Non-Votes** |
|---|---|---|---|---|
| | **For** | **Against** | **Abstain** | |
| Advisory vote approving executive compensation | 508,396,319 | 48,062,521 | 2,821,010 | 62,743,072 |
| | **One Year** | **Two Years** | **Three Years** | **Abstain** |
| Advisory vote on Frequency of Future Votes on Executive Compensation | 534,196,530 | 2,904,080 | 19,274,873 | 2,904,367 |
| | **For** | **Against** | **Abstain** | **Broker Non-Votes** |
| Ratification of PricewaterhouseCoopers LLP as independent auditor for fiscal year 2023 | 567,205,899 | 53,449,710 | 1,367,313 | |
| Shareholder proposal regarding the Report on Public Health Costs from the Sale of Tobacco Products | 70,505,903 | 484,313,990 | 4,459,957 | 62,743,072 |

| | | | | |
|---|---|---|---|---|
| Shareholder proposal regarding Listing of Charitable Contributions of $10,000 or More | 36,872,645 | 516,894,975 | 5,512,230 | 62,743,072 |
| Shareholder proposal regarding a Report on Recyclability of Packaging | 176,509,674 | 379,352,202 | 3,417,974 | 62,743,072 |
| Shareholder proposal regarding a Report on Racial and Gender Pay Gaps | 288,358,833 | 267,381,681 | 3,539,336 | 62,743,072 |
| Shareholder proposal regarding EEO Policy Risks | 10,458,817 | 544,893,409 | 3,927,624 | 62,743,072 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE KROGER CO.

June 23, 2023

By: */s/ Christine S. Wheatley*
Christine S. Wheatley
Group Vice President, Secretary and General Counsel

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington D.C. 20549

---

**SCHEDULE 14A**
Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

---

Filed by the Registrant             Filed by a Party other than the Registrant     ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

     Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Under Rule 14a-12

# THE KROGER CO.

**(Name of Registrant as Specified in Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

     No fee required.

☐   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(4) and 0-11.

In addition to market-competitive wages, our associates have access to a wide variety of benefits that provide value in their lives today and in the future. We invest in the whole person with a benefits package that generally includes: quality, affordable healthcare; retirement savings plans and pension plans; on-demand access to mental health assistance and free counseling to support emotional wellness; career advancement opportunities; financial education programs to help associates manage their day-to-day finances; and an industry-leading continuing education benefit that provides up to $21,000 for associates, part-time and full-time alike, which, along with scholarships for children of associates - most of whom are first-generation college attendees - provide pathways to social mobility to associates who choose to participate. We also offer associates a variety of grocery discounts, volunteer opportunities, and other perks and rewards.

**Diversity and inclusion are part of Kroger's core organizational values, and the organization has strong programs in place to create and maintain an equitable workplace and inclusive culture.**

Diversity and inclusion have been longstanding Kroger values. In 2020, we introduced Kroger's *Framework for Action* to further advance diversity, equity and inclusion in our culture and communities. The plan's action steps include creating a DE&I advisory council reporting to senior leadership, providing diversity training to our associate population, improving diverse talent recruiting through expanded partnerships with HBCUs and Hispanic-serving institutions, establishing two-way mentorship and advocacy programs, increasing spend with diverse suppliers, and more. We report progress against these goals in Kroger's annual ESG report.

Kroger strives to attract, retain and develop leaders and associates who best reflect our communities. Because of our unique business model, we help unlock economic opportunity for nearly half a million people of various ages and aspirations, from those wanting an entry-level part-time job to graduate-degree specialists across corporate functions. We also aim to develop and promote diverse leaders to roles with increasing levels of responsibility. For open leadership positions, we assemble a diverse slate of candidates for consideration.

In 2022, every manager across the organization was expected to actively mentor and develop an associate who has a different background than them. This, along with other objectives, is used to assess the manager's performance and ultimately affects their compensation. Currently, over 80% of retail division executive leadership teams have at least one diverse leader.

We believe that Kroger's current compensation practices promote diversity, inclusion and fair pay across our workforce. While Kroger welcomes continued engagement with shareholders on these issues, we believe that the adoption of this proposal is not necessary in light of our existing practices.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

**Item No. 9 - Report on EEO Policy Risks**

We have been advised that the National Center for Public Policy Research or an appointed representative will present the following proposal for consideration during the 2023 Annual Shareholders' Meeting. We will promptly provide the shareholdings upon written or oral request to Kroger's Secretary at our executive offices.

**"RESOLVED**

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

**SUPPORTING STATEMENT**

Kroger does not explicitly prohibit discrimination based on viewpoint or ideology in its written EEO policy.

