No. 23-60230

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH;
NATHANIEL FISCHER; PHILLIP ARONOFF,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

_____

Petition for Review from an Order of the Securities and Exchange
Commission

_____

**PETITION FOR REHEARING EN BANC**

_____

REED D. RUBINSTEIN
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
202-964-3721

R. TRENT MCCOTTER
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

*Counsel for Petitioners*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

### *National Center for Public Policy Research et al. v. SEC*

No. 23-60230

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. National Center for Public Policy Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Nathaniel Fischer

3. Phillip Aronoff

4. The Securities and Exchange Commission

5. Boyden Gray PLLC (formerly Boyden Gray & Associates PLLC)

6. R. Trent McCotter

7. Jonathan Berry

8. Michael Buschbacher

9. Jared M. Kelson

10. The Kroger Co. It is publicly traded under the ticker KR, and, according to public information, The Vanguard Group, Inc., owns 10% or more of its stock.

11. Gene P. Hamilton

12. Reed D. Rubinstein

13. America First Legal Foundation

14. Theodore J. Weiman

15. Tracey A. Hardin

16. Megan Barbero

17. Michael A. Conley

18. National Association of Manufacturers

19. Lehotsky Keller Cohn LLP

20. Steven P. Lehotsky

21. Adam Steene

22. Erica Klenicki

23. Scott A. Keller

24. Matthew H. Frederick

25. Todd Disher

26. Alexis Swartz

/s/ R. Trent McCotter
R. Trent McCotter
*Counsel of Record for Petitioners*

## <u>INTRODUCTION AND RULE 35(B)(1) STATEMENT</u>

As Judge Jones's dissent explained, "[t]he SEC is playing catch-me-if-you-can with legal challenges to its recent penchant for issuing viewpoint-discriminatory no-action letters about controversial shareholder proposals." Slip Op. ("Ex.A.") at 17 (Jones, J., dissenting). "Sadly, the panel majority lets the SEC's manipulations prevail," even though the SEC "brazenly admits that, if put to a legal test, its no-action letter here should be vacated" as unlawful. *Id.* The Court should grant rehearing because the panel majority directly contradicts controlling Fifth Circuit caselaw. *Id.*

As background: various federal agencies issue "no-action letters" to give a "green light" for private parties to take regulated actions without facing subsequent agency enforcement. Ex.A.26–27 (Jones, J., dissenting). Here, Kroger sought a no-action letter from the SEC authorizing Kroger to exclude Petitioners' shareholder proposal about viewpoint diversity from Kroger's annual proxy statement. Despite previously *refusing* to block an otherwise identical proposal about LGBT diversity, the SEC's Division of Corporation Finance greenlit the exclusion of Petitioners' viewpoint-diversity proposal without any

explanation. The SEC Commissioners then declined to review that decision, and Petitioners sought review from this Court.

The panel held—with Judge Jones dissenting—that it lacked jurisdiction because SEC no-action letters are not final orders, and thus are *never* judicially reviewable.

Rehearing is warranted because the majority opinion "conflicts directly with *Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023), which held that a CFTC no-action letter was a judicially reviewable final agency action." Ex.A.17 (Jones, J., dissenting). The CFTC itself told this Court in *Clarke* that its no-actions letters are "virtually indistinguishable" from "SEC no-action letters," CFTC Br. at 38, *Clarke*, 74 F.4th 627, yet the majority here insisted that the two are fundamentally different. Not so.

Like CFTC no-action letters, parties rely on SEC no-action letters as a "license" and "safe harbor" to take regulated action that affects the rights of other interested parties, Ex.A.24–25 (Jones, J., dissenting), and the SEC itself even assigns such letters weight in future proceedings, Ex.A.27 (Jones, J., dissenting). If anything, the outcome is even clearer here than *Clarke* because of several aspects specific to SEC orders and its review statute. On that note, the majority also created a circuit split

by holding that an "order" under the APA is *not* an "order" under the Exchange Act.

"As a result of the panel opinion, a CFTC no-action letter is reviewable in this circuit but an SEC no-action letter is not." *Id.* This conflict creates significant "uncertainty for litigants" on an important and recurring issue of administrative law. *Id.*

Rehearing is also warranted on the panel's decision that Petitioners' dispute with the SEC was not reasonably expected to recur and thus was moot. As Judge Jones's dissent explained, "this case is tailor-made for the mootness exception for cases capable of repetition yet evading review" because the proxy season lasts only a few months, numerous other companies have repeatedly sought and obtained the *exact same* no-action relief from the SEC for the *exact same* shareholder proposal over a course of many years, and Petitioners have declared they intend to keep submitting the proposal in the future. Ex.A.17, 21–22.

The majority acknowledged it was "reasonable to anticipate that third-party companies will seek [SEC no-action relief] to exclude the proposal in the future," Ex.A.10 (cleaned up), yet inexplicably concluded this was insufficient to show there is a "reasonable expectation … that

[Petitioners] will be subject to the same unlawful governmental action," Ex.A.6 (quoting *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010)) (cleaned up). The majority effectively eliminated the capable-of-repetition-yet-evading-review doctrine.

Judicial review is especially critical given the "compelling evidence that the SEC has routinely applied [its no-action regulations] in a manner that disfavors conservative-oriented proposals." Ex.A.28 (Jones, J., dissenting). This Court has not hesitated to hold the SEC accountable when it has veered outside its lawful lane.[1] The Court should do so again.

---

[1] *See, e.g.*, *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159 (5th Cir. 2024) (*en banc*); *Liberty Energy, Inc. v. SEC*, No. 24-60109, 2024 WL 1152283, at *1 (5th Cir. Mar. 15, 2024).

<u>**TABLE OF CONTENTS**</u>

CERTIFICATE OF INTERESTED PERSONS ........................................... i

INTRODUCTION AND RULE 35(B)(1) STATEMENT ......................... iv

TABLE OF CONTENTS ........................................................................ viii

TABLE OF AUTHORITIES .................................................................... ix

STATEMENT OF ISSUES MERITING REHEARING *EN BANC* .......... 1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
      DISPOSITION OF THE CASE ........................................................ 1

    I.   Background ................................................................................. 1

    II.  Proceedings Before This Court ................................................. 5

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT ........... 6

ARGUMENT ............................................................................................. 6

    I.   The Court Should Grant Rehearing to Reconcile the
        "Direct Conflict" Between the Panel Decision and *Clarke*..... 6

       A.   *Clarke*'s Holding ............................................................. 6

       B.   *Clarke* Directly Controls Here ........................................ 8

       C.   This Case Is Easier than *Clarke*. ................................. 12

    II.  The Panel's Mootness Analysis Essentially Eliminates the
        Capable-of-Repetition-Yet-Evading-Review Doctrine. .......... 14

CONCLUSION .......................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for Fair Bd. Recruitment v. SEC,*
   125 F.4th 159 (5th Cir. 2024) ............................................ vii

*Black v. SEC,*
   ___ F.4th ___, 2025 WL 84919 (4th Cir. Jan. 14, 2025) ...................... 8

*Clarke v. CFTC,*
   74 F.4th 627 (5th Cir. 2023) ......... v, 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021) ............................................... 8

*Libertarian Party v. Dardenne,*
   595 F.3d 215 (5th Cir. 2010) ............................................. 16

*Liberty Energy, Inc. v. SEC,*
   No. 24-60109, 2024 WL 1152283 (5th Cir. Mar. 15, 2024) ............... vii

*Med. Comm. for Hum. Rts. v. SEC,*
   432 F.2d 659 (D.C. Cir. 1970) ............................................. 9

*Nat'l Fed'n v. U.S. Treasury,*
   827 F.3d 51 (D.C. Cir. 2016) .............................................. 8

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ...................................................... 13

*Qureshi v. Holder,*
   663 F.3d 778 (5th Cir. 2011) .............................................. 9

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ............................................. 12

*Trinity Wall St. v. Wal-Mart Stores, Inc.,*
   75 F. Supp. 3d 617 (D. Del. 2014) ....................................... 15

*Trinity Wall St. v. Wal-Mart Stores, Inc.,*
   792 F.3d 323 (3d Cir. 2015) ............................................... 1

**Statutes**

5 U.S.C. § 551 ............................................................... 8

ix

15 U.S.C. § 78d-1 ................................................................. 13, 14

15 U.S.C. § 78y................................................................... 8

**Other Authorities**

17 C.F.R. § 240.14a-8......................................................... 2, 3, 13

17 C.F.R. § 202.1 ............................................................... 13

17 C.F.R. § 202.2 ............................................................... 13

17 C.F.R. § 202.3 ............................................................... 13

*CorVel Corp.*, 2019 WL 1640021 (SEC No-Action Decision
    June 5, 2019) ................................................................ 4

Donna M. Nagy, *Judicial Reliance on Regulatory
    Interpretations in SEC No-Action Letters*, 83 Cornell L.
    Rev. 921 (1998) ............................................................ 3

*Statement of Informal Proposals for the Rendering of Staff
    Advice with Respect to Shareholder Proposals*, 41 Fed.
    Reg. 29,989 (July 20, 1976)............................................ 13

## STATEMENT OF ISSUES MERITING REHEARING *EN BANC*

(1) Whether a Securities and Exchange Commission no-action letter greenlighting the exclusion of a shareholder proposal is a final order under *Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023), which held that nearly identical Commodity Futures Trading Commission no-action letters are reviewable.