Kroger's lack of a company-wide best practice EEO policy sends mixed signals to company employees and prospective employees and calls into question the extent to which individuals are protected due to inconsistent state policies and the absence of a relevant federal protection. Approximately half of Americans live and work in a jurisdiction with no legal protections if their employer takes action against them for their political activities or discriminates on the basis of viewpoint in the workplace.

Companies with inclusive policies are better able to recruit the most talented employees from a broad labor pool, resolve complaints internally to avoid costly litigation or reputational damage, and minimize employee turnover. Moreover, inclusive policies contribute to more efficient human capital management by eliminating the need to maintain different policies in different locations.

There is ample evidence that individuals with conservative viewpoints may face discrimination at Kroger.

Kroger recently kowtowed to leftwing social media criticism by removing patriotic and Second Amendment related paraphernalia from store shelves. For instance, after someone complained on Twitter about a drink sleeve that stated, "Arms Change, Rights Don't", the Company reportedly recalled the items.[1] Kroger's subsidiary grocery store, Harris Teeter, likewise complied with liberal demands to pull "Freedom Series" items from its shelves, removing items that read, "Give me liberty or give me death" and "America, love it or leave it."[2]

While removing patriotic items from its stores, Kroger has simultaneously pushed a leftwing social agenda. Published in 2021, the Company released an "allyship guide" that told employees to use "inclusive language" and celebrate transgender holidays.[3] Defining terms such as "non-binary," "transgender," and "pansexual," the guide asserts that, "Some people's morality can be a barrier to accepting LGBTQ+ people."[4]

Removing pro-America items from store shelves while publishing "allyship" training guides for staff certainly raise concerns over how Kroger treats employees with diverse points of view, particularly those who disagree with the Company's blatant leftwing actions. This places the Company in reputational, legal, and financial risk, as evidenced by a recent settlement with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs.[5]

Presently, shareholders are unable to evaluate how Kroger prevents discrimination towards employees based on their ideology or viewpoint, mitigates employee concerns of potential discrimination, and ensures a respectful and supportive work atmosphere that bolsters employee performance.

We recommend that the report evaluate risks including, but not limited to, negative effects on employee hiring and retention, as well as litigation risks from conflicting state and company anti-discrimination policies."

**The Board of Directors Recommends a Vote _Against_ This Proposal for the Following Reasons:**

**Kroger strives to reflect the communities we serve and foster a culture that empowers everyone to be their true self, inspires collaboration, and feeds the human spirit.**

We are committed to a policy of equal opportunity for all associates without regard to race, color, religion, sex, national origin, age, disability, sexual orientation, or gender identity. In implementing our policy, we seek and embrace differences in the backgrounds, cultures, and perspectives of all associates, and we encourage and expect all of our associates to collaborate and actively work together regardless of these differences. Moreover, as we identify in our ESG Report, our diversity, equity and inclusion (DE&I) programs demonstrate our commitment to building a diverse and inclusive workforce, fostering an environment where diversity is a competitive advantage and providing equal opportunities for associates.

**We are focused on creating a culture of fairness and respect.**

Our formal DE&I Framework for Action, launched in 2020, is focused on creating a more inclusive culture and advancing equitable communities, among other goals, underscoring Kroger's commitment to standing together and mobilizing our people, passion, scale and resources to transform our culture and our communities. The framework is built around pillars focused on creating a more inclusive culture, developing diverse talent, advancing diverse partnerships, advancing equitable communities and deeply listening and reporting progress.

---

[1] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

[2] https://www.bizpacreview.com/2022/06/21/harris-teeter-kroger-remove-pro-america-items-from-shelves-after-woke-complaints-backlash-is-swift-1252599/; https://www.foxbusiness.com/retail/harris-teeter-kroger-backlash-pro-america-items-complaints

[3] https://www.breitbart.com/social-justice/2022/08/31/kroger-allyship-guide-tells-employees-to-celebrate-trans-holidays-support-bail-fund/

[4] https://www.thekrogerco.com/wp-content-uploads/2021/03/AAPI-Allyship-Guide_v3.2-External-merged.pdf

[5] https://news.yahoo.com/kroger-pay-180K-lawsuit-over-162047710.html

In particular, we understand that our associates have a wide range of viewpoints. We are committed to a culture of fairness, respect and inclusion that drives us to value and embrace differences. As part of our Framework for Action, we are engaging with external and internal stakeholders to seek perspectives and provide associates with platforms to continue sharing their stories and feedback. To that end, Kroger launched an internal DEI Advisory Council made up of cross-functional leaders who are committed to advancing this progress, working closely with senior officers and business leaders to identify opportunities and specific actions for improvement, as well as the Board's Compensation & Talent Development Committee overseeing progress on our human capital efforts, including DEI.