(2) Whether Petitioners' dispute with the SEC is capable of repetition given that the SEC has uniformly granted no-action relief against Petitioners for years on the exact same shareholder proposal and on the exact same basis, and Petitioners submitted declarations stating they intend to keep submitting this same proposal in the future.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

### I.   BACKGROUND

In advance of annual shareholder meetings, public companies solicit the votes of shareholders by circulating "proxy" voting materials. The ability to "[v]ote by proxy has become an indispensable part of corporate governance." *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015) (cleaned up).

1

Under the SEC's Rule 14a-8, companies by default *must* include certain shareholder proposals in their proxy materials but can seek to exclude proposals on certain bases the Rule provides. *See id.* at 335–37. If the company believes a proposal falls within an exclusion, the company "must file with the [SEC's Division of Corporation Finance ('Division')] staff the reasons why it believes the proposal is excludable." *Id.* at 336. The proponent and company can submit numerous rounds of responsive briefing on their positions. The Division can then issue a "no-action letter" agreeing the proposal is excludable and stating the Division will not recommend enforcement action if the proposal is excluded; or issue a letter refusing to grant no-action relief.

No-action decisions are treated as binding by companies, which have followed the SEC's decisions nearly 100% of the time. *See* Pet.Br.45–46. Beyond operating as a green light and safe harbor for otherwise-regulated conduct, the Division's no-action decision receives deference within the SEC itself: the Commissioners have apparently never overturned the Division's decisions regarding administrative enforcement, and no-action decisions serve as precedent for future no-action proceedings, *see* 17 C.F.R. § 240.14a-8(j)(2)(ii). Sometimes they

even receive deference in subsequent judicial proceedings. *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters*, 83 Cornell L. Rev. 921, 977–85 (1998).

One basis for exclusion of a proposal is when it "deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). The SEC has long taken the position that this exclusion does *not* apply to a proposal involving "significant discrimination matters" because those topics "transcend the day-to-day business" of the company, so long as the proposal does not seek to micromanage the company. JA14.

Petitioner National Center for Public Policy Research ("NCPPR"), which owns shares of The Kroger Company, sought to have Kroger include the following proposal ("Proposal") in its proxy materials for its 2023 shareholder meeting:

> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

JA3.

On February 16, 2023, Kroger asked the Division to grant no-action relief so Kroger could exclude the Proposal. JA6. Kroger argued that the Proposal fell within the "ordinary business operations" exclusion and therefore "should be excluded from Kroger's Proxy Materials pursuant to Rule 14a-8(i)(7)." JA10. Over numerous rounds of lengthy briefing, NCPPR opposed Kroger's arguments and pointed out that, several years earlier, the SEC had *refused* to grant no-action relief against a proposal that was identical *except* it referred to "sexual orientation" and "gender ideology" rather than "viewpoint" and "ideology."[2]

Despite this, the Division granted Kroger its requested no-action relief, finding without further explanation that it "relates to, and does not transcend, ordinary business matters." JA34. The Division thus agreed that Kroger could exclude the Proposal from its proxy materials and stated the Division would recommend against enforcement action if Kroger excluded the Proposal. *Id.*

Petitioners sought review by the SEC Commissioners themselves, who declined review.

---

[2] *CorVel Corp.*, 2019 WL 1640021 (SEC No-Action Decision June 5, 2019).

## II.   PROCEEDINGS BEFORE THIS COURT

Petitioners challenged the SEC's no-action decision in this Court in April 2023 and immediately obtained a stay of the SEC's decision. Because the stay deprived the SEC no-action letter of its legal effect, Kroger did what any company does when it does not have a legally binding no-action letter: Kroger included the Proposal in the proxy statement.

The SEC argued this mooted the case, but Petitioners demonstrated that (1) they had submitted this exact same Proposal to numerous other companies in the past, (2) the SEC *always* granted no-action relief upon request, (3) Petitioners planned to continue submitting the same Proposal going forward, and (4) the SEC's rules would compel it to reach the same outcome regardless of the specific company at issue. Ex.A.17, 19 n.2 (Jones, J., dissenting).

By a vote of 2-1, the Court held that the SEC no-action letter was not a reviewable final order. The majority then held the case was moot because there was no reasonable expectation the SEC would again grant no-action relief against Petitioners. Ex.A.10

Judge Jones dissented. She argued the majority opinion "conflicts directly" with *Clarke*'s holding that a nearly identical CFTC no-action letter was judicially reviewable. Ex.A.17, 25–27. Judge Jones also argued "this case is tailor-made for the mootness exception for cases capable of repetition yet evading review." Ex.A.17, 21–22.

## STATEMENT OF FACTS NECESSARY TO THE ARGUMENT

No additional facts are necessary to the argument of the issues.

## ARGUMENT

### I.   THE COURT SHOULD GRANT REHEARING TO RECONCILE THE "DIRECT CONFLICT" BETWEEN THE PANEL DECISION AND *CLARKE*.

Judge Jones's dissent correctly argued that the majority opinion "conflicts directly" with this Court's decision less than two years ago in *Clarke*. Ex.A.17. The majority opinion here repeatedly adopted holdings that *Clarke* had expressly rejected.

#### A.   *CLARKE*'S HOLDING.

In *Clarke*, this Court held that a no-action letter issued by a division within the Commodity Futures Trading Commission allowing PredictIt to operate was final agency action under the APA. When that decision was challenged in court, the CFTC insisted a no-action letter is "neither

'agency action' nor 'final.'" 74 F.4th at 636. This Court rejected both arguments.

*First*, the no-action letter effectively "allow[ed]" the recipient to operate, and thus it was a "form of permission," making it a "license" under the APA—and thus agency action. *Id.* at 637. "[T]he whole point of … requesting [a] no-action letter" from the CFTC is "to obtain" that "green light" before taking a potentially regulated action. *Id.*

*Second*, the Court held that the letter was "final" because (a) it was the consummation of the agency process, and (b) it resulted in legal consequences. It marked the consummation of the agency's decisionmaking process because no "further agency review" was possible. *Id.* at 638. And it yielded legal consequences because it "withdrew some of the CFTC's discretion" by agreeing not "to bring enforcement proceedings against the holder of [the] no-action letter." *Id.* at 638 & n.6.

It "does not change our analysis" that a no-action decision "represents the position only of the Division that issued it" and "binds only the issuing Division." *Id.* at 638 n.6. Nor did it matter that a recipient "is free to continue unabated with or without any staff no-action

relief," *id.* at 638, or that the agency might "reverse course" at some future point, *id.* at 639.

### B. *CLARKE* DIRECTLY CONTROLS HERE.

The SEC raised the same arguments *Clarke* rejected. Except the majority here accepted them. The Court should resolve the conflict.

***Clarke* Confirms There Is an "Order."** Review in *Clarke* was under the APA, which requires final "agency action," whereas the Exchange Act applicable here requires a "final order." 15 U.S.C. § 78y(a)(1). But "a 'final order' as used [in the Exchange Act] is synonymous to the term 'final agency action.'" *Black v. SEC*, ___ F.4th ___, 2025 WL 84919, at *4 (4th Cir. Jan. 14, 2025); *see Cochran v. SEC*, 20 F.4th 194, 227 n.5 (5th Cir. 2021) (*en banc*). Some courts even construe "order" in "special review statutes" "*more* expansively than its definition in the APA." *Nat'l Fed'n v. U.S. Treasury*, 827 F.3d 51, 55 (D.C. Cir. 2016).

Further, *Clarke* held that a no-action letter is a "license," 74 F.4th at 637, which the APA defines as being a type of "order," 5 U.S.C. § 551(6) (defining "order" as "including licensing"). Thus, by holding that no-action letters are licenses, *Clarke necessarily* held that they are "order[s]," too. Ex.A.24 (Jones, J., dissenting).

But the majority opinion declined to follow *Clarke* and also created a circuit split by construing "order" in the Exchange Act more narrowly than even the APA does. The majority stated that SEC no-action letters are not orders because an order requires "a clear, formal record of an administrative hearing." Ex.A.12. That contradicts *Clarke* and other circuits' caselaw. Anyway, Kroger and Petitioners submitted *hundreds* of pages of briefing to the SEC, *see* ECF No. 117, which then "formally decide[d] among conflicting adversary claims premised on detailed legal arguments," *Med. Comm. for Hum. Rts. v. SEC*, 432 F.2d 659, 669–70, 675 (D.C. Cir. 1970), *vacated on other grounds*, 404 U.S. 403 (1972). That's a clear, formal record of an administrative hearing, and thus an order even under the majority's erroneous test.