**Diverse viewpoints are respected and encouraged.**

Our policies and practices demonstrate that diverse viewpoints are respected and encouraged and are an essential part of advancing our business. In light of our demonstrated commitment to our core values of diversity and inclusion for all stakeholders, we do not believe that issuing a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from our equal employment opportunity policy, as contemplated by this proposal, is necessary or in the best interests of Kroger or our shareholders.

**For the foregoing reasons, we urge you to vote AGAINST this proposal.**

# EXHIBIT C

Correspondence Relating
to the 2024 Proposal

**From:** Sarah Rehberg <████████████████████>
**Sent:** Friday, May 19, 2023 1:53 PM
**To:** Heiser, Stacey M <████████████████>
**Cc:** Scott Shepard <██████████████████>
**Subject:** Re: Shareholder proposal

[EXTERNAL EMAIL]: Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thank you, Stacey. In light of the decision to include our 2023 proposal in the Kroger proxy statement, we withdraw the identical 2024 proposal dated May 10.

Sincerely,
Sarah

On Fri, May 19, 2023 at 1:34 PM Heiser, Stacey M <████████████████> wrote:

The Kroger Co. (the "Company") received the shareholder proposal (the "Proposal") dated May 10, 2023, submitted by the National Center for Public Policy Research (the "Proponent") for inclusion in the proxy statement for the Company's 2024 Annual Meeting of Shareholders.

Under Rule 14a-8, a shareholder is required to show proof of ownership and we have not received the proof of ownership for the Proponent. Thus, we are required to inform you that the Proposal contains certain procedural deficiencies. To remedy this defect, you must submit proof of continuous ownership of the Company's common shares as required by Rule 14a-8.

We would also like to inform you that the Company has included an identical proposal submitted by the Proponent in its proxy materials for the 2023 Annual Meeting of Shareholders, which will be held on June 22, 2023 at 11:00 am ET. The proxy materials for the 2023 Annual Meeting were filed with the SEC on May 12, 2023.

Thank you,

Stacey

Stacey Heiser

Senior Counsel

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Sarah Rehberg <█████████████████████>
**Sent:** Wednesday, May 31, 2023 4:50 PM
**To:** Heiser, Stacey M <█████████████████████>
**Cc:** Scott Shepard <█████████████████████>; Caleb Orr <█████████████████████>
**Subject:** Re: Shareholder proposal

[EXTERNAL EMAIL]: Do not click links or open attachments unless you recognize the sender and know the content is safe.

Stacey,

Please see the attached letter demonstrating the National Center for Public Policy Research's proof of ownership.

My best,
Sarah

On Thu, May 25, 2023 at 4:51 PM Scott Shepard █████████████████████ wrote:
Stacey,

  Forgive this follow-up note, but I'm afraid that the previous exchange with you was in error. We do not withdraw that shareholder proposal for the 2024 season, and will be sending along the proof of ownership letter presently.

Very best,

Scott

On Fri, May 19, 2023 at 1:53 PM Sarah Rehberg <█████████████████████> wrote:
Thank you, Stacey. In light of the decision to include our 2023 proposal in the Kroger proxy statement, we withdraw the identical 2024 proposal dated May 10.

Sincerely,
Sarah

On Fri, May 19, 2023 at 1:34 PM Heiser, Stacey M █████████████████████ wrote:

The Kroger Co. (the "Company") received the shareholder proposal (the "Proposal") dated May 10, 2023, submitted by the National Center for Public Policy Research (the "Proponent") for inclusion in the proxy statement for the Company's 2024 Annual Meeting of Shareholders.

Under Rule 14a-8, a shareholder is required to show proof of ownership and we have not received the proof of ownership for the Proponent. Thus, we are required to inform

you that the Proposal contains certain procedural deficiencies. To remedy this defect, you must submit proof of continuous ownership of the Company's common shares as required by Rule 14a-8.

We would also like to inform you that the Company has included an identical proposal submitted by the Proponent in its proxy materials for the 2023 Annual Meeting of Shareholders, which will be held on June 22, 2023 at 11:00 am ET. The proxy materials for the 2023 Annual Meeting were filed with the SEC on May 12, 2023.