**Clarke Confirms the Order is "Final."** Finality is a "pragmatic" inquiry that looks to whether the agency action has legal consequences. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). Recall that *Clarke* held that no-action letters qualify because they "withdr[a]w some of the [agency's] discretion" to "bring enforcement proceedings against the holder of a no-action letter." *Clarke*, 74 F.4th at 638 & n.6. Moreover, the recipient could "rely" on that "advisory opinion," even though it was

subject to rescission and even though it represented only the views of staff, not the Commissioners. *Id.* at 638.

The same is true for the SEC's no-action decision here. The CFTC itself told this Court that its letter in *Clarke* was "virtually indistinguishable" from "SEC no-action letters." CFTC Br. at 38, *Clarke*, 74 F.4th 627. The SEC Division "withdrew some of the SEC's discretion to bring enforcement proceedings against the holder of the no-action letter." Ex.A.24 (Jones, J., dissenting) (cleaned up). And Kroger—like any recipient of no-action relief—could rely on that decision as a "'green light' to exclude NCPPR's proposal." Ex.A.26–27 (Jones, J., dissenting) (quoting *Clarke*, 74 F.4th at 637). "[A]void[ing] compliance with administrative requirements" is the "whole point" of seeking such relief, Ex.A.24, 26–27 (Jones, J., dissenting) (quoting *Clarke*, 74 F.4th at 637).

Time after time, however, the majority opinion adopted the exact arguments that *Clarke* had rejected, or ignored arguments that *Clarke* had adopted. On half a dozen different points, "[t]here is no basis for distinguishing *Clarke*," Ex.A.24 (Jones, J., dissenting), as summarized in the following chart:

| *Aspect of No-Action Letter* | *Clarke*'s Holding | **Majority Holding Here** |
|---|---|---|
| *The letter withdraws agency discretion by saying staff will not recommend enforcement.* | This *confirms* finality even though it's issued by staff, not the Commissioners. 74 F.4th at 638 & n.6 ("legal consequences flowed"). | This shows a *lack* of finality because it's issued by staff, not the Commissioners. Ex.A.15 ("Commission can choose to disregard"). |
| *Agency regulations say the letter can be relied upon in certain circumstances.* | This *confirms* finality. 74 F.4th at 638 ("legal consequences flowed"). | *Majority opinion does not address* SEC regulations saying letter is precedential and "can be relied upon." Ex.A.25 (Jones, J., dissenting). |
| *The letter does not bind the Commissioners.* | The letter is *final anyway*. 74 F.4th at 638 n.6 (this "does not change our analysis"). | This shows a *lack* of finality. Ex.A.15 ("Commission can choose to disregard"). |
| *The letter does not represent the views of the Commission.* | The letter is *final anyway*. 74 F.4th at 638 n.6 (this "does not change our analysis"). | This shows a *lack* of finality. Ex.A.11 ("do[es] not constitute an official expression of the Commission's views"). |
| *The letter does not bind the recipient.* | The letter is *final anyway*. 74 F.4th at 638 (does not matter that recipient "is free to continue unabated with or without any staff no-action relief"). | This shows a *lack* of finality. Ex.A.12 ("binds no one"); Ex.A.14 ("'letter does not bind' the company, shareholder proponent, staff, or the Commission"). |
| *The issuing Division may change its own mind.* | The letter is *final anyway*. 74 F.4th at 639 ("the possibility that the DMO may reconsider is irrelevant to our inquiry"). | This shows a *lack* of finality. Ex.A.14 ("'does not bind' … staff" in the Division). |

### C.    THIS CASE IS EASIER THAN *CLARKE*.

Reviewability here is even more obvious than it was in *Clarke*. *First*, SEC no-action decisions are "applied by the agency in a way that indicates [they will be] binding" within the agency itself. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015). The "SEC points to no instances where the Commission has overridden no-action letters to institute enforcement actions." Ex.A.25 (Jones, J., dissenting). And out of the thousands of such decisions issued by the Division over the decades, the SEC claims only four or five times has the Commission ever voiced the slightest disagreement. Ex.A.27 (Jones, J., dissenting). The decisions thus "operate[], in practice, 'as a norm or safe harbor by which' recipient companies 'shape their actions.'" Ex.A.25 (Jones, J., dissenting) (quoting *Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019)).

There was no such historic pattern of reliance in *Clarke*. Yet the majority opinion here never addressed this important aspect.

*Second*, some courts give deference to SEC no-action decisions,[3] and when agency action "gets deference, the people are bound to obey it on pain of sanction, no less surely than they are bound to obey substantive

---

[3] *See* Nagy, *supra*, at 977–85.

rules" that are mandatory. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 110 (2015) (Scalia, J., concurring in the judgment). The majority sidestepped this by saying that some courts merely find such letters "persuasive." Ex.A.15. But some courts defer to them—and that is enough.

*Third*, and independently dispositive: under 15 U.S.C. § 78d-1(c), entitled "*Finality* of delegated action," the Commissioners' act of declining review means the Division's decision "shall, *for all purposes*, including appeal or review thereof, be deemed the action of the Commission." 15 U.S.C. § 78d-1(c) (emphases added). There was no such statutory guarantee of "[f]inality" in *Clarke*.

Section 78d-1 applies when the Commissioners have delegated authority via order or regulation to a Division within the SEC. *See id.* § 78d-1. The majority expressly *agreed*—on page one, no less—that this has occurred here: the SEC has "delegate[d]" no-action "responsibilities" to the Division and its staff per "regulat[ion]." Ex.A.1.[4] Yet the majority

---

[4] A bevy of regulations and orders reflect this delegation. *See, e.g.*, 17 C.F.R. § 240.14a-8(g), (j), (j)(2), (k), (m)(2); *id.* § 202.1(d); *id.* § 202.2; *id.* § 202.3(a); *Statement of Informal Proposals for the Rendering of Staff Advice with Respect to Shareholder Proposals*, 41 Fed. Reg. 29,989,

(*footnote continued on next page*)

apparently never realized that this means § 78d-1 applies and requires the Division's decision be treated as the "[f]inal[]" decision "of the Commission" itself "for all purposes" including "review" because the Commissioners declined review here. 15 U.S.C. § 78d-1(c). This statutory provision independently confirms there is a final SEC order here, yet the majority never once addressed it.

* * *

Rehearing is warranted to reconcile the majority opinion and *Clarke*, and also to eliminate the circuit split created.

## II. THE PANEL'S MOOTNESS ANALYSIS ESSENTIALLY ELIMINATES THE CAPABLE-OF-REPETITION-YET-EVADING-REVIEW DOCTRINE.

Rehearing is also warranted on the majority's seriously flawed mootness analysis. *Clarke* held that "[p]ost-filing events do not moot a case as long as the parties have a concrete interest, however small, in the outcome of the litigation." *Clarke*, 74 F.4th at 636 (cleaned up).

Just as in *Clarke* itself, "[t]hat is true here" because the "parties continue to spar over whether" the viewpoint-diversity proposal falls

---

29,989 (July 20, 1976) (the Division will handle all cases, with "the Commission itself [getting involved] only in those relatively rare cases where unusual problems exist and the staff or an interested person requests it").

14

within the SEC's exception for excludable proposals. *Id.* The SEC has never changed its view that the Proposal is excludable. The majority opinion, however, never addressed this dispositive mootness holding from *Clarke* and thus again contradicted that case.

Moreover, disputes over proxy proposals occur during an extraordinarily brief time, often just weeks, and thus courts have held they present a textbook example of when to apply the capable-of-repetition-yet-evading-review doctrine. *See, e.g.*, *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 75 F. Supp. 3d 617, 625–27 (D. Del. 2014). Despite this, the majority held this dispute is *not* capable of repetition. Ex.A.10. As Judge Jones argued, that is "simply wrong." Ex.A.22.

"[T]his case is tailor-made for the mootness exception for cases capable of repetition yet evading review," given the short period for review, the years-long record of the SEC granting no-action relief against this *exact same* Proposal regardless of the company at issue, and the declarations saying Petitioners will continue submitting the Proposal. Ex.A.17, 21–22 (Jones, J., dissenting); *id.* at 19 n.2.