Thank you,

Stacey

Stacey Heiser

Senior Counsel

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

--
Sarah Rehberg
Deputy Director
Free Enterprise Project
National Center for Public Policy Research

--
Scott Shepard
Director
Free Enterprise Project
National Center for Public Policy Research

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Scott Shepard █████████████████████ >
**Sent:** Wednesday, January 31, 2024 11:51:22 AM
**To:** Heiser, Stacey M < ██████████████████ >
**Subject:** Re: FW: Rehberg Ltr.

**[EXTERNAL EMAIL]:** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks, Stacey. Sarah left for another position at the end of November, and our mechanisms for monitoring email to her Center account failed in this case.

I think we may well withdraw, and I don't want to waste any of Kroger's time, but as we're suing the SEC staff re: pretty much every aspect of the no-action process, we may be obliged to force you to attempt no-action for litigation purposes.

I'll review and get back to you definitively asap.

Scott

On Wed, Jan 31, 2024, 9:51 AM Heiser, Stacey M < ██████████████████ > wrote:

Good morning:

I haven't heard back from Sarah Rehberg so wanted to follow up with you.

Thanks,
Stacey


**From:** Heiser, Stacey M
**Sent:** Monday, January 29, 2024 11:20 AM
**To:** Sarah Rehberg < ██████████████████ >
**Subject:** FW: Rehberg Ltr.
**Importance:** High


Good morning:

I am just following up on the attached letter. Could you please confirm receipt and advise of your position?

Thanks,
Stacey

I am just following up on the attached letter.  Could you please confirm receipt and advise of your position?

Thanks,
Stacey

**From:** Heiser, Stacey M
**Sent:** Wednesday, January 17, 2024 11:18 AM
**To:** Sarah Rehberg ███████████████████
**Subject:** FW: Rehberg Ltr.

Please see attached letter.

Thanks,
Stacey

---

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

--
Scott Shepard
Director
Free Enterprise Project
National Center for Public Policy Research

---

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Scott Shepard ██████████████████ >
**Sent:** Monday, February 5, 2024 11:06 AM
**To:** Heiser, Stacey M <██████████████████ >
**Subject:** Re: FW: Rehberg Ltr.

**[EXTERNAL EMAIL]:** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Stacey,

 Thanks so much for forwarding this to my attention, and I'm sorry that our monitoring of Sarah's "legacy" emails didn't catch it initially.

 After review, we've decided that we're not able to withdraw. As you know we firmly believe that your primary ground for exclusion this year was improperly granted last year by the Staff. Additionally, we fundamentally believe that the Staff's thresholds also violate the SEC's basic duties by effectively placing the renewal of proposals in the hands not of final shareholders but instead of giant investment houses misusing the power of other people's money and unregulated proxy advisory services.

 I expect you'll prevail before the Staff, but we feel it's important to push back when agencies act in arbitrary, capricious and *ultra vires* ways.

Very best,

Scott



**THE KROGER CO.**    •    **LAW DEPARTMENT**    •    **1014 VINE STREET**    •    **CINCINNATI, OHIO 45202-1100**

**STACEY M. HEISER SENIOR COUNSEL**
████████████████████

January 17, 2024

Sarah Rehberg
National Center for Public Policy Research
2005 Massachusetts Ave., N.W.
Washington, D.C. 20036
*Via Email:* ████████████████

     Re:     Shareholder Proposal for 2024 Poxy

Dear Ms. Rehberg:

     We are in receipt of your shareholder proposal regarding publication of an EEO Policy Risk Report, dated May 10, 2023.

     In light of the shareholder vote that took place at The Kroger Co. (the "Company") 2023 Annual Meeting of Shareholders and the inclusion of this identical proposal in the Company's 2023 Proxy Statement and related proxy materials, we ask that you voluntarily withdraw this proposal. Under Rule 14a-8(i)(12) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a company may exclude a proposal if it addresses substantially the same subject matter as a proposal previously included in the company's proxy materials within the preceding five calendar years if the most recent vote occurred within the preceding three calendar years and the most recent vote was less than 5% of the votes cast if previously voted on once.

     In our 2023 Proxy Statement, we included your proposal regarding the EEO Policy Risk Report (the "2023 Proposal") that is substantially the same subject matter as the proposal you submitted for the upcoming 2024 Annual Meeting of Shareholders. Your 2023 Proposal received 1.887% of the votes cast. Accordingly, we ask for you to voluntarily withdraw your proposal. If you are unwilling to do so, we intend to request no-action relief from the Staff of the U.S. Securities and Exchange Commission pursuant to Rule 14a-8 of the Exchange Act.

     Regards,

     *Stacey Heiser/dm*

     Stacey Heiser
     Senior Counsel