All Petitioners needed to show was a "reasonable expectation … that they will be subject to the same unlawful governmental action,"

15

*Libertarian Party*, 595 F.3d at 217 (cleaned up), and the majority even acknowledged it was "reasonable to anticipate that third-party companies will seek [SEC no-action relief] to exclude the proposal in the future," Ex.A.10 (cleaned up). Despite that, the majority inexplicably believed it was "hypothetical" that the SEC would actually grant no-action relief again, Ex.A.9, even though it has uniformly done so every time it has been presented with the Proposal. The real "hypothetical" was assuming that a uniform course of conduct would suddenly change.

If it isn't enough for the government to uniformly impose the *same* harm against the *same* Petitioners for the *same* proposal over a course of *years*, with unrebutted declarations showing the *same* confrontation will very likely be provoked in the future, then the capable-of-repetition-yet-evading-review doctrine is a dead letter.

Moreover, Petitioners immediately sought and obtained a judicial stay of the SEC's no-action letter, which discouraged other companies from seeking no-action relief against the same Proposal while this case was pending. But the majority then used this *against* Petitioners to claim that companies were no longer seeking no-action relief. Ex.A.8–9. That is

16

an odd conclusion: by issuing a stay to ensure the case remained live, this Court somehow caused it to become moot.

*  *  *

Without rehearing, the SEC will get away with "rank viewpoint discrimination," Ex.A.17 (Jones, J., dissenting), and the majority's opinion will impose significant "uncertainty for litigants and potential litigants" on a recurring and important issue administrative law, Ex.A.27 (Jones, J., dissenting).

Finally, it makes no difference that the majority labeled its opinion as non-precedential. This Court's strict rule of orderliness applies just the same, and accordingly the Court routinely grants *en banc* rehearing of important unpublished opinions—e.g., it reheard at least two such cases just in 2024. *See Jackson Mun. Airport Auth. v. Harkins*, No. 21-60312; *B.W. v. Austin Indep. Sch. Dist.*, No. 22-50158.

## <u>CONCLUSION</u>

The Court should grant rehearing *en banc*.

January 29, 2025

Respectfully submitted,

REED D. RUBINSTEIN
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
202-964-3721

/S/ R. TRENT MCCOTTER
R. TRENT MCCOTTER
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

/s/ R. Trent McCotter

R. Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3898 words, excluding the parts of the petition exempted by Rule 32(f). This petition complies with the typeface and type style requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ R. Trent McCotter

R. Trent McCotter

# EX. A

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2024

Lyle W. Cayce
Clerk

_____

No. 23-60230

_____

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NATHANIEL
FISCHER; PHILLIP ARONOFF,

*Petitioners*,

*versus*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

_____

Appeal from the Securities & Exchange Commission
Agency No. 2022-2023 No-Action Responses

_____

Before JONES, DENNIS, and DOUGLAS, *Circuit Judges*.

PER CURIAM:[*]

Empowered by Congress, the United States Security and Exchange Commission (SEC or Commission) oversees security trading and protects shareholders in the risk-based security market. *See* 15 U.S.C. §§ 78b, 78d. To achieve that end, the SEC delegates certain responsibilities to its several operating divisions. Within the divisions, the SEC's regulatory framework allows staff to offer informal advice on a range of issues to "members of the

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

public dealing with the Commission." 17 C.F.R. § 202.1(d). In this case, the National Center for Public Policy Research (Center), takes issue with such advice received by a third-party company.  The SEC has moved to dismiss this case in response because, in its view, the Center's challenge is unfit for judicial review.  We agree and DISMISS this appeal for lack of jurisdiction.

## I

Shareholders of publicly traded companies have long governed corporations by voting in shareholder meetings. America's earliest corporate laws "assumed that shareholders" would cast these votes in person. Sarah C. Haan, *Voting Rights in Corporate Governance: History and Political Economy*, 96 S. Cal. L. Rev. 881, 887 (2023). But as the nation's economy advanced, more Americans and foreigners alike began investing in large corporations. *Id.* That meant fewer shareholders could personally attend meetings to exercise their right to vote. By the nineteenth century, however, most voting procedures began adapting to the changing corporate landscape: States started allowing proxy voting, a mechanism where shareholders could delegate their votes to a "proxyholder" who attended the meeting in the shareholder's place.  In the ensuing decades, proxy voting became a shareholding right in every state. *Id.* at 902.

For all its benefits, however, the early proxy process had some setbacks. Notably, the proxy system invited corruption among corporate management, and shareholders were often asked to vote for proposals based on little or no information. H.R. Rep. No. 73-1383, at 13–14 (1934). By the 1930s, such abuses encouraged Congress to act.  *See id.*  It did so by empowering the SEC to regulate the proxy voting framework for publicly traded corporations. *Id.*  The Commission, in turn, has developed procedures to ensure that shareholders can make informed decisions before casting a vote.  One procedure, for example, requires companies to circulate proxy

materials before shareholder meetings. *See* 17 C.F.R. § 240.14a-3. These materials include measures eligible for voting, like proposed amendments to a corporation's charter or election information regarding corporate management. As relevant here, the materials must also include proposals sponsored by shareholders, who are entitled to submit such statements for the company's consideration. 17 C.F.R. § 240.14a-8. The Commission enshrined this edict in its regulations, believing that "fair corporate suffrage" required that all shareholders receive notice of such matters when their proxies are solicited. *See id*; H.R. Rep. No. 73-1383, at 13 (1934) ("Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.").

That said, submitting shareholder proposals to a corporation does not guarantee its inclusion on the proxy ballot. There are, in fact, at least thirteen substantive or procedural reasons why a company may decide to exclude it. 17 C.F.R. §§ 240.14a-8(i)(1)–(13). One reason, for instance, could be that the proposal lacks a relationship with normal business operations. *Id.* § 240.14a-8(i)(5). Another may be that the shareholder missed the submission deadline or failed to follow some other procedural rule. *Id.* § 240.14a-8(f)(1). In all cases, when a company chooses to exclude a proposal, the company is required to notify the Commission and the proposal's supporter. *Id.* § 240.14a-8(j). This notification procedure "is informational only and no response by the Commission or its staff is required." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 423 n.13 (D.C. Cir. 1992) (quoting Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals, Exchange Act Release No. 12,599, 41 Fed. Reg. 29,989, 29,990 (July 7, 1976) (Informal Procedures) (alteration in original)). Still, the process aims to bring the matter to the Commission's attention in case an "enforcement action may be appropriate" and to "alert the shareholder proponent" so that the shareholder can consider whether to

pursue its own remedies against the company. Informal Procedures, 41 Fed. Reg. at 29,991.

For almost a century, the Commission staff has maintained a practice of providing informal advice on whether a particular shareholder proposal is excludable. *See* 17 C.F.R. §§ 202.1(d), 202.2. When a company decides exclusion is called for, it can ask Commission staff for a "no-action letter." Such a letter effectively means that the staff will not recommend the SEC to intervene with an enforcement action if the company follows through with its decision. The staff may also respond in other ways; they may take no position or even disagree with the company's exclusion decision. In either case, the staff's response is not binding on anyone, as it "do[es] not constitute an official expression of the Commission's views." *Id.* § 202.1(d). Indeed, the Commission may have different views than its staff and choose to pursue a different course of action altogether.

## II

This case began with the Center's desire to include a proxy statement in the Kroger Company's 2023 proxy materials. As a Kroger investor, the Center grew concerned about what it labeled the company's "blatant leftwing actions." To ensure that Kroger did not discriminate against those with conservative viewpoints, the Center requested Kroger issue, in pertinent part, "a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity (EEO) policy."

After reviewing the Center's proposal, Kroger initially declined to include it. Citing one of the permissible bases for exclusion, Kroger concluded that the measure was unsuitable because it "relat[ed] to the company's ordinary business operations." *Id.* § 240.14a-8(i)(7). Kroger notified Commission staff of its intentions, and the Commission staff

No. 23-60230

responded with a no-action letter. It agreed that Kroger had "some basis" for excluding the proposal because it "relate[d] to, and [did] not transcend, ordinary business matters."

Dissatisfied, the Center asked Commission staff to reconsider its decision and requested review by the SEC Commissioners. The Center was unsuccessful twice over. As a result, it appealed directly to this court, alleging that the Commission engaged in viewpoint discrimination and failed to maintain its neutrality. According to the Center, the no-action letter made the Center's proposal "less effective by preventing [it] from receiving votes" and "chill[ed] [its] speech by discouraging [it] from making proposals." For that reason, the Center urges us to "vacate the [Commission's] decision below." But a few weeks after the Center filed its appeal, it encountered an unforeseen issue: Kroger filed its 2023 shareholder proxy materials, and in them, Kroger included the Center's proposal. When put to a vote at the shareholder meeting, support for the measure was sparse: It garnered less than two percent of the votes cast and accordingly failed.

## III

The Commission moves to dismiss this appeal on two jurisdictional grounds. The first is mootness. In the Commission's view, the Center received the relief it sought after Kroger included the measure at issue in its 2023 proxy materials. Kroger's doing so, the Commission reasons, extinguished any dispute on appeal. The other basis for dismissal is our alleged lack of subject matter jurisdiction over the challenged letter. According to the Commission, the no-action letter was informal and nonbinding staff advice, not a "Commission order." And without such an order, the Commission contends that we have no authority to review the merits of the Center's challenge. We agree and address each argument below.

No. 23-60230

A

We begin with mootness, a jurisdictional limitation affecting our decision-making power under the Constitution. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Though the Center recognizes Kroger's 2023 final proxy materials and corresponding shareholder vote, it nevertheless contends that its challenge remains viable. In so arguing, it cites the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine, a standard used in only the most "exceptional circumstances." *See Empower Texans, Inc. v. Geren*, 977 F.3d 367, 371 (5th Cir. 2020). The exception is narrowly limited to situations where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Yarls v. Bunton*, 905 F.3d 905, 911 (5th Cir. 2018) (citation omitted).

Even if the litigation period was brief,[1] the Center fails on the second prong. To satisfy this element, the Center "must show either a 'demonstrated probability' or a 'reasonable expectation,' . . . that it will be subject to the same unlawful governmental action." *Libertarian Party v. Dardenne,* 595 F.3d 215, 217 (5th Cir. 2010) (quoting *Lopez v. City of Houston*,

---

[1] Of course, to be capable of review, we must have subject matter jurisdiction over the dispute. For the reasons outlined in Section III(B) below, however, we do not believe the Kroger letter was or is reviewable as a Commission order.

617 F.3d 336, 340 (5th Cir. 2010)). The Center advances two theories to support its argument. Neither is convincing.

First, the Center argues that this case is "guaranteed to recur," citing Kroger's and the SEC staff's past actions. In making its argument, the Center ensures that it will submit the same proposal to Kroger in future meetings. It logically follows, the Center reasons, that Kroger will continue excluding the proposal and seek a no-action letter. The Center goes on to argue that Commission staff will continue issuing the non-enforcement advice, thereby subjecting the Center to the same discriminatory behavior it challenges today.

That reasoning cannot overcome mootness. Indeed, the United Supreme Court rejected the same argument more than five decades ago. In *SEC v. Medical Committee for Human Rights*, 404 U.S. 403 (1972), petitioners challenged a Commission order that refused to force a company to include a Vietnam War-related proposal in its proxy statement. But after the petitioners filed suit against the SEC, the company reversed course and included the proposal in its proxy materials the following year. When put to a vote, less than three percent of shareholders chose to support the measure. That meager showing meant that the company could exclude the same proposal for the following three years under SEC regulations. *Id.* at 406; *see also* 17 C.F.R. § 240.14a-8(i)(12) (stating that companies may exclude a resubmitted proposal that received "[l]ess than 5 percent of the votes cast" within the previous three years).

Despite those developments, petitioners nevertheless argued that the controversy remained live. For one, it assured the Court that it would "continue to urge the adoption of the proposal and its inclusion in proxy statements." *Med. Comm.*, 404 U.S. at 406. Petitioners also stressed that the company was "likely" to reject the proposal's "inclusion in the future as it

has in the past" thus emphasizing the likelihood of recurrence. *Id.* Finding these arguments unconvincing, however, the Court concluded that the case was moot. Given "the meager support the proposal attracted," the Court reasoned, one could "only speculate" that the company would continue including "the proposal when it again becomes eligible for inclusion, rather than to repeat [the] litigation." *Id.*

That same reasoning holds equally to foreclose the Center's arguments here. There is no reasonable expectation that what happened in 2023 will recur anytime soon. By rule, Kroger need not include the Center's proposal for the next three years because it attracted less than five percent of the votes cast. *See* 17 C.F.R. § 240.14a-8(i)(12). Even if the Center again submitted the same proposal and Kroger again chose to exclude it, there would be an independent procedural ground for Kroger's decision to do so. That said, given the measure's scant support in 2023, Kroger may reach a different conclusion altogether: It might choose to include the Center's proposal to avoid potential litigation. In either case, we can "only speculate" about Kroger's future actions.

The Center's other argument fares no better. If not Kroger, the Center claims, it will submit the same proposal to other companies which will reject it, and naturally, the Commission will again issue the same no-action letter as the one it sent to Kroger in 2023. But this argument, like the first, is purely theoretical. To illustrate, consider the chain of assumptions the Center's theory requires. First, we must anticipate that third-party companies uninvolved in this litigation will choose to exclude the Center's measure in their proxy materials. We must do so mindful that many companies have since opted to include the Center's measure without SEC intervention. *See* EDGAR, https://www.sec.gov/edgar/search/#/q=view point%2520ideology%2520%2522written%2520equal%2520employment%252 0opportunity%2522&category=form-cat8 (listing the several companies that

have included the measure at issue in their proxy materials) (last visited July 7, 2024).

Next, we must assume the same third-party companies will base their exclusion decision on the same grounds as Kroger and seek SEC staff advice. No matter that at least thirteen independent reasons exist for excluding proxy statements, or that the SEC staff is under no obligation to offer its advice if requested. *See* 17 C.F.R. §§ 240.14a-8(i)(1)–(13) (listing *thirteen independent* reasons a company may choose to exclude a shareholder proposal from its proxy materials).

We must further assume that the SEC will issue the same no-action letter sent to Kroger, disregarding that staff advice is limited to each "particular instance." Informal Procedures, 41 Fed. Reg. at 29,991. If SEC staff issues the letter, we must also infer that the third-party companies will ultimately follow through with their initial decision and exclude the proposal from their proxy materials.[2]

While the Center might be willing to make those theoretical assumptions, we are neither willing nor able to do the same. *See Lopez*, 617 F.3d at 342 ("[T]his is an event that 'may not occur as anticipated, or indeed may not occur at all,' which means the claim is merely abstract or hypothetical, and thus too speculative to be fit for judicial review at this time." (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985))). For its part, the dissent sides with the Center, believing it "at

---

[2] We note that the Center has the right to sue Kroger or any other company directly for excluding its proxy statement. But the district court is the proper forum for challenging what a proponent deems an improper decision to exclude its shareholder proposal. *See KBR v. Chevedden*, 478 F. App'x 213, 214 (5th Cir. 2012).

least *reasonable*" to anticipate that third-party companies "will seek to exclude the proposal in the future." Perhaps so. But that alone does not mean this case will recur. A company can exclude a shareholder-backed proposal for a range of reasons, including, for example, a missed submission deadline. *See* 17 C.F.R. § 240.14a-8. Surely, such a decision grounded in this or some other procedural basis would not serve to replicate the same case or controversy. And what of the 2023 shareholder vote at Kroger? Considering "the meager support the proposal attracted," who is to say other third-party companies will not choose to *include* the Center's measure to avoid future litigation? *See Med. Comm.*, 404 U.S. at 406. These unanswered questions highlight the difficulty in accepting the Center's reasoning. Indeed, nowhere does the Center explain why any one company is likely to take the same actions as Kroger or would necessarily rely on the same exclusion. And disguising theoretical possibilities as empty assurances makes them no more likely to occur. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (holding that "a mere physical or theoretical possibility" of recurrence is not enough to overcome the general mootness rule).

In the end, the Center "accomplished the purpose for which it sought ancillary assistance from the SEC." *See Mancusi v. Stubbs*, 408 U.S. 204, 207 n.1 (1972). Kroger, which was not required to do anything under a court judgment, or by order from the SEC, chose to include the challenged measure in its proxy materials. Doing so extinguished any live controversy on appeal. Though the dissent might be comfortable engaging with theoretical uncertainties to hold otherwise, "[w]e are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). Because the appeal is moot, we are unable to reach the merits of the Center's challenge.

No. 23-60230

B

Even if the case were a live controversy, however, jurisdictional bars abound, and we may alternatively dismiss this appeal on a separate ground: Congress did not give us the authority to resolve it.

Section 25 of the Securities Exchange Act of 1934 authorizes "[a] person aggrieved by a final order of the Commission" to obtain review in certain United States Courts of Appeals. 15 U.S.C.A. §§ 78y(a)(1). But the Commission—which generally acts through a vote of the majority of its five commissioners, *see id.* § 78c(a)(15), 78d(a))—has issued no order concerning this matter, final or otherwise. Nor do the informal staff views in the Kroger letter represent such an order. To be clear, the no-action letter was issued by SEC staff as guidance. And by rule and function, such staff statements "do not constitute an official expression of the Commission's views," much less an order. 17 C.F.R. § 202.1(d).

In rejecting that well-established principle, the Center urges us to instead apply an expansive reading to "final order" and find the letter here reviewable under the Administrative Procedure Act (APA). For support, it points to our ruling in *Clarke v. Commodity Futures Trading Commission*, 74 F.4th 627 (5th Cir. 2023). There, a division within the Commodity Futures Trading Commission (CFTC) issued a no-action letter to a futures trading company, "effectively" allowing it to operate without registering under federal law. *Id.* at 633. Several years later, however, the division rescinded its no-action letter, accusing the company of violating the original letter's terms. Various parties moved for a preliminary injunction to enjoin that recission, and we directed the district court to grant their motion. Our jurisdiction to do so stemmed from the nature of the CFTC's letter: We reasoned it was a "final agency action" and reviewable under the APA. *Id.* at 637–39.

Believing that *Clarke* "directly controls" this case, the Center claims we have jurisdiction to review the Kroger letter under 5 U.S.C. § 704. That APA provision permits judicial review of "final agency action[s]." The Center's argument proceeds in two steps. First, the Center first says the no-action letter was an "agency action" like the one in *Clarke*. "Under the APA, 'agency action' is a defined term, limited to an 'agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (quoting 5 U.S.C. § 551(13)). In *Clarke*, we reasoned that the letter at issue was a "license" because it granted "permission to avoid compliance with administrative requirements." *Clarke*, 74 F.4th 627 at 637. So too here, argues the Center, where the no-action letter gave Kroger a "green light" to exclude the Center's proxy statement. We disagree.

For one, the agency action in *Clarke* is dissimilar to the Kroger letter. The SEC and CFTC, after all, were created by different legislation, have different responsibilities, and different regulatory approaches. *Clarke*, for example, does not consider Section 25 of the Exchange Act. That jurisdictional provision empowers our review of SEC "orders," which under Section 25, is "a narrower concept than that of 'agency action' reviewable" under the APA. *Kixmiller v. SEC*, 492 F.2d 641, 645 n.24 (D.C. Cir. 1974). Indeed, Section 25 "was intended to provide direct review" in a court of appeals only "in cases wherein a clear, formal record of an administrative hearing would be before the reviewing court without the need for presentation to a court of evidence (or affidavit) of the agency's action." *Indep. Broker-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 143 (D.C. Cir. 1971). The Center's challenge here falls outside of those parameters, focusing instead on informal advice that does "not constitute an official expression of the Commission's views"—advice, in other words, that "does not order anybody to do anything" and "binds no one." 17 C.F.R. § 202.1(d); *Int'l Tel.*

*& Tel. Corp. v. Local 134*, 419 U.S. 428, 443–44 (1975) (holding that such a decision cannot be an "order" within the meaning of the APA).

But that just scratches the surface. The Center's belief that SEC staff advice constitutes a Commission order runs counter to the wealth of judicial authority on the topic. Indeed, every other circuit to consider the issue unanimously rejects the Center's (and the dissent's) position. *See Amalgamated Clothing & Textile Workers Union v. SEC*, 15 F.3d 254, 257 (2d Cir. 1994); *Bd. of Trade of Chi. v. SEC*, 883 F.2d 525, 529–30 (7th Cir. 1989); *Kixmiller*, 492 F.2d at 644 (per curiam); *see also N.Y.C. Emps. Ret. Sys. v. SEC*, 45 F.3d 7, 13–14 (2d Cir. 1995) (no-action letter that "went further" than "most no-action letters" by "expressly abandon[ing] a previous SEC rule" was purely "interpretive" and unreviewable).[3]

While the lack of a Commission order alone is dispositive for jurisdictional purposes, the Center's argument fails at the other step, too. In the Center's view, the Kroger letter was not only an "agency action," but also a "final" one under the APA. Accepting that argument requires that we answer two questions in the affirmative. One question asks whether the

---

[3] Contrary to the dissent's suggestion, these decisions did not predate the pragmatic test of agency action. *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) (noting that the finality element is interpreted "in a pragmatic way"). And the opinions on which the dissent relies to discredit the other circuits' opinions—*U.S. Army Corps of Engineers v. Hawkes Co., Inc.* and *Sackett v. EPA*—are distinguishable. In both cases, the Supreme Court found an agency action final where the agency *required* particular action or otherwise bound parties, including the agency itself. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597-600 (2016) (finding that where an opinion that was statutorily and regulatorily binding was revised by the agency, the revised opinion was also final); *Sackett v. EPA*, 566 U.S. 120, 125-28 (2012) (finding that an EPA compliance order which required affirmative action from individuals and subjected them to potential enforcement proceedings was a final agency action). Contrast these with the no-action letter, an SEC staff recommendation that is not binding on the SEC's ultimate enforcement determination or future determinations. 17 C.F.R. § 202.1(d).

agency's decision "mark[s] the consummation of the agency['s] decisionmaking process." *Clarke*, 74 F.4th 627 at 637 (quoting *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022)). We found this element met in *Clarke* because the agency's decision to withdraw the letter was not "subject to further agency review." *Id.* at 638 (citation omitted). Supporting this conclusion was the regulatory language that stated recipients of the letter "may rely" on the agency's decision. *Id.* (quoting 17 C.F.R. § 140.99(a)(2)). Here, no such language is present in the Kroger letter or the governing SEC regulations. In fact, the relevant rules suggest the opposite. 17 C.F.R. § 202.1(d) ("[O]pinions expressed by members of the staff do not constitute an official expression of the Commission's views."). Moreover, the SEC's regulatory framework anticipates that any ultimate enforcement decision belongs to the Commission alone, meaning the letter does not mark the consummation of any Commission decision-making process. *See Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 582 (5th Cir. 2016).

We also find the Center's answer to the second finality question unconvincing. This inquiry involves determining whether the no-action letter carries "legal consequences." *Clarke*, 74 F.4th at 637. In *Clarke*, we held that the agency action met that standard because it "withdrew some of the CFTC's discretion." *Id.* It did so by agreeing not "to bring enforcement proceedings against the holder of [the] no-action letter." *Id.* at 638 & n.6. And the receiving party could "rely" on such a letter because CFTC provisions "bound" the issuing branch of the agency to that decision. *Id.*; *see* 17 C.F.R. § 140.9. The Center says that the Kroger letter here had the same effect. In its view, Commission staff similarly withdrew SEC discretion by stating that it would not recommend an enforcement action if Kroger excluded the Center's proposal. Not so. To the contrary, an SEC no-action "letter does not bind" the company, shareholder proponent, staff, or the Commission. *N.Y.C. Emps.*, 45 F.3d at 13. Nor does it "affix any legal

relationship[]" among them. *Id.* Indeed, the Commission can choose to disregard the letters and "proceed no matter what the [staff] recommends." *Bd. of Trade*, 883 F.2d at 529; *Kixmiller*, 492 F.2d at 644 ("[M]embers of the Commission's staff . . . 'have no authority individually or collectively to make "orders."'"). Given such a regulatory scheme, it is unclear how the Kroger letter and those like it could ever "usurp" the exclusive discretion of the Commission.

Apart from diminishing SEC discretion, the dissent also reasons that the Kroger letter carries an added "legal weight": In its telling, such letters "serve as precedent" for future SEC decisions. It is true that courts and companies might view no-action letters as "persuasive." *See N.Y.C. Emps.*, 45 F.3d at 13 ("[N]o-action letters are nonbinding statements of the SEC's intent not to prosecute a potential rule violation."). But "persuasive" does not equate to "precedential." If it did, we would be bound by the relevant "persuasive" rulings from our sister circuits, all of which reject the view that the dissent advances today. *United States v. Sauseda*, 596 F.3d 279, 282 (5th Cir. 2010) (holding that other circuits' decisions are "persuasive"). But that, of course, is not the case. *Calle-Yanza v. Garland*, No. 20-60834, 2022 WL 3153807, at *6 (5th Cir. Aug. 8, 2022) ("Decisions from our sister circuits are of course not binding on this court."). And the same holds true for SEC no-action letters. Though persuasive, the staff's indication of an intent to recommend an enforcement action—or not—is not binding on anyone: not the staff person, not any other person on the staff, and not the Division of Enforcement or the Commission itself.

Without an order, agency action, or finality, the Center is left tilting at windmills, and we accordingly dismiss this appeal for want of subject matter jurisdiction. *See Louisiana*, 834 F.3d at 584 ("Final agency action . . . is a jurisdictional prerequisite of judicial review.").

No. 23-60230

IV

For the reasons outlined above, the SEC's motion to dismiss is GRANTED. This appeal is DISMISSED for lack of jurisdiction. All remaining motions are DENIED as moot.

No. 23-60230

Edith H. Jones, *Circuit Judge*, dissenting:

The SEC is playing catch-me-if-you-can with legal challenges to its recent penchant for issuing viewpoint-discriminatory no-action letters about controversial shareholder proposals.[1] The agency brazenly admits that, if put to a legal test, its no-action letter here should be vacated as arbitrary and capricious. Sadly, the panel majority lets the SEC's manipulations prevail.

First, the panel majority accepts the agency's contention that this case is moot. But it is impracticable to fully litigate a challenge to the SEC's no-action policy within the interval between issuance of a no-action letter and a company's distribution of proxy materials. And there is no reason to believe the agency will *not* follow its past practice of issuing no-action letters against the National Center for Public Policy Research's shareholder proposals concerning ideological discrimination in the workplace. Thus, this case is tailor-made for the mootness exception for cases capable of repetition yet evading review.

Alternatively, the panel's holding that no-action letter is not a final order of the SEC is also incorrect because it conflicts directly with *Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023), which held that a CFTC no-action letter was a judicially reviewable final agency action under the APA.

This court should exercise jurisdiction and vacate the SEC's no-action letter as arbitrary and capricious under the APA, because the agency engages in rank viewpoint discrimination. I respectfully dissent.

---

[1] SEC displays a pattern of insulating unlawful actions behind claims of non-reviewability. *See, e.g., SEC v. Novinger*, 40 F.4th 297 (5th Cir. 2022).

## I.

Before annual shareholder meetings, public companies circulate proxy statements to their shareholders. These statements "include information on items or initiatives on which the shareholders are asked to vote." *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 328 (3d Cir. 2015) (citation omitted). Shareholders may return ballots to the company or authorize the company to vote their shares in accordance with recommendations of the board of directors.

Proxy statements are subject to regulations promulgated under Section 14(a) of the Securities Exchange Act. The regulation at issue in this case, Rule 14a-8, requires companies to include any eligible shareholder proposal in the company's own proxy materials, unless one of thirteen bases for exclusion applies. 17 C.F.R. § 240.14a-8.

Companies that wish to exclude a proposal on one of the bases listed in Rule 14a-8 must submit a statement of reasons for doing so to SEC staff before distributing proxy materials. *Id.* § 240.14a-8(j). In submitting this statement, companies typically also ask SEC staff "for a no-action letter to support the exclusion of a proposal." *Trinity Wall St.*, 792 F.3d at 336.

A company is not required to include a shareholder's proposal in its own proxy materials "[i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). For decades, the SEC would apply the ordinary business exclusion to block proposals concerning social issues. That changed in 1998, when the SEC announced that proposals that "focus[] on s*ufficiently significant social policy issues* (e.g., significant discrimination matters) generally would *not* be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." SEC Release No. 34-40018, 1998

WL254809, at *4 (May 21, 1998) (emphasis added). The SEC thus created the "social policy exception" to the ordinary business exclusion.

In December 2022, NCPPR, a longtime shareholder of Kroger, requested that the following proposal be included in Kroger's 2023 proxy materials:

> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.[2]

The proposal was modeled on an earlier proposal that the SEC determined was not excludable under the ordinary business exclusion. The earlier proposal requested that CorVel Corporation "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity policy." 2019 WL 1640021, at *1 (June 5, 2019).

In February 2023, Kroger sent SEC staff a letter stating its intention to exclude NCPPR's proposal under the ordinary business exclusion and seeking a no-action letter. NCPPR sent response letters in which it invoked the social policy exception and argued that the SEC would be engaging in viewpoint discrimination if it issued no-action relief, because the agency had

---

[2] As explained below, the same proposal was contemporaneously submitted to BlackRock, Walgreens, American Express, Apple, Alphabet, and Redfin. And NCPPR asserts it will continue to submit the same proposal to other companies in which it holds shares. Since 2019, the SEC has granted no-action relief to the following companies regarding the same proposal: BlackRock, Inc., Walgreens Boots All., Inc., Salesforce.com, Inc., Alphabet, Inc., Apple Inc.

previously denied such relief with respect to "substantially identical" proposals that adhered to a different political viewpoint.

Without explaining its reasoning, SEC staff sent Kroger a no-action letter in April 2023, stating in part: "There appears to be some basis for your view that the Company may exclude the Proposal under Rule 14a-8(i)(7). In our view, the Proposal relates to, and does not transcend, ordinary business matters."

After the Commission declined to review the SEC staff decision, NCPPR filed this petition for review.

## II.

The controversy over the specific no-action letter concerning Kroger's 2023 proxy materials is moot because the 2023 proxy season closed over a year ago. Further, SEC staff issued another no-action letter in 2024, albeit on different grounds, with respect to the proposal that NCPPR resubmitted to Kroger this year.[3] But notwithstanding mootness as to the 2023 issue, the controversy represented by this case is perfectly capable of repetition yet evading review, and we should resolve it on the merits.

"A case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quotation marks and citation omitted). According to the Supreme Court, the exception to mootness for cases that are "capable of repetition yet evading review" applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the

---

[3] *See* 17 C.F.R. § 240.14a-8(i)(12) (providing that a company may exclude a resubmitted proposal that, within the previous three years, received "[l]ess than 5 percent of the votes cast").

same complaining party [will] be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 439–40, 131 S. Ct. 2507, 2515 (2011) (citation omitted).

## 1.

The panel focuses on the second prong of mootness analysis, concluding mistakenly that there is no reasonable expectation that NCPPR will be subjected to the same action by SEC staff in the future. When predicting future action by an entity, observing how the same entity has acted in the past is usually informative. The SEC previously issued five no-action letters to every company (BlackRock, Walgreens, Salesforce, Apple, Alphabet) that requested one concerning the same proposal that NCPPR submitted to Kroger in 2023. NCPPR attests that it has submitted or will submit the same proposal to these and other companies in the future. It is at least *reasonable* to expect both that these companies will seek to exclude the proposal in the future, as they have in the past, and that SEC staff will continue issuing no-action letters when requested.

The reasonableness of this prediction of future conduct is bolstered by a 2021 announcement that SEC staff "is no longer taking a company-specific approach to evaluating the significance of a policy issue under Rule 14a-8(i)(7)." SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021). In other words, regardless of the company requesting no-action relief, staff will reach the *same* conclusion: the subject of NCPPR's proposal is not a "significant social issue" that transcends ordinary business matters, and any proposal on the subject can be excluded under Rule 14a-8(i)(7).

The panel opinion contends that *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S. Ct. 577 (1972), supports dismissal for mootness. I disagree. There, the Court determined that the case was mooted on appeal by Dow Chemical's inclusion of the Medical Committee's shareholder

proposal in its proxy materials, and that Dow's allegedly wrongful exclusion of the proposal was not reasonably likely to recur. *Id.* at 405–06, 92 S. Ct. at 579. The Court found unpersuasive the Committee's contention that "it is likely that Dow will reject inclusion in the future as it has in the past." *Id.* at 406, 92 S. Ct. at 579. It explained, "[w]hether or not the Committee will actually resubmit its proposal or a similar one in 1974 is purely a matter of conjecture at this point, as is whether or not Dow will accept it." *Id.* In this case, however, whether NCPPR will resubmit its proposal is not conjectural; it already has done so—and not only to Kroger, but to *other companies* as well. It is more than likely, not just reasonable to expect that some company will again seek to by no-action letter to exclude the proposal under the ordinary business exclusion, and SEC staff will authorize them to do so.

The panel opinion is simply wrong to find a mere "theoretical possibility" that SEC staff will issue no-action letters against NCPPR's proposals in the future. The reasonable expectation prong is satisfied here.

**2.**

The panel opinion does not address the first mootness prong (on duration), but the answer is obvious. Paradigmatically, SEC staff issued its no-action letter on April 12, 2023, and Kroger distributed its materials thirty days later—on May 12, 2023. The SEC is correct that this court has recognized that there is no "calendar for evading review," and "[c]laims need to be judged on how quickly relief can be achieved in relation to the specific claim." *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020). But "[c]omplete judicial review" is extraordinarily unlikely in a timeframe as short as thirty days. *See id.* ("The Supreme Court has stated that a case evades review if its duration is too short to receive '*complete judicial review*,' apparently meaning review in that Court.'" (quoting *First*

No. 23-60230

*Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774, 98 S. Ct. 1407, 1414 (1978))).

The SEC invokes this court's decision in *Empower Texans* to argue that, because "expedited procedures" were "available" to NCPPR, this case was not too short in duration to be fully litigated before being rendered moot by Kroger's distribution of proxy materials. *Id.* at 371. But the availability of expedited procedures was significant in *Empower Texans* only because the appellant "did not take advantage of" the rules permitting it to seek expedited review. *Id.* at 372. NCPPR attempted to take advantage of those rules here by seeking expedited briefing; the motions panel simply denied relief.

This important dispute, going to the heart of agency evenhandedness, is plainly capable of repetition yet evading review. The exception to mootness should have been applied.

## III.

The SEC raises two other threshold issues apart from mootness. The SEC argues that the no-action letter is not a reviewable "final order" under the APA, and alternatively, it asserts that no-action letters, being inherently discretionary, are not judicially reviewable at all. The majority agrees with the SEC on the first contention and does not address the second. Both contentions are meritless.

### 1.

Under 15 U.S.C. § 78y(a)(1), "A person aggrieved by a final order of the [SEC] . . . may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has a principal place of business . . . ." The SEC contends, and the majority agrees, that the no-action letter issued by SEC staff is neither "final" nor an "order."

23

This court's recent decision in *Clarke v. CFTC* holds otherwise in a strikingly similar situation. 74 F.4th 627 (5th Cir. 2023). In *Clarke*, a division of the CFTC issued a letter in 2022 rescinding a no-action letter the division had issued many years earlier. This court held that the 2022 letter was a "final agency action" under the APA and therefore reviewable. *Id.* at 636–39. The 2022 letter was an "agency action" because the first no-action letter amounted to a "grant[] of permission to avoid compliance with administrative requirements" and, thus, was a "license" within the meaning of the APA. *Id.* at 637; *see* 5 U.S.C. § 551(8), (13). The letter was "final" because it satisfied the two-pronged standard for finality: It consummated the CFTC's decisionmaking process because the "decision to issue or withdraw the letter [wa]s unappealable" within the agency. *Clarke*, 74 F.4th at 638. And it carried legal consequences because regulations provided that a recipient of a no-action letter "may rely" on it, which effectively "withdrew some of the CFTC's discretion." *Id.* (quoting 17 C.F.R. § 140.99(a)(2)).

There is no basis for distinguishing *Clarke*. First, the SEC's no-action letter, like the CFTC's underlying letter in *Clarke*, operated similarly to a license by effectively authorizing Kroger to exclude NCPPR's proposal. Whether technically a license or some other agency action, it is an "order" under the APA. *See* 5 U.S.C. § 551(6) (defining "order" to include "a final disposition . . . of an agency in a matter other than rule making but including licensing"). Second, the no-action letter was final because it was not subject to further agency review and carried legal consequences. The full Commission refused NCPPR's request for review of the staff decision, meaning it was not subject to further review, and the letter carried legal consequences because it "withdrew some of the [SEC's] discretion" to "bring enforcement proceedings against the holder of [the] no-action letter." *See Clarke*, 74 F.4th at 638 & n.6. The SEC staff's no action letter stated that

staff would not recommend enforcement action if Kroger excluded NCPPR's proposal. Such a recommendation in this and other no-action letters operates, in practice, "as a norm or safe harbor by which" recipient companies "shape their actions." *See Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019) (citation omitted). SEC points to no instances where the Commission has overridden no-action letters to institute enforcement actions. And SEC no-action letters have additional legal weight because they serve as precedent for future no-action decisions. *See* 17 C.F.R. § 240.14a-8(j)(2)(ii) (indicating that companies must "refer to the most recent applicable authority, such as prior Division letters issued under [Rule 14a-8]" when seeking to exclude a shareholder proposal); *see also* 17 C.F.R. § 202.1(d) (no-action letters "can be relied upon as representing the views of that division").

*Clarke's* logic emanated directly from this court's recent decision in which an "advisory opinion" by the Department of Labor, a formally non-binding statement applying the Employee Retirement Income Security Act to a specific situation, was held to be reviewable final agency action. *Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022). *Data Marketing*, in turn, relied on the Supreme Court's most recent explanation that for appellate review purposes, the finality of agency action, including its legal effect, "is generally a 'pragmatic' inquiry." *Id.* at 854-55 (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 599, 136 S. Ct. 1807, 1815 (2016)). As in *Clarke*, the advisory opinion in *Data Marketing* satisfied the first finality prong because it was "not subject to further Agency review." 45 F.4th at 853 (quoting *Sackett v. EPA*, 566 U.S. 120, 127, 132 S. Ct. 1367, 1369 (2012)). The advisory opinion satisfied the second prong because it provided requesters the right to rely in certain circumstances on the opinion and is "binding as a practical matter." *Id.* at 854 (citing *Texas*, 933 F.3d at 442).

Together, these cases demonstrate that the SEC's no-action letter to NCPPR is a final, appealable agency action.

To the extent the law of other circuits differs, the law of this circuit controls our court. *Compare Data Mktg.*, 45 F.4th at 855 (agency advisory opinion is "binding as a practical matter"), *and Texas*, 933 F.3d at 442 (agency guidance document was final agency action), *with Amalgamated Clothing & Textile Workers Union v. SEC*, 15 F.3d 254, 257 (2d Cir. 1994) (no-action letter is not formally binding). The majority opinion cites *Amalgamated Clothing* and other cases that have held SEC no action letters to be neither "agency action" nor "final" for purposes of appeal. *See N.Y.C. Emp's Ret. Sys. v. SEC,* 45 F.3d 7, 12 (2d Cir. 1995)(defining no-action letters as "interpretive rules"); *Roosevelt v. E.I. DuPont de Nemours & Co.,* 958 F.2d 416, 427 (D.C. Cir. 1992)(no-action letter is neither "an agency adjudication or rulemaking"); *Kixmiller v. SEC*, 492 F.2d 641, 644 (D.C. Cir. 1974)(no-action letter issued by SEC staff rather than the Commission and without formal Commission sanction is unreviewable); *Bd. of Trade of City of Chi. v. SEC*, 883 F.2d 525, 529 (7th Cir. 1989)(no-action letter is tentative and thus not final because the SEC can change its position). But notably, all of these decisions long predate the Supreme Court's recent decisions, characterized by *Hawkes* and *Sackett, supra,* which have espoused pragmatic tests of final agency action. The Court's decisions have thus broadened judicial review where administrative agencies' actions, despite disclaimers, actually do guide private entities' behavior. As in *Clarke* and *Data Marketing,* it cannot be doubted that parties regulated by the SEC, and their lawyers, devote much time and effort to securing and relying on staff no action letters, while parties like NCPPR have no practical remedy, apart from judicial review, against unfavorable "informal" agency actions.

The whole point of the CFTC's letter in *Clarke*, just like the "whole point" of Kroger's seeking an SEC no-action letter, was to get a "green

light" to exclude NCPPR's proposal. *Id.* at 637. That recipients of no-action letters may rely on them is also evident not only from the regulation that gives them precedential weight, 17 C.F.R. § 240.14a-8(j)(2)(ii), but also from the practice of the SEC over the years. As NCPPR notes in reply, "Out of the thousands of [no-action] decisions issued by the Division over the decades, the SEC claims only four or five times the Commission ever voiced the slightest disagreement."

As a result of the panel opinion, a CFTC no-action letter is reviewable in this circuit but an SEC no-action letter is not. The distinct treatment of the two letters from agencies with comparable statutory missions is unjustifiable in its own right. Even worse, the disparity yields uncertainty for litigants and potential litigants, especially those adversely affected by no-action letters from agencies other than the CFTC and SEC. Under a more sensible and logical approach, this circuit's treatment of no-action letters' reviewability would be uniform.

The panel should have adhered to *Clarke* and held that the SEC's no-action letter is a final, reviewable order.

## 2.

*Clarke* likewise resolves the SEC's contention that its decision to issue a no-action letter is "committed to agency discretion by law" and therefore beyond APA judicial review. *See Heckler v. Chaney*, 470 U.S. 821 (1985); 5 U.S.C. § 701(a)(2). *Clarke* rejected a nearly identical argument. *See* 74 F.4th at 639 ("This case does not challenge an agency's discretionary decision to enforce (or not enforce) the law. What is challenged, rather, is the withdrawal of a regulatory instrument (the no-action letter) that ensured the DMO would not recommend that the agency enforce the CEA against PredictIt").

## IV.

No. 23-60230

On the merits, this panel should have held that the SEC's no-action letter was arbitrary and capricious, in violation of the APA. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158 (2021). The SEC itself concedes that, were this court to exercise jurisdiction, the no-action letter is arbitrary and capricious because it lacks a reasoned explanation for its conclusion that NCPPR's proposal was excludable under the ordinary-business exclusion. The no-action letter to Kroger should have been vacated and remanded on that basis.

Finally, although it is unnecessary to reach the other arguments that NCPPR and the Intervenor[4] present, it must be noted that NCPPR and its Amicus[5] cite compelling evidence that the SEC has routinely applied the ordinary business exclusion in a manner that disfavors conservative-oriented proposals. Thus, while proposals that touch on sexual-orientation discrimination have been denied no-action letters and must be voted on by shareholders, that of NCPPR, concerning ideological discrimination, has consistently been disfavored by the agency. The SEC's disfavoring of conservative proposals also extends beyond the discrimination context, reaching topics like gun regulation, "misinformation," and ESG as well. To apply a rule selectively, as the SEC appears to have done, is lawless.

The panel opinion errs in refusing to reach the merits in this case. I respectfully dissent.

---

[4] The Intervenor is the National Association of Manufacturers.

[5] Specifically, the Alliance Defending Freedom